UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED

2014 NOV -7 P 9 45

U S DISTRICT COURT SDNY

| | |
|---|---|
| WOBURN RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | No. |
| Plaintiff, | **CLASS ACTION** |
| vs. | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| SALIX PHARMACEUTICALS, LTD., CAROLYN J. LOGAN, and ADAM C. DERBYSHIRE, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Woburn Retirement System ("Woburn" or "Plaintiff"), by and through its undersigned counsel, alleges the following individually and on behalf of a class of all persons and entities similarly situated, upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's allegations are based upon the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Salix Pharmaceuticals, Ltd. ("Salix" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a federal securities class action brought on behalf of all persons or entities who purchased or otherwise acquired the publicly-traded securities of Salix (the "Class")

between November 8, 2013 and November 6, 2014, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against Salix and certain of its officers and/or directors.

2.      Salix is a pharmaceutical company that focuses on treatments for digestive system diseases and disorders.  Its top-selling drug is XIFAXAN® (rifaximin) ("Xifaxan"), an antibiotic that is currently approved to treat a condition referred to as "traveler's diarrhea" and a liver disorder that impairs brain function.

3.      Salix primarily sells its products through wholesalers, which then resell and distribute the Company's products to and through pharmacies.  As a result, inventories of Salix's products held by wholesalers offer investors and analysts critical information regarding the volume and growth of physician prescriptions and sales—metrics that are factored into determining the Company's net revenues and earnings per share.

4.      During the Class Period, Salix reported that Xifaxan was selling well, with demand at times exceeding supply, and that the Company's prospects were bright.

5.      The disingenuous nature of these representations was revealed on November 6, 2014, when Salix shocked the market with a series of disclosures reflecting poor prospects and corporate misconduct.

6.      First, Salix disclosed that it had replaced its Chief Financial Officer ("CFO") Adam C. Derbyshire ("Derbyshire"), who had abruptly resigned after fourteen years with the Company, with an acting CFO.

7.      Minutes later, in connection with its announcement of disappointing financial results for the third quarter ended September 30, 2014, Salix revealed a massive increase in inventory levels for many of its drugs, including its premier drug, Xifaxan.  Specifically, Salix

disclosed that the wholesalers who sell Xifaxan to pharmacies had a nine-month supply of the drug, as opposed to a supply of two months of the drug, which the Company claimed to have been targeting on a second quarter conference call.

8.     The Company also disclosed that the ***threefold growth in inventories*** had prompted the audit committee of its board of directors to engage outside counsel to "conduct[ ] a review of issues related to management's prior characterizations of wholesaler inventory levels."

9.     Salix further announced that it had reduced guidance for full-year 2014 of $1.6 billion in net product revenues and $475 million in earnings—projections that had been offered and affirmed repeatedly during the Class Period.  Specifically, Salix lowered expectations for net product revenues by $200 million to $1.4 billion, and earnings-per-share ("EPS") estimates by $0.96 per share to a total of $400 million.

10.     In reaction to these revelations, Salix's stock price declined $47.08 per share, or 33.98 percent, to close at $91.47 per share on extraordinary trading volume.

11.     The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were as follows:

(a)     Salix's business prospects and demand for Xifaxan and its other drugs were materially deteriorating;

(b)     Salix's wholesale inventory levels of Xifaxan and its other drugs were rising more quickly than wholesalers could sell the drug to pharmacies, and more rapidly than revealed to investors;

(c)     Salix's reserves for outstanding inventory were understated and, because of this understatement, its reported quarterly and annual net revenue and EPS figures were overstated; and

3

(d)     Salix's  disclosure controls and procedures and its internal controls over financial reporting and accounting were subject to material weaknesses.

12.     As a result of Defendants' false statements, Salix's securities traded at artificially inflated levels during the Class Period.  However, when the truth about Salix's growing wholesaler inventory of Xifaxan and other drugs, lack of demand for its drugs, and improper accounting practices were revealed to investors, the Company's share price dramatically declined, falling 45.93 percent from its Class-Period high closing price of $169.17 per share on September 23, 2014.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.P.R. § 240.10b-5.

14.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1331 (15 U.S.C. § 78a(a)).

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Salix maintains a listing of its common equity on the NASDAQ Global Select Market ("the NASDAQ"), which is located in this District.  The Company's stock traded on the NASDAQ throughout the Class Period.  Additionally, certain false statements alleged herein occurred in this District.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.     Plaintiff Woburn is one of 106 contributory retirement systems within the Commonwealth of Massachusetts and maintains its primary executive offices in Woburn Massachusetts.  Woburn purchased the common stock of Salix during the Class Period, as set forth in the certification attached hereto, and was damaged as the result of Defendants' wrongdoing as alleged in this complaint

18.     Defendant Salix is a Delaware corporation that manufactures and markets pharmaceuticals and medical devices.  Salix maintains its principal executive offices at 8510 Colonnade Center Drive, Raleigh, North Carolina 27615.  Salix's common stock is listed on the NASDAQ, where it trades under the ticker symbol "SLXP."

19.     Defendant Carolyn J. Logan ("Logan") is the President and Chief Executive Officer ("CEO") of Salix.  Throughout the Class Period, CEO Logan spoke to investors as part of the Company's regularly scheduled discussions relating to operating results and at analyst conferences, and signed and certified the accuracy of Salix's periodic filings with the SEC.

20.     Defendant Derbyshire was the CFO and Executive Vice President, Finance and Administration of Salix during the Class Period prior to his resignation on November 5, 2014. Throughout the Class Period, CFO Derbyshire spoke to investors as part of the Company's regularly scheduled discussions relating to operating results and signed and certified the accuracy of Salix's periodic filings with the SEC.

21.     Defendants Logan and Derbyshire are collectively referred to herein as the "Individual Defendants."  Together with Defendant Salix, the Individual Defendants are collectively referred to herein as "Defendants."

## BACKGROUND

22.     Salix acquires, develops, and commercializes prescription drugs and medical devices with a focus on gastrointestinal conditions.  The Company mainly sells its products through wholesalers, which then resell and distribute Salix's products to and through pharmacies.  Accordingly, inventories of Salix's products held by wholesalers offer investors and analysts critical information regarding the volume and growth of physician prescriptions and sales.

23.     Salix generally recognizes gross revenues for product sales to its wholesale distributors when products are shipped.  These product sales are subject to certain customer credits including discounts, rebates, and returns.  Therefore, Salix estimates allowances for these customer credits by taking charges on its income statement.  One of the key factors in determining the amount of these allowances is wholesaler inventory levels.  According to Salix, at least each quarter, the Company estimates its wholesaler inventory levels for each product and then determines how much of that inventory is subject to rebate, chargeback, and product return.

24.     Among the Company's key products is rifaximin, an oral antibiotic sold under the trade name Xifaxan.  Xifaxan is used to treat, among other things, a condition referred to as "traveler's diarrhea," which is caused by the E. Coli bacterium.

25.     Historically, Xifaxan was responsible for 70 percent of Salix's revenues.  Even as the Company has acquired competitors and their drugs, Xifaxan has continued to provide approximately 50 percent of Salix's revenues.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING
## STATEMENTS DURING THE CLASS PERIOD

26.     Following the close of the markets on November 7, 2013, Salix issued a press release reporting its financial and operating results for the third quarter of 2013 ended September 30, 2013.  Therein, the Company reported that:

Total product revenue was $238.2 million for the third quarter of 2013, a 29% increase compared to $185.1 million for the third quarter of 2012. Total product revenue for the first nine months of 2013 was $676.2 million, a 26% increase compared to $537.3 million for the first nine months of 2012. *XIFAXAN® revenue for the third quarter of 2013 was $165.9 million, a 20% increase compared to $137.9 million for the third quarter of 2012.* XIFAXAN revenue for the first nine months of 2013 was $469.8 million, a 28% increase compared to $367.5 million for the first nine months of 2012.[1]

27.     In connection with these results, CFO Derbyshire stated: "XIFAXAN 550 mg continued to perform well during the third quarter of 2013 as demonstrated by impressive prescription growth of 24% compared to the third quarter of 2012."

28.     In a separate press release published that day, Salix announced that it had entered into an agreement to purchase Santarus, Inc. for $32.00 per share in cash without interest.

29.     The following day, Salix filed with the SEC a quarterly report on Form 10-Q for the third quarter ended September 30, 2013, which included the same results previously reported in the Company's November 7, 2013 press release. The Company's Form 10-Q included a certification signed by CEO Logan, incorporated therein as Exhibit 31.1, which stated:

I, Carolyn J. Logan, certify that:

1.     I have reviewed this quarterly report on Form 10-Q of Salix Pharmaceuticals, Ltd.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the

---

[1] All emphases are added.

financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case

of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

The Company's Form 10-Q also included a substantially similar certification, signed by CFO Derbyshire, as Exhibit 31.2.

30.   Following the close of the markets on February 27, 2014, Salix issued a press release reporting its financial and operating results for the fourth quarter and full year ended December 31, 2013. Therein, the Company reported the following financial highlights for the reporting period:

Key financial highlights include:

- For the fourth quarter of 2013, as compared to the fourth quarter of 2012, **total product revenue increased 30% to $257.6 million**. EBITDA increased 50% to $101.9 million. [EPS not calculated pursuant to Generally Accepted

Accounting Principles ("GAAP")] increased 31% to $1.06 per diluted share.

- For the full year 2013, as compared to the full year 2012, *total net product revenue increased 27% to $933.8 million*. EBITDA increased 37% to $352.5 million. Non-GAAP EPS increased 17% to $3.76 per diluted share.

- GAAP net income was $52.3 million, or $0.76 per diluted share, in the fourth quarter of 2013 compared to $17.6 million, or $0.28 per diluted share, in the year ago period. For the full year 2013, GAAP net income was $143.0 million, or $2.18 per diluted share, compared to $64.2 million, or $1.01 per diluted share, for the prior year.

31.     In connection with the results, CEO Logan stated:

Both *XIFAXAN® 550* for the reduction in risk of overt hepatic encephalopathy (HE) recurrence and APRISO® *continued to demonstrate sustained growth and market penetration* during the fourth quarter and full year 2013. *During December XIFAXAN 550 achieved a record-high level of total monthly prescriptions, exceeding the previous monthly record by 8%*. The number of monthly prescribers increased 20% from December 2012 to December 2013, and the majority of these new prescribers were from specialties other than gastroenterology (GI), reinforcing our belief that many patients with HE as a result of chronic liver disease are being managed by their primary care physician. In 2014 and beyond we anticipate continued prescription growth from primary care physicians as we fully deploy and utilize our newly-created Digestive Disease Specialty Sales Force. . . .

\*     \*     \*

*We enter 2014 with strong momentum in our core XIFAXAN franchise* and greater resources to pursue expanded opportunities for all of our currently marketed products.

32.     In the same press release, the Company reported its financial guidance for full-year 2014:

For the full year 2014, Salix expects:

- **Total product revenue of approximately $1.6 billion**. . . .

- **Non-GAAP net income of approximately $475 million, or $6.46 per share, fully diluted**.

33.     The following day, Salix filed an Annual Report on Form 10-K with the SEC, which included the same results previously reported in the Company's February 27, 2014 press release.  The Company's Form 10-K also included certifications substantially similar to those described in paragraph 29.

34.     After the close of the markets on May 8, 2014, Salix issued a press release reporting its financial and operating results for the first quarter of 2014 ended March 31, 2014. Therein, the Company reported that:

> **Total net product revenue was $384.4 million for the first quarter of 2014 compared to $202.6 million for the first quarter of 2013**, primarily driven by the Santarus acquisition. **Revenue was comprised of sales for XIFAXAN®, UCERIS®, APRISO®, GLUMETZA®, ZEGERID®, CYCLOSET®, MOVIPREP®/ OSMOPREP®, RELISTOR® and DEFLUX® of $114.3 million**, $62.9 million, $14.2 million, $130.3 million, $37.6 million, $10.1 million, $7.1 million, $4.9 million and $5.9 million, respectively.

35.     CEO Logan offered the following assessments in connection with these results, including strong demand for Xifaxan:

> **We continued to experience positive momentum in the business in the first quarter of 2014 demonstrated by strong prescription growth for XIFAXAN® 550, APRISO® and UCERIS®**, with all three key products reaching new record-highs for total monthly prescriptions in March.  As we transitioned Santarus into our distribution model, **sales of XIFAXAN 550 and APRISO were below prescription demand for the first quarter of 2014** as wholesalers and drug chains focused on securing Santarus' products to establish adequate inventories, resulting in very strong revenue growth in Santarus' products.  We expect XIFAXAN 550 sales to exceed prescription demand or be in line with prescription

demand in the second quarter of 2014 as wholesalers bring XIFAXAN 550 inventories back to more typical levels, and shipments for all of the Company's products to track in line with prescription growth by the second half of the year. . . .

*Since the successful integration of our respective sales forces, we believe we have established good traction with our expanded sales efforts* as evidenced by the growth in new prescribers, among other indicators. . . .

Looking ahead, we continue to be optimistic about the future trajectory for the business driven by organic growth and potential product expansions. Over the coming months we anticipate several important milestones, which have the ability to significantly grow our base business. . . .

36.     The Company again affirmed net product revenue guidance of $1.6 billion for full-year 2014 as well as earnings projections of $475 million:

For the full year 2014, Salix continues to expect:

- *Total net product revenue of approximately $1.6 billion*. . . .

- *Non-GAAP net income of approximately $475 million, or $6.33 per diluted share*. The change in per share amount from prior guidance is due to the effect of the Company's higher stock price on the fully diluted calculation.

37.     On the morning of May 9, 2014, Salix filed with the SEC a quarterly report on Form 10-Q for the first quarter ended March 31, 2014, which included the same results previously reported in the Company's May 8, 2014 press release. The Company's Form 10-Q also included certifications substantially similar to those described in paragraph 29.

38.     Ten days later, on May 19, 2014, CEO Logan participated in the UBS Global Healthcare Conference in New York City. During her remarks, CEO Logan addressed the benefits of the Company's expanded sales force, which had grown as a result of the Santarus acquisition.

39.    The following month, on June 4, 2014, CEO Logan participated in another conference, the Jefferies Global Healthcare Conference held in New York City.  Among other things, during that conference, CEO Logan touted the Company's sales force:  "We have a very strong sales and marketing effort.  Our sales force has just been recognized again as the number one sales force calling on gastroenterologists."

40.    On August 7, 2014, Salix issued a press release reporting its financial and operating results for the second quarter of 2014 ended June 30, 2014.  Therein, the Company reported that:

> For the second quarter of 2014, as compared to the second quarter of 2013, **total net product revenue increased 62% to $382.0 million**.  EBITDA increased 88% to $154.7 million.  Non-GAAP EPS increased 109% to $1.59 per diluted share.  Total net product revenue for the first six months of 2014 increased 75% to $766.4 million, compared to $438.0 million for the first six months of 2013.  For the first six months of 2014, EBITDA increased 100% to $303.9 million and non-GAAP EPS increased 89% to $2.65 per diluted share.

41.    CEO Logan also stated that:

> **Demand for key products remained robust in the second quarter with prescriptions for XIFAXAN® 550, APRISO® and UCERIS® achieving strong year-over-year growth and accelerating trends quarter over quarter in 2014**.  The impact of this quarter's strong prescription growth was partially offset by adjustments in the supply chain as wholesalers managed inventory levels following the acquisition of the Santarus products.  While we anticipate the difference between prescription growth and wholesaler purchases continuing near term, we expect the situation to normalize during the remainder of the year **as prescription growth trends for XIFAXAN® 550, APRISO® and UCERIS® remain very healthy**.

42.    At the time the Company continued to affirm guidance for its results for the full-year 2014 and the third quarter of 2014:

For the full year 2014, Salix expects:

- **Total net product revenue of approximately $1.6 billion**. . . .

- **Non-GAAP net income of approximately $475 million, or $6.16 per diluted share.** The change in per share amount from prior guidance is due to the effect of the Company's higher stock price on the fully diluted share calculation.

The Company also offered guidance for the third quarter of 2014:

For the third quarter of 2014, Salix expects:

- **Total net product revenue of approximately $395.0 million**.

43.     On a related earnings conference call, CFO Derbyshire addressed demand for the Company's drugs: "Demand for our key products remained very strong in the quarter, with XIFAXAN and APRISO prescriptions growing 23% and 25%, respectively, from the second quarter of last year." Although CFO Derbyshire acknowledged that "product revenue for XIFAXAN and APRISO was impacted by some inventory destocking in the wholesale channel during the second quarter of 2014," he projected that "destocking may continue to a lesser degree in the third quarter and normalize in the fourth quarter." On the call, CFO Derbyshire confirmed that the Company aimed to keep inventory supply levels in the range of 10 to 12 weeks and explained that normalized inventory supply levels would be an "**8-week, or minus a little bit, range** for the entire channel." CFO Derbyshire also **confirmed full-year 2014 guidance of $1.6 billion for net product revenue** even with the "softening of inventory levels [built into] into [Salix's] third-quarter guidance."

44.     Following the close of the markets on August 8, 2014, Salix filed with the SEC a quarterly report on Form 10-Q for the second quarter ended June 30, 2014 which included the

same results previously reported in the Company's August 7, 2014 press release. The

Company's Form 10-Q also included certifications substantially similar to those described in

paragraph 29.

## SALIX SHOCKS MARKET WITH NEWS OF A MASSIVE INVENTORY BUILDUP

45.     Following the close of the markets on November 6, 2014, Salix issued a series of

disclosures that surprised investors and analysts and revealed corporate misconduct and a poor

outlook.

46.     First, Salix announced in a press release that, after 14 years with the Company,

CFO Derbyshire had resigned and had been replaced, effective immediately, by an Acting CFO.

Salix did not offer an explanation for CFO Derbyshire's abrupt departure.

47.     Within minutes, Salix issued a press release with its financial and operating

results for the third quarter of 2014 ended September 30, 2014. Therein, the Company reported

net product revenue of $354.7 million—well below its projections of $395 million—and a

GAAP EPS loss of $1.39 for the quarter. Salix also announced reduced guidance for full-year

2014:

> For the full year 2014, Salix expects:
>
> - ***Total net product revenue of approximately
>   $1.4 billion* . . . .**
>
> - ***Non-GAAP net income of approximately
>   $400 million, or $5.20 per diluted share***.

48.     Significantly, in connection with its quarterly results, Salix disclosed a dramatic

increase in wholesaler inventory levels:

> **Wholesaler Inventory Levels**
>
> The Company estimates that, as of September 30, 2014, it had the
> following wholesaler inventory levels:

- XIFAXAN® 550: approximately *9 months*;

- APRISO®: approximately *9 months*;

- GLUMETZA®: approximately *7 months*; and

- UCERIS®: approximately *5 months*.

49.     During an earnings conference call on November 6, 2014, CEO Logan disclosed

an internal investigation related to this marked rise in wholesaler inventory:

> In our earnings press release issued earlier this afternoon, we
> provided disclosure regarding our estimate of the wholesaler
> inventory levels of our major products at September 30. *The audit
> committee of our board of directors*, which is comprised solely of
> independent directors, *has retained outside counsel and is
> conducting a review of issues related to management's prior
> characterizations of wholesaler inventory levels.*
>
> The review will be conducted by the audit committee in a thorough
> manner and will be independent of company management.
> Management's expectation however is that the audit committee
> will advise management when the review is complete and the
> company expects to make an appropriate announcement at that
> time.

50.     During the conference call, CEO Logan attempted to attribute the increase in

inventory to attrition in Salix's sales force stemming from the November 2013 acquisition of

Santarus.

51.     Analyst reactions during the conference call highlighted the misleading nature of

Salix's prior statements about inventory for its drugs, specifically Xifaxan:

> **[Piper Jaffray Analyst David Amsellem:]**   So you've said
> historically that there were 10 weeks to 12 weeks of XIFAXAN
> inventory on hand, now we're being told nine months on hand. So,
> how do you square that?  And I guess the other way of asking that
> is *given your comments on inventory on the last couple of calls,
> how can we now say that those comments were not misleading?*
> Thanks.

[CEO Logan:]  David, unfortunately, we really can't comment on that.  As I mentioned earlier, the audit committee has retained outside counsel, and they are conducting a review of this.  And to preserve the integrity of that process, it's just not appropriate for me to comment. . . .

\*     \*     \*

[Amsellem:]  Okay.  *I guess the comment is, I don't know how you square 10 weeks to 12 weeks, which is what you said historically versus what we're being told today of nine months.* But, I guess, I'll just jump back in the queue.  Thanks.

52.     Other analysts have noted that the Company's jump in inventory levels may reflect that Salix's financial statements in prior quarter contained improper figures.  For example, a Sterne Agee analyst noted that "*Bears believe [Salix] may restate*" its financial reports as a result of the revelations.  Cristin Flanagan, *SALIX STREET WRAP: Analysts/Investors Still in Dark After Call*, Bloomberg, Nov. 7, 2014.

53.     *The Wall Street Journal* also has reported that concerns about Salix's accounting derailed a potential takeover of the Company earlier this year by Allergan, Inc.  *See* Liz Hoffman and Jonathan D. Rockoff, *Salix Shares Plunge as Accounting Revision Showed Weak Drug Sales*, Wall St. J., Nov. 6, 2014.

54.     On November 7, 2014, Salix filed with the SEC a quarterly report on Form 10-Q for the third quarter ended September 30, 2014, which included the same results previously reported in the Company's November 6, 2013 press release.

55.     In reaction to these disclosures, Salix's stock price declined $47.08 per share, or 33.98 percent, to close at $91.47 per share on extraordinary trading volume, representing a market capitalization loss of approximately $2.99 billion.

56.     The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were as follows:

(a)     Salix's business prospects and demand for Xifaxan and its other drugs were materially deteriorating;

(b)     Salix's wholesale inventory levels of Xifaxan and its other drugs were rising more quickly than wholesalers could sell the drug to pharmacies, and more rapidly than revealed to investors;

(c)     Salix's reserves for outstanding inventory were understated and, because of this understatement, its reported quarterly and annual net revenue and EPS figures were overstated; and

(d)     Salix's disclosure controls and procedures and its internal controls over financial reporting and accounting were subject to material weaknesses.

57.     As a result of Defendants' false statements, Salix's securities traded at artificially inflated levels during the Class Period.  When Defendants revealed Salix's dramatically rising inventory levels, lack of demand for its drugs, and improper accounting practices were revealed to investors, the price of Salix common stock fell more than 45 percent from its Class Period high.

## LOSS CAUSATION

58.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Salix securities, and operated as a fraud or deceit on Class-Period purchasers of Salix securities by misrepresenting the state of the Company's inventory, internal controls, and business prospects.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on November 6, 2014, the price of Salix securities fell precipitously, as the prior artificial inflation came out of the price.  As a result of

their purchases of Salix securities during the Class Period, Plaintiff and other members of the

Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of all persons or entities who purchased the securities of Salix

during the Class Period (the "Class"). Excluded from the Class are Defendants, members of the

immediate family of each of the Individual Defendants, any subsidiary or affiliate of Salix, and

the directors and officers of Salix and their families and affiliates at all relevant times.

60.     The members of the Class are so numerous that joinder of all members is

impracticable. The disposition of their claims in a class action will provide substantial benefits

to the parties and the Court. As of November 5, 2014, Salix had 63,723,282 shares of common

stock outstanding, owned by thousands of persons.

61.     There is a well-defined community of interest in the questions of law and fact

involved in this case. Questions of law and fact common to the members of the Class which

predominate over questions which may affect individual Class members include:

      (a)     Whether the Exchange Act was violated by Defendants;

      (b)     Whether Defendants omitted and/or misrepresented material facts;

      (c)     Whether Defendants' statements omitted material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not

misleading;

      (d)     Whether Defendants knew or recklessly disregarded that their statements

were false and misleading;

      (e)     Whether the price of Salix securities was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate

measure of damages.

62.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class

sustained damages from Defendants' wrongful conduct.

63.     Plaintiff will adequately protect the interests of the Class and has retained counsel

experienced in class action securities litigation.  Plaintiff has no interests which conflict with

those of the Class.

64.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

### INAPPLICABILITY OF STATUTORY SAFE HARBOR

65.     Salix's verbal "Safe Harbor" warnings accompanying its oral forward-looking

statements ("FLS") issued during the Class Period were ineffective to shield those statements

from liability.

66.     Defendants are also liable for any false or misleading FLS pleaded because, at the

time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

authorized and/or approved by an executive officer of Salix who knew that the FLS was false.

None of the historic or present tense statements made by Defendants were assumptions

underlying or relating to any plan, projection, or statement of future economic performance, as

they were not stated to be such assumptions underlying or relating to any projection or statement

of future economic performance when made, nor were any of the projections or forecasts made

by Defendants expressly related to, or stated to be dependent on, those historic or present tense

statements when made.

## ADDITIONAL ALLEGATIONS REGARDING SCIENTER

67.    During the Class Period, Defendants had both the motive and opportunity to

commit fraud.  They also had actual knowledge of the misleading nature of the statements they

made or acted with reckless disregard for the true information known to them at the time for the

reasons discussed above.  In so doing, Defendants committed acts, and practiced and participated

in a course of business that operated as a fraud or deceit on purchasers of Salix securities during

the Class Period.

## PRESUMPTION OF RELIANCE

68.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-

the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material

facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor

to misjudge the value of the Company's securities; and

(e)    Plaintiff and other members of the Class purchased Salix securities

between the time Defendants misrepresented or failed to disclose material facts and the time the

true facts were disclosed, without knowledge of the misrepresented or omitted facts.

69.    At all relevant times, the markets for Salix securities were efficient for the

following reasons, among others:

(a)    as a regulated issuer, Salix filed periodic public reports with the SEC;

(b)    Salix regularly communicated with public investors via established market

communication mechanisms, including through regular disseminations of press releases on the

major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

        (c)     Salix was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

        (d)     Salix common stock was actively traded in an efficient market, namely the NASDAQ, under the ticker symbol "SLXP."

70.     As a result of the foregoing, the market for Salix securities promptly digested current information regarding Salix from all publicly available sources and reflected such information in Salix's stock price.  Under these circumstances, all purchasers of Salix securities during the Class Period suffered similar injury through their purchase of Salix securities at artificially inflated prices and the presumption of reliance applies.

71.     Further, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## COUNT I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

72.     Plaintiff repeats, incorporates, and realleges paragraphs 1 through 71 by reference.

73.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that

they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

74.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Salix securities during the Class Period.

75.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Salix securities.  Plaintiff and the Class would not have purchased Salix securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

76.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Salix securities during the Class Period.

## COUNT  II

### For Violation of Section 20(a) of the Exchange Act
### <u>Against the Individual Defendants</u>

77.     Plaintiff repeats, incorporates, and realleges paragraphs 1 through 76 by reference.

78.     The Individual Defendants acted as controlling persons of Salix within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Salix, the Individual Defendants had the power and ability to control the actions of Salix and its employees.  Salix controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.     Awarding Plaintiff and the members of the Class damages and interest;

C.     Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 7, 2014

Respectfully submitted,

_____
Christopher J. Keller (CK-2347)
Michael W. Stocker (MS-1309)
Rachel A. Avan (RA-5177)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: ckeller@labaton.com
mstocker@labaton.com
ravan@labaton.com

*Counsel for Plaintiff*
*Woburn Retirement System*

## CERTIFICATION

I, Maureen Marcucci, as Retirement Administrator of Woburn Retirement System ("Woburn"), hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of Woburn.  I have reviewed a complaint prepared against Salix Pharmaceuticals, Ltd. ("Salix"), alleging violations of the federal securities laws and authorized its filing;

2.     Woburn did not purchase securities of Salix at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.     Woburn is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.     Woburn's transactions in Salix securities during the Class Period are reflected in Exhibit A, attached hereto;

5.     Woburn sought to serve as a lead plaintiff in the following class action under the federal securities laws filed during the last three years:

*In re OmniVision Technologies, Inc. Securities Litigation*, No. 5:11-cv-5235 (N.D. Cal.)

6.     Woburn is currently serving as a lead plaintiff in the following class action filed under the federal securities laws during the last three years:

*In re OmniVision Technologies, Inc. Securities Litigation*, No. 5:11-cv-5235 (N.D. Cal.)

7.     Beyond its pro rata share of any recovery, Woburn will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____ day of November, 2014.

Maureen Marcucci,
*Retirement Administrator of*
*Woburn Retirement System*

EXHIBIT A

## TRANSACTIONS IN SALIX PHARMACEUTICALS, LTD.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 06/27/14 | 50.00 | $122.81 | ($6,140.50) |