UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re SALIX PHARMACEUTICALS, LTD.

14-CV-8925 (KMW)

**OPPOSED MOTION**

MOTION TO INTERVENE OF STEVE SCHONBERG

Pursuant to FRCP Rules 23 and 24, Steve Schonberg respectfully requests the Court's Order granting him the right to intervene and to file the Intervention Petition which is attached hereto as EXHIBIT 1.

The bases for this motion are:

1. Movant lost more than $21,000 because of Defendant Salix Pharmaceutical's securities fraud as set forth in EXHIBIT 1 and ECF 1, the Woburn Retirement Systems Complaint.

2. This class action lawsuit is highly likely to settle after the Court's approval following a Fairness Hearing.

3. In 90% of pharmaceutical class action lawsuits that settle, the terms of the settlement are exactly those presented to the Court by the parties at the Fairness Hearing.

4. Prior to the Fairness Hearing the existing parties will have agreed to the terms of the settlement, thus creating a lack of adversity among the existing parties at the Fairness Hearing. It will be in the best interests of lead plaintiffs' counsel to maximize the

1

attorney fees and minimize the recovery of movant and all class members at the Fairness Hearing. The Fairness Hearing will be unfair to movant unless he is a party with knowledge of all of the discovery, pleadings, and Court Opinions and Orders which take place prior to the Fairness Hearing.

5. If movant is allowed to intervene, it is likely that the Court will grant him an ECF password so that he will have free access to all filed documents. Such access will assist movant in determining the merits of the proposals at the Fairness Hearing.

6. Movant has had decades of experience both as a licensed medical doctor and a practicing attorney without any disciplinary complaints against him. Movant has been the lead plaintiff's attorney in more than six successful product liability lawsuits against pharmaceutical companies. His participation in this lawsuit will be an asset to the Court at the time of the Fairness Hearing.

7. If the Court grants this motion, there is a possibility that the settlement value of the class action will increase because of movant's participation in and/or knowledge of the discovery proceedings.

8. If movant determines an appeal of the Court's Order regarding the settlement of this matter should be taken, such an appeal may be impossible unless movant is a party.

9. This motion is timely. The Rule 16 conference is set for April 7, 2015 at 2:00 p.m.

10. Movant cannot be adequately represented by lead counsel, Bernstein Litowitz Berger & Grossman LLP ("BLB&G") because of the conflict of interest recited above. Class action settlements for SEC violations create a unique conflict of interest for lead counsel for the plaintiffs. The conflict is created because the injured members of the class

generally have small financial injuries which pale in comparison to the attorney fees awarded to the lead counsel. In the present case, movant should be entitled to thousands of dollars in compensation, while BLB&G will likely receive millions of dollars in attorney fees.

11. BLB&G has a history of unseemly misbehavior in its quest to maximize the attorney fees of its partners, at least one of whom is the lead counsel now in charge of the plaintiffs in this litigation. Attached as EXHIBIT 2, is a highlighted transcript of a New York trial court opinion in the matter of Guggenheimer v. BLB&G. In this reported case, which movant believes was settled, BLB&G refused to pay a former associate the attorney fees she had earned. If BLB&G can't be fair to its own employees, it is unlikely BLB&G will be fair to a person the firm has never met, such as movant.

12. The Court has appointed Pentwater Funds as the lead plaintiff in this lawsuit, based primarily upon the pleadings filed by BLB&G and the amount of damages Pentwater Funds has claimed.

13. Movant previously sent the Clerk of Court a motion for filing to obtain a CM/ECF password upon movant's assurance to the Court of his plan to file a motion to intervene. Subsequently one of the Court's law clerk's contacted movant by telephone, asking why movant claimed to have completed CM/ECF training when the Court Clerk had no evidence that movant had appeared in person for a CM/ECF training course. Movant stated in this telephone conversation to the law clerk that he had completed the training online, as allowed on the website for the USDC for the Southern District of New York. Movant's prior motion for a CM/ECF password was never filed by the Court Clerk.

14. Because movant was never provided a CM/ECF password, there has been no reasonable, cost effective way for him to even superficially review the claim that Pentwater Funds suffered losses of $61,368,262 which the Court referenced in *Woburn* ECF 64 at 3, the OPIONION and ORDER in which Pentwater Funds was appointed lead plaintiff.

15. The Court and the two original plaintiffs have described the members of this class action as "…all persons or entities who purchased . . . publicly-traded securities of Salix . . . between November 8, 2013 and November 6, 2014." *Woburn* ECF 64 at 2. SLXP stock is presently trading far above its price during these cited dates. Thus, many members of the class have no damages because they sold their SLXP stock at a profit or still hold the stock with substantial gains yet to be locked in.

16. Plaintiffs' attorneys and Defendant Salix have a commonality of interest in defining the class members as "…all persons or entities who purchased . . . publicly-traded securities of Salix . . . between November 8, 2013 and November 6, 2014." By including uninjured individuals and uninjured entities in the class, the lawsuit is easier to settle. The injuries of the class members are diluted, the plaintiffs' attorneys reap a larger share of settlement funds, and Salix escapes with the least amount of reasonable damages paid.

17. Movant has not been and probably will not be fairly and adequately represented by BLB&G.

18. As a party, movant-petitioner will seek to limit the members of the class to those who actually suffered financial losses after purchasing SLXP stock "between November 8, 2013 and November 6, 2014." See FRCP 23(c)(1)(C).

19. FRCP Rule 23(d)(1)(B)(iii) allows the Court to protect movant, to give him "the opportunity to signify whether" he considers "the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action."

4

20. FRCP Rule 24 provides for intervention as of right and permissive intervention. Movant seeks intervention on both theories.

Wherefore, movant respectfully requests that this motion be granted.

Respectfully submitted,

*[signature]*

Steve Schonberg, *Pro Se*
7938 SE 12th Circle
Ocala, FL 34480
352-789-0610
Email: sschonberg@aol.com

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re SALIX PHARMACEUTICALS, LTD.

14-CV-8925 (KMW)

PETITION

RECEIVED SDNY PRO SE OFFICE 2015 APR -6 A 11: 51

### INTERVENTION PETITION OF STEVE SCHONBERG

INTRODUCTION

Petitioner contends defendant Salix Pharmaceuticals and two of its executives violated the federal securities laws, causing a "run" from its stock traded on the NASDAQ stock exchange on November 6th and 7th, 2014. Petitioner was victimized by Salix's violations and lost several thousand dollars from his retirement account. Petitioner adopts by reference and fully incorporates doc. 1, the Complaint filed by Woburn Retirement Systems.

1. Defendant Salix Pharmaceuticals is a publicly traded corporation subject to the Securities Exchange Act of 1934 and the regulations of the Securities and Exchange Commission, (SEC).

2. Defendant Logan was the Chief Executive Officer of Salix and Defendant Derbyshire was the Chief Financial Officer of Salix for all times when the Federal Securities Violations took place.

3. Petitioner is a retired attorney and physician who invested in Salix stock. Petitioner was formerly a member of the bar of the USDC for the District of New Mexico. He was also a

1

former practicing physician in the United States Naval Reserve (active duty 1968-71), and the States of Wyoming and New Mexico. Petitioner has never had a disciplinary complaint filed against him either as a medical doctor or an attorney.

4.  Petitioner held a DEA (Drug Enforcement Administration) license prior to his retirement. That license would have allowed petitioner to prescribe all Salix drugs which were FDA approved in the United States.

5.  Petitioner purchased 500 shares of Salix Pharmaceuticals stock (ticker SLXP) on October 20, 2014 at a purchase price of $130.53 per share. The following excerpt from petitioner's investment account proves his loss of more than $21,887 in Salix stock on November 13, 2014:

**Fidelity Traditional IRA**  STEVEN E SCHONBERG - TRADITIONAL IRA - FIDELITY MANAGEMENT TRUST CO - CUSTODIAN

**Transaction Details**
*Investment Activity*

| Settlement Date | Security | Description | Quantity | Price per Unit | Cost | Transaction Amount |
|---|---|---|---|---|---|---|
| 11/13 | ISHARES EUROPE ETF | You sold<br>Transaction cost: -$8.62<br>Transaction Profit $236.38 | -700.000 | 43.29000 | 30,058.00 | 30,294.38 |
| 11/13 | ISHARES EUROPE ETF | You sold<br>Transaction cost: -$0.29<br>Transaction Profit $104.74 | -300.000 | 43.29010 | 12,882.00 | 12,986.74 |
| 11/13 | PROSHARES TRUST PSHS ULSHT SP500 (POST REVERSE SPLIT) | You bought<br>Transaction cost: -$7.95 | 2,000.000 | 22.97550 | | -45,958.95 |
| 11/13 | PROSHARES TR ULTRASHORT QQQ NEW JAN 2014 | You bought<br>Transaction cost: -$7.95 | 1,000.000 | 41.46320 | | -41,471.15 |
| 11/13 | ← SALIX PHARMACEUTICALS LTD | You sold<br>Transaction cost: -$8.91<br>Transaction Loss $21,887.31 ← | -500.000 | 86.78910 | 65,272.95 | 43,385.64 |

6.  The huge loss in petitioner's Salix investment was the result of fraudulent misrepresentations by Salix and its executives in violation of Federal Securities laws in the year prior to the close of business on the NASDAQ stock exchange on November 6, 2014.

7.  By November 7, 2014, Salix confessed to its fraudulent misrepresentations and fired Defendant Derbyshire. The value of SLXP gigantically tumbled on November 6th and 7th, 2014. And in the days thereafter, stock analysts, business newspapers and business TV networks ridiculed SLXP as a horribly bad investment, resulting in petitioner's decision to sell his SLXP shares.

8.  The specifics of Salix's fraudulent misrepresentations are voluminously enumerated in the *Woburn* complaint cited above.

9.  Because of the egregious nature of Defendant Salix's transgressions in this matter, and because Salix Pharmaceuticals, LTD., is about to merge with Valeant Pharmaceuticals International, Inc., (ticker VRX), the underlying lawsuit is likely to settle without a trial.

10. Presently, the members of this class action are identified as "…all persons or entities who purchased . . . publicly-traded securities of Salix . . . between November 8, 2013 and November 6, 2014." This identification of class members is too broad, and it dilutes the expected recovery for each member of the class.

11. SLXP stock is presently trading at a premium far above the share price in the weeks prior to November 6, 2014. Many present members of the class have had or will have large *profits*, rather than losses, as a result of their purchase of SLXP between November 8, 2013 and November 6, 2014.

12. The members of this class action lawsuit should be defined as "…all persons or entities who purchased . . . publicly-traded securities of Salix . . . between November 8, 2013 and November 6, 2014 *and subsequently sold the securities at a net loss.*"

13. Petitioner cannot be adequately and fairly represented by Bernstein Litowitz Berger & Grossman LLP, ("BLB&G" hereafter) counsel for the lead plaintiff in this matter. BLB&G can expect a large multimillion dollar attorney fee for its services in this case. There is a natural conflict of interest between the BLB&G firm's desire to settle this matter for a large attorney fee and petitioner's desire to receive full compensation for his financial injury.

14. BLB&G has a past history of improper dealings with regard to its attorney fees. See Motion to Intervene of Steve Schonberg, EXHIBIT 2.

WHEREFORE, petitioner demands the following relief:

I.  Compensatory damages in the amount of $21,877.31.

3

II. Punitive damages as are just from Defendants Salix, Logan, and/or Derbyshire if there is proof of intentional misconduct.

III. Reasonable fees for petitioner's work on this case as a *pro se* retired attorney.

IV. The costs of this action.

V. Whatever other and further relief the Court deems just.

## JURY DEMAND
**Petitioner demands a Trial by Jury.**

Respectfully submitted,

_____
Steve Schonberg, Pro Se
7938 SE 12th Circle
Ocala, FL 34480
352-789-0610
Email: sschonberg@aol.com

4

# EXHIBIT 2

**Supreme Court, New York County, New York.**

**Leah GUGGENHEIMER, Plaintiff, v. BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Defendant.**

**Decided: February 24, 2006**

Quarto Dunning LLP, Carol A. Dunning, Esq., New York, for Plaintiff. The Shapiro Firm, LLP, Jonathan S. Shapiro, Esq., New York, for Defendant.

Defendant Bernstein Litowitz Berger & Grossmann LLP moves, pursuant to CPLR 3211(a)(7), to dismiss the complaint in its entirety, on the ground that the complaint fails to state a cause of action.

Plaintiff was employed as an associate at Bernstein Litowitz Berger & Grossmann (BLBG or defendant) from May 1998 through May 2002. Defendant is a class-action law firm, specializing in, inter alia, consumer and securities class-action lawsuits. Plaintiff alleges that although the starting salary at BLBG was substantially less than salaries at other similarly sized law firms, she took the position because she was informed at the time of her hiring that the firm encouraged associates to bring in business, and that she would be eligible for bonuses for successful cases that she brought into the firm. Plaintiff states that "[t]he possibility of receiving bonuses for business development as a young associate was very intriguing and greatly influenced my decision to accept BLBG's offer of employment" (Guggenheimer affidavit, ¶ 4). It is not disputed that plaintiff's employment was at will.

Plaintiff alleges that, after joining the firm, she was repeatedly told about the firm's bonus policy. At weekly firm lunches, Max Berger (Berger), a BLBG partner, encouraged associates to develop the firm's business as a means to earn additional income (Guggenheimer affidavit, ¶ 6). Plaintiff alleges that while she understood that the amount of the bonus was discretionary, at no time did Berger ever state that an associate's entitlement to the bonus was discretionary if certain criteria were met. Plaintiff contends that she understood, as did her associate colleagues, that if they brought a case to the firm and if the case were to be accepted by the firm, the associate would be paid additional income in accordance with the following three factors: (a) the ultimate outcome of the case; (b) the role the associate played in bringing in the case; and the work the associate contributed to the success of the case (id.). BLBG associates were eligible for a bonus of up to 10% of the total amount of fees received by BLBG in these matters (Complaint, ¶ 6).

Plaintiff alleges that, in 1999, she was responsible for attracting a number of Internet privacy cases to the firm because of novel legal theories she had originated in a seminal case in this area of the law. She alleges that she was also responsible for bringing several large and lucrative automobile lending discrimination cases to BLBG. Plaintiff alleges that she was responsible for BLBG obtaining a co-counseling agreement with two other law firms for existing cases against Nissan Motor Acceptance Corp. (NMAC) and General Motors Acceptance Corp. (GMAC), as well as for all future automobile financing discrimination cases brought under the Equal Credit Opportunity Act. Plaintiff states that, as a result of her efforts, three other cases were brought to BLBG, to wit: Ford Motor Credit, Chrysler Financial and Toyota Motor Credit (Guggenheimer affidavit, ¶¶ 18,19). Plaintiff alleges that she was also responsible for bringing a case against Credit Union National Association (CUNA), a large credit disability insurer, into the law firm. She also alleges that, as a result of her efforts with CUNA, BLBG was entitled to receive a substantial fee under a settlement agreement.

Plaintiff alleges that she approached Berger in or about July 2000 to discuss her bonus for these cases and was told by him to prepare a memorandum detailing her business development efforts, her role in procuring the cases, and a description of the work that she had performed on them. In her memorandum of July 24, 2000, plaintiff stated: "[w]hile I realize, based on our past discussions, that it is impossible to know what my referral fee, up to the full 10%, for these cases would be (assuming they are successful) until the conclusion of the litigation, the purpose of this memorandum is to reach agreement as to my role in bringing in these cases now, so that there is no dispute later" (Guggenheimer affidavit, exhibit D). Plaintiff did not receive a formal response to this memorandum. After receipt of the memorandum, however, plaintiff alleges that she was orally reassured by Berger that "everything was fine" and that she "shouldn't worry" about receiving a bonus (Guggenheimer affidavit, ¶ 25). Plaintiff alleges that she also spoke frequently to another partner, Darnely Stewart (Stewart), about her entitlement to a bonus.

In February 2001, after receipt of plaintiff's memorandum, Berger circulated an e-mail entitled "Special Bonuses for Businesses Referrals." In it, he stated that although an associate could still receive a bonus of up to 10% of the firm's fee on a case, this amount

would be capped at $250,000 for each matter. He also stated that "[t]he entitlement to a special bonus and the actual percentage of the firm's fee to be awarded in any particular situation are in the absolute and sole discretion of the Management Committee" (Guggenheimer affidavit, exhibit E). Plaintiff wrote to Berger and asked whether the $250,000 cap applied to any of the cases that she had already brought to the firm. He replied to her in an e-mail that "the cap does not apply to any case referred prior to the institution of the new policy." Berger added, "you know, however, that the amount of any special referral bonuses to associates has always been in the complete discretion of the partnership" (id.).

In May 2002, after her first child was born, plaintiff left the BLBG law firm. Several months after she left, she learned that the NMAC case had settled with BLBG receiving approximately $900,000 in legal fees. Plaintiff spoke with Stewart on numerous occasions about her bonus, but was told that the firm could not pay a bonus at that time because the settlement had yet to be approved. In December 2003, Stewart informed plaintiff that legal fees had been distributed, and that plaintiff should speak with Berger about receiving her bonus.

Plaintiff wrote to Berger in December 2003 about her bonus. She was told that Berger was away for the holidays and could not respond until after January 20, 2004. By February, plaintiff had not received a response. Plaintiff e-mailed Berger again on or about February 17, 2004 (Guggenheimer affidavit ¶ 31). Berger responded that he was going away and would not be able to address this issue until March 2004. Plaintiff alleges, on information and belief, that sometime in early 2004, the GMAC case settled and that BLBG received approximately $1.35 million in legal fees. Plaintiff again e-mailed Berger on March 17, 2004 to discuss the subject of her bonus. Berger responded that he was too busy to address the issue, and that the firm's management committee had referred the matter to Stewart and Dan Berger, another BLBG partner. On March 19, 2004, plaintiff spoke with Stewart, who informed her that the management committee had considered plaintiff's involvement in and contribution to the GMAC and NMAC cases and had determined that it did not meet the requirements of the firm's policy to qualify for a bonus (Guggenheimer affidavit, ¶35). Plaintiff was offered $50,000, i.e., $25,000 for each of the NMAC and the GMAC cases. Plaintiff claims that she is entitled to a bonus for the other automobile cases, as well as the Internet privacy cases and the CUNA case 1.

Plaintiff commenced this action seeking recovery on the ground of breach of contract; misrepresentation; promissory estoppel; unjust enrichment and quantum meruit. Defendant moves for dismissal, pursuant to CPLR 3211(a)(7), on the ground that the complaint fails to state a cause of action. Defendant argues that since an employee has no enforceable right to a discretionary bonus, an employer cannot be in breach of contract concerning a discretionary bonus policy. Defendant argues that even if it had made prior, contradictory oral statements concerning its bonus policy, they are of no import, since an employer is entitled to change its policy for an at-will employee, such as plaintiff. Defendant further argues that plaintiff's continued employment for more than a year after the written policy pronouncement upon which she relies, is deemed consent to such policy. Defendant contends that not only does plaintiff have no breach of contract claim, she has neither a quasi contact nor a promissory estoppel claim, since the entitlement and the amount of any additional compensation is entirely discretionary. Defendant argues that plaintiff's misrepresentation claim must fail because none of the alleged oral misrepresentations call into question the discretionary nature of the bonus policy, the eligibility for which was to be determined in the sole discretion of BLBG's Management Committee.

In the context of a CPLR 3211(a)(7) motion, directed at the sufficiency of the pleadings, the pleadings are to be afforded a liberal construction, and the court must accept the allegations as true, according the plaintiff the benefit of every reasonable inference to determine whether they come within the ambit of any cognizable legal theory (see Sokoloff v. Harriman Estates Dev. Corp., 96 N.Y.2d 409, 414, 729 N.Y.S.2d 425, 754 N.E.2d 184 [2001]; Rovello v. Orofino Realty Co., 40 N.Y.2d 633, 634, 389 N.Y.S.2d 314, 357 N.E.2d 970 [1976]; Hirschhorn v. Hirschhorn, 194 A.D.2d 768, 599 N.Y.S.2d 613 [2d Dept. 1993] ). A CPLR 3211 motion should be granted only when, even viewing the allegations as true, the plaintiff still cannot establish a cause of action. The standard is not whether the plaintiff has stated a cause of action, but whether the plaintiff has a cause of action (McGuire v. Sterling Doubleday Enters., L.P., 19 A.D.3d 660, 799 N.Y.S.2d 65 [2d Dept. 2005] ). "The motion must be denied if from the pleadings' four corners, factual allegations are discerned which taken together manifest any cause of action cognizable at law' " (511 West 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 152, 746 N.Y.S.2d 131, 773 N.E.2d 496 [2002] ).

Although, as a general rule, an employee has no enforceable right to compensation under a discretionary compensation or bonus plan (Namad v. Salomon Inc., 147 A.D.2d 385, 537 N.Y.S.2d 807 [1st Dept.], affd. 74 N.Y.2d 751, 545 N.Y.S.2d 79, 543 N.E.2d 722 [1989] ),

in Weiner v. Diebold Group, 173 A.D.2d 166, 167, 568 N.Y.S.2d 959 [1st Dept. 1991], the Appellate Division, First Department recognized New York State's " long standing policy against the forfeiture of earned wages." Whether unpaid " incentive compensation" under a defendant's bonus plan constitutes a discretionary "bonus" or "earned wages" not subject to forfeiture, is an issue of fact (see Kaplan v. Capital Co. of Am. LLC, 298 A.D.2d 110, 111, 747 N.Y.S.2d 504 [1st Dept. 2002], citing Mirchel v. RMJ Sec. Corp., 205 A.D.2d 388, 389, 613 N.Y.S.2d 876 [1st Dept. 1994] ). Thus, employees in this State may enforce an agreement to pay an annual bonus made at the onset of the employment relationship, where such bonus constitutes "an integral part of plaintiff's compensation package" (Mirchel v. RMJ Sec. Corp., 205 A.D.2d at 389, 613 N.Y.S.2d 876, citing Harden v. Warner Amex Cable Communications, 642 F.Supp. 1080, 1096 [S.D.N.Y.1986] ). In the instant case, there is an issue of fact as to whether the representations made to plaintiff compel a conclusion that the bonus was vested and mandatory, as opposed to discretionary and forfeitable (see Peck v. Heidrick and Struggles, Inc., 177 A.D.2d 431, 576 N.Y.S.2d 273 [1st Dept. 1991] ).

Defendant's assertion that the law firm's policy made payment of a bonus totally discretionary, contradicts plaintiff's conflicting contention that the company entered into an explicit oral employment agreement, reaffirmed by the statements of two of its partners that plaintiff was assured of receiving a bonus as part of her compensation. Thus, although the bonus plan, as conceived by the firm, may have been discretionary, there is a question of fact as to whether there was an oral contract agreeing to exercise that discretion in plaintiff's favor, sufficient to defeat defendant's CPLR 3211(a)(7) motion (see Martin H. Bauman Assoc. v. H & M International Transp., Inc., 171 A.D.2d 479, 567 N.Y.S.2d 404 [1st Dept. 1991] ). Notably, defendant fails to submit an affidavit refuting plaintiff's contention that there was a course of conduct over a two-year period promising a bonus if certain criteria were met. An implied contractual relationship may be established by conduct of the parties, as well as by express agreement (Land-Site Contr. Corp. v. Marine Midland Bank, 177 A.D.2d 413, 415, 576 N.Y.S.2d 255 [1st Dept. 1991] ). The course of dealing between the parties, as alleged by Plaintiff, evinces an implied promise that plaintiff would receive a bonus as part of her compensation if she brought cases to the law firm that proved to be successful (Giuntoli v. Garvin Guybutler Corp., 726 F.Supp. 494 [S.D.N.Y.1989]; Shapira v. United Med. Serv., 15 N.Y.2d 200, 210, 257 N.Y.S.2d 150, 205 N.E.2d 293 [1965] ["existence of an implied contract is a question of fact"] ). Implicit in every contract is a covenant of good faith and fair dealing (Dalton v. Educational Testing Serv., 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289 [1995]; Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566 [1978] ). The covenant of good faith and fair dealing requires that the contracting parties will not take any action which will have the effect of destroying the rights of the other party to receive the benefit of the contract (511 West 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 746 N.Y.S.2d 131, 773 N.E.2d 496, supra ).

Nor can a bonus be withheld because, as here, the employee did not work until the date the bonus was to have been paid (Watson v. Prentice-Hall, Inc., 50 A.D.2d 1077, 376 N.Y.S.2d 339 [4th Dept. 1975] ). When a bonus that is an integral part of a compensation package has already been earned by the time the employer decides not to pay it, the latter can no longer argue that such bonus is discretionary. At that point, failure to pay it constitutes a breach of the employment agreement (see Harden v. Warner Amex Cable Communications, 642 F.Supp. at 1096). Although the memorandum indicated that both the entitlement to the bonus and the amount of the bonus were discretionary, the memorandum must be read in the plaintiff's context of plaintiff's allegations that she had been repeatedly reassured that such discretion had already been exercised in her favor and that she had no cause for concern. The facts as alleged, permits the reasonable inference that plaintiff only sought clarification on the $250,000 cap, because she was secure in her belief that she was to receive the bonus. "[A]n implied contractual relationship may be established by conduct of the parties, as well as by express agreement. The course of dealing between the parties evinces an implied promise that bonus payments constitute a part of plaintiff's compensation" (Mirchel v. RMJ Securities Corp., 205 A.D.2d at 390, 613 N.Y.S.2d 876; Berardi v. Fundamental Brokers, Inc., 1990 WL 129174 [S.D.N.Y.1990] ).

The fact that the precise amount of the bonus to be awarded was not specified, does not make the contract unenforceable. Employment contracts that contain open additional compensation clauses are nonetheless binding contracts (see Knapp v. McFarland, 344 F.Supp. 601 [S.D.N.Y.1971] ). That the amount of the bonus could not be determined until the case settled, does not bar recovery under an implied contract (Giuntoli v. Garvin Guybutler Corp., 726 F.Supp. 494 at 508). A determination of whether there exist sufficiently definite guidelines to enable a court to supply a bonus figure is a factual issue and survives a motion to dismiss (see Zucker v. Katz, 708 F.Supp. 525, 532 [S.D.N.Y.1989] ). I find that the conduct of the parties and the surrounding circumstances as alleged, are sufficient to establish a sustainable cause of action for breach of an oral contract for payment, particularly in the

context of a CPLR 3211 motion, wherein the court accepts, as it must, the allegations in the complaint as true and "resolve(s) all inferences which reasonably flow therefrom in favor of the pleader" (Sanders v. Winship, 57 N.Y.2d 391, 394, 456 N.Y.S.2d 720, 442 N.E.2d 1231 [1982] ).

Plaintiff's second cause of action is designated as a cause of action for misrepresentation. The elements of fraudulent misrepresentation are: (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiffs thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of his or her reliance (Swersky v. Dreyer and Traub, 219 A.D.2d 321, 326, 643 N.Y.S.2d 33 [1st Dept. 1996] ). I find that the second cause of action states a claim of misrepresentation with sufficient particularity required by CPLR 3016(b). The language of 3016(b) merely requires that a claim of misrepresentation be pleaded in sufficient detail to give adequate notice (see Foley v. D'Agostino, 21 A.D.2d 60, 64, 248 N.Y.S.2d 121 [1st Dept. 1964] ). Indeed, the Court of Appeals has specifically noted that this rule "is not to be interpreted so strictly as to prevent an otherwise valid cause of action in situations where it may be impossible to state in detail the circumstances constituting a fraud' " (Lanzi v. Brooks, 43 N.Y.2d 778, 780, 402 N.Y.S.2d 384, 373 N.E.2d 278 [1977] [citation omitted] ). In the instant case, the complaint contains some rational basis for inferring that the alleged misrepresentations were knowingly made (Houbigant, Inc. v. Deloitte & Touche LLP, 303 A.D.2d 92, 753 N.Y.S.2d 493 [1st Dept. 2003] ). On a motion to dismiss for failure to state a cause of action, "a plaintiff   need only plead that he relied on misrepresentations made by the defendant   since the reasonableness of his reliance [generally] implicates factual issues whose resolution would be inappropriate at this early stage" (Internet Law Lib., Inc. v. Southridge Capital Mgt., LLC, 223 F.Supp.2d 474, 485 [S.D.N.Y.2002], cited in Knight Sec. v. Fiduciary Trust Co., 5 A.D.3d 172, 173, 774 N.Y.S.2d 488 [1st Dept. 2004]; Oxford Health Plans (NY) v. BetterCare Health Care Pain Mgt. & Rehab, 305 A.D.2d 223, 762 N.Y.S.2d 344 [1st Dept. 2003] ).

To establish a viable cause of action sounding in promissory estoppel, the third cause of action, a plaintiff must allege (1) an oral promise that is sufficiently clear and unambiguous, (2) reasonable reliance on the promise by a party, and (3) an injury caused by the reliance (see Knight Sec. v. Fiduciary Trust Co., 5 A.D.3d 172, 774 N.Y.S.2d 488, supra ). Accepting the facts alleged in the complaint as true, and giving the plaintiff the benefit of all inferences (see Sokoloff v. Harriman Estates Dev. Corp., 96 N.Y.2d 409, 729 N.Y.S.2d 425, 754 N.E.2d 184, supra ) I find that plaintiff established a viable cause of action based upon promissory estoppel arising out of plaintiff's reliance on defendant's clear and unambiguous promise that plaintiff would be rewarded with a bonus if she expended certain efforts that resulted in fees earned by the firm.

Plaintiff's fourth cause of action sounds in unjust enrichment. "To state a cause of action for unjust enrichment a plaintiff must allege that (she) conferred a benefit upon the defendant and that the defendant will obtain such benefit without adequately compensating plaintiff therefor" (Nakamura v. Fujii, 253 A.D.2d 387, 390, 677 N.Y.S.2d 113 [1st Dept. 1998] ). "The essence of unjust enrichment is that one party has received money or a benefit at the expense of another"(City of Syracuse v. R.A.C. Holding, Inc., 258 A.D.2d 905, 906, 685 N.Y.S.2d 381 [4th Dept. 1999] ), and that it "is against equity and good conscience to permit [the other party] to retain what is sought to be recovered" (Citibank, N.A. v. Walker, 12 A.D.3d 480, 481, 787 N.Y.S.2d 48 [2d Dept. 2004], quoting Paramount Film Distrib. Corp. v. State of New York, 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 285 N.E.2d 695 [1972] ). Having induced plaintiff to bring business into the firm, BLBG refused to pay her the bonus they promised to pay. Based upon these allegations, I find that the complaint pleads adequate factual allegations to support relief under the equitable theory of unjust enrichment

Plaintiff's fifth cause of action is for quantum meruit.

Quantum meruit recovery "rests on a narrow exception to the rule that a party may not expect compensation for a benefit conferred gratuitously upon another' (Trott v. Dean Witter & Co., 438 F.Supp. 842, 844, affd. 578 F.2d 1370 [2d Cir.1978] )"   In order to make out a claim in quantum meruit, a plaintiff must establish: (1) the performance of the services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services (Moors v. Hall, 143 A.D.2d 336, 337-338 [532 N.Y.S.2d 412] [2d Dept. 1988] ).

As a general rule, the performance and acceptance of services gives rise to the inference of an implied contract to pay for the reasonable value of such services (see Matter of Adams, 1 A.D.2d 259, 262, 149 N.Y.S.2d 849 [4th Dept. 1956] affd. 2 N.Y.2d 796, 159 N.Y.S.2d 698, 140 N.E.2d 549 [1957] ). This inference, however, may not be drawn, "where because of the relationship between the

parties, it is natural that such service should be rendered without expectation of pay    In such situations, the claimant, in order to prevail, must present evidence to indicate that he or she expected to be paid for the services" (Moors v. Hall, supra at 338, 532 N.Y.S.2d 412). "The question of whether a party had a reasonable expectation of compensation for services rendered is a matter for the trier of fact to determine based on the evidence before it" (Moors v. Hall, supra, cited in Matter of Alu, 302 A.D.2d 520, 520, 755 N.Y.S.2d 289 [2d Dept. 2003] ). Here, plaintiff has produced such evidence in the form of her uncontradicted sworn affidavit, detailing a four-year course of conduct by defendant which persuaded her to perform certain services for defendant in return for compensation in the form of a bonus. I conclude that plaintiff's cause of action for quantum meruit is sufficiently stated as to survive defendant's CPLR 3211 challenge.

Accordingly, it is hereby

ORDERED that defendant's motion to dismiss is denied.

FOOTNOTES

1. At a November 14, 2005 conference, defendant stated that the $50,000 was a settlement offer and in no way related to any of the matters discussed (TR, pp. 7).

BERNARD J. FRIED, J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re SALIX PHARMACEUTICALS, LTD. | 14-CV-8925 (KMW) |

## ORDER

The Motion to Intervene of Steve Schonberg, having come before the Court and being well-taken, it is hereby ORDERED that the Motion is GRANTED.

_____
UNITED STATES DISTRICT JUDGE

1