**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE SALIX PHARMACEUTICALS, LTD. | Case No. 14 Civ. 8925(KMW) |
| | **JURY TRIAL DEMANDED** |
| | **ECF CASE** |

## CONSOLIDATED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 2

II.   JURISDICTION AND VENUE ................................................................. 11

III.  PARTIES ................................................................................................... 12

    A.    Plaintiffs ........................................................................................12

    B.    Defendants .....................................................................................12

IV.   BACKGROUND AND NATURE OF THE FRAUD ................................ 14

    A.    Background Of The Company ........................................................14

    B.    Salix's Reported Wholesaler Inventory Levels Were Critical To
        The Company's Business And Closely Monitored By The
        Company .........................................................................................16

    C.    Prior To The Start Of The Class Period, Defendants Stuff The
        Wholesale Channel With Nine Months Of Inventory For Salix's
        Key Products ...................................................................................20

    D.    Defendants Falsely Represent That The Wholesalers Maintained
        10- To 12-Week Inventory Levels, Which Was Strictly "In Line"
        With Strong Demand .....................................................................23

    E.    Following the Santarus Acquisition, Defendants Immediately
        Stuffed The Channels For Santarus's Products While Continuing
        To Conceal The True Inventory Levels For Xifaxan And Apriso ........................26

    F.    In An Effort To Conceal Their Fraud, Defendants Manufacture
        False Reasons To Explain Shifting Inventory Levels ...........................30

    G.    Defendants Next Falsely Claim That Inventories For All Products
        Are Being Reduced And Will "Normalize" At Seven- To Eight-
        Week Levels ...................................................................................33

    H.    Once Defendants Are Forced To Provide Confidential Due
        Diligence To Allergan, It Immediately Identifies Serious Problems
        With Salix's Wholesaler Inventory Levels And Calls Off The
        Acquisition .....................................................................................36

V.    THE TRUTH IS REVEALED .................................................................. 39

VI.   POST-CLASS PERIOD EVENTS AND ADMISSIONS ......................... 45

A.   Further Confirming the Material Negative Impact of the Fraud, Salix Withdraws Its Guidance for 2014, Slashes Guidance for 2015 and CEO Logan Also "Retires" ..............................................................45

B.   Salix Restates Its Financial Results ........................................................47

C.   Valeant Acquires Salix And Further Confirms That Defendants Had "As Close To Perfect Information As You Could Have" About Salix's True Wholesaler Inventory Levels ..................................................51

D.   Salix's Board Determines That Logan And Derbyshire "Intentionally Engaged In Wrongdoing" That Resulted In "Material Harm" ......................................................................................53

VII.   ADDITIONAL ALLLEGATIONS OF SCIENTER ........................................................ 54

VIII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................... 64

A.   Materially False And Misleading Statements And Omissions Concerning the Third Quarter of 2013..................................................64

B.   Materially Misleading Statements and Omissions Concerning the Company's 2014 Guidance......................................................................69

C.   Materially False and Misleading Statements and Omissions Concerning the Fourth Quarter of 2013 and Fiscal Year 2013............................70

D.   Materially False and Misleading Statements and Omissions Concerning the First Quarter of 2014 ................................................75

E.   Materially False and Misleading Statements Concerning the Second Quarter of 2014 ......................................................................84

IX.   LOSS CAUSATION.............................................................................................. 95

X.   CLASS ACTION ALLEGATIONS ........................................................................ 96

XI.   PRESUMPTION OF RELIANCE .......................................................................... 98

XII.   NO SAFE HARBOR ........................................................................................... 99

XIII.   CAUSES OF ACTION ...................................................................................... 100

XIV.   PRAYER FOR RELIEF ..................................................................................... 105

XV.   JURY DEMAND ................................................................................................ 106

1.      Lead Plaintiff the Pentwater Funds (defined below), by its undersigned counsel, hereby brings this action on behalf of itself and all persons or entities who purchased or otherwise acquired the publicly traded common stock of Salix Pharmaceuticals, Ltd. ("Salix" or the "Company"), purchased or otherwise acquired publicly traded call options on Salix common stock, or sold publicly traded put options on Salix common stock, during the period from November 8, 2013 through November 6, 2014, inclusive (the "Class Period") and were damaged thereby.  Lead Plaintiff brings this action against Salix, its former CEO Carolyn Logan and its former CFO Adam Derbyshire.  Defendants Logan and Derbyshire are sometimes referred to herein as the "Executive Defendants."

2.      Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters.  Lead Plaintiff's information and belief is based on, *inter alia*, the independent investigation of Lead Counsel.  This investigation included a review and analysis of: (i) regulatory filings made by Salix, Valeant Pharmaceuticals International, Inc. ("Valeant"), and Santarus, Inc. ("Santarus") with the United States Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of Salix's, Valeant's, and Santarus's earnings and other investor conference calls; (iv) publicly available presentations by Salix; (v) Salix's press releases and media reports; (vi) economic analyses of the movement and pricing data associated with Salix publicly traded common stock and options; (vii) consultations with relevant consultants and experts; and (viii) other publicly available material and data identified herein.  Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.  Lead Plaintiff believes that

substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.      INTRODUCTION

3.      This case arises from a series of material misrepresentations by the senior executives of Salix, a specialty pharmaceutical company, concerning one of its most important metrics: its "wholesaler inventory levels."  The Company's "wholesaler inventory levels" represented the number of weeks' worth of inventory that the Company's wholesaler customers kept on hand to fill orders placed by pharmacies.  These figures were supposed to be based on actual demand for Salix's core drug products, which directly impacted current and future revenue.  Accordingly, Salix's wholesale inventory levels served as the primary indicator of the strength of the Company's present and future revenue stream, and the market looked to this metric to assess the Company's value.

4.      To reassure investors of Salix's continued revenue growth, Defendants repeatedly represented before and throughout the Class Period that wholesalers maintained 10 to 12 weeks of inventory for Salix's blockbuster drug, Xifaxan, and its other key products.  For example, throughout the Class Period, former Salix CEO Carolyn Logan and former CFO Adam Derbyshire falsely represented that inventory levels for Xifaxan and other drugs were tightly maintained at "10 to 12 weeks," "exactly where we want to keep it," were "right in line with demand," and "demand for our key products [was] healthy."  Defendants also reassured the market that they closely monitored the wholesaler inventory levels that they reported to investors.  For instance, Defendant Derbyshire explained that Defendants knew with "specificity" the Company's wholesaler inventory levels because "we know what we ship, we know what pulls through, we know what returns are…we have a visibility into inventory levels."

5.     As Defendants would eventually be forced to admit, however, their representations about the level of wholesaler inventory for Salix's key products were false.  In reality, Defendants had undertaken a scheme to "stuff the channel" for Salix's key drugs – that is, they had induced wholesalers to purchase quantities of product that were vastly greater than demand – in an effort to make Salix's growth prospects and financial performance appear far better than they were.  As a result of this scheme, by no later than the beginning of the Class Period, Salix's wholesalers had accumulated at least <u>nine months' worth of inventory</u>, or more than triple the amount Defendants had represented existed—a backlog so massive that analysts would later describe it as "astoundingly" and "unconscionably high."  Salix's inventory backlog was so large that it would take at least a year to sell down, and doing so would reduce the Company's revenues by over $500 million—a sum greater than the combined profits that Salix had reported in its 17-year existence as a public company.

6.     Before the fraud was revealed, however, the increasing revenues generated through Defendants' channel-stuffing scheme attracted the interest of larger companies that were considering acquiring Salix given its ostensibly stellar financial performance.  On November 7, 2013, the day before the Class Period began, David Pyott – the CEO of the well-financed Botox maker, Allergan, Inc. ("Allergan") – called Defendant Logan to discuss a potential acquisition of the Company.  An Allergan acquisition provided a unique opportunity for the Executive Defendants to enrich themselves.  Under the "change in control" provisions of the Executive Defendants' "golden parachute" pay packages, all unvested restricted stock and other equity compensation they had been previously awarded would immediately vest upon a change in control, providing them with a cash payment totaling tens of millions of dollars.  The size of this payout would increase commensurately with the price of Salix stock, and thus, the price at which the

Company was acquired.  Of course, a deal with Allergan also presented a risk to Defendants' scheme because Allergan would seek to conduct due diligence of Salix, including a review of its wholesaler inventory levels, which could potentially uncover the fraud.

7.     Accordingly, Defendants undertook a series of steps to conceal the fraud as the parties began their negotiations, including by repeatedly rebuffing Allergan's requests for due diligence and access to the Company's internal information.  Keeping Allergan at bay not only ensured that Salix's true inventory levels would be kept a secret, but that Salix's stock price would continue to climb as the Company consistently reported false wholesaler inventory levels— enabling Salix to ask for a higher price than it otherwise could have sought, and increasing the value of the compensation Defendants stood to receive.  Thus, Salix continued to deny Allergan due diligence even as Allergan proposed an all-cash offer that represented a nearly 40% premium to Salix's then-stock price—one of the largest such premiums in over a year.

8.     At the same time, Defendants took numerous steps to continue to conceal their channel stuffing from the investing public.  For instance, during the first quarter of 2014, revenues for Salix's core products began to falter because wholesalers could no longer continue purchasing Xifaxan in large quantities given the extraordinary nine months' worth of inventory they already had on hand.  To offset these declining sales – and maintain the illusion that Salix's revenues would continue to grow as Defendants courted an Allergan acquisition – Defendants began stuffing Salix's wholesale channel with new drugs the Company had obtained through its recent acquisition of another pharmaceutical company called Santarus.  These channel-stuffing measures included artificially inflating the Company's reported revenues by paying wholesalers millions of dollars for "marketing services" in exchange for wholesalers' *quid pro quo* agreement to buy more product.  In addition to these concealed practices, Defendants telegraphed unprecedented price

increases for the Company's key products to induce wholesalers to purchase drugs in amounts that far exceeded actual demand before those price increases took effect. Defendants also offered wholesalers steep price discounts on key products that were <u>two to four times</u> greater than industry standards to encourage wholesalers to purchase even more product. By the middle of the Class Period, these channel-stuffing efforts had caused inventory levels for Salix's newly-acquired Santarus drugs to grow as high as <u>five to seven months</u>, or more than 130%-180% greater than Defendants represented were maintained for these products.

9.     By the middle of 2014, these channel-stuffing practices began to result in fluctuating revenue trends that raised questions in the minds of analysts, who were confused by the results Defendants reported. For example, because Defendants had already stuffed the channel with Xifaxan, revenues for this product fell even as prescription demand continued to grow— causing analysts to question why wholesaler sales were declining while prescriptions were increasing. At the same time, revenues for Salix's newly-acquired Santarus products immediately began to spike far in excess of the moderate growth in prescription demand.

10.     To alleviate investors' concerns, Defendants concocted a series of false excuses to explain these seemingly contradictory trends. For example, during Salix's first quarter earnings conference call on May 8, 2014, Defendants told investors that revenues for newly acquired Santarus products increased only because Santarus had supposedly maintained "razor thin" inventory levels, and wholesalers were now "focused" on bringing inventories for these products up to and "in line" with Salix's preferred 10- to 12-week levels. At the same time, Defendants falsely represented that Xifaxan sales had stalled as a result of wholesalers' purported desire to "destock" inventories to <u>below</u> their 10 to 12-week levels. None of this presented any concern,

Defendants claimed, because these inventory trends would soon "normalize" and revenues for Xifaxan and "all products [would] come in line with demand for the second half of the year."

11.     Defendants' representations had their intended effect.   Analysts credited Defendants' representations, reporting that "Salix product had 12 weeks of channel inventory," Salix continued to demonstrate "strong underlying Rx trends for key products [with] normalization of inventory levels by year end," and, accordingly, their "bullish thesis [was] unchanged."  As a result of Defendants' scheme, Salix's stock price more than doubled from $73.31 immediately before the start of the Class Period to a high of $169.17 per share on September 23, 2014—an increase of over 130% in just 10 months.

12.     By August 2014, however, Defendants' scheme began to unravel.  By that time, it was clear that wholesalers were no longer willing to continue purchasing additional product and, in just a few short weeks, Salix would be required to file its third quarter results and report another sequential decline in Xifaxan revenues—a decline that would have been exceedingly difficult to explain given Xifaxan's reported growing prescription demand.  At the same time, Allergan's own window to complete a deal with Salix was quickly closing.

13.     On August 26, 2014, Allergan raised its offer price for Salix to $205 per share, which equated to over $13 billion for the Company—representing a massive potential payout for Defendants.  Two days later, on August 28, 2014, Salix and Allergan entered into a confidentiality, standstill and exclusivity agreement, and Salix provided Allergan access to "an electronic data room" containing internal Company data so that it could conduct due diligence.

14.     Defendants' fraud was so egregious that, unknown to investors, Allergan discovered it almost immediately.  Just days after being granted access to the Company's internal information, Allergan privately discovered what Defendants knew throughout the Class Period:

that Salix's inventories were in fact at stunningly high nine-month levels. Based on this discovery and unbeknownst to investors, Allergan immediately ceased discussions with Salix, informing the "Company that it had become concerned with the levels of wholesaler inventory of the Company's key products in the distribution channel," and subsequently reduced its offer by nearly $2 billion. Soon thereafter, Allergan told Salix that it would not continue any negotiations until after Salix disclosed its third quarter results—including, presumably, the secret inventory backlog that Allergan had uncovered.

15.     Desperate to avoid this result, Salix rushed to seek out another potential suitor, Actavis plc ("Actavis"), which proposed to acquire Salix for $178 to $185 per share on September 30, 2014. Salix granted Actavis confidential access to its electronic data room on October 3, 2014. But just like Allergan, Actavis uncovered the exact same channel-stuffing fraud and terminated its offer on October 9, 2014, just six days later.

16.     Without the ability to announce a potential acquisition, Defendants were forced to come clean. After the close of the market on November 6, 2014, Defendants finally admitted the truth about Salix's inventory levels, disclosing that inventory levels for its four key drugs had soared to unprecedented nine-month levels and that selling down that backlog would materially depress revenues for at least two years. The Company further admitted that wholesaler inventory levels for Xifaxan and Apriso had held "largely constant" at nine months throughout all of 2014, while levels for Santarus products had jumped by at least five months, thus admitting that Defendants' Class Period representations that there were only 10 to 12 weeks of inventory in the wholesale channel were materially false when made. Salix also disclosed that the Company's CFO, Defendant Derbyshire, had "resigned" effective immediately. In addition, Defendants disclosed that the Company's Audit Committee had initiated an investigation and retained outside

7

counsel to examine senior management's "prior characterizations of inventory levels" and the Company's financial results – *i.e.*, the materially false and misleading statements at issue in this case.

17.     Analysts – who were highly experienced in the pharmaceutical industry – were astonished.  On a conference call held that evening to discuss these stunning disclosures, analysts demanded an explanation as to how the Company's prior statements could possibly have been true. For example, a Piper Jaffray & Co. analyst pointedly demanded to know how anyone could believe the Company's prior statements "were not misleading," stating "I don't know how you square 10 to 12 weeks – [] what you said historically – versus what we're being told today of nine months." A JMP Securities analyst similarly insisted Defendants explain how their prior statements regarding Xifaxan "destocking" to below 10 to 12 weeks could possibly be consistent with the fact that, as the Company had now admitted, inventory levels were "stable" at nine months throughout 2014.  Defendants refused to answer analysts' questions, citing the Audit Committee investigation.

18.     Following the conference call, industry analysts widely reported that Defendants had materially misstated the Company's inventory levels, calling the disclosure of nine months of inventory "unconscionable," "hard to fathom," "startling," "astoundingly," "dramatically," and "extraordinarily high," and irreconcilable with Defendants' Class Period representations.  Analysts specifically reported that Defendants "<u>did make misleading comments regarding distribution channel inventory</u>," that "<u>SLXP's former CEO and CFO did make repeated public comments regarding inventory levels that simply put were not reflective of reality</u>," and that "<u>management had clearly been misleading investors on inventory levels</u>."  Analysts also widely reported that Defendants' false misrepresentations about Salix's inventory levels could not have been made by mistake, and that Defendants deliberately misled investors.  For example, analysts from William

Blair concluded the Executive Defendants must have known about the backlog given that "<u>our discussions with other top management in the field have noted the difficulty of building 9 months of wholesaler inventory in the channel without broad knowledge internally at the company</u>," while JMP Securities noted that "<u>a six-month surplus would take a long time to accumulate—likely at least 2 years</u>," and thus would have been obvious to the Company's senior executives.

19.     In response to these disclosures, on November 7, 2014, the first trading day after Defendants' revelations (and the last day of the Class Period), Salix's stock price collapsed.  Salix stock plunged 34% in a single day, falling from a close of $138.55 on November 6, 2014, to a close of $91.47 on November 7, 2014 on extraordinarily high trading volume, causing massive damages to Lead Plaintiff and the members of the class.

20.     Events occurring after the Class Period further confirmed that Defendants intentionally misled investors.  First, on January 5, 2015, Salix announced that, similar to its CFO, Salix's CEO, Defendant Logan, would be "retiring" from Salix.  Analysts reported that Logan's departure was unsurprising given that she "was manning the wheel when SLXP confessed in November that it was stuffing inventory into the wholesale channel."

21.     Second, on January 28, 2015, the Company announced that the Audit Committee had determined that Salix needed to restate its financial statements for the full year of 2013 and for the first three quarters of 2014 (the "Restatement").  In the Restatement, the Company admitted to certain related "channel stuffing" practices, including fraudulently accounting for Salix's payments for "marketing services," prematurely recognizing revenue under certain contracts, and improperly recording revenue for "out-of-policy" returns, and admitted that the Company lacked effective internal controls that would have prevented these "errors" from occurring.  In addition,

on March 2, 2015, Salix disclosed that the SEC had initiated an investigation into Salix's disclosures regarding its wholesaler inventory levels and its accounting practices.

22.     Third, following the November disclosures, Salix desperately sought out another bidder in the face of a growing "liquidity risk" that had resulted from its bloated wholesaler inventory, which had impaired the revenues needed to pay the Company's debt as it came due.  In sharp contrast to its negotiations with Allergan, on January 20, 2015, Salix immediately provided due diligence access to a new suitor – Valeant – before Valeant even provided an offer price.  On February 22, 2015, Salix and Valeant disclosed that Valeant would be acquiring Salix for $158 per share—or $3 billion less than Allergan had offered during the Class Period.  In announcing the deal the next day, Valeant CEO Michael Pearson was asked how he had been able to accurately gauge the Company's inventory levels.  Further confirming that Defendants were well aware of Salix's true inventory levels when they made their false statements, Pearson said that determining Salix's inventory levels was "straightforward," that Valeant had simply acquired the "wholesale reports" which provided "<u>as close to perfect information as you could have</u>," and set forth "<u>precisely how much of each product…is in the channel</u>."

23.     Finally, one month later, Salix's Board of Directors confirmed that Defendants Logan and Derbyshire had intentionally misled investors about Salix's inventory levels during the Class Period.  On March 18, 2015, *Bloomberg* reported that Defendants Logan and Derbyshire were about to "walk away with a combined $46 million" in restricted stock and other compensation that would vest upon closing of the Valeant merger on April 1, 2015.  On March 26, 2015, however, Salix revealed in an SEC filing that the Company's Board of Directors had taken the extraordinary step of invoking the "clawback" provisions in Defendant Logan and Derbyshire's resignation and retirement agreements.  Pursuant to these provisions, the Board terminated their

health insurance and revoked the unvested equity awards they were set to receive just a week before they would have vested, "without any shares of stock or any payment or other consideration therefor," thus cancelling a substantial portion of the compensation that Defendants were slated to receive.  Significantly, under the terms of their resignation and retirement agreements, the Board could claw this compensation back only if the Board concluded that Defendants Logan and Derbyshire "intentionally engaged in wrongdoing that has resulted…in material harm" to the Company—leaving no doubt about their culpability for the fraud alleged herein.

## II.      JURISDICTION AND VENUE

24.      This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, § 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

25.      This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C.  § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

26.      Venue is proper in this District under Section 17 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Salix maintained a listing of its common stock on the NASDAQ Global Select Market (the "NASDAQ"), which is located in this District, false statements were made or prepared in this District, and acts giving rise to the violations complained of herein occurred in this District.  The Company's stock traded on the NASDAQ throughout the Class Period.

27.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

III.    PARTIES

A.    Plaintiffs

28.    Lead Plaintiff consists of the following five related private investment funds (collectively referred to as the "Pentwater Funds"): (1) PWCM Master Fund Ltd.; (2) Pentwater Equity Opportunities Master Fund Ltd.; (3) Oceana Master Fund Ltd.; (4) Pentwater Merger Arbitrage Master Fund Ltd.; and (5) LMA SPC for and on behalf of the MAP98 Segregated Portfolio.  As reflected in the certification filed with the Court (ECF No. 23), the Pentwater Funds purchased Salix common stock during the Class Period and were damaged thereby.

29.    Additional named plaintiff, City of Fort Lauderdale General Employees' Retirement System ("Fort Lauderdale"), is a public pension system organized for the benefit of current and retired public employees of the City of Fort Lauderdale, Florida.  As reflected in its certification (ECF No. 28), Fort Lauderdale purchased Salix common stock during the Class Period and was damaged thereby.

B.    Defendants

30.    Defendant Salix Pharmaceuticals Ltd. is a pharmaceutical company specializing in products for the treatment of gastrointestinal diseases.  Salix is incorporated in the state of Delaware and maintained its principal executive offices at 8510 Colonnade Center Drive, Raleigh, North Carolina 27615.  During the Class Period, Salix's common stock traded on the NASDAQ stock market under the ticker symbol "SLXP."  On March 16, 2015, Salix announced that it had entered into a final agreement to be acquired by Valeant Pharmaceuticals, Inc. for $173 per share, and on April 13, 2015 Salix filed a Form 15 with the SEC to terminate the registration of its securities.

31.    Defendant Carolyn J. Logan served as the President, Chief Executive Officer, and a Director of Salix from 2002 through 2014.  From 2000 to 2002 she was the Senior Vice President

of Sales and Marketing.   During the Class Period, Defendant Logan reviewed, approved, and signed Salix's false and misleading SEC filings, as well as certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 therein ("SOX Certifications").   Specifically, Defendant Logan signed the Forms 10-Q that the Company filed with the SEC on November 8, 2013, May 9, 2014, and August 8, 2014; and the Form 10-K filed with the SEC on February 28, 2014.   Defendant Logan also participated in conference calls with securities analysts during which Salix's false and misleading SEC filings and press releases were presented and discussed.   Specifically, Defendant Logan made false and misleading statements on the Company's conference calls held on January 16, 2014, February 27, 2014, March 11, 2014, May 8, 2014, May 13, 2014, May 19, 2014, June 4, 2014, June 18, 2014, and August 7, 2014.   On January 5, 2015, Salix announced that Logan was "retiring" from the Company and would cease serving as President, CEO and a Director effective January 30, 2015.

32.   Defendant Adam C. Derbyshire served as Salix's Chief Financial Officer from 2000 until November 6, 2014.   During the Class Period, Defendant Derbyshire reviewed, approved, and signed Salix's false and misleading SEC filings, as well as SOX Certifications. Specifically, Defendant Derbyshire signed the Form 8-K dated November 7, 2013; Forms 10-Q that the Company filed with the SEC on November 8, 2013, May 9, 2014, and August 8, 2014; and the Form 10-K filed with the SEC on February 28, 2014.   Defendant Derbyshire also participated in conference calls with securities analysts during which Salix's false and misleading SEC filings and press releases were presented and discussed.   Specifically, Defendant Derbyshire made false and misleading statements on the Company's earnings conference calls held on November 7, 2013, February 27, 2014, May 8, 2014, and August 7, 2014.   On November 6, 2014,

Salix announced Defendant Derbyshire's sudden "resignation" from the Company, the same day it announced its massive backlog of wholesaler inventory.

33.    Salix and the Executive Defendants are sometimes collectively referred to as the "Defendants."

## IV.    BACKGROUND AND NATURE OF THE FRAUD

### A.    Background Of The Company

34.    Salix is a specialty pharmaceutical company that sells drugs used to treat gastrointestinal disorders.  Its most valuable product by far was its "blockbuster" drug Xifaxan, which accounted for approximately 70% of Salix's net product revenue from 2010-2013. While the FDA originally approved Xifaxan to treat traveler's diarrhea in May 2004, the primary indication that drove sales of Xifaxan during the Class Period was its use in treating the rare disorder hepatic encephalopathy ("HE"), which is the loss of brain function that accompanies late-stage liver disease.  Salix originally received FDA approval in 2010 to market Xifaxan as an "orphan" drug, *i.e.*, one that was developed to treat a rare medical condition.  The FDA's orphan drug designation entitled Salix to a special seven-year period of exclusivity in which other manufacturers were prohibited from selling generic equivalents.

35.    Since the FDA's approval of Xifaxan as an orphan drug, reported net product revenues more than tripled, from $233 million in 2009 to $735 million in 2012. Driven principally by increased reported Xifaxan sales, as well as reported sales of a second drug called Apriso, which treats ulcerative colitis ("UC"), or chronic inflammation of the colon, the Company's annual net income soared from a loss of $27 million at the end of 2009 to a profit of $143 million in 2013. The Company directly attributed its rapid growth to increased reported sales of Xifaxan and Apriso, which both consistently were reported as showing double-digit growth rates year-over-year since their respective product launches.

36.     Before and during the Class Period, Salix was viewed as an attractive investment because of its remarkable reported growth and the fact that it was actively pursuing FDA approval to market Xifaxan for the treatment of irritable bowel syndrome ("IBS"), which would exponentially expand the drug's potential market and sales.  By no later than the beginning of the Class Period, analysts predicted that an FDA approval for Xifaxan to treat IBS would "propel[] the franchise," with Xifaxan alone providing "well in excess" of $1 billion in sales in 2016.

37.     Salix's impressive reported growth rates also made the Company an attractive takeover target in an industry that had experienced significant merger and consolidation activity in recent years among smaller specialty pharmaceutical companies seeking to be purchased by large pharmaceutical companies.  *Barron's* reported as early as January 2011 that "Nearly everyone has flagged Salix as a takeover target."

38.     As noted above, an acquisition of Salix presented a unique opportunity for the Executive Defendants to reap extremely large sums of personal compensation through "change in control" provisions in their employment agreements.  Specifically, those provisions – which Defendants enhanced after the beginning of the Class Period – provided that unvested restricted stock and other equity-based awards could immediately accelerate and vest upon an acquisition of Salix, resulting in payments to the Executive Defendants potentially totaling tens of millions of dollars.  Because the vast majority of the Executive Defendants' compensation came in the form of restricted stock, the size of the Executive Defendants' payout upon a change in control increased commensurately with the price of Salix stock, as well as the size of any premium above Salix's stock price that would be paid in any acquisition.

B.     **Salix's Reported Wholesaler Inventory Levels Were Critical To The Company's Business And Closely Monitored By The Company**

39.     Salix did not sell its products directly to pharmacies or physicians.  Rather, the Company derived its revenue through product shipments to its wholesale pharmaceutical customers.  The wholesalers, in turn, sold the products to pharmacies where patients' prescriptions were filled.   In 2014, approximately 83% of the Company's sales were to three wholesale customers: Cardinal Health, Inc., AmerisourceBergen Corporation, and McKesson Corporation.

40.     The Company's reported "wholesaler inventory level" was one of the most critical metrics to investors in analyzing Salix's value as a company.   Salix's reported wholesaler inventory level represented the number of weeks' worth of product that the wholesalers kept to fill orders placed by pharmacies dispensing the drug to patients.   Thus, the reported wholesaler inventory level was a key measure of demand for the Company's core products and the growth of its revenue stream.  For example, if reported wholesaler inventory levels were to rise significantly, this could signal a backlog at the wholesaler level, which could in turn cause wholesalers to reduce their orders, thereby reducing the Company's future revenues and growth rate.  As eventually happened in this case, revenues can stagnate or materially decrease if wholesalers halt purchases from Salix and sell off excess inventory that has accumulated in the wholesale sales channel.  For this reason, Salix stated in its SEC filings throughout the Class Period that its reported wholesaler inventory levels were one of the "most critical accounting policies and estimates upon which [the Company's] financial status depends."

41.     Analysts were particularly focused on the Company's reported 10- to 12-week wholesaler inventory levels because they were unusually high for the pharmaceutical industry, where wholesale inventory levels of three to four weeks were common among Salix's peers.  Salix told investors that its higher inventory levels were appropriate because Salix drugs had expiration

dates of between three and five years, which was longer than many other pharmaceutical products. Nevertheless, analysts noted that one of the Company's investment "risks" was its "high trade inventories relative to the group at over two months." The risk was that wholesalers could decide to "destock" Salix inventory for a number of weeks—selling product to pharmacies without having to purchase additional product from Salix. Thus, given Salix's comparatively high inventory level relative to industry peers, analysts were highly attuned to any fluctuations in Defendants' reported inventory levels to ensure that they could accurately assess the demand for Salix's key products, monitor its present and future revenue stream and gauge the Company's value.

42.     Accurate information regarding wholesaler inventory levels was also necessary for Salix to account for the reported revenue Salix had already recorded for product shipments. Until the wholesalers sold the products to retail pharmacies, the revenue Salix had recorded for its sales to wholesalers for that outstanding inventory could be subject to reserves for product returns, chargebacks, customer rebates, and other potential price adjustments. Under Generally Accepted Accounting Principles ("GAAP"), Salix was required to establish accounting reserves or "accruals" to account for the fact that a sale could be reversed or revenues could other be otherwise reduced until the retail sales were actually made. Any such accruals reduced the Company's pre-tax income on a dollar-for-dollar basis. Each reporting period, Salix stated in its SEC filings that it determined the correct reserves through a detailed analysis that was based on, among other things, the "estimated levels of inventory in the distribution channel" for each product, and an "analysis of prescription data gathered by a third-party prescription data provider."

43.     The Company stated that it calculated its wholesaler inventory levels on at least a quarterly basis "by adding estimated inventory in the channel at the beginning of the period, plus net product shipments for the period, less estimated prescriptions written for the period." This

17

analysis, which was overseen by Defendant Derbyshire as CFO, required the Company's senior executives to obtain detailed and up-to-date information concerning the amount of inventory in Salix's wholesale distribution channels for each of its products, which Salix stated it obtained through "direct communication with customers" and "members of the Company's sales, marketing and operations group."

44.     In addition to this internal analysis, each wholesaler closely tracked the precise amount of Salix inventory it maintained and confidentially made that information available to Salix.  Absent any external incentives from the manufacturers, wholesalers have no reason to carry (and pay to store) excess inventory from manufacturers.  As Salix wholesaler McKesson's CEO put it during a November 2014 conference call,

> We do manage inventory, first off, so that we can get great service levels for our customers. But we also know that <u>anything above that level of inventory is money that needs to have a return</u>.
>
> And so to the extent that we can make money off of inventory, we're certainly going to do that. But our principal value proposition is related to customer service and…. <u>we're focused on working in a collaborative nature with the manufacturers, particularly the branded manufacturers, where they have more transparency to the inventory we have</u>, and we have less incentive to build inventory in advance of price increases.

45.     As was revealed after the end of the Class Period, the Company's senior executives – including Defendants Logan and Derbyshire – had direct access to the actual "wholesale reports" from Salix's wholesalers.  As noted above, Valeant's CEO stated on February 23, 2015 that Valeant had obtained the wholesale reports for Salix's products prior to agreeing to purchase the Company, and these "wholesale reports" reflected "<u>precisely how much of each product, each SKU is in the channel and in detail</u>," demonstrating that the Executive Defendants had direct access

to the Company's wholesale inventory levels throughout the Class Period.[1]  In fact, Salix admitted at the end of the Class Period in the Company's November 6, 2014 earnings call that when it compared its own internal estimates of inventory levels with the inventory data it obtained from its wholesalers, "those numbers [were] consistent with… numbers [Salix] received from the wholesalers."

46.     While the wholesalers had significant economic incentives to carry only enough inventory to meet demand (with some cushion for spikes in demand), Salix could "stuff" the wholesaler channel – thus bumping up Salix's reported revenue and creating the false impression of more robust growth  – by offering incentives to purchase more product.  According to the SEC, "channel stuffing" is "the pulling forward of revenue from future fiscal periods by inducing customers – through price discounts, extended payment terms or other concessions – to submit purchase orders in advance of when they would otherwise do so."

47.     Significantly, following the SEC's increased focus on channel stuffing in the early 2000s, many pharmaceutical manufacturers and wholesalers began entering into Distribution Services Agreements ("DSAs," also sometimes referred to as Inventory Management Agreements, or "IMAs").  DSAs gained increasing popularity as a way to reduce the risks related to channel stuffing, as well as better control and manage inventories.  DSAs assist manufacturers in establishing reserves for their products by setting forth clear, standardized terms with wholesalers concerning the inventory levels of products that wholesalers will maintain, as well as terms standardizing price discounts, chargebacks, rebates and similar charges.  These agreements therefore limited, if not eliminated, the ability of manufactures such as Salix to incentivize

---

[1] A "SKU," or "stock keeping unit," is a code number, typically used as a machine-readable bar code, assigned to a single item of inventory and represents the smallest unit of a product that can be sold from inventory, purchased or added to inventory.

wholesalers to buy more product than they needed.  In 2008, Salix's auditor, Ernst & Young LLP, recommended that pharmaceutical manufacturers like Salix enter into DSAs as a way to "reduce the risk of accounting issues related to 'channel stuffing,'" as doing so helps companies to "maintain inventory levels that are consistent with the underlying demand."

48.     As the Company told investors before and during the Class Period, however, it did not enter into such agreements purportedly because it did not believe the benefit of enhanced "visibility" that DSAs provided outweighed their perceived cost.  At the same time, Salix reassured investors that its refusal to enter into DSAs was not a disadvantage given the close control it had over its inventory levels.  As noted above, when Defendant Derbyshire was asked by an analyst "how do you actually know [wholesaler inventory levels] with specificity," he stated that the Company's internal data allowed the Company to accurately track its inventory levels each quarter, replying, "we have visibility in the inventories because we know what we ship, we know what pulls through, we know what returns are."  In truth, Salix did not enter into DSAs because doing so would have curtailed its ability to stuff its wholesaler inventory channels.  In fact, upon acquiring Santarus during the Class Period, Salix immediately terminated the pre-existing DSAs that Santarus had used in order to stuff the channels for Santarus drugs.

C.     **Prior To The Start Of The Class Period, Defendants Stuff The Wholesale Channel With Nine Months Of Inventory For Salix's Key Products**

49.     In the time leading up to the Class Period, Defendants repeatedly represented that they kept the wholesaler inventory levels for Salix's key products in the range of 10 to 12 weeks, providing these figures for Xifaxan on numerous conference calls dating back to as early as 2005. For example, during an investor conference call on May 9, 2013, Defendant Derbyshire stated that "inventory has not changed significantly over the past quarter," and reassured investors that

Xifaxan "inventories are in that 10- to 12-week range that we like to keep them." These representations had a continuing effect as they were reiterated during the Class Period.

50.     As Salix was ultimately forced to admit at the end of the Class Period, by the start of the Class Period on November 8, 2013, Defendants had "stuffed" the Company's wholesale channels so severely that the wholesaler inventory was at least <u>nine months</u> for Xifaxan and Apriso, its two key products. These inventory levels were at least <u>three times</u> what Defendants had told the market Salix maintained. Defendants' scheme not only inflated wholesaler inventory levels to an astronomical degree, it had also had a severe negative impact on Salix's revenue stream when wholesalers could no longer take on any additional product. As was ultimately revealed, this channel stuffing would cost Salix more than $500 million in lost revenue when, following the disclosure of the fraud, Salix was forced to dramatically reduce or stop selling Salix products altogether for an extended period of time so that the wholesalers could sell down the extraordinary backlog.

51.     Prior to the revelation of the fraud, however, Defendants' severe channel stuffing practices created the false impression that demand and growth for Salix's key products were materially higher than they actually were. This, in turn, heightened the interest of potential acquirers. Unbeknownst to investors at the time, by the beginning of the Class Period, Salix's reported performance and growth prospects had drawn the attention of a very well-financed potential acquirer.

52.     On November 7, 2013, the day before the Class Period began, Defendant Logan received a phone call from David Pyott, the CEO of Allergan, who informed Logan that Allergan was interested in acquiring the Company and requested a meeting. An acquisition by Allergan – a $37 billion specialty pharmaceutical company that sold the wrinkle treatment Botox and could

pay a significant premium for Salix – presented the opportunity for the Executive Defendants to enrich themselves, but also carried the risk that their channel stuffing could be exposed. On the one hand, the acquisition offered the prospect of tens of millions of dollars in personal compensation to Defendants Logan and Derbyshire through their change-in-control provisions. On the other hand, however, an acquirer such as Allergan was sure to conduct due diligence before it purchased Salix, including a review of its wholesaler inventory levels.

53.     From the very beginning of the parties' negotiations, Allergan sought to conduct due diligence in order to confirm the accuracy of the Company's historical financial results and the reasonableness of Salix's projections for future performance.  One of the principal goals of performing due diligence is to identify any "deal stoppers"—*i.e.*, facts that would make the buyer walk away – and would include, among other things, an assessment of Salix's relationships with third parties (including wholesalers), any significant business risks (including potential fraud or abuse), and a review of the data underlying the Company's financial results—the very information that could expose Defendants' fraud.

54.     To prevent this from happening, Defendants repeatedly rejected Allergan's requests to perform due diligence, even as their discussions progressed to advanced stages.  For example, Salix rejected Allergan's request to perform "high level" due diligence on December 20, 2013 and again rejected a similar request to perform due diligence on March 13, 2014.  On August 13, 2014 – after Allergan had formally offered to buy Salix for $180 per share on July 29, 2014 – Salix again rejected Allergan's request to conduct only "high level due diligence," even though Allergan's offer represented a nearly 40% premium to Salix's then-stock price, making it one of the highest premiums for a specialty pharmaceutical company in the past year.

55.     While seeking to delay due diligence with Allergan to the last possible moment, the Executive Defendants also made a series of material misrepresentations designed to perpetuate the fiction that Salix's inventory levels remained at their historic 10- to 12-week levels, and conceal from the market the true inventory crisis they had created.   As explained below, these misstatements ensured that Salix's true inventory levels would be kept a secret, and drove its stock price sharply upward, thus allowing Salix to seek out a higher offer price from which to bargain.

**D.     Defendants Falsely Represent That The Wholesalers Maintained 10- To 12-Week Inventory Levels, Which Was Strictly "In Line" With Strong Demand**

56.     On November 7, 2013, the day before the Class Period began, the Executive Defendants announced two pieces of purportedly positive news that promptly inflated Salix's stock price.  First, the Company announced impressive financial results for the third quarter of 2013 that exceeded analysts' expectations, driven by reported strong sales of its cornerstone product, Xifaxan.  On an investor conference call after the market closed that day, Salix reported total product revenues of $238.2 million, with $165.9 million in revenues for Xifaxan alone—a 20% increase compared to the prior year quarter, and ahead of *Bloomberg* consensus estimates of $237.5 million.

57.     In reporting these results, Defendant Derbyshire reassured investors that the Company's Xifaxan revenues were closely tracking actual demand.  On the conference call, an analyst from Mizuho Securities asked whether the $165.9 million in reported sales for Xifaxan was attributable to "anything unusual in the quarter, be it inventory, price, anything like that." Rather than disclose the truth – that Defendants had achieved these results by stuffing the channel with hundreds of millions of dollars in overstocked inventory – Defendant Derbyshire assured investors that the actual "demand for the quarter was about $159 million," essentially in-line with current shipments.  Derbyshire told investors that, to the extent there was any difference between

Salix's reported Xifaxan revenues and actual prescription demand, Xifaxan shipments were only "a little bit ahead of demand" by a negligible $6 million – representing just a few days of inventory.

58.     Second, the Company announced that it was acquiring Santarus, another gastrointestinal pharmaceutical company that marketed two drugs, Glumetza and Uceris, which were expected to generate over $300 million in additional revenues in 2014 alone.   On the November 7, 2013 conference call, Defendants described the "very exciting" opportunities that the Santarus acquisition offered, telling investors that the transaction would be "transformative" for the Company, as it would increase by one-and-a-half times the size of the Company's drug portfolio and sales force, and generate hundreds of millions of dollars in additional revenues with sales of Santarus' drugs.

59.     Unbeknownst to investors, the Santarus acquisition presented Defendants with another opportunity to further their scheme.  By acquiring new products, Defendants could stuff the channel for these drugs as well, therefore showing new growth as they were positioning the Company for a takeover.  Moreover, given the nine-month backlog clogging the channel for Xifaxan and Apriso, Defendants understood that wholesalers would soon have no choice but to reduce their purchase orders for these drugs in order to bring bloated inventories down to more reasonable levels.  In fact, Defendants knew that, with nine months of inventory of Salix's two primary drugs on hand, the Company's 2014 revenues would soon begin to flatten or, more likely, decline.  By acquiring multiple new products through the Santarus acquisition, and by immediately stuffing the channel for those new products, Salix would be able to offset anticipated revenue declines for Xifaxan and Apriso, and mitigate the risk that 2014 top-line revenues would shrink.

60.     Defendants' representations had their intended effect, and investors and analysts were uniformly positive in their assessment of the Company's financial prospects and reported

inventory levels for Salix's products.  For example, JMP analysts explained on November 8, 2013 that the "strong growth in 3Q13 for Xifaxan" reflected growth in actual prescription demand and the "~$6 million stocking" – the amount by which Xifaxan sales were supposedly "a little bit ahead of demand" – was not a concern.  Similarly, Brean Capital analysts positively noted Xifaxan's "strong prescription growth," that "Apriso prescription during the first nine months in 2013 were roughly the same as its prescriptions in the entire year 2012," and reported that the Santarus acquisition "should be immediately accretive." As a result of Defendants' misrepresentations and omissions concerning demand for Xifaxan and the news concerning the Santarus acquisition, on the first day of the Class Period, Salix's stock price shot up nearly 18%, from $71.31 on November 7 to close at $84 on November 8, the Company's biggest single-day increase since 2010.

61.     The following quarter, Defendants continued to conceal the inventory backlog by falsely misrepresenting that Xifaxan and Apriso inventory levels were "in line" with demand and maintained at the Company's "historical," "typical" 10-12 week levels.  On February 27, 2014, Salix announced financial results for the fourth quarter and year-end 2013 that exceeded analysts' expectations, driven by strong reported Xifaxan sales.  On an investor conference call that day, Defendants reassured investors that Xifaxan revenues were growing "right in line" with demand. In response to an analyst who asked whether there was "anything going on in the quarter, inventory wise [with Xifaxan], which would prevent quarter-over-quarter growth," a Salix spokesperson denied any concerns about the Company's inventory levels.  According to Salix, "in terms of inventory levels on Xifaxan, based on the latest…run-rate data, we were right in line with demand."

62.     On the call, analysts also focused on the accuracy of inventory levels for the recently-acquired Santarus products, and asked whether they were also in-line with demand.

25

Noting that channel stuffing can potentially occur at a pharmaceutical company that is being acquired, an analyst from UBS bluntly asked whether there had been any "stuffing of the channel" at Santarus before the acquisition closed.  In response, Defendants Derbyshire and Logan could not have been more emphatic, saying "[t]hat did not occur."

### E.   Following the Santarus Acquisition, Defendants Immediately Stuffed The Channels For Santarus's Products While Continuing To Conceal The True Inventory Levels For Xifaxan And Apriso

63.   Unbeknownst to investors, given the unprecedented inventory levels for Xifaxan and Apriso, by no later than the end of 2013, wholesalers were no longer able to continue buying these drugs in steady quantities and began to reduce their purchase orders.  As a result, during the first quarter of 2014, reported Xifaxan revenue fell 25% year-over-year, while reported Apriso revenue was flat.  In the second quarter of 2014, reported Xifaxan revenue fell 7% year-over-year, while reported Apriso revenue fell 21% year-over-year.  In an effort to offset and soften the blow of reporting declining revenues on these key products while Defendants were negotiating with Allergan during the first half of 2014, Defendants immediately "stuffed the channel" with Santarus products after the Santarus acquisition closed on January 2, 2014.

64.   In order to do so, Defendants eliminated the DSAs that Santarus previously had in place with its wholesale customers.  As noted above, DSAs are contracts between pharmaceutical manufacturers and wholesale customers that establish standardized terms concerning the inventory levels that wholesalers must maintain which greatly reduce, if not eliminate, manufacturers' ability to "stuff the channel" with excess product.  Prior to being acquired by Salix, Santarus maintained such DSAs with its wholesaler customers – including the same three wholesalers that accounted for over 80% of Salix's sales – pursuant to which Santarus maintained strict, industry-standard levels of inventory.  Accordingly, in order to free Salix from the restrictions imposed by Santarus's DSAs, Defendants immediately cancelled them as soon as the acquisition closed.

65.     After eliminating Santarus's DSAs, Defendants began to stuff the channel through a number of different manipulations during the first two quarters of 2014.  For instance, Salix informed its wholesalers that it would soon implement some of the largest-ever price increases on Santarus products and invited wholesalers to purchase significant quantities of Santarus products at the lower price, motivating them to stuff inventory channels at the then-lower price.  As the Company disclosed in its SEC filings throughout the Class Period, "at the time that the Company implements a price increase, it generally offers its existing customer base an opportunity to purchase a limited quantity of product at the previous list price."  Shortly after Salix closed the Santarus transaction on January 2, 2014, the Company increased prices for Uceris by 8% – the largest publicly reported price increase for Uceris in the product's history.  Weeks later, Salix told wholesalers that, in the second quarter of 2014, prices for Glumetza would increase by 15% – the largest publicly reported price increase for Glumetza in over two years.  Similarly, during the second quarter of 2014, the Company separately announced that it would be increasing the price of Xifaxan 200 mg by 10% and the price of Xifaxan 550 mg by 7%.  However, the inventory backlog for these drugs was so extreme that these actions were insufficient to mitigate the trend of declining sales for Xifaxan and Apriso.

66.     Cancelling the Santarus DSAs also enabled Salix to offer its wholesalers steep price discounts for Santarus products, thereby further incentivizing wholesalers to purchase products well in excess of prescription demand.  As was revealed after the Class Period, Salix offered its wholesale customers price discounts for Xifaxan and other key drugs of between 15% to 20%— which was between two and four times greater than price discounts offered under typical DSAs.  By eliminating the Santarus DSAs, Salix was able to offer those same 15% to 20% price discounts for Santarus products.  Indeed, after the end of the Class Period and after Salix had been acquired

by Valeant, Valeant CEO Michael Pearson revealed that Salix's 15% to 20% price discounts had a significant (and previously undisclosed) impact on the Company's margins. As Pearson stated on an April 29, 2015 conference call after the end of the Class Period, "under [Valeant's] ownership, Salix's gross margins will increase significantly…because we will not be doing the discounting that they were doing to the wholesalers" and, unlike Salix, "<u>we certainly aren't going to be giving discounts to get people to buy the product</u>."

67.     In addition to these measures, Salix also agreed to spend significant sums on "marketing services" offered by wholesalers in exchange for the wholesalers' agreement to purchase Salix drugs at rates that far exceeded actual demand. Wholesalers offer marketing services to manufacturers that include, for example, placing advertising in wholesalers' mailings to retail pharmacy customers. Significantly, however, as Salix did here, payments for such "marketing services" can also be used to induce wholesalers to purchase significant additional product as part of a *quid pro quo* arrangement.

68.     Specifically, in the Restatement, Salix admitted that it agreed to spend a total of $8.5 million dollars in three separate transactions during the Class Period – including a $7.5 million transaction and a separate $500,000 transaction in the second quarter of 2014 – on "marketing services" that were "associated with a sale" to a wholesaler and in order to "consummate an additional sale" to the wholesaler. This subsequent admission made clear that these payments were intended to induce the wholesaler to purchase product it would not have otherwise, and for the specific purpose of artificially inflating wholesaler demand for the Company's key products and its financial results.

69.     Notably, in order to disguise the true purpose of these expenditures – to stuff the channels by inducing wholesalers to purchase additional products – Defendants violated GAAP

repeatedly.  Under GAAP (Accounting Standards Codifications ("ASC") 605-50), if the Company did not actually receive any realizable benefit from the wholesaler marketing services or the wholesaler was not obligated to provide any such services, then the payment to the wholesalers for "marketing services" should have been immediately recorded as a revenue-reducing discount to the transaction.  Rather than doing so, Salix disguised these payments – which were effectively kickbacks – as "operating expenses."  Moreover, Salix improperly recorded these wholesaler incentives during quarters subsequent to the corresponding sale transactions.  This had the two-fold benefit to Salix of artificially increasing revenue and pre-tax net income for the then-current quarter and concealing the true nature of the expenditure, which was not even reported until later.

70.     This falsification of the Company's financial results came at a critical time during the Company's negotiations with Allergan.  Specifically, the $8 million in charges that should have been but were not included in the Company's second quarter financial results reported on August 7, 2014 – just a week after Allergan made its official proposal to acquire Salix for $180 per share – impacted Salix's reported results at a time when declining sales of Xifaxan had Apriso significantly cut into the Company's earnings.  In fact, the Company's $8 million "error" allowed it to report net income of approximately $3 million for the second quarter, when it otherwise would have reported a $5 million loss.

71.     Most of all, as a result of all the manipulations described above, Defendants succeeded in reporting large increases in revenue for the key Santarus products at the time when Xifaxan and Apriso sales were slowing because of Salix's channel stuffing.  For example, for the first quarter of 2014, the Company reported massive year-over-year revenue increases for Glumetza and Uceris of 213% and 853%.  For the second quarter, Salix reported year-over-year revenue growth for Glumetza and Uceris of 131% and 162%, respectively.  However, as the

Company was ultimately forced to admit, this success was driven by its channel stuffing scheme. As a consequence of Defendants' efforts to stuff the channels for these newly-acquired products, by no later than the end of the second quarter 2014, inventory levels for Glumetza and Uceris were at a shocking seven months and five months, respectively—or approximately twice as much as the amount of the inventory that the Company told investors it typically maintained.

72.     At the same time Defendants had taken these steps to conceal their inventory channel-stuffing scheme, the Company implemented new "change in control" provisions to the Executive Defendants' compensation packages that made their potential payouts even larger if Salix was acquired.  Under a new compensation package approved by the Company in February 2014, if Defendants Logan and Derbyshire were removed from their position within one year of the change in control, they would receive a lump sum cash payment equal to 36 months of salary and a bonus equal to three times their maximum eligible bonus, as well as 36 months' worth of benefits—new terms that sweetened the already large payouts the Executive Defendants stood to reap.

   **F.     In An Effort To Conceal Their Fraud, Defendants Manufacture False
            Reasons To Explain Shifting Inventory Levels**

73.     As Defendants manipulated the Company's wholesaler inventory levels during the first half of 2014, their maneuvers began to further distort Salix's reported revenues in ways that raised questions in the minds of analysts.  For instance, as noted above, during the first two quarters of 2014, Salix reported declining revenues for Salix and Apriso—yet prescription rates were increasing by between 19% and 58% for those drugs, causing analysts to question why revenues declined.  At the same time, the Company reported surging revenues for Glumetza and Uceris that far outpaced prescription demand for these newly-acquired Santarus products.  As noted above, in the first quarter of 2014, the Company reported year-over-year revenue increases for Glumetza

and Uceris well in excess of 200%, even as prescriptions for these two products rose only moderately.

74.     These results confused analysts, who began to focus their attention on Salix's inventory levels with increasing intensity.  In response, Defendants concocted several explanations to rationalize these inventory shifts, while also reassuring analysts that they were "in touch" with Salix's wholesalers about the Company's inventories and knew exactly what they were.  As the Company was later forced to admit, these explanations were lies.

75.     Among other things, Defendants falsely stated that revenues for newly acquired Santarus products were increasing because, prior to the acquisition, Santarus had maintained inventory at "razor thin" levels, and wholesalers now desired to bring inventories for these products up to Salix's "preferred" 10- to 12-week levels.  In addition, Defendants claimed, because Salix had more than doubled the size of its sales force following the Santarus acquisition – and purportedly was a "more aggressive marketing company" than Santarus – wholesalers had "focused" on increasing inventories for Santarus products in anticipation that prescriptions for those products would rise.  Defendants also blamed declining revenues for Xifaxan and Apriso on wholesalers' purported desire to "destock" inventories, falsely representing to investors that wholesalers were temporarily reducing inventories for these products below their historical 10- to 12-week levels while increasing their Santarus product inventories.

76.     For example, when reporting Salix's first quarter 2014 earnings on May 8, 2014, Defendant Derbyshire explained in prepared remarks that Salix's wholesalers were attempting to increase levels of Santarus products to match the existing 10- to 12-week inventory levels they purportedly maintained for "legacy" products Xifaxan and Apriso.  According to Derbyshire, because of their "focusing on securing additional [Santarus] product," wholesalers also had

temporarily reduced their purchases of Xifaxan and Apriso, bringing inventory for these products below their "typical" 10- to 12-levels.  As Derbyshire explained, the trends could be explained by the fact that:

> [W]holesalers and drug chains, which have had very thin inventories for Santarus products, focusing on securing additional product during the quarter to establish adequate inventories in accordance with our preferred inventory levels.  This resulted in strong revenue growth for Santarus products in the first quarter.  With the wholesale inventories for Santarus products now at a more appropriate levels, we expect Xifaxan 550 sales to exceed or to track in line with prescription demand in the second quarter of 2014 as wholesalers bring Xifaxan 550 inventories back to more typical levels.

In other words, while revenue for Xifaxan and other Salix products had slowed while wholesalers purportedly focused on bringing up levels of legally Santarus products, Salix expected Xifaxan revenue to increase in the second quarter 2014 as wholesalers brought Xifaxan inventory "back to more typical levels."

77.     Defendants also falsely claimed that the increased revenue for Santarus products was attributable to Salix's decision to terminate the IMAs that Santarus had maintained with its wholesalers, suggesting that without these agreements, wholesalers were uncomfortable maintaining "razor thin" inventories now that Salix had taken over.  Conveniently for Defendants, this helped to explain both why wholesalers reduced their purchases of Salix products as demand for those products increased, while at the same time purchasing Santarus drugs in amounts that outpaced prescription demand. During the same May 8 conference call, for example, Defendant Derbyshire told investors that:

> You may or may not be aware that Santarus did have inventory management agreements in place until shortly after the acquisition closed.  We terminated those agreements, which I think caused a little angst with wholesalers with respect to their products, so they were focused and we were focused on wanting to make sure those inventory levels got to the level that we are comfortable with, which is typically in that 10 to 12 weeks.

[T]hey had existing inventories of the legacy Salix products, which they were comfortable with.  So what we expect in second quarter is that Xifaxan 550 will rebound and more than likely exceed demand.

And then we would expect the Santarus products to come in line with demand for the remainder of the year and then all products to come in line with demand for the second half of the year.

78.     Once this purported inventory shifting was completed, Defendant Derbyshire explained, inventories for "all of our products" – both "legacy" Salix products and newly-acquired Santarus drugs – would be "in that 10- to 12-week range."  In fact, the opposite was true.  As noted above, after acquiring Santarus, Defendants immediately terminated its IMAs so that it could stuff the channel with its newly-acquired products.

79.     Analysts, however, were reassured by Defendants' representations.  For example, Sterne Agee noted that, because "Salix does not have Inventory Management Agreements (IMAs) with its customers, wholesalers tend to stock 10-12 weeks of inventory of key products," and accepted Defendants' explanation that "levels of legacy Salix products [including Xifaxan] were temporarily brought down to 7-8 weeks, which is still enough to meet near-term patient demand." Similarly, Piper Jaffray credited Defendants' representations, concluding that investors should "not worry about 1Q14 inventory movement" because "wholesalers purchased significant amounts of supply to bring inventory levels for these assets to the 10-12 weeks that is typically seen for SLXP products," and that one "consequence of this was more limited wholesaler buying of Xifaxan and Apriso (hence the 1Q14 headwinds)."  As a result, Piper Jaffray concluded, its "bullish thesis [was] unchanged."

G.      **Defendants Next Falsely Claim That Inventories For All Products Are Being Reduced And Will "Normalize" At Seven- To Eight-Week Levels**

80.     Contrary to Defendants' claims in May 2014, Xifaxan and Apriso revenue continued to decline in the second quarter 2014 even as prescription demand was soaring.  Rather

than admit the truth, Defendants doubled down on their lies.  Defendants told investors that wholesalers had not only continued to "destock" Salix legacy products, but the Company had decided to reduce its inventory levels for <u>all products to seven to eight-weeks</u> – *i.e.*, levels that were closer to industry standards – and therefore wholesalers' destocking pattern would "normalize" at these reduced levels by the end of the year.

81.     On August 7, 2014, the Company reported financial results for the 2014 second quarter that were largely in-line with consensus estimates, and reaffirmed its full-year guidance of $1.6 billion in revenues.  Defendants reported that while demand for Xifaxan and Apriso had escalated – with prescriptions growing 23% and 25%, respectively – product revenue for Xifaxan and Apriso had declined as a result of "some inventory destocking in the wholesale channel during the second quarter of 2014."   To explain the revenue declines in the face of rising prescription rates, Defendant Derbyshire told investors that the Company had decided to reduce inventory levels for all of its products to seven to eight weeks, explaining that "the reality of keeping that three months of inventory" that Salix told investors it had maintained "is no longer going to be the case."   As Derbyshire explained, Salix was "obviously" in touch with its wholesale customers concerning inventory levels, and had determined that inventory levels for <u>all</u> Salix products would be significantly reduced by the end of the year, explaining that "from an overall portfolio standpoint I would say that's in the 8-week, or minus a little bit, range <u>for the entire channel</u>."

82.     Analysts accepted this explanation, and were reassured that Salix's inventory patterns would "normalize" once Salix wholesalers reached the new seven- to eight-week level that Defendants represented would be the new "reality" by the end of the year.  Defendants' false representations also convinced analysts that inventory levels for Xifaxan and other core Salix products were in fact currently maintained at an acceptable 10- to 12-week range, and would

continue declining over the next two quarters. For example, on August 7, 2014, analysts at Deutsche Bank credited the Company's representations, noting that:

> The issue and the main questions on the call was why the channel shrinking its weeks in inventory of the legacy Salix products but growing the inventory for the acquired Santarus products (mainly Uceris and Gulmetza).… [and the] message from SLXP after many questions seemed to be that the wholesalers are brining [sic] all inventory levels to 7-8 weeks for all of the products.  The channel issue is supposed to stabilize itself before the end of the year.  <u>Legacy Salix product had 12 weeks of channel inventory</u>.

83.    Similarly, Jeffries analysts accepted the Company's explanations concerning the inventory shifts, noting that:

> Following cancellation of Santarus' inventory management agreements (IMAs) earlier this year, Salix's product sales have been distorted by the ongoing normalization of channel inventories, which have led to significant variances relative to consensus projections.  On the Q1 call, mgt had expected wholesaler inventory to normalize in 2H14, with legacy Santarus inventories to fall in line with Salix's historical levels (10-12 weeks).   Following further discussions with wholesalers during the quarter, <u>mgt has now decided that ~8 weeks is a more appropriate level of inventory to have in the channel</u>.… Mgt now believes that product sales will finally track more in line with Rx trends in Q4.

84.    Accordingly, on August 7, 2014, Jeffries concluded, "we continue to see strong underlying Rx trends for key products and expect normalization of inventory levels by year end." Analysts from Canaccord were similarly reassured that the inventory movements were not a concern, stating in an August 8, 2014 report, "[p]er guidance, we expect the destocking to slow in 3Q and to 'normalize' (~8 weeks of inventory) in 4Q," and noting that it was "comforting to know that Salix has not changed its full-year guidance of $1.6 billion in revenue."

85.    Defendants' reassurances also had their intended effect on Salix's stock price.  As Defendants concealed the Company's true inventory levels and reported fraudulently inflated financial results throughout the Class Period, Salix's stock price more than <u>doubled</u>, rising from $73.31 per share on November 7, 2013 to $169.17 per share on September 23, 2014—a sharp

increase that strengthened their bargaining position with Allergan and inflated the massive golden parachute payments they stood to receive.

### H. Once Defendants Are Forced To Provide Confidential Due Diligence To Allergan, It Immediately Identifies Serious Problems With Salix's Wholesaler Inventory Levels And Calls Off The Acquisition

86.     As noted above, the Executive Defendants staunchly resisted allowing Allergan to conduct due diligence, refusing to provide Allergan with due diligence even after the company offered $180 per share for Salix in July 2014.  However, by September 2014, a number of factors converged which forced the Executive Defendants to acquiesce.

87.     By August 2014, it had become increasingly clear to the Executive Defendants that wholesalers were no longer willing to continue purchasing additional product as, unbeknownst to investors, the inventory levels for their products had reached absurd levels, and Defendants were running out of options.  By early November, Salix would be required to file second quarter financial results, and would be forced to report another sequential decline in Xifaxan revenues—a decline that would be impossible to credibly blame, yet again, on purported wholesaler "destocking."

88.     Allergan also had a limited timeframe in which it could complete any deal.  In April 2014, reports emerged that Valeant was launching a hostile takeover bid for Allergan.  Allergan had taken significant measures to defend itself from this hostile bid, going so far as to sue Valeant for insider trading in an attempt to scuttle a Valeant deal.  As the *Wall Street Journal* reported on August 19, 2014, Allergan's pursuit of Salix could make a takeover by Valeant prohibitively expensive and complex.  Allergan's vulnerable position also mitigated the risk that Allergan would focus on Salix's inflated inventory levels, as a distracted and desperate acquirer may not object as strongly to what it might find as another.

89.     While Allergan's defensive posture provided Salix with additional leverage in negotiations, the Company's window to complete the acquisition was narrowing as Valeant moved closer to being able to complete its takeover of Allergan.  Specifically, on August 22, 2014, Valeant filed litigation seeking to compel Allergan to hold a special meeting by no later than December 20, 2014 during which it would seek to replace Allergan's board with members who would vote in favor of the Valeant-Allergan deal—meaning that a Salix transaction, if it were to occur, would have to be completed before then.

90.     Given this deadline, on August 26, 2014, Allergan raised its offer price for Salix to $205 per share.  Allergan's bid now represented a premium of 30% over Salix's soaring stock price—and, under all of these circumstances, forced Salix to move the discussions forward.  Thus, two days later, on August 28, 2014, Salix and Allergan entered into a confidentiality, standstill, and exclusivity agreement—and Salix provided Allergan access to "an electronic data room" so that it could conduct due diligence.

91.     Allergan immediately discovered Defendants' fraud.  Just days after being granted access to Salix's data, Allergan discovered that the inventory levels for Salix's key products were shockingly high.  Accordingly, as set forth in a Schedule 14D-9 filed by Salix only well after the Class Period, on September 4, 2014 – less than one week after being granted access to Salix's electronic data room – Allergan informed Salix that it had serious "questions regarding the data provided by the Company with respect to in-channel inventory and advised the Company that [Allergan] needed to conduct additional due diligence."  The inventory backlog that Allergan identified was so significant that, on September 15, 2014, Allergan ceased its original deal discussions with Salix and confidentially "advised the Company that it had become concerned with the levels of wholesaler inventory of the Company's key products in the distribution channel."

Rather than continue with the terms Allergan originally proposed, Allergan provided Salix with a dramatically lower bid on September 23, 2014, dropping its offer by $30 per share—a reduction of approximately $2 billion in value specifically "as a result of its review of wholesaler inventory levels of the Company's key products."

92.     As the negotiations with Allergan stalled, the Company scrambled to seek out other potential suitors.  Desperate to complete a transaction before reporting its third quarter results, on the same day that Allergan lowered its bid, Salix began discussions to be acquired by Actavis, another specialty pharmaceutical manufacturer. On September 23, 2014, Actavis approached Salix and a week later proposed an offer of $178 to $180 per share with the consideration paid in 60-70% cash and the remainder in Actavis stock—well below Allergan's pre-due diligence $205 per share all-cash offer.  Two weeks later, on October 3, 2014, Salix agreed to provide Actavis with access to its electronic data room to conduct due diligence.  As later reported after the end of the Class Period in a March 16, 2015 *Bloomberg* article, just like Allergan, Actavis immediately uncovered the exact same inventory and accounting issues at Salix and terminated its offer six days later, on October 9, 2014.

93.     Days later, Allergan privately told Salix that, given the depth of the backlog, it would not be moving forward with any transaction until Salix came clean to investors about its inventory levels.  On October 13, 2014, Allergan CEO Pyott informed Defendant Logan that Allergan would not be proceeding with any transaction until after Salix disclosed its third quarter results, which were expected to be released in early November.  The next day after Pyott's warning, on October 14, 2013, Salix's Board of Directors directed the Board's Audit Committee to retain independent counsel and conduct a review of "the facts and circumstances raised with respect to the inventory levels of the Company's key products, including whether such facts and

circumstances raised any significant accounting concerns or impacted the Company's reported financial results."

## V.   THE TRUTH IS REVEALED

94.     After the close of the market on November 6, 2014, the last day of the Class Period, Defendants were finally forced to admit the truth about Salix's inventory levels.  On that day, Salix disclosed that, contrary to its prior statements, there was a stunning <u>nine months</u> of inventory of Salix's key products at wholesalers and that selling down that inventory would materially depress expected revenue for at least two years.

95.     Specifically, in a press release issued after the close of the market on November 6, Salix admitted that the Company's inventory levels for its five key drugs had soared to unprecedented levels of <u>nine months</u> for Xifaxan and Apriso, <u>seven months</u> for newly-acquired Glumetza, and <u>five months</u> for newly-acquired Uceris. The Company further admitted that – notwithstanding its prior statements regarding "destocking" at the wholesalers – wholesaler inventory levels for Xifaxan and Apriso had held "largely constant" throughout all of 2014, while levels of newly-acquired Santarus drugs Glumetza and Uceris had escalated by at least five months since November 2013.  The Company also admitted that its inventory levels were so elevated that it would take <u>more than two years to normalize its inventory levels</u>, stating that it would need until the end of 2016 to reduce wholesaler levels for Xifaxan, Apriso, and Uceris to three months.  The Company also reduced its full year guidance for 2014 from $6.16 per share on revenue of $1.6 billion to $5.20 per share on revenue of $1.4 billion—a 16% cut.

96.     In a feeble attempt to suggest that it lacked "visibility" into the wholesaler inventory levels of which it had repeatedly assured the market it possessed detailed knowledge, the Company announced that it was negotiating DSAs that would be operative by the beginning of 2015 in order to "improve its visibility into wholesaler levels." Although the Executive Defendants had

staunchly refused to enter into DSAs for years, immediately terminated Santarus' DSAs following that acquisition (in order to stuff the channel), and assured investors that it had full visibility without DSAs, the Company now tried to use the absence of these agreements as an excuse for its misconduct, stating that the "lack of [DSAs] with wholesalers had contributed to the Company's difficulty in forecasting revenue[.]"

97.     Salix further disclosed that the Company's CFO, Defendant Derbyshire, had "resigned," effective immediately.  Significantly, as the Company disclosed in a November 7, 2014 SEC filing, the Company required that Defendant Derbyshire sign a "resignation agreement" on November 5, 2014 that contained new "clawback" provisions that had not been included in any of his prior employment agreements with the Company.  These new clawback provisions enabled the Board to revoke the unvested compensation that Defendant Derbyshire had previously been awarded if the Board were to determine that Defendant Derbyshire "intentionally engaged in wrongdoing that has resulted, or would reasonably be expected to result, in material harm to [Salix]."  If the Board made that determination, then any outstanding equity-based awards would "immediately terminate and [Defendant Derbyshire] will not receive any shares of stock or any payment or consideration therefor."

98.     After the close of trading on November 6, the Company held a conference call with analysts to discuss these announcements and to disclose further material information. On the call, Defendant Logan disclosed that the Company was investigating the Executive Defendants' misstatements at the core of this case, stating that "[t]he audit committee of our Board of Directors, which is comprised solely of independent directors, has retained outside counsel and is conducting a review of issues related to Management's prior characterizations of wholesaler inventory levels."

99.     Analysts immediately recognized that these disclosures revealed that the Executive Defendants' prior representations were false.  On the call, analysts grilled Logan and the other Salix executives regarding the massive disconnect between Defendants' past statements regarding inventory levels and reality.  To avoid answering the myriad probing questions from analysts into their prior false statements, Logan and the other Salix executives cited to the Audit Committee investigation and refused to answer.  For example, a Piper Jaffrey & Co. analyst asked,

> So you've said historically that there were 10 to 12 weeks of Xifaxan inventory on hand. Now, we're being told nine months on hand. <u>How do you square that?</u>

> And I guess, the other way of asking that is, given your comments on inventory on the last couple of calls, <u>how can we now say that those comments were not misleading</u>? Thanks.

100.     Logan declined to respond, purportedly in order "to preserve the integrity" of the Audit Committee investigation.  In response, the analyst reiterated, "<u>I don't know how you square 10 to 12 weeks – was what you said historically – versus what we're being told today of nine months</u>."

101.     Similarly, a frustrated JMP Securities analyst asked how Defendants' statements over the prior two quarters regarding "destocking" could possibly be consistent with Defendants' disclosure that inventory levels were "stable" over 2014:

> Okay. And if I could just try the same question – just one last angle. And please, bear with me. The last two quarters, we've all been operating under the assumption that, based on the run rate you gave us and sales you reported and the two shortfalls we had the last two quarters, <u>that that indicated, quote unquote, destocking, right?</u> You had a run rate number. You reported a number that wasn't really consistent with that, and hence, <u>the difference being destocking – many weeks on several products, we thought</u>.

> But then <u>today, you're telling us inventory has actually been really stable at nine months for Xifaxan. So there hasn't been destocking the last two quarters</u>. What was happening the last two quarters, when your sales were significantly lower than the, quote unquote, run rate? Or when you investigated the difference, what did you learn six months ago in March – the first time that happened?

41

102.    In response, acting CFO Tim Creech again cited the Audit Committee investigation and the fact it retained outside counsel to assist in its "review of issues related to Management's prior characterizations of wholesaler inventory levels," stating that he was "unable to really comment" on the question.

103.    In response to these assertions, analysts also questioned how it was possible that the Company's past financial statements could have been accurate if the Company's executives had genuinely believed that Salix was carrying 10 to 12 weeks of inventory.  In other words, because inventory levels were a critical input in determining how much revenue and reserves to book, if Defendants had accurately accounted for revenue and the Company's reserves during the Class Period, then they had to have known that there was in fact nine months of backlog of the Company's key products.  For example, a Wells Fargo analyst asked:

> Just a question on the inventory. This may be simplistic, but if your past revenues are verified as correct and your current revenues and your current inventories as of today's press release are correct, then I guess the conclusion has to be that the past inventory levels that you've talked about in the past – for example, Xifaxan at 2.5 months – were incorrect. Am I thinking about that the right way?

Logan declined to respond, citing the Audit Committee investigation.

104.    During the call, the Company also confirmed that the inventory backlog had a severe negative impact on Salix's future revenue stream.  Given that the Company would have to sell down at least six months in excess inventory in its largest drugs by the end of 2016, acting CFO Creech confirmed in response to questions from analysts that the Company would lose six months of revenues on its key products—a figure that analysts later estimated to equal a $560 million negative hit to revenues over 2015-2016.

105.    The market reacted with astonishment.  Following the call, analysts immediately reported that the Executive Defendants' prior representations about inventory were false, and that these revelations had a material negative impact on the value of the Company.  For example,

according to a November 6, 2014 Piper Jaffray report, the "[d]epth of inventory mismanagement is hard to fathom.  <u>SLXP noted that there was an unconscionable 9 months of inventory on hand for Xifaxan550 and Apriso, and that simply does not square with previous commentary that there was around 10-12 weeks on hand</u>."  Indeed, Piper Jaffray explained that, even with Derbyshire's departure, "we are left with <u>a management team we no longer trust</u>" and that "it is not clear to us that the senior management changes should be or will be limited to the CFO position."  Similarly, UBS wrote in a November 6 report that "<u>we can't believe where inventory levels are for the key products. We haven't seen such levels in years</u>, and so it's easy for us to understand why the CFO is leaving."

106.    Leerink Partners issued a report stating that, while the Company's inventory levels were concerning, "<u>More concerning are inconsistencies in mgmt.'s characterization of the inventory situation</u>—the CFO resigned + current mgmt.'s decision not to address question relating to an audit."  Wells Fargo reduced its estimates for Salix going forward, stating in a November 7 report entitled "SLXP: Inventory Issues Lead To CFO Resignation and Acct'g Review" that "<u>Management characterization of wholesaler inventory levels appear to be the core issue</u>."  The Wells Fargo report went on to enumerate multiple unanswered questions from Salix's disclosure, including "[w]hy is there such a large difference between the inventory levels that SLXP quoted on prior earnings calls and the levels disclosed at Q3?"  Similarly, a November 7, 2014 Jefferies report observed that Salix "<u>disclosed startling levels of channel inventory that were inconsistent with previous mgt commentary</u>," while William Blair analysts concluded in a November 7 report that "<u>management had clearly been misleading investors on inventory levels</u>."

107.    JMP Securities placed Salix under review, stating that the extent of the channel stuffing was so extraordinary that it would have likely taken Defendants "<u>at least 2 years</u>" to create

a backlog that large, and it was now not even possible "to assess [Salix's] investment merits at this time:"

> Following the sudden departure of the CFO, disclosure of dramatically higher inventory levels that previously indicated, and Salix Pharmaceutical's audit committee retaining outside counsel and conducting an investigation, we no longer have confidence in the relevance of prior sales/profitability data and have less visibility on future fundamentals; thus we place our rating and price target under review until we gain further clarity.

> … Further, prior 1Q and 2Q misses had been attributed to wholesaler de-stocking; however, we now learn that these elevated inventories have been steady all year. This seems to imply that recent depressed sales may actually reflect pull-through demand, and that numbers prior to 1Q14 included significant channel fill.

> Regardless of how/why inventory levels ramped, a six-month surplus would take a long time to accumulate – likely at least 2 years – so we could surmise that 2012 and 2013 revenues were, perhaps, inflated beyond true demand by ~20%. Given SLXP's operating leverage, 20% lower sales would have yield 40% lower earnings.

> With 4Q14 guided even lower (with unclear explanation, in our view), we are doubtful that product "run-rates" provided by management are credible . . . . we believe there is too much uncertainty around the company's near-term future (e.g., legal risks, leadership uncertainty, M&A disruption) to assess its investment merits at this time.

108.    While the Company admitted that the excess six-month inventory backlog had existed for all of 2014, the Company's own financial history makes it clear that this buildup did not occur overnight and existed at least as of the beginning of the Class Period in November 2013. During the fourth quarter of 2013 (*i.e.*, the three months leading up to the point when the Company admittedly had nine months of inventory, or at least three times as much as it claimed to have) Salix's revenue for Xifaxan increased by $10 million (6%), while the Xifaxan prescription run rates increased by $70 million (11%). If Salix had been stuffing the channel with six months of inventory over just the fourth quarter of 2013, the Company would have either reported an enormous spike in Xifaxan revenue or an extreme slowdown in prescription demand for the quarter. As Salix reported, however, prescription demand was slightly ahead of revenue –

indicating that inventory likely <u>declined</u> slightly over those three months during the fourth quarter 2013, thus demonstrating that the channel had already been stuffed.

109.    In response to the revelation of Defendants' fraud, Salix's stock price precipitously declined.   On November 7, 2014, the first trading day after Defendants' revelations, the Company's stock price plummeted 34% in a single trading session on extraordinarily high trading volume, falling from a close of $138.55 on November 6, 2014, to a close of $91.47 on November 7, 2014, and causing substantial losses to investors.

## VI.    POST-CLASS PERIOD EVENTS AND ADMISSIONS

110.    Events subsequent to Salix's November 6, 2014 disclosure have provided further confirmation that the Executive Defendants knew the truth about the Company's wholesaler inventory levels throughout the Class Period and deliberately misled investors.

### A.    Further Confirming the Material Negative Impact of the Fraud, Salix Withdraws Its Guidance for 2014, Slashes Guidance for 2015 and CEO Logan Also "Retires"

111.    On December 16, 2014, Salix filed a Form 8-K with the SEC providing information on the Company's effort to reduce inventory levels to the ranges Defendants falsely represented had been maintained during the Class Period.   The Company announced a new plan to work with Salix's "principal pharmaceutical wholesalers" to accelerate the reduction of wholesaler inventory levels to approximately three months for Xifaxan, Apriso and Uceris and one month for Glumetza by the end of 2015, or one year earlier than the Company had previously told investors.

112.    Salix also reported that the Company was withdrawing its previously-issued guidance for the fourth quarter of 2014 and full year 2014 given that it could sell only minimal amounts of Xifaxan, Apriso and Uceris during the fourth quarter of 2014.   In addition, the Company announced new guidance for 2015 based on the lower sales that could be achieved because the Company was forced to reduce its inventory levels closer to those it represented

existed throughout the Class Period.  In a sharp departure from the $1.6 billion the Company claimed was projected for 2014, the Company's revised 2015 guidance projected revenues of $1.25 to $1.35 billion in revenue—a 25% decline from the prior year.

113.    Despite these steps to accelerate the destocking process, investors remained wary of the Company's financial performance in light of the shocking disclosures in November.  As analysts from William Blair explained in a December 16, 2014 report, "[w]hile we believe investors will appreciate the expedited work-down, the 3 months of inventory still remains above industry norms and above the 4-6 weeks of inventory the company had been suggesting was held in the channel prior to October's disclosure."  Moreover, as William Blair concluded, the Executive Defendants must have known about the backlog given that "our discussions with other top management in the field have noted the difficulty of building 9 months of wholesaler inventory in the channel without broad knowledge internally at the company."

114.    Then, on January 5, 2015, Salix announced that Defendant Logan also would be "retiring" from Salix and stepping down as a director at the end of January.  As with Defendant Derbyshire, Salix required Defendant Logan to sign a "retirement agreement" on December 30, 2014 that contained similar clawback provisions to those set forth in Defendant Derbyshire's resignation agreement.  Similar to Defendant Derbyshire's agreement, these new clawback provisions – which had not appeared in any of Defendant Logan's prior employment agreements with Salix – enabled the Company's Board to revoke unvested equity compensation upon the Board's determination that she had engaged in "intentional[] wrongdoing."

115.    Given Defendant Logan's intimate involvement in Salix's inventory problems, the market was not surprised that she had "resigned."  For instance, Piper Jaffray noted in a January 5 report that "given the depth of the inventory mismanagement, along with previous commentary

regarding inventory levels that simply did not jibe with reality, we had a difficult time envisioning how Ms. Logan's position could be tenable going forward" and that her departure "sets the stage for [an] eventual sale of the company."   Analysts from Gordon Haskett likewise reported on January 6 that, given that Logan "was manning the wheel when SLXP confessed in November that it was stuffing inventory into the wholesale channel…. it shouldn't come as a big surprise" that she was leaving, and suggested the move could be part of an effort to "draw buyers out" for a sale of the Company.

### B.  Salix Restates Its Financial Results

116.    Next, on January 28, 2015, the Company announced that the Audit Committee had determined that Salix's financial statements for the full year of 2013 and for the first three quarters of 2014 (the "Restatement") were materially misleading when issued and would have to be restated.   The Company further announced that its previously issued financial statements and disclosures, as well as related communications for these periods, should no longer be relied upon. Under GAAP, a restatement of previously issued financial statements is an admission that the financial statements were materially misstated when issued.  *See* ASC 105-10-05-6 and ASC 250-10-50-7 (recognizing that errors triggering a restatement are material).

117.    The Company's Restatement corroborated the fraud alleged herein.   In the Restatement, the Company admitted to engaging in several classic channel stuffing practices that led the Company to materially misstate its financial statements.  First, as noted above at ¶¶67-70, the Company admitted to fraudulently accounting for $8.5 million worth of "marketing services" the Company purchased from the wholesalers, which, in reality, were simply *quid pro quo* transactions to induce the wholesalers to purchase more product, in violation of FASB 605-50.

118.    Second, the Company admitted that it had improperly prematurely recognized revenue for certain transactions, which allowed it to pull revenues forward for its key drug

47

products.   Specifically, for certain transaction governed by "FOB Destination contracts," the Company prematurely recognized $30 million in revenue by recognizing the revenue <u>before</u> the shipments of drugs had been delivered to wholesalers.   This violated ASC 605-10-S99, which required Salix to recognize revenue for transactions governed by FOB Destination contracts upon delivery, not prior to delivery.

119.   <u>Third</u>, Salix admitted in the Restatement that it overstated its revenue for the fourth quarter of 2013 by understating its reserve for product returns by $8.2 million.   The Company's Restatement correcting this misstatement doubled the Company's 2013 provision for returns related to prior period sales from $7.5 million to $15.6 million, and reduced revenue by $8.2 million.

120.   The Restatement (which was released on March 2, 2015) restated Salix's net income, earnings per share, and net product revenue as follows:

|  | 2013 FY Reported | Restated | 1Q 2014 Reported | Restated | 2Q 2014 Reported | Restated | 3Q 2014 Reported | Restated |
|---|---|---|---|---|---|---|---|---|
| **Net Income** | $143 | $130.8 | ($43.9) | ($34.57) | $3.3 | $0.418 | ($88.6) | ($93.108) |
| **Diluted EPS** | $2.18 | $1.99 | ($0.69) | ($0.55) | $0.04 | $0.1 | ($1.39) | ($1.46) |
| **Net Product Revenue** | $933.8 | $913.8 | $384.4 | $402.9 | $382 | $375.5 | $354.7 | $341.5 |
| *All figures in millions* | | | | | | | | |

121.   The Restatement also revealed material weakness in Salix's internal controls. Specifically, Salix admitted that:

> [M]anagement has concluded that we did not maintain effective internal control over financial reporting as of [year-end 2013 and the first three quarters of 2014] because we did not (1) establish and maintain adequate procedures and controls for (a) product returns and for the communications between our sales and accounting/finance functions to record agreed upon returns and (b) the recognition of revenue for sales to customers with FOB Destination shipping terms, (2) comply with established policies to properly obtain, evaluate, review and approve

agreements with customers and (3) periodically review and assess our account classification policies in light of changes in our organization, management and personnel over time, and the effect of non-routine transactions.  These control deficiencies resulted in the restatement of our audited consolidated financial statements as of December 31, 2013…and the restatement of the unaudited quarterly consolidated financial information for the quarters ended March 31, 2014, June 30, 2014, and September 30, 2014.

122.    While the Restatement showed that Salix materially misstated its financial results during the Class Period, the fact that the Company avoided a larger restatement while channel stuffing to such a massive degree is strong evidence of Defendants' scienter in fraudulently misrepresenting the Company's wholesaler inventory levels to investors.  For example, as noted above, the Company's stated policy for calculating its allowance for product returns depended heavily on the Company accurately assessing the amount of inventory outstanding.  All things being equal, if there is more product that is sitting unsold at the wholesalers, there is more product that could be returned to Salix or be subjected to price adjustments, and the Company's allowance for product returns and adjustments should increase commensurately.  Accordingly, when the Company reviewed its allowances for product returns, chargebacks, rebates and other price incentives in connection with the Restatement, investors could reasonably expect that the Company's historical allowance figures would materially increase to account for the Company having triple the amount of inventory outstanding (thus decreasing the Company's historical income figures on a dollar-for-dollar basis).

123.    Remarkably, however, except for the specific changes to account for the transactions noted above at ¶¶117-19, the Company (and E&Y) did not restate the Company's allowance for product returns.  If Salix was, as a general matter, appropriately accounting for product returns on a stunning nine months of inventory, this means that the Company's executives knew of the Company's inventory levels and carefully calibrated the product return reserve so that the Company did not under-reserve for these massive inventory levels.  Stated another way, the

Company kept the equivalent of two sets of books: one that contained the wholesale inventory levels it provided to investors, and another with the more accurate inventory levels it used to calibrate its reserves.

124.   The Company also apparently carefully and skillfully avoided other channel-stuffing practices during the Class Period that typically lead to larger restatements of revenue, including, for example, offering extended payment terms to wholesalers.  GAAP requires that companies reduce revenue when they extend payment terms – such as the payment due date – in order to induce wholesalers to purchase excess inventory.  ASC 985-25 states that in order for a Company to properly recognize revenue, the fee to be paid must be fixed or determinable and collection of the fee must be probable.  Extended payment terms indicate that a fee is not fixed or determinable and collectible because the possibility that the customer will seek a refund or concession increases as payment terms become longer.  The Executive Defendants, knowing that any extension of payment terms would require them to reduce revenue, keenly steered clear of engaging in those practices during the Class Period.  In short, the fact that the Executive Defendants reserved for nine months' of inventory and avoided pitfalls that would have triggered a larger restatement demonstrates that they were fully aware of Salix's true inventory levels during the Class Period and engaged in a host of intentional practices to channel stuff while attempting to reduce the impact on the Company's financial statements by skillfully avoiding GAAP rules intended to prevent channel stuffing.

125.   Analysts viewed the Restatement as confirmation that Defendants had deliberately engaged in skilled channel stuffing and made false and misleading representations to investors concerning the Company's inventory levels and the Company's true financial prospects throughout the Class Period.  For example, Sterne Agee stated in a January 28 report that "today's restatements

50

indicates that the previous management team did make misleading comments regarding distribution channel inventory as an ~1% change in reported revenues does not equate to as much as a tripling of estimated channel inventory." Piper Jaffray similarly noted in a report that day that while the restatement appeared "modest" in light of the extraordinary size and extent of the inventory backlog, "[t]o be clear, we believe that SLXP's former CEO and CFO did make repeated public comments regarding inventory levels that simply put were not reflective of reality."

126.    Notably, the Audit Committee's investigation into Salix's and the Executive Defendants' statements to investors concerning wholesaler inventory levels was still not complete at the time of the Restatement on January 28, 2015. Salix's 2014 Form 10-K filed on March 2, 2015 stated that while the Audit Committee had completed its review of Salix's accounting issues, its review of the Defendants' statements concerning wholesaler inventory was ongoing. As of the filing of this Complaint, the Company has not disclosed the results of this review.

127.    Salix also revealed in its 2014 Form 10-K filed on March 2, 2015 that the SEC was conducting an investigation into Salix's disclosures regarding its wholesaler inventory levels and accounting practices. Specifically, Salix disclosed that it had received information requests from the SEC and expected to receive subpoenas for documents and testimony during the course of the SEC's investigation, and had already provided relevant documents to SEC Enforcement Staff.

C.    **Valeant Acquires Salix And Further Confirms That Defendants Had "As Close To Perfect Information As You Could Have" About Salix's True Wholesaler Inventory Levels**

128.    Weeks after the November 6 disclosure revealing the Company's true inventory levels, Salix's Board of Directors decided to seek out potential suitors because the reduction of future revenue associated with reducing Salix's massive inventory levels had contributed to a "liquidity risk" that the Company would be unable to pay debt due in May 2015. One such suitor was Valeant. In contrast to Salix's prior denials of Allergan's requests to perform due diligence

during the Class Period, Salix now readily provided potential suitors access to its electronic data room following disclosure of the Company's true inventory levels.  Notably, Salix provided access to its electronic data room to Valeant before Valeant had proposed any price for a potential offer.  Salix agreed to permit Valeant to perform due diligence on January 21, 2015, just one day after Valeant indicated to Salix that, "if Valeant were to pursue a potential transaction, it expected to pursue one on an all-cash basis and would be interested in moving quickly."

129.   Following negotiations with Valeant and other potential suitors, on February 22, 2015, Salix announced that it would be acquired by Valeant for $158 per share in cash – an amount that was approximately 25% or $3 billion less than Allergan had been willing to pay before it discovered Salix's inventory backlog.  Xifaxan was the main driver of Valeant's interest in Salix, as well as the expected approval for Xifaxan's use in the treatment of IBS.

130.   Endo International PLC then launched a surprise bid for Salix on March 11, offering $175 a share in cash and in stock.  In response, Valeant increased its bid to $173 per share in cash.  After a series of negotiations, Salix agreed to Valeant's revised offer, and the two companies announced Salix's acceptance of the revised offer on March 16, 2015.

131.   In announcing the proposed acquisition on February 23, 2015, Valeant disclosed additional facts about the extent of the impact of Salix's inventory backlog on the Company's business and the Executive Defendants' knowledge of the Company's inventory levels during the Class Period.  Valeant CEO Michael Pearson told investors that Valeant had "conduct[ed] extensive due diligence on Salix inventory estimates, its standalone inventory remediation plan, as well as the associated potential litigation and regulatory exposure" and determined that the "net impact of this on 2015 revenue is expected to be greater than $500 million"—a figure that is larger than the total profits that Salix had reported during its existence as a public company.

132.    Pearson also confirmed on that same conference call that the Executive Defendants had ready access to the precise inventory levels for Salix products throughout the Class Period, and that any ignorance of those levels could only have been willful.  In response to an analyst's question regarding how Valeant became comfortable with its due diligence and its valuation of Salix's business given the inventory backlog disclosed in November, Pearson stated:

> In terms of inventories, we feel very good about the due diligence we did.  It was actually pretty straightforward.  We went in and we actually got our financing and got the wholesale reports.  We know precisely how much of each product each SKU is in the channel and in detail.  And so, I don't want to say we had perfect information, but about as close to perfect information as you could have in terms of what the inventory situation is.

### D.    Salix's Board Determines That Logan And Derbyshire "Intentionally Engaged In Wrongdoing" That Resulted In "Material Harm"

133.    Despite their culpability for the fraud alleged herein, as a result of the change in control provisions in their employment contracts, Defendants Logan and Derbyshire were poised to cash in on tens of millions of dollars in golden parachute payments that were triggered by the Valeant acquisition.  A Schedule 14D-9 amendment that Salix filed with the SEC on March 18, 2015 disclosed that while Defendant Logan had "retired" from the Company and Defendant Derbyshire had "resigned," they were slated to receive approximately $38 million in compensation because of the Merger, with Logan garnering over $29 million and Derbyshire receiving over $9 million.

134.    On March 18, 2015, news reports began to circulate concerning the enormous payments these Defendants were slated to receive upon the closing of the Valeant merger, notwithstanding their misconduct.  In response, on March 24, 2015 – just a week before the Valeant merger was set to close, at which point Logan's and Derbyshire's golden parachute equity awards would vest – the Salix Board took the extraordinary action of clawing back these payments by cancelling all unvested awards.

53

135.     Specifically, in an Amendment to the Schedule 14D-9 filed on March 26, 2015, Salix reported under the header "Merger-Related Compensation" that:

> On March 24, 2015, the Board made certain determinations under Carolyn Logan's Retirement Agreement, dated December 30, 2014, and Adam Derbyshire's Letter Agreement, dated November 5, 2014, as a result of which the continued health insurance coverage provided to Ms. Logan and Mr. Derbyshire under their respective agreements will be terminated, and <u>all outstanding unvested Company equity awards held by Ms. Logan and Mr. Derbyshire are immediately terminated, without any shares of stock or any payment or other consideration therefor</u>.

136.     The Board's decision to cancel Logan's and Derbyshire's unvested equity-based awards – and deprive them of millions of dollars in compensation – was an unequivocal indictment of these Defendants, and yet another confirmation that they had intentionally misled investors about Salix's wholesaler inventory levels.  As noted above, under the "clawback" provisions set forth in Logan's retirement agreement and Derbyshire's letter agreement, in order to effectuate these clawbacks, the Board was required to determine "in good faith [] that, … [they] <u>intentionally engaged in wrongdoing that resulted, or would reasonably be expected to result, in material harm to [Salix]</u> …, or to the business or reputation of [Salix]."

## VII.     ADDITIONAL ALLLEGATIONS OF SCIENTER

137.     Numerous facts, considered collectively, demonstrate that Salix and the Executive Defendants knew they were misrepresenting Salix's wholesaler inventory levels or, at minimum, acted with severe recklessness. <u>First</u>, as noted above, Salix's Board has determined that Defendants Logan and Derbyshire, the longstanding two most senior officers during the Class Period, engaged in intentional wrongdoing in misrepresenting Salix's wholesaler inventory levels for its core products.  Specifically, one week before Logan's and Derbyshire's equity awards were due to vest as a result of the Valeant acquisition – thus providing Logan with over $29 million and Derbyshire with over $9 million – the Salix Board took the extraordinary step of clawing back their unvested equity compensation.  In order to claw back these payments, the Board was required to determine

that Logan and Derbyshire "intentionally engaged in wrongdoing that has resulted, or would reasonably be expected to result, in material harm to [Salix]." The Board's determination that Logan and Derbyshire "intentionally" misrepresented Salix's wholesaler inventory levels to investors is extraordinary evidence of scienter.

138.    Moreover, Defendant Logan and Derbyshire did not voluntarily "resign" or "retire" from their positions, but were in fact forced to leave the Company as a result of their role in the fraud alleged herein. Given that Defendants Logan and Derbyshire stood to receive a cash payment equal to three times their annual salary and three times their maximum annual bonus if they were to leave Salix within one year after a change in control, it is implausible that these two executives would voluntarily "resign" or "retire" before Salix was acquired, thus making themselves ineligible to receive these payments. Rather, the far stronger inference is that Defendants Logan and Derbyshire were forced to leave the Company because Salix concluded that they had committed wrongdoing—a fact that was subsequently confirmed by the Board of Directors' determination to claw back their compensation after finding that they had engaged in "intentional[] wrongdoing."

139.    Second, although Defendants Logan and Derbyshire's golden parachute payments were ultimately clawed back as a result of their intentional misconduct, Defendants' entitlement to these massive payments provided them with a concrete and specific motivation to create the false impression of increased growth for Salix by channel stuffing its core products. By artificially inflating the true wholesaler demand for Salix's products, Defendants made the Company as attractive as possible to a potential acquirer, thereby bringing them closer to achieving their change-in-control payments—which is, in fact, precisely what occurred when Allergan sought to acquire Salix for a huge premium over its stock price. Moreover, once Allergan emerged as a

55

potential acquirer, Defendants were highly motivated to conceal the inventory crisis they had created in order to prevent the truth about Salix's bloated inventory levels from being discovered by the investing public or through Allergan's due diligence.  Again, this is exactly what occurred: following Allergan's expressions of interest and premium all-cash offer for Salix shares, Defendants repeatedly rebuffed Allergan's attempts to conduct even "high level" due diligence, while making a series of public misrepresentations designed to convince the market that Salix's wholesaler inventory was within normal ranges.

140.    Third, the information showing Salix's true inventory levels was clearly set forth in Salix's own books and records, so clearly in fact, that Allergan and Actavis found it within days of being permitted to conduct due diligence.  As noted above, less than one week after being granted confidential access to Salix's electronic data room, Allergan privately expressed serious "questions regarding the data provided by the Company with respect to in-channel inventory," and soon thereafter ceased discussions with Salix and confidentially "advised the Company that it had become concerned with the levels of wholesaler inventory of the Company's key products in the distribution channel."  Similarly, less than one week after Salix gave Actavis confidential access to its electronic data room to conduct due diligence, Actavis uncovered the exact same inventory and accounting issues and terminated its offer to acquire Salix.  Given that two separate companies discovered Salix's true inventory levels within days of being granted access to internal Salix information, there is a strong inference that Defendants, who had access to this same information for their entire careers at Salix, knew Salix's true inventory levels.  At a bare minimum, any purported ignorance of these facts would amount to willful blindness.

141.    Fourth, further corroborating the fact that the Company's own internal data accurately reflected the Company's true wholesaler inventory levels, Defendants repeatedly

assured investors that they possessed detailed personal knowledge of wholesaler inventory levels based on this internal Company data.  For instance, on the August 7, 2014 conference call, an analyst asked Defendant Derbyshire, "how do you actually know [inventory levels] with specificity without IMAs?"  Defendant Derbyshire stated that "we have visibility in the inventories because we know what we ship, we know what pulls through, we know what returns are."  In other words, Salix's CFO, who was responsible for overseeing the Company's wholesaler inventory levels, flatly stated that the Company kept close track of those levels through detailed and reliable internal data.  Given that the Executive Defendants admitted that they possessed this data and purported to review it on at least a quarterly basis, there is a strong inference that they knew what Salix's actual wholesaler inventory levels were at the time they made their material misrepresentations.

142.  Fifth, throughout the Class Period, the information contradicting Defendants' public statements was not only set forth in the Company's own data, but also readily available in reports from wholesalers. Specifically, as noted above at ¶¶43-45, Salix was able to, and did, receive reliable non-public reports concerning inventory levels from its wholesalers on at least a quarterly basis.  The information concerning Salix's wholesaler inventory levels was so easily accessible that Valeant swiftly obtained it in connection with its acquisition of Salix, and so exact and reliable that Valeant's CEO said it was close to "perfect."  As Valeant's CEO stated after the Class Period, obtaining the information showing Salix's true inventory levels "was actually pretty straightforward.  We went in and … got the wholesale reports.  We know precisely how much of each product each SKU is in the channel and in detail.  And so, I don't want to say we had perfect information, but about as close to perfect information as you could have in terms of what the inventory situation is."  At the end of the Class Period, Salix acting CFO Tim Creech confirmed

that the wholesale reports provided accurate levels of inventory for Salix's products.  During the November 6, 2014 call disclosing the fraud, Creech stated that the Company had "confidence in the numbers [concerning the nine-month inventory backlog] we've given you today" because Salix had obtained "inventory data from our major wholesalers," and "compared that to our estimate, which was based on total inventory estimates based on internal shipments," and "those numbers are consistent." Given the ease with which Salix and Valeant obtained near-perfect information on Salix's wholesaler inventory levels through wholesale reports, there is a strong inference that Defendants had this same information during the Class Period.  At minimum, any failure by Defendants to acquire this information could only have been willful.

143.   <u>Sixth</u>, throughout the Class Period, Defendants engaged in a series of machinations designed to inflate, stage-manage, and conceal the Company's true inventory levels.  For instance, when wholesalers began to cut their orders for Xifaxan and Apriso in the first half of 2014, Defendants attempted to stimulate artificial demand by announcing price increases.  When those efforts failed to induce wholesalers to maintain their purchases of Xifaxan and Apriso in light of the astonishing amount of inventory already in the channel for these drugs, Defendants sought to offset faltering demand for Salix's core products by inflating the inventory levels for their newly-acquired Santarus products.  Immediately after acquiring Santarus, Defendants announced historic price increases for the Santarus products, and spent millions of dollars on so-called "marketing" fees to wholesalers—all in a successful effort to inflate inventory levels for the Santarus products far beyond true demand.  The fact that Defendants engaged in a numerous maneuvers to orchestrate artificial demand for the suite of Salix's core products is highly indicative of fraudulent intent at the Company's highest levels.

144.    Seventh, when analysts raised questions about shifts in Salix's revenues during the first and second quarters of 2014, Defendants concocted a series of false and misleading explanations to hide their scheme.  For instance, following the Santarus acquisition, analysts questioned why revenues for Xifaxan and Apriso were faltering.  Defendants explained away these declines by falsely asserting that wholesalers were "focused" on building inventory for newly-acquired Santarus products and were "destocking" Salix's core products to below their typical levels.  After the Class Period, analysts widely recognized that this excuse was untrue, and concluded that, in reality, demand for these products had faltered because the wholesaler channel was already stuffed to the extreme and wholesalers were no longer able to keep buying these drugs at prior levels.  Similarly, when analysts questioned why surges in revenue for Glumetza and Uceris far outpaced demand in the first quarter of 2014, Defendants again fabricated a false explanation.  Defendants falsely claimed that these surges were due to the "razor thin" inventory levels that Santarus had previously maintained for these products, and wholesalers' resulting desire to bring their inventory levels up to a normal range—when, in fact, these revenue surges were due to Defendants' channel stuffing scheme.  Likewise, when the revenue declines for Xifaxan and Apriso continued in the second quarter of 2014, raising additional questions from analysts, Defendants pretended that wholesalers had decided to adjust inventory levels down to just eight weeks.  The fact that Defendants made up a series of lies when analysts questioned about these revenue trends is further proof of fraudulent intent.

145.    Eighth, the Company's admissions in the Restatement further support a strong inference of scienter.  As noted above, the Restatement further confirms that Salix engaged in several classic channel stuffing tactics.  For example, Salix paid millions of dollars in marketing fees that were really *quid pro quo* arrangements with wholesalers to take on more product, offered

price discounts to its wholesalers that were <u>two to four times</u> greater than industry standards, and prematurely recognized revenue under FOB rules—well-established means of channel stuffing. At the same time, Salix's most senior officers carefully and skillfully avoided additional GAAP violations that would have required an even larger Restatement. Notably, for virtually the entire Class Period, Salix accurately calculated its product return reserves <u>based on nine months of wholesaler inventory</u>—thus confirming that Derbyshire and Logan were well aware that this inventory backlog existed. And Salix steered clear of extending payment terms to its wholesalers, practices that would have required the Company to restate its revenues to a greater degree than it did. The fact that Salix: (1) engaged in classic channel stuffing practices; (2) yet accurately calculated its reserves based on nine months' worth of inventory for its key products; and (3) scrupulously avoided certain clear triggers for a larger restatement, demonstrate that the Company's most senior executives were well aware of the Company's inventory levels, and were consciously taking steps to minimize the size and frequency of their GAAP violations. Indeed, analysts reported that the Restatement confirmed that Defendants had deliberately attempted to avoid detection of their channel stuffing, writing that, while the Restatement appeared limited in size, the "restatement[] indicates that the previous management team did make misleading comments to investors regarding distribution channel inventory."

146.   <u>Ninth</u>, the Company's wholesaler inventory levels were one of its most critical metrics, a subject of intense market scrutiny and concern, and a topic on which Defendants made numerous public statements during the Class Period. As noted above, the Company identified its wholesaler inventory levels as one of its "most critical accounting policies and estimates upon which [the Company's] financial status depends." Given the importance of this metric to the Company's value and the value of its stock, analysts were intensely focused on this metric both

before and during the Class Period, repeatedly asking about these inventory levels, and questioning the causes of any shift in inventory or underlying demand. Defendants, who were the Company's highest ranking executives, made a litany of statements about these subjects in response to analyst questions, and were well aware that analysts were relying on the veracity of their statements. For instance, when Defendants Logan and Derbyshire falsely reassured analysts that the revenue trends in the first half of 2014 were due to "destocking" of Xifaxan, and wholesalers' desire to compensate for the "razor thin" inventory levels previously maintained for Santarus products, Defendants were obviously aware that analysts widely accepted these explanations in their ensuing reports. In light of the fact that Defendants made numerous reassuring statements to the market on a topic of immense importance to the Company's value, it was incumbent on them to ensure they knew the true facts concerning the subject of which they spoke. While there is a strong inference that Defendants knew the true facts, even if they purportedly lacked knowledge of the Company's inventory levels, their supposed ignorance would amount to severe recklessness at a minimum.

147.    Tenth, Defendants Logan and Derbyshire were two of the longest-serving senior executives at the Company, and were intimately involved in overseeing the Company's inventory management and addressing the Company's wholesaler inventory levels on investor conference calls for years prior to the beginning of the Class Period. Defendant Logan was employed by Salix for nearly 14 years, and served as its CEO for 12 of those years; Defendant Derbyshire held the position of Salix CFO for nearly 15 years. In those roles, Defendants Logan and Derbyshire were not only responsible for managing the Company's relationships with Salix's three primary wholesalers, but also repeatedly addressed analyst and investor questions concerning the Company's inventory levels for its key products. For example, Defendant Logan addressed the

Company's inventory levels during quarterly earnings calls dating back to Xifaxan's initial launch, telling investors on a May 11, 2005 conference call, for example, that Salix maintained close relationships with its wholesaler "partner[s]" that allowed it to "manage our inventory levels." Similarly, and by way of illustration, Defendant Derbyshire addressed analyst questions concerning wholesaler inventory levels during an August 9, 2005 conference call, explaining that "trade inventory is three months" for Xifaxan; reporting on a February 28, 2007 conference call that Xifaxan inventory levels were between "8 to 10 weeks"; disclosing during a November 8, 2010 conference call that Xifxan "inventory levels will flatten out at roughly the 10 to 12 week level that we like to keep in the channel," and reporting on August 9, 2010 that Salix would maintain 10- to 12-week inventory levels for Xifaxan, which is "where the majority of our products are." Defendant Logan and Derbyshire's extensive experience addressing the inventory levels for Xifaxan and other key Salix drugs on a regular, recurring basis with its wholesalers and investors for over a decade prior to the beginning of the Class Period provides a strong inference that they knew the true inventory levels during the Class Period – at a time when analysts were intensely focused on those levels – or, at minimum, were severely reckless.

148.    Eleventh, as noted above, Defendants understated Salix's Wholesaler inventory levels by enormous amounts. While Defendants represented that there was between 10 to 12 weeks of inventory, in reality, there was nine months of inventory for the Company's key products—an amount which was approximately 300% larger than Defendants claimed. Further, in August 2014, Defendants falsely stated that inventory levels were being reduced to approximately seven to eight weeks, when, in reality, they knew that there was nine months' of inventory, an amount more than 400% greater than what they had represented. After the truth was revealed, analysts reported that the size of the inventory backlog was extraordinary, calling it "astoundingly high" and

"unconscionable," reporting that they "can't believe" it, and noting it was so large that it would have taken "at least 2 years" to create. The backlog was so huge that eliminating it was expected to cost the Company more than $500 million in sales—an amount that was greater than the profit that Salix had reported during its entire existence as a public company. Given the enormity of the channel stuffing and backlog, the length of time it took to create, and the highly material negative impact it had on the Company's revenues, it is extremely likely that the Executive Defendants were well aware of it during the Class Period. Indeed, as analysts noted, "our discussions with other top management in the field have noted the difficulty of building 9 months of wholesaler inventory in the channel without broad knowledge internally at the company."

149.   Twelfth, the Executive Defendants steadfastly refused to enter into DSAs prior to or during the Class Period—even though the Company's own auditor concluded as early as 2008 that these agreements would "reduce the risk of accounting issues related to 'channel stuffing'" by helping companies to "maintain inventory levels that are consistent with the underlying demand." As Defendants' conduct during the Class Period makes clear, they refused to enter into DSAs precisely because they did not want their ability to stuff the channels for Salix's most important drugs to be curtailed. And after Salix acquired Santarus, the Executive Defendants promptly cancelled the DSAs that Santarus had in place—a maneuver that was necessary to free them to stuff the channels for Santarus's key drugs, which is exactly what they did during the first half of 2014. The fact that the Executive Defendants refused to enter into – and actively eliminated – agreements that would have constrained their ability to channel stuff is additional compelling evidence of fraudulent intent.

150.   Finally, throughout the Class Period, three wholesalers accounted for nearly all of Salix's inventory. Clearly, this is not a case where reaching out to these parties was difficult or

time-consuming; all the Executive Defendants had to do to determine inventory levels at these wholesalers was contact three entities.  This fact further demonstrates the ease with which Defendants could have (and did) discover the information showing the Company's true wholesaler inventory levels.

## VIII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

151.   Throughout the Class Period, Defendants carried out a scheme to mislead investors about the Company's wholesaler inventory levels, and its financial results and condition.  Even as analysts raised specific and pointed questions concerning the Company's inventory levels following the Santarus acquisition, Defendants continued to reassure investors that inventories for Salix's products were at appropriate levels and that demand for them remained high.  In regular press releases, conference calls and filings made with the SEC, Defendants made materially false and misleading statements and omissions concerning: (i) wholesaler inventory levels of Salix's key products; (ii) the Company's financial results, including its net income, net product revenue, and compliance with GAAP and SEC rules; and (iii) the Company's internal controls.

### A.      Materially False And Misleading Statements And Omissions Concerning the Third Quarter of 2013

#### i.      Third Quarter 2013 Press Release and Form 8-K

152.   On November 7, 2013, Salix issued a press release entitled "Salix Pharmaceuticals Reports 3Q2013 Results" ("Third Quarter 2013 Press Release").  That same day, the Company filed with the SEC a Form 8-K ("Third Quarter Form 8-K"), which Defendant Derbyshire signed, that included the press release as an exhibit, reporting third quarter 2013 financial results, including net income of $47.3 million, earnings per share of $0.71, and net product revenue of $238.2 million, a 29% increase compared to the third quarter of 2012.  Additionally, the Company reported net product revenue of $165.9 million for Xifaxan and $38.1 million for Apriso.

64

153.    As a result of Defendants' channel-stuffing scheme set forth above at ¶¶49-72, this statement was materially false and misleading.  It was materially false and misleading for Salix to report its financial results and net product revenues of $165.9 million for Xifaxan and $38.1 million for Apriso while failing to disclose that these reported revenues had been generated by sales to wholesalers that were far in excess of demand and by creating wholesaler inventory levels that were as high as nine months, which were "astoundingly high" for the industry and far greater than Defendants had represented.

### ii.    Third Quarter 2013 Conference Call

154.    On November 7, 2013, Defendants Salix, Logan and Derbyshire held a conference call with investors to discuss Salix's reported 2013 third quarter results, during which they falsely represented the Company's financial results and its wholesaler inventory levels.  In response to an analyst's question regarding whether anything had changed during the quarter in terms of inventory levels or demand for Xifaxan, Defendant Derbyshire stated that "demand for the quarter was about $159 million.  Of course we shipped $165 million, $166 million so it was a little bit ahead of demand."

155.    As a result of Defendants' channel-stuffing scheme set forth above at ¶¶49-72, this statement was materially false and misleading.  It was materially misleading for Defendant Derbyshire to state that Salix had shipped a negligible $6 million in Xifaxan "a little bit ahead of demand," while omitting the material fact that wholesaler inventory levels for Xifaxan were then at least at nine-month levels – levels that are "astoundingly high" for the industry and far in excess of demand.  Indeed, as the Company later admitted on November 6, 2014, the nine-month levels were "largely constant during the first nine months of 2014," and, as explained above at ¶108, inventories exceeded nine months as of the third quarter of 2013.

### iii.    Third Quarter 2013 Form 10-Q

156.    On November 8, 2013, Salix filed with the SEC its Form 10-Q for the quarter ended September 30, 2013 ("Third Quarter 2013 Form 10-Q") signed by Defendants Logan and Derbyshire.  The Third Quarter 2013 Form 10-Q was materially false and misleading because it failed to disclose the information required by Item 303 of Regulation S-K.  Item 303 requires the disclosure of known trends that will affect future revenue, specifically: "known trends…that have had or that the registrant reasonably expects will have a material…unfavorable impact on…revenues."  GAAP regulation ASC 275-1 similarly requires that a company disclose risks and uncertainties that could significantly affect the amounts reported in financial statements in the near term and particularly calls for disclosure if the volumes of business transacted with particular customers could be severely impacted in the near term.

157.    Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [set forth above] require disclosure of forward-looking information."  Indeed, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company…with particular emphasis on the registrant's prospects for the future."  *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  *See* Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

158.    Disclosure of known trends and forward-looking information concerning the registrant's revenue are required by Item 303 "where a trend, demand, commitment, event or uncertainty is both [i] presently known to management and [ii] reasonably likely to have material effects on the registrant's financial condition or results of operations."  *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

159.    As set forth in detail above at ¶¶39-72, both of these conditions were satisfied here. First, as set forth above at ¶¶43-45 and 140-42, the trend of Salix's dramatically increasing wholesaler inventory levels was "known" to the Executive Defendants.  The facts set forth above establish that this trend was "reasonably likely to have material effects on [Salix's] financial condition or results of operations."  Indeed, as set forth above at ¶¶50, 104 and 148, as a direct result of this trend, Salix's near-term sales of its products would be dramatically impacted as wholesalers would have to decrease these inventory levels.  The anticipated impact of this trend on Salix's revenue was over $500 million.

160.    Accordingly, pursuant to Item 303, Defendants were required to disclose: (i) the existence of trends within the Company, namely that inventory levels for key products had been built to nine months; and the fact that (ii) whether the dramatic increase in wholesaler inventory that was out of line with demand had or was reasonably expected to have a "material…unfavorable impact on…revenues."  Nevertheless, Defendants failed to disclose any of this information during the Class Period.

161.    In addition, in the Third Quarter Form 10-Q, the Company provided a description of price increase programs offered to customers and other aspects of its relationship with wholesalers.  Specifically, the Company stated:

In addition to promotional discounts, at the time that the Company implements a price increase, it generally offers its existing customer base an opportunity to purchase a <u>limited quantity</u> of product at the previous list price.  <u>Shipments resulting from these programs generally are not in excess of ordinary levels</u>, therefore, the Company recognizes the related revenue upon shipment and includes the shipments in estimating various product related allowances. In the event the Company determines that these shipments represent purchases of <u>inventory in excess of ordinary levels for a given wholesaler, the potential impact on product returns exposure would be specifically evaluated and reflected as a reduction in revenue at the time of such shipments</u>.

162.    This statement was materially false and misleading for the reasons set forth in ¶¶63-72 above.  It was materially false and misleading for Salix to state that inventory shipped to wholesalers at the time of price increases was "not in excess of ordinary levels" because, as Salix eventually admitted, wholesaler inventory levels for its main products, including products shipped at the time of price increases, were nine months, which was well in excess of demand and Salix's "ordinary" inventory levels of 10 to 12 weeks.  It was further materially false and misleading for Salix to represent that if it determined that shipments had been made in excess of ordinary inventory levels, the "potential impact" on its exposure would be evaluated and "reflected as a reduction in revenue" because, as would be revealed at the end of the Class Period, Salix would be forced to forego $500 million in revenues in order for wholesaler inventory levels to be reduced to "ordinary levels" – amounts that were not reflected in the Company's financial statements.

163.    Salix made the same or substantially similar materially false and misleading statements in its Forms 10-Q through the rest of the Class Period on May 9, 2014, August 8, 2014 and its 2013 Form 10-K filed on February 28, 2014, each of which were signed by Defendants Logan and Derbyshire.  These statements were materially false and misleading for the same reasons described above in ¶162.

164.    In the Third Quarter 2013 Form 10-Q, Salix also stated the following:

Our results of operations might fluctuate from period to period, and a failure to meet the expectations of investors or the financial community at large could result in a decline in our stock price.

As they have in the past, <u>our results of operations might fluctuate significantly on a quarterly and annual basis due to, among other factors:</u>

[…] <u>the level of revenue generated by commercialized products, including potential increased purchases of inventory by wholesalers</u> in anticipation of potential price increases or introductions of new dosages or bottle sizes, and subsequent lower than expected revenue as the inventory is used.

165.    As a result of Defendants' channel-stuffing scheme as set forth in ¶¶49-72 above, this statement was materially false and misleading.  It was materially misleading for Salix to state that its "results of operations might fluctuate significantly on a quarterly and annual basis" as a result of "potential increased purchases of inventory by wholesalers," when Defendants knew that wholesalers had in fact purchased dramatically increased levels of inventory for the Company's core products as a result of the channel stuffing scheme, and that, as a result, the Company's "results of operations," including its revenue, would in fact decline by at least $500 million in the near term.

166.    Salix made substantially similar statements in its Forms 10-Q throughout the rest of the Class Period on May 9, 2014, August 8, 2014 and its 2013 Form 10-K filed on February 28, 2014, each of which were signed by Defendants Logan and Derbyshire.  These statements were materially misleading for the same reasons as discussed above at ¶165.

### B.    Materially Misleading Statements and Omissions Concerning the Company's 2014 Guidance

167.    On January 13, 2014, after the close of Salix's acquisition of Santarus, Salix issued a press release that it filed with the SEC on a Form 8-K providing an update regarding its business operations and guidance for fiscal year 2014.  Specifically, Salix announced it was "on track with its integration plan and is ahead of internal expectations in certain key areas such as field sales

reorganization and hiring" and announced that it expected to generate $1.6 billion in total product revenue for 2014. Defendant Logan also reiterated the Company's guidance of $1.6 billion in total product revenue during investor conferences held on January 16, 2014, March 11, 2014, May 13, 2014, and June 18, 2014, as well as during investor conferences held in New York, New York on May 19, 2014 and June 4, 2014, and the Company reiterated the $1.6 billion guidance figure in a slideshow presented during the Company's Investor Day held in New York, New York on July 9, 2014.

168.    As a result of Defendants' channel-stuffing scheme as set forth in ¶¶49-72 above, these statements were materially misleading. It was materially misleading for Defendants to state that Salix expected $1.6 billion in total product revenue for 2014 when Defendants knew in January 2014 and throughout the Class Period that, contrary to Defendants' representations, wholesaler inventory levels of Xifaxan and Apriso were at nine months, which was far in excess of ordinary levels, and this massive backlog would have a material negative impact on the Company's expected revenue. At minimum, Defendants had no reasonable basis to state that Company would make $1.6 billion in total product revenue for 2014 given their knowledge of the nine month inventory backlog for the Company's core products. This statement was also materially misleading because Defendants failed to disclose that at this time, they had undertaken a concerted effort to stuff the wholesaler channels with Uceris and Glumetza, which maintained Salix's revenue at artificially inflated levels.

C.    **Materially False and Misleading Statements and Omissions Concerning the Fourth Quarter of 2013 and Fiscal Year 2013**

   i.    **Fourth Quarter 2013 Press Release and Form 8-K**

169.    On February 27, 2014, Salix issued a press release entitled "Salix Pharmaceuticals Reports 4Q2013 and FY2013 Results" ("Fourth Quarter 2013 Press Release"). That same day,

Salix filed with the SEC a Form 8-K ("Fourth Quarter 2013 Form 8-K") that included the press release as an exhibit. The Fourth Quarter 2013 Press Release and Fourth Quarter 2013 Form 8-K reported that for fiscal year 2013, the Company's net income was $143 million, or $2.18 per share, compared to $64.2 million, or $1.01 per share for the prior year, and that total net product revenue had increased 27% to $933.8 million from fiscal year 2012. Salix also reported net revenue for fiscal year 2013 for Xifaxan of $645.6 and $126.4 for its inflammatory bowel drugs, which included Apriso.

170.    The financial metrics set forth above were materially false and misleading, which the Company admitted in the Restatement. The later restated financial metrics for fiscal year 2013 were as follows:

|  | 2013 FY Reported (millions) | 2013 FY Later Restated (millions) |
|---|---|---|
| Net Income | $143 | $130.8 |
| Diluted EPS | $2.18 | $1.99 |
| Net Product Revenue | $933.8 | $913.8 |
| Xifaxan Product Revenue | $645.6 | $635.9 |
| Inflammatory Bowel Disease Net Product Revenue (includes Apriso) | $126.4 | $117.9 |

**ii.    Fourth Quarter 2013 Conference Call**

171.    On February 27, 2014, Defendants Salix, Logan, and Derbyshire held a conference call with investors to discuss Salix's fourth quarter 2013 and fiscal year 2013 results (the "Fourth Quarter 2013 Conference Call"). On the Fourth Quarter 2013 Conference Call, analysts asked numerous questions concerning the inventory levels for Xifaxan. Indeed, an analyst from Mizuho Securities USA asked: "On Xifaxan, anything going on in the quarter, inventory-wise, which would prevent quarter-over-quarter growth into the first quarter?" Company spokesperson

William F. Forbes stated in response that "in terms of inventory levels on Xifaxan, based on the latest…run-rate data, we were right in line with demand, so no changes with Xifaxan."

172.    As a result of Defendants' channel-stuffing scheme set forth above at ¶¶49-72, this statement was materially false and misleading.  It was materially misleading for the Company to state that Xifaxan "inventory levels" were "in line with demand," when in truth, at this time there was at least nine months of inventory in the channel, which vastly exceeded actual demand.

173.    On the same conference call, Defendants were also asked about the inventory levels for the Santarus products that had become part of Salix's portfolio. Specifically, an analyst from UBS and Defendants Derbyshire and Logan had the following exchange:

| | |
|---|---|
| Analyst: | Quick question, when companies are acquired by other companies, a lot of times there is the stuffing of the channel.  So, I was curious whether there was any stuffing of the channel by the Santarus people and whether we're going to see that as an issue come back in the next couple of months? If not, then great. |
| Derbyshire: | No, that did not occur. |
| Analyst: | That did not occur? |
| Derbyshire: | Correct. |
| Logan: | They actually had very low inventory levels. |

174.    As a result of Defendants' channel-stuffing scheme set forth above at ¶¶49-72, these statements were materially misleading.  It was materially misleading for Defendants Logan and Derbyshire to state that there was no "stuffing of the channel" at Santarus when in reality, Defendants were engaged in a concerted effort to "stuff the channel" with newly-acquired Santarus products by inducing wholesalers to increase their inventory of Santarus products at rates that exceeded demand.  Indeed, as Salix later admitted, wholesaler inventory levels for Uceris and Glumetza – Santarus's two most important products – dramatically increased during the first half

of 2014.  Specifically, wholesaler inventory for Uceris had grown from two months to five months, and wholesaler inventory for Glumetza had grown from less than one month to seven months.

### i.   2013 Form 10-K

175.    On February 28, 2014, Salix filed with the SEC its Form 10-K for the quarter ended December 31, 2013 and fiscal year end ("2013 Form 10-K").  The 2013 Form 10-K reported the same financial results set forth in ¶169 above and was signed by Defendants Logan and Derbyshire.  The 2013 Form 10-K also: (i) failed to make the proper disclosures as required by Item 303, as described above at ¶¶157-60; (ii) contained the same misleading statement that inventory shipped in connection with price increase programs was "not in excess of ordinary levels," as described above at ¶¶161-62; and (iii) contained the same misleading risk factor, as described above at ¶¶164-65.

176.    The 2013 Form 10-K also misrepresented the effectiveness of the Company's internal controls over financial reporting.  Specifically, the 2013 Form 10-K represented that the Company's "internal control over financial reporting was effective" and provided reasonable assurance concerning the reliability of the Company's publicly reported financial statements as of December 31, 2013; that the Company's "disclosure controls and procedures [were] effective to provide [] reasonable assurance" that the information required to be contained in the Company's SEC filings was timely accumulated and reported; and that there was "no change in [the Company's] internal controls over financial reporting [that] has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting" during the fourth quarter of 2013.

177.    The statements regarding the Company's internal controls were materially false and misleading because, as the Company later admitted in the Restatement, Salix did "not maintain

effective internal control over financial reporting" and the Company's disclosure controls and procedures were "not effective."   As the Company admitted in the Restatement, Salix had numerous deficiencies in internal controls over financial reporting, including those set forth in ¶121 above, and these deficiencies constituted material weaknesses that resulted in the misstatement of the Company's financial statements and other disclosures during the periods covered by the Restatement.

178.   The 2013 Form 10-K also contained SOX Certifications by Defendants Logan and Derbyshire.  In the SOX Certifications, Defendants Logan and Derbyshire falsely affirmed that Salix's financial statements were accurate, and falsely certified that Defendants Logan and Derbyshire had designed and implemented internal controls over financial reporting that provided reasonable assurance that Salix's financial reporting was reliable and complied with GAAP. Specifically, the SOX Certifications provided, in relevant part:

> I have reviewed this annual report on Form 10-K of Salix Pharmaceuticals, Ltd.;
>
> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting…for the registrant and have:
>
> - designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities…;

- designed such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

- evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures…;

- disclosed in this report any change in the registrant's internal controls over financial reporting that occurred during the registrant's most recent fiscal quarter[.]

179.    Defendants' SOX Certifications were materially false and misleading.  Contrary to the representations that the 2013 Form 10-K did "not contain any untrue statement of a material fact" and "fairly present[ed] in all material respects the financial condition [and] results of operations" of Salix, the 2013 Form 10-K materially misstated Salix's key financial metrics and the effectiveness of Salix's internal controls, as set forth above at ¶¶121 and 177.  Specifically, in the Restatement, as detailed above at ¶121, Salix later revealed that as of December 31, 2013 and in the other periods covered by the Restatement, it did not maintain effective internal controls over financial reporting.

**D.    Materially False and Misleading Statements and Omissions Concerning the First Quarter of 2014**

**i.    First Quarter 2014 Press Release and Form 8-K**

180.    On May 8, 2014, Salix issued a press release entitled, "Salix Pharmaceuticals Reports 1Q2014 Results" ("First Quarter 2014 Press Release").  That same day, the Company filed with the SEC a Form 8-K ("First Quarter 2014 Form 8-K") that included the press release as an exhibit.  The First Quarter 2014 Press Release and the First Quarter 2014 Form 8-K reported net product revenue of $384.4 million, a 90% increase compared to the first quarter of 2013, which

was "primarily driven by the Santarus acquisition," and a net income loss of $43.9 million and an earnings per share loss of $0.69, which included $86.4 million in transaction costs from the Santarus acquisition.  Additionally, the Company reported net product revenue of $114.3 million for Xifaxan, $14.2 million for Apriso, $62.9 million for Uceris and $130.3 million for Glumetza.

181.    It was materially false and misleading for Salix to report net product revenue of $114.3 million for Xifaxan, $14.2 million for Apriso, $62.9 million for Uceris and $130.3 million for Glumetza, while failing to disclose that these revenues had been generated by sales to wholesalers that were far in excess of demand, and by creating wholesaler inventory levels that were as high as nine months, which were "astoundingly high" for the industry and far greater than Defendants had represented.

182.    In the First Quarter 2014 Press Release, Defendants continued to misleadingly emphasize the value of the Santarus acquisition and the anticipated growth of the business, and Defendant Logan specifically addressed demand for Salix's products, including the new Santarus products it had acquired in the merger:

> We continued to experience <u>positive momentum in the business in the first quarter of 2014 demonstrated by strong prescription growth for Xifaxan 550, Apriso and Uceris, with all three key products reaching new record-highs for total monthly prescriptions in March</u>.  As we transitioned Santarus into our distribution model, <u>sales of Xifaxan 550 and Apriso were below prescription demand for the first quarter of 2014 as wholesalers and drug chains focused on securing Santarus products to establish adequate inventories, resulting in very strong revenue growth in Santarus' products</u>.  We expect Xifaxan 550 sales to exceed prescription demand or be in line with prescription demand in the second quarter of 2014 as wholesalers bring Xifaxan 550 inventories back to more typical levels, and shipments for all of the Company's products to track in line with prescription growth by the second half of the year.

183.    As a result of Defendants' channel-stuffing scheme as set forth in ¶¶49-72 above, these statements were materially false and misleading.  It was materially false and misleading for Defendant Logan to state that sales of legacy Salix products were decreasing because wholesalers

and drug chains were "focused" on building up inventory of the new "Santarus products," when in reality, sales were decreasing because wholesalers had an astounding nine months of inventory of legacy Salix products due to Salix's channel stuffing. Further, it was false and misleading to state that wholesalers and drug chains had purchased Santarus products to "establish adequate inventories" when, in truth, inventory levels for Glumetza and Uceris were already well above demand and had reached those levels as a result of the incentives Salix offered wholesalers to stuff the channel with Santarus products.

184.    Similarly, in the same press release, Defendant Derbyshire reaffirmed that Salix was "on course" to achieve its guidance of $1.6 billion for total product revenue for 2014 "supported by our expanded sales and marketing resources."

185.    That statement was materially misleading.  It was materially misleading for Defendant Derbyshire to state that Salix expected $1.6 billion in total product revenue for 2014 when Defendants knew in May 2014 that, contrary to Defendants' representations, wholesaler inventory levels of Xifaxan and Apriso were at nine months, which was far in excess of ordinary levels, that wholesaler inventory levels for Uceris and Glumetza were also growing dramatically out of line with demand, and that this massive backlog would have a negative impact on the Company's expected revenue.  At minimum, Defendants had no reasonable basis to state that the Company would make $1.6 billion in total product revenue for 2014 given their knowledge of the nine month inventory backlog for the company's core products. This statement also was misleading because Defendants failed to disclose that at this time, they had undertaken a concerted effort to stuff the wholesaler channels with Uceris and Glumetza, which continued to artificially inflate revenue.

      ii.      **First Quarter 2014 Conference Call**

186.    On May 8, 2014, Defendants Salix, Logan and Derbyshire held a conference call with investors to discuss Salix's 2014 first quarter results (the "First Quarter 2014 Conference Call"). On that call, Defendants reiterated the materially false and misleading financial statements discussed above at ¶180 and also sought to falsely explain away the fluctuations in Salix's revenue for its key products. Specifically, Defendant Derbyshire noted:

> Relative to the prior-year period, first-quarter 2014 revenue for Xifaxan declined 25% while Apriso revenue was flat, despite strong year-over-year prescription growth of 19% and 58%, respectively. <u>This was due to wholesalers and drug chains, which have had very thin inventories for Santarus products, focusing on securing additional product during the quarter to establish adequate inventories in accordance with our preferred inventory levels.</u> This resulted in strong revenue growth for Santarus products in the first quarter.

187.    As a result of Defendants' channel-stuffing scheme set forth above at ¶¶49-72, these statements were materially misleading. It was materially false and misleading for Defendant Derbyshire to state the decline in Xifaxan and Apriso revenue was attributable to wholesalers being "focused" on building up inventory of the legacy-Santarus products, when, in reality, the decline in revenue was due to the fact that the Company's principal wholesalers already had an "extraordinarily high" nine months of inventory of Xifaxan and Apriso. It was also materially false and misleading for Defendant Derbyshire to state that wholesalers were attempting to "establish adequate inventories in accordance with [Salix's] preferred inventory levels" for Santarus products when, in reality, Salix was stuffing the channel with Santarus products and wholesalers already had inventory levels of Santarus products that were well in excess of demand.

188.    Derbyshire also stated on the First Quarter 2014 Conference Call:

With the wholesale inventories for Santarus products now at a more appropriate level[], we expect Xifaxan 550 sales to exceed or to track in line with prescription demand in the second quarter of 2014 as wholesalers bring Xifaxan 550 inventories back to more typical levels. We believe growth—revenue growth for all of the

Company's products should track in line with prescription demand by the second half of the year.

189.    As a result of Defendants' channel-stuffing scheme set forth above at ¶¶49-72, these statements were materially false and misleading.  It was materially false and misleading for Defendant Derbyshire to state that Xifaxan 550 sales would "exceed or [] track in line with prescription demand" or that revenue growth for all products would track in line with demand by the second half of the year because, as discussed above at ¶¶43-45 and 140-42, Defendants knew that, as a result of their ongoing scheme, Salix's key products were already at "astoundingly high" nine-month levels, vastly in excess of demand. In fact, rather than revenue growing "in line with prescription demand," the Company would be required to sell "minimal amounts" of these products over at least the next year to bring inventory levels down "in line" with demand, and doing so would cost the Company over $500 million in lost revenues.

190.    On the First Quarter 2014 Conference Call, analysts questioned Defendants as to the fluctuations in revenue for Salix's key products.   For example, an analyst from Piper Jaffray questioned why inventory levels for Santarus products would have an impact on Salix's existing products:

Analyst:      First, I just want to make sure I understand the inventory dynamics here.  Why would the addition of the Santarus assets necessarily impact your inventory pattern on your existing products, like Xifaxan?  And then secondly, to be clear, should we expect the Santarus sales to be down sequentially in 2Q?

Derbyshire:   You may or may not be aware that Santarus did have inventory management agreements in place until shortly after the acquisition closed.  We terminated those agreements, which I think caused a little angst with wholesalers with respect to their products, so they were focused and we were focused on wanting to make sure those inventory levels got to the level that we are comfortable with, which is typically in that 10 to 12 weeks.

> We didn't quite achieve that.  <u>We are probably more in the 2-to-3-month range with the Santarus products.  So again, they were focused on getting there.  We were focused on that as well, and they had existing inventories of the legacy Salix products, which they were comfortable with</u>.  So what we expect in second quarter is that Xifaxan 550 will rebound and more <u>than likely exceed demand</u>.
>
> <u>And then we would expect the Santarus products to come in line with demand for the remainder of the year and then all products to come in line with demand for the second half of the year</u>.

191.    As a result of Defendants' channel-stuffing scheme set forth above at ¶¶49-72, these statements were materially false and misleading.  It was materially false and misleading for Defendant Derbyshire to state that the decline in Xifaxan and Apriso revenue was attributable to wholesalers' being "focused" on building up inventory of Santarus products, when in reality the decline in revenue was due to the fact that wholesalers already had nine months of Xifaxan and Apriso inventory on hand – an amount that was well in excess of demand. It was also materially false and misleading for Defendant Derbyshire to state that wholesalers were increasing Santarus inventory because they "want[ed] to make sure those inventory levels got to…10 to 12 weeks" when, in reality, Salix was stuffing the channel with Santarus products at levels far in excess of demand.  It was also materially false and misleading for Defendant Derbyshire to state that "all products" would "come in line with demand for the second half of the year" when he knew that, as a result of the channel-stuffing scheme, the amount of inventory in the channel vastly exceeded actual demand and would continue to do so.

192.    An analyst from Susquehanna Financial Group similarly requested clarity on inventory levels:

> Analyst:    Maybe you can clarify the comment about the inventory level, as you said 10 to 12 weeks and three months for – <u>if you can just clarify for each of your products and the Santarus products where it stood at the end of the year and where it stands now, since the difference between the run rates you gave and the 1Q sales for</u>

<u>some of these products indicate a swing of several months' worth of demand trends</u>. […]

Derbyshire:   Yes, so we would expect by the end of second quarter that, ideally, all of our inventories for all of our products would be in that 10-to 12-week range.  Clearly, we would be in the 2-to 3-month range, so we would fully expect that – keep in mind that the shipments, especially of the Santarus products, were happening very early in the quarter – in first quarter, and <u>so here we are in May, so inventories are again at that 2- to 3-month time frame.  We would like for it to be 10 to 12 weeks and we would expect it to be there by the end of second quarter</u>.

[…]

Logan:   And I think our wholesalers and drug chains view us as being a more aggressive marketing company than Santarus and we are putting a lot of people on these products and I think they expected us to grow at a faster rate than Santarus.

Derbyshire:   And we've overdoubled or sales force, too.  So it's a prudent thing for us to do.

Logan:   And Santarus just had razor thin inventories for whatever reason. <u>But they really didn't have enough to support the retail demand that we expected to pull through with prescriptions</u>.

193.   As a result of Defendants' channel-stuffing scheme set forth at ¶¶49-72 above, these statements were materially false and misleading.  It was materially false for Defendant Derbyshire to state that inventories were at two to three months for Santarus products, when in reality, wholesalers' inventory for these products were between five and seven months.  It was further materially false and misleading for Defendant Derbyshire and Defendant Logan to state that wholesalers were increasing inventories for Santarus products because they viewed Salix as "a more aggressive marketing company" or because they wanted to compensate for supposedly "razor thin inventories" because, in truth, the increase in inventory for Santarus products was due to Defendants' efforts to stuff the channel.

194.    Analysts also asked Defendants to provide more granular information on the inventory fluctuations addressed on the call.   In response, Defendant Derbyshire stated the following:

> Analyst:       First, I was wondering if you guys could maybe quantify on a dollar basis how much inventory contributed to maybe Uceris and how much of the drawdown contributed to Xifaxan.   And also just wondering if you had some comments on where you guys are with the integration of the sales force and how long should we expect to see an impact to Xifaxan HE in primary care and also with Uceris with the Salix sales force?
>
> Derbyshire:   Yes, so I'll handle your first question.  <u>So if you look at the run rates as a surrogate for that and you do the math, what you will come up with on the Santarus products, that upon shipment, it was roughly 4 months of inventory.</u>  <u>And then, obviously that's been working down ever since.  So again, at the end of the second quarter, we would expect to be in the 2- to 3-month range.</u>  And then if you look at the run rate for Xifaxan and apply it to what was shipped—<u>so the run rate would be about $175 million and we shipped $114 million, so that would imply that a month and a half or so of inventory was— came down</u>.

195.    As a result of Defendants' channel-stuffing scheme as set forth at ¶¶49-72 above, this statement was materially false and misleading.  It was false and misleading for Defendant Derbyshire to state that wholesaler inventory levels for the Santarus products were at four months and would decrease to two to three months because wholesaler inventory levels for those products were between five and seven months, and Defendants were attempting to further increase those inventory levels dues to their channel-stuffing scheme.  It was also misleading for Defendant Derbyshire to state that Salix was shipping Xifaxan at levels below demand such that wholesalers had destocked "a month and a half of inventory" and therefore Xifaxan levels were below the two to three-month range when, in truth, Salix's wholesalers had approximately nine months of inventory on hand.

196.   The questions on inventory continued with an inquiry from an analyst from Buckingham Research:

Analyst:  [I]n terms of the overall revenues, I know you gave for a couple of products – I'm wondering if you have analysis of what the net impact of the inventory changes was overall in the – it looks like versus our number of $367 million and around $371 million, I guess, for consensus, the $384 million was above, but I'm wondering how much of that was inventories.  […]

Derbyshire:  [O]n your question regarding the revenue that's made up of more inventory than demand for Glumetza and Uceris, by the end of the quarter – end of March, that is – it roughly represented about 2 to 3 months of inventory, which is exactly where we want to keep it.  And then for Xifaxan, it represented a decrease in inventory of a little over a month.

197.   As a result of Defendants' channel-stuffing scheme as set forth in ¶¶49-72 above, this statement was materially false and misleading.  It was materially false and misleading for Defendant Derbyshire to state that inventory levels for Glumetza and Uceris were at two to three months, when in reality, they were at approximately seven months and five months, respectively. It was further materially misleading for Defendant Derbyshire to state that inventory for Xifaxan had decreased by "a little over a month" without also disclosing that inventory for Xifaxan was at least at nine months at this time, vastly greater than 10- to 12-week range Defendants had represented.

### iii.   First Quarter 2014 Form 10-Q

198.   On May 9, 2014, Salix filed with the SEC its Form 10-Q for the quarter ended March 31, 2014 ("First Quarter 2014 Form 10-Q") signed by Defendants Logan and Derbyshire. The First Quarter 2014 Form 10-Q reported the same misleading financial results set forth in ¶180 above.  The First Quarter 2014 10-Q also: (i) misrepresented the effectiveness of the Company's internal controls over financial reporting, as described above at ¶¶176-77; (ii) contained SOX

Certifications by Defendants Logan and Derbyshire that were materially false and misleading for the same reasons set forth above at ¶¶178-79; (iii) failed to make the proper disclosures as required by Item 303, as described above at ¶¶157-60; (iv) contained the same misleading statement that inventory shipped in connection with price increase programs to wholesalers was "not in excess of ordinary levels," as described above at ¶¶161-62; and (v) contained the same misleading risk factor, as described above at ¶¶164-65.

     **E.**     **Materially False and Misleading Statements Concerning the Second Quarter of 2014**

     **i.**     **Second Quarter 2014 Press Release and Form 8-K**

199.     On August 7, 2014, Salix issued a press release entitled, "Salix Pharmaceuticals Reports 2Q2014 Results" ("Second Quarter 2014 Press Release"). That same day, Salix filed with the SEC a Form 8-K ("Second Quarter 2014 Form 8-K") that included the press release as an exhibit. The Second Quarter 2014 Press Release and Second Quarter 2014 Form 8-K reported net income of $3.3 million, earnings per share of $0.04, and net product revenue of $382.0 million, an increase of 62% from the second quarter of 2013, primarily driven by the Santarus acquisition. Further, the Company reported net product revenue of $140.5 million for Xifaxan, $30.8 million for Apriso, $42.5 million for Uceris and $102.7 million for Glumetza.

200.     The financial metrics set forth above were materially false and misleading, which the Company later admitted in the Restatement. The later restated financial results for the second quarter of 2014 were as follows:

|  | 2Q 2014 Reported (millions) | 2Q 2014 Later Restated (millions) |
|---|---|---|
| **Net Income** | $3.3 | $0.418 |
| **Diluted EPS** | $0.04 | $0.01 |
| **Net Product Revenue** | $382 | $375.5 |
| **Xifaxan Net Revenue** | $140.5 | $133.6 |
| **Inflammatory Bowel Disease Net Product Revenue** | $70.3 | $70.1 |

| | 2Q 2014 Reported (millions) | 2Q 2014 Later Restated (millions) |
|---|---|---|
| (includes Apriso and Uceris) | | |

It was materially false and misleading for Salix to report net product revenue of $382 million, $140.5 million for Xifaxan, $30.8 million for Apriso, $42.5 million for Uceris and $102.7 million for Glumetza while failing to disclose that these revenues had been generated by sales to wholesalers that were far in excess of demand, and by creating wholesaler inventory levels that were as high as nine months, which were "astoundingly high" for the industry, and far greater than Defendants had represented.

201.    In the Second Quarter 2014 Press Release, Defendants again affirmed that Salix was on track to achieve its guidance of $1.6 billion in total product revenue for 2014.   This statement was materially misleading.   It was materially misleading for Defendants to state that it expected $1.6 billion in total product revenue for 2014 when Defendants knew in August 2014 that, contrary to Defendants' representations, wholesaler inventory levels of Xifaxan and Apriso were at nine months, which was far in excess of ordinary levels, that wholesaler inventory levels for Uceris and Glumetza were at five and seven months, respectively, which was far in excess of ordinary levels, and that this massive backlog would have a material negative impact on the Company's expected revenue.   At minimum, Defendants had no reasonable basis to state that the Company would make $1.6 billion in total product revenue for 2014 given their knowledge of the nine month inventory backlog for the Company's core products. This statement was also materially misleading because Defendants failed to disclose that, at this time, they had undertaken a concerted effort to stuff the wholesaler channels with Uceris and Glumetza, which continued to artificially inflate reported revenue.

202.    In the Second Quarter 2014 Press Release, Defendant Logan also stated that there had been "adjustments in the supply chain as wholesalers managed inventory levels following the

acquisitions of the Santarus products," but noted that while the "difference between prescription growth and wholesaler purchases" would continue near term, the Company "expect[ed] the situation to normalize during the remainder of the year as prescription growth trends for Xifaxan 550, Apriso and Uceris remain very healthy."

203.    This statement was materially false and misleading for the reasons set forth above in ¶¶49-72.  It was materially false and misleading for Defendant Logan to portray the changes in wholesaler inventory levels as near term issues that would "normalize" because prescription trends remained "very healthy," when in reality, the Company's wholesaler inventory levels were shifting because Defendants had stuffed the channels far above demand and at extremely elevated levels.

### ii.    Second Quarter 2014 Conference Call

204.    On August 7, 2014, Defendants Salix, Logan and Derbyshire held a conference call with investors to discuss Salix's second quarter 2014 results (the "Second Quarter 2014 Conference Call").  On that call, Defendant Derbyshire stated in prepared remarks that while "[d]emand for our key products remained very strong in this quarter, with Xifaxan and Apriso prescriptions growing 23% and 25%, respectively, from the second quarter of last year.  However, product revenue for Xifaxan and Apriso was impacted by some inventory destocking in the wholesale channel during the second quarter of 2014, although less than the first quarter of 2014. Currently we expect destocking may continue to a lesser degree in the third quarter and normalize in the fourth quarter."

205.    As a result of Defendants' channel-stuffing scheme, this statement was materially false and misleading.  It was materially false and misleading for Defendant Derbyshire to attribute a decline in Xifaxan and Apriso revenue to wholesalers "destocking" inventory, when in reality the decline in revenue was due to wholesalers resisting more inventory for Salix products as they

already had nine months on hand due to Defendants' channel-stuffing scheme.  It was further misleading for Defendant Derbyshire to state that the Company expected destocking to "normalize in the fourth quarter" of 2014 when Defendants knew that inventory levels were so elevated that it would take up to two years for them to "normalize" and would result in the loss of over $500 million in revenue.

206.    On the same conference call, Defendant Logan similarly assured investors that "demand for our key products…remained very healthy in the second quarter, posting strong year-over-year gains in prescriptions.  We are also very encouraged by the acceleration in prescription growth for these products from the first quarter of the second quarter, signaling the positive impact from our new sales force structure."

207.    As a result of Defendants' channel-stuffing scheme set forth in ¶¶49-85 above, these statements were materially misleading.  It was misleading for Defendant Logan to state that "demand for our key products" was "very healthy" when she knew that the Company's wholesaler inventory levels for its key products were far in excess of demand, as discussed above at ¶¶43-45 and 140-42.

208.    On the same conference call, Defendants sought to mollify analysts' concerns over inventory movements.  For instance, an analyst from Wells Fargo asked what was causing the inventory movements and when they were expected to normalize.  In response, Defendant Derbyshire stated "Frankly, we really don't know what's causing it other than wholesalers are wanting to lower their overall inventories.  But what we did is we built into our guidance for third quarter continued softening to a lesser degree of inventory levels, and then that normalizing in fourth quarter."  Derbyshire similarly stated that "obviously we're sticking with our full-year guidance of $1.6 billion."

209.     As a result of Defendants' channel-stuffing scheme as set forth in ¶¶49-72 above, this statement was materially false and misleading.  It was materially false and misleading for Defendant Derbyshire to state that Salix did not know what was causing the changes in inventory when in reality, Defendants knew that wholesalers were lowering inventories because Defendants had stuffed to channel with "astoundingly high" levels of inventory far in excess of actual demand. It was further misleading for Defendant Derbyshire to state that the Company expected destocking to normalize in the fourth quarter of 2014 when Defendants knew that inventory levels were so elevated that it could take up to two years for levels to return to three-month levels.  It was further misleading for Defendant Derbyshire to affirm Salix's guidance when Defendants knew that inventory levels were so elevated that it would take up to two years for them to "normalize," and would result in the loss of approximately $500 million in revenue.

210.     Similarly, an analyst from Susquehanna Financial Group questioned Defendants concerning their prior statements regarding inventory levels and what steps Defendants had taken to confirm them.  Specifically:

Analyst:     If I could follow up on inventory a little bit more.  I know some of these things are difficult to predict, but maybe you could share a little bit more perspective on what investigation you've done with your customers, and where things stand relative to IMA levels.  I think we discussed last quarter you try to keep these products in a pretty tight range of 10 to 12 weeks.  And looking over last quarter and this quarter, it seems that some of these products have come down, relative to the run rates, quite significantly.  I think seven weeks or so for Xifaxan, many weeks for the purgatives, and then up dramatically for Glumetza maybe by as much as six months worth of inventory.

I was hoping you could share a little bit more color on a product-by-product basis – some of them seem to be at very high inventory levels and some quite low – where they individually stand.  And particularly with 3Q for Glumetza, what your thinking happens there, whether that comes down a lot. […]

| | |
|---|---|
| Derbyshire: | Yes, sure.  I would expect that Glumetza and Uceris will come down in third quarter.  And then, as you can see, both with Apriso and Xifaxan, they did come more in line with demand.  They didn't quite get there.  But we would expect that to continue to become more in line with demand in third quarter, and then to normalize in fourth quarter. |
| Analyst: | But, specifically, what's your sense of how much inventory is in the channel at this point?  Is it within your contractual ranges or not? |
| Derbyshire: | We don't have IMAs.  We don't have any contracts. |
| Analyst: | Okay.  So you have nothing – so your 10 to 12 weeks is not contractual?  It's just your goal? |
| Derbyshire: | Correct.  […] |
| Logan: | Santarus did have IMA agreements, and they had very little.  Part of the uptick in Glumetza is that, when we started with our increased sales force, we realized we didn't have a lot of their products, a lot of Santarus products, at retail pharmacies.  So, we did put a drive in to try to get more product in retail pharmacies so that when patients got prescriptions and went into pharmacies, that hopefully drug would be available on the shelf. |

211.    As a result of Defendants' channel-stuffing scheme set forth in ¶¶49-72 above, these statements were materially false and misleading.  It was materially false for Defendant Logan to state that the "uptick in Glumetza" was caused by the fact that "we didn't have a lot of [Santarus] products…at retail pharmacies" when, in reality, the increase in Glumetza revenue was due to Defendants' concerted efforts to stuff the channel with Santarus products during the first half of 2014.  It was materially false and misleading for Defendant Derbyshire to state that he expected that "Glumetza and Uceris [inventories] will come down in the third quarter" when Defendants had stuffed the channels for Glumetza and Uceris far beyond the actual levels of demand for the products.

212.    Despite Defendants' efforts to assuage analysts' concerns, the questions continued. On the same call, Company spokesperson Forbes had the following exchange with an analyst from Mizuho Securities:

> Analyst:    I hate to keep harping on the inventory situation, but just trying to make sure if I understand this correctly.  So, in the third quarter we should be expecting to see Xifaxan reported below demand.  And for the Santarus products, is it still coming in above demand?
>
> So, is your assumption that the price increases that were taken in the quarter, there was some buying ahead of those in the absence of agreements?  And then, again, so is this a portfolio issue, like you thought it was last quarter where, if they're buying more of the Santarus products, they're destocking Xifaxan?  Or is this specifically purposeful destocking of Xifaxan?  And on the eight weeks for Xifaxan, is that a guess or is that something that has been communicated to you? […]
>
> Forbes:    Sure.  <u>No.  I just think it's a – again, with the Santarus products, we would expect them not to remain at this level</u>.  We've put a lot of effort behind getting, as Carolyn said earlier, distribution, especially at the pharmacy level.  <u>So I would expect them to come down to maybe even be slightly in line with demand or slightly below.  When I say the Santarus products, I'm really just referring to Glumetza and Uceris</u>.
>
> <u>And then we would expect the legacy [Salix] products to come further in line with demand.  Whether it actually gets there in third quarter we're not sure, so we built that into our guidance for the quarter.  But we would expect that to come in line in fourth quarter.</u>

213.    These statements were materially false and misleading.  It was materially false for the Company to state that it expected Glumetza and Uceris "to come down to maybe even be slightly in line with demand or slightly below" when, in fact, Defendants were actively stuffing the channel for Glumetza and Uceris at levels far above actual demand.  It was further false and misleading for the Company to state that "legacy [Salix] products to come further in line with demand" when, in reality, Defendants had stuffed the channel for those products such that

wholesalers already had nine months of inventory on hand, which was greatly in excess of actual demand.

214.    Analyst questions on wholesaler inventory levels continued with the following exchange between Defendant Derbyshire and an analyst from Sterne Agee:

Analyst:        Adam, just conceptually, you know you have been asked a lot of inventory questions, but <u>can you explain to us conceptually why wholesalers would be reducing inventory of your products, because of increasing inventory of Santarus products</u>?  I'm just struggling to understand that. […]

Derbyshire:    I think it's a function of where the Santarus products were when we acquired the Company.  Again, we talked about this in the first quarter, how their products <u>were razor thin and they didn't have the distribution we wanted to have at the retail level.  So, we wanted to get that in order.  That's the only explanation I have for that.</u>

Analyst:        What does that got to do with the Salix legacy products?  That's my key question.

Derbyshire:    <u>I think what we talked about in the first quarter call, we really don't know is the answer</u>.  But I think our customers [are] very comfortable with the Salix legacy products.  <u>And, so, I think they feel comfortable bringing those inventory levels down</u>, and they have told us they want to bring those inventory levels down.  And I think that's why we think in fourth quarter that things will normalize.

215.    As a result of Defendants' channel-stuffing scheme as set forth in ¶¶49-72 above, these statements were materially misleading.  It was materially false and misleading for Defendant Derbyshire to state that wholesalers were purchasing large volumes of Santarus products to compensate for "razor thin" inventory levels when wholesalers were purchasing these products in large quantities as a direct result of Defendants' channel stuffing scheme, which had inflated inventory levels for these products to five-to-seven months.  It was further misleading for Defendant Derbyshire to state that Salix did not know why wholesalers were reducing inventories for legacy Salix products when Defendants knew, as discussed above at ¶¶43-45 and 140-42 that

wholesalers were reducing inventories for these products because they already had nine months of Salix inventory on hand.

216. An analyst from Buckingham Research Group sought further clarification on the Company's wholesaler inventory levels:

Analyst:  […] Maybe a little bit more on the topic of the day, which is inventories. What are your plans to get better clarity going forward so we have more of a -- is there anything you can do in terms of reaching out to customers? Is the former target of, say, 12, 13 weeks just too high for the wholesalers without some type of contractual arrangement? […]

Derbyshire:  Sure. So, your first question, yes. Obviously, we're in touch with our trade partners. But you're right. I think the reality of keeping that three months of inventory is no longer going to be the case. So they, again, they're softening and we can expect them to continue to soften some in third quarter and more so normalize in fourth quarter.

217. This statement was materially misleading as a result of Defendants' channel-stuffing scheme set forth at ¶¶49-72 above. It was materially misleading for Defendant Derbyshire to state that "keeping that three months of inventory" was "no longer going to be the case," and that inventory would decline from three-month levels when, in reality, inventory levels for key Salix products were then at nine month levels. It was further misleading for Defendant Derbyshire to state that inventory levels were "softening," would "continue to soften some in third quarter," and then "normalize in the fourth quarter" when Defendant Derbyshire knew that inventory levels were so elevated that it could take up to two years for wholesaler inventories to return to three-month levels.

218. An analyst from Deutsche Bank also asked about the Company's inventory levels for Xifaxan and Apriso in the following exchange:

Analyst:  […] I don't think I heard your estimate for where you think inventory levels actually are at the end of the second quarter for

92

|  | XIFAXAN and APRISO. And perhaps a naive question, but how do you actually know with specificity without IMAs? My other question is about gross margin guidance. Is the lower guidance tied to higher GLUMETZA sales? Thanks. |
|---|---|
| Derbyshire: | Correct. That's why there's some pressure on margins based on our 80% guidance in early year, so now we're guiding at 78%. So we do expect -- we have visibility in the inventories because we know what we ship, we know what pulls through, we know what returns are. So, we have a visibility into inventory levels. |
|  | Again, we would be hopeful, because we are not under IMAs, that when things do normalize [in the fourth quarter], <u>that we can normalize around that eight-week or a little less level. And that would be true for both XIFAXAN and for APRISO.</u> |
| Analyst: | But just so everyone understands who's on the phone here, the history here, in context, you chose not to do IMAs because of the cost of them not being worth the visibility they provide. Is that fair? |
| Derbyshire: | Correct. |

219.   As a result of Defendants' channel-stuffing scheme set forth at ¶¶49-72 above, these statements were materially false and misleading.  It was materially false and misleading for Defendant Derbyshire to state that Salix would "normalize around that eight-week or a little less level" for "both Xifaxan and for Apriso" when, in reality, inventory levels for those two products were then at nine-month levels as a result of Defendants' channel-stuffing scheme, or approximately five times the level Defendant Desrbyshire claimed would be the case.  It was further misleading for Defendant Derbyshire to claim that Salix "chose not to do IMAs because of the cost of them not being worth the visibility they provide" because, as explained above at ¶¶63-72, Salix refused to enter into IMAs and terminated the preexisting Santarus IMAs in order to carry out Defendants' channel-stuffing scheme.

220.   Analysts further sought clarification as to what inventory levels would be once they had "normalized" in the fourth quarter.  In response, Derbyshire claimed that wholesale inventory levels would actually be dropping to eight weeks or less:

Analyst:   Hi. Thanks for taking my question. I promise this is going to be the last inventory question. Can you just define what normalizing means? Is that a new level that you're targeting now, not 10 to 12 weeks but something else? Can you just help us understand that?

Derbyshire:   I think from an overall portfolio standpoint I would say that's in the 8-week, or minus a little bit, range for the entire channel.

221.   This statement was materially false and misleading.  It was materially misleading for Defendant Derbyshire to state that inventory levels would "normalize" at approximately eight weeks "for the entire channel" when, in reality, the Company's inventory levels were "astoundingly high," including as high as nine months for the Company's key products, or approximately five times the level that Defendant Derbyshire claimed would be the case.

### iii.   Second Quarter 2014 Form 10-Q

222.   On August 8, 2014, Salix filed with the SEC its Form 10-Q for the quarter ended June 30, 2014 ("Second Quarter 2014 Form 10-Q") signed by Defendants Logan and Derbyshire. The Second Quarter 2014 Form 10-Q reported the same financial results set forth in ¶199 above. The Second Quarter 2014 10-Q also: (i) misrepresented the effectiveness of the Company's internal controls over financial reporting, as described above at ¶¶176-77; (ii) contained SOX Certifications by Defendants Logan and Derbyshire that were materially false and misleading for the same reasons set forth above at ¶¶178-79; (iii) failed to make the proper disclosures as required by Item 303, as described above at ¶¶157-60; (iv) contained the same misleading statement that inventory shipped in connection with price increase programs to wholesalers was "not in excess of ordinary levels," as described above at ¶¶161-62; and (v) contained the same misleading risk factor, as described above at ¶¶164-65.

IX.     **LOSS CAUSATION**

223.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiff and the Class to suffer substantial losses.  During the Class Period, Lead Plaintiff and the Class purchased Salix common stock at artificially inflated prices and were damaged thereby when the price of Salix common stock declined when the truth was revealed.  The price of Salix's common stock significantly declined (causing investors to suffer losses) when Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by Defendants materialized.  The prices for Salix publicly traded options were also distorted during the Class Period on account of the artificially inflated price of Salix common stock.  Salix publicly traded options also suffered significant declines when Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by Defendants materialized, causing substantial damage to members of the Class who purchased publicly traded call options on Salix common stock or sold publicly traded put options on Salix common stock during the Class Period.

224.    Specifically, Defendants' materially false and misleading statements misrepresented the true level of wholesalers' inventory for Salix's key products, the Company's prospects for future revenue growth, and its financial performance.  When those statements were corrected and the risks concealed by them materialized, including when the disclosure of the Company's "astoundingly high" wholesaler inventory levels was announced, investors suffered losses as the price of Salix common stock declined.  As a result of the disclosure of the truth of Defendants' fraud, Salix's stock price declined over 34%, from a close of $138.55 on November 6, 2014 to close at $91.47 on November 7, 2014.  As the Company has admitted, this dramatic

stock price decline occurred immediately after the Company's disclosures "regarding its wholesaler inventory levels and the Audit Committee's review."  Accordingly, as a result of their purchases of Salix's publicly traded common stock, publicly traded call options and/or sales of publicly traded put options on Salix common stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss and damages.

## X.      CLASS ACTION ALLEGATIONS

225.     Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired Salix's publicly traded common stock, purchased or otherwise acquired publicly traded call options on Salix common stock, or sold publicly traded put options on Salix common stock during the period from November 8, 2013 through November 6, 2014, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants; Salix's affiliates and subsidiaries; the officers and directors of Salix and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest.

226.     The members of the Class are so numerous that joinder of all members of impracticable.  Throughout the Class Period, Salix's common shares were actively traded on the NASDAQ.  As of November 5, 2014, Salix had approximately 63.7 million shares of common stock issued and outstanding.  Although the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes that there are at least thousands of members of the proposed Class.  Members of the Class can be identified from records maintained by Salix or its transfer agent(s), and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

227.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

228.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of fact and law common to the Class are:

(a)  whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

(b)  whether Defendants' misrepresentations and omissions as alleged herein misrepresented material facts about among other things, Salix's wholesaler inventory levels and financial performance during the Class Period;

(c)  whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(d)  whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

(e)  whether the members of the Class have sustained damages, and the proper measure of damages.

229.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Lead Plaintiff has no interest that conflicts with the interests of the Class.

230.    A class action is superior to all other available methods for the fair and efficient adjudication of this action.  Joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

231.    The names and addresses of those persons and entities that purchased or acquired Salix's publicly traded common stock and call options (or who sold put options) during the Class Period are available from Salix's transfer agent(s) or other sources.  Notice may be provided to such class members via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## XI.    PRESUMPTION OF RELIANCE

232.    Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact that there was a duty to disclose.

233.    Lead Plaintiff is also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a)  Salix's common stock was actively traded in an efficient market on the NASDAQ;

(b)  Salix common stock traded at high weekly volumes, with an average of over 6 million shares traded each week during the Class Period.  The average weekly turnover as a percentage of shares outstanding was approximately 9.4% (median of 7.6%), well surpassing the higher 2% threshold level of average weekly trading volume necessary for an efficient market;

(c)  Salix publicly-traded options were listed and actively traded on the Chicago Board of Options and other national options exchanges, highly efficient markets;

(d)  As a regulated issuer, Salix filed periodic public reports with the SEC;

(e)  Salix was eligible to file registration statements with the SEC on Form S-3;

(f)  Salix regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through

other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(g) The market reacted promptly to public information disseminated by Salix;

(h) Salix securities were covered by numerous securities analysts employed by major brokerage firms, including Deutsche Bank, Wells Fargo Securities, Susquehanna Financial Group/SIG, Leerink Partners, Buckingham Research Group, Stifel Nicolaus, Goldman Sachs, Mizuho Securities Co., Ltd., Piper Jaffray & Co., Cantor Fitzgerald, Canaccord Genuity, and Sterne, Agee & Leach, Inc. Each of these reports was publicly available and entered the public marketplace;

(i) The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Salix securities; and

(j) Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased or acquired Salix securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

234.   Accordingly, the market for Salix's publicly traded common stock and options promptly digested current information with respect to Salix from all publicly-available sources and reflected such information in the prices of those securities. Under these circumstances, all purchasers of the Company's publicly traded common stock and call options during the Class Period suffered similar injury through their purchases at artificially inflated prices, and a presumption of reliance applies. Likewise, all sellers of the Company's publicly-traded put options during the Class Period suffered similarly injury through their transactions at prices that were distorted by the artificially inflated price of Salix common stock, and a presumption of reliance applies.

## XII.   NO SAFE HARBOR

235.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this

Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

236. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Salix who knew that the statement was materially false or misleading when made.

## XIII. CAUSES OF ACTION

### COUNT 1

**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER**
**(Against Defendant Salix And The Executive Defendants)**

237. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

238. During the Class Period, Defendants Salix, Logan, and Derbyshire carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (i) deceive the investing public regarding Salix's business, operations, management and the intrinsic value of Salix common stock; (ii) enabled Defendants to artificially inflate the price of Salix common stock; and (iii) caused Lead Plaintiff and other members of the Class to purchase Salix common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan

and course of conduct, Defendants jointly and individually (and each of them) took the actions set forth herein.

239.   The Defendants named in this count: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock during the Class Period in an effort to maintain artificially high market prices for Salix common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  The Defendants named in this count are sued as primary participants in the wrongful and illegal conduct charged herein.  The Executive Defendants are also sued as controlling persons as alleged below.

240.   These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Salix as specified herein.

241.   These Defendants employed devices, scheme and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Salix's value and performance and continued substantial growth, which included the making of, and the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Salix and its business operations and future prospects in light of the circumstances in which they were made, not misleading, as set forth more particularly herein,

and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Salix common stock during the Class Period.

242.    These Defendants are liable for the following materially false and misleading statements and omissions made during the Class Period as alleged above in Section VIII:

> (a) Defendant Salix:  Defendant Salix is liable for all the false and misleading statements and omissions made by itself, its spokespersons, and Defendants Logan and Derbyshire, its senior most officers during the Class Period and lead spokespersons for the Company during that time, which are set forth above in Section VIII;
>
> (b) Defendant Logan:  Defendant Logan is liable for the false and misleading statements and omissions made in the Company's Forms 10-Q dated November 8, 2013, May 9, 2014 and August 8, 2014; and Form 10-K dated February 28, 2014; and statements she made on conference calls that the Company held on January 16, 2014, February 27, 2014, March 11, 2014, May 8, 2014, May 13, 2014, May 19, 2014, June 4, 2014, June 18, 2014, and August 7, 2014, as well as for statements made by Company spokesperson Forbes on conference calls held on February 27, 2014 and August 7, 2014;
>
> (c) Defendant Derbyshire: Defendant Derbyshire is liable for the false and misleading statements and omissions made in the Company's Forms 10-Q dated November 8, 2013, May 9, 2014 and August 8, 2014; and Form 10-K dated February 28, 2014; and statements he made on earnings conference calls that the Company held on November 7, 2013, February 27, 2014, May 8, 2014, and August 7, 2014, as well as for statements made by Company spokesperson Forbes on conference call calls held on February 27, 2014 and August 7, 2014;
>
> (d) In addition, Defendants Logan and Derbyshire are liable for all false statements made by other Defendants in conference calls in which they participated during the Class Period.

243.    Defendants Logan and Derbyshire, as senior officers of the Company, are liable as direct participants in the wrongs complained of herein.  Through their high-ranking positions of control and authority as the most senior executive officers of Salix, each of these Defendants was

able to control, and did directly control, the content of the public statements disseminated by Salix. Defendants Logan and Derbyshire had direct involvement in the daily business of the Company and participated in the preparation and dissemination of Salix's materially false and misleading statements set forth above.

244.     The allegations in this Complaint establish a strong inference that Defendants Salix, Logan and Derbyshire acted with scienter throughout the Class Period in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts.   As demonstrated by Defendants' material misstatements and omissions throughout the Class Period, if Defendants did not have actual knowledge of the misrepresentations and omissions alleged herein, they were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether their statements were false or misleading, even though such facts were available.

245.     Lead Plaintiff and the other members of the Class have suffered damages in that, in reliance on the integrity of the market in which the securities traded, they paid artificially inflated prices for Salix common stock, which inflation was removed from the stock when the true facts became known. Lead Plaintiff and the other members of the Class would not have purchased Salix common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially inflated by Defendants' misleading statements.

246.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

247.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of Salix securities during the Class Period.

## COUNT II

**FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT**
**(Against Defendants Logan and Derbyshire)**

248.     Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

249.     Defendants Logan and Derbyshire acted as controlling persons of Salix within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

250.     By reasons of their high-level positions of control and authority as the Company's most senior officer and, in the case of Defendant Logan, also as a Salix director, the Executive Defendants had the power and authority to influence and control, and did influence and control, the decision-making and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  The Executive Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Salix during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.  The Executive Defendants were provided with or had unlimited access to copies of the Company's press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements to be corrected.

251.     In their capacities as Salix's most senior corporate officers, and as more fully described above, the Executive Defendants had direct and supervisory involvement in the day-to-

day operations of the Company and, therefore, are presumed to have had the power to control of influence the particular transactions giving rise to the securities law violations as alleged herein. Defendants Logan and Derbyshire signed Salix's SEC filings, and Sarbanes-Oxley certifications, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by Salix during the Class Period.

252.    Each of the Executive Defendants culpably participated in some meaningful sense in the fraud alleged herein.  Defendants Logan and Derbyshire each acted with scienter, as set forth more fully in Section VII.

253.    By virtue of their positions as controlling persons of Salix and as a result of their own aforementioned conduct, Defendants Logan and Derbyshire together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a)    Declaring that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Awarding such other and further relief as the Court may deem just and proper

**XV.    JURY DEMAND**

Lead Plaintiff hereby demands a trial by jury.


Dated:  New York, New York
          May 8, 2015

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Salvatore J. Graziano*
Salvatore J. Graziano
Mark Lebovitch
John Rizio-Hamilton
Katherine M. Sinderson
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
sgraziano@blbglaw.com
markl@blbglaw.com
johnr@blbglaw.com
katherinem@blbglaw.com

*Lead Counsel for Lead Plaintiff and for the Proposed Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Samuel H. Rudman
58 South Service Road, Suite 200
Melville, New York 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173
srudman@rgrdlaw.com

*Additional Counsel for the City of Fort Lauderdale General Employees' Retirement System*