UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                        |

In re SALIX PHARMACEUTICALS, LTD.      |        14-CV-8925 (KMW)

                        |

                        |        **<u>OPINION & ORDER</u>**

                        |
-------------------------------------------------------------X

KIMBA M. WOOD, U.S. District Judge:

       Lead Plaintiff Pentwater Funds and additional named Plaintiff City of Fort Lauderdale

General Employees' Retirement System (collectively, "Plaintiffs") bring this class action against

Salix Pharmaceuticals ("Salix") and two of its former officers: Carolyn J. Logan, the former

Chief Executive Officer (CEO) of Salix, and Adam C. Derbyshire, the former Chief Financial

Officer (CFO) of Salix (collectively, "Defendants"). Plaintiffs allege that Defendants made false

or misleading statements regarding the financial health of Salix during the period from

November 8, 2013 to November 6, 2014 (the "Class Period"), and that these statements

artificially increased the price of Salix's publicly-traded securities. On behalf of all parties who

purchased Salix shares during the Class Period, Plaintiffs assert that Defendants' conduct

violates Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

       Defendants have moved to dismiss the Consolidated Class Action Complaint pursuant to

Federal Rules of Civil Procedure 9(b) and 12(b)(6). For the reasons stated below, the Court

DENIES Defendants' Motions to Dismiss in their entirety.

## I.    BACKGROUND

       The following facts are taken from Plaintiffs' Consolidated Class Action Complaint

("CCAC") and are assumed to be true for purposes of Defendants' Motions to Dismiss. *See*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Shipping Fin.*

*Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) ("When considering a motion to dismiss . . . for failure to state a cause of action, a court must accept as true all material factual allegations in the complaint.").

### A.  The Parties

Lead Plaintiff Pentwater Funds consists of five related private investment funds. (CCAC ¶ 28).[1] Additional named Plaintiff City of Fort Lauderdale General Employees' Retirement System is a pension system organized for the benefit of current and retired public employees of the City of Fort Lauderdale, Florida. *Id.* ¶ 29. Plaintiffs purchased Salix common stock during the Class Period and allege that they were damaged thereby. *Id.* ¶¶ 28-29.

Defendant Salix is a pharmaceutical company based in Raleigh, North Carolina, that specializes in products for the treatment of gastrointestinal diseases. *Id.* ¶ 30. Defendant Carolyn J. Logan served as a senior executive at Salix from 2000 to 2014, first as Senior Vice President of Sales and Marketing, from 2000 to 2002, and then as President and CEO, from 2002 to 2015. *Id.* ¶ 31. Defendant Adam C. Derbyshire served as CFO of Salix from 2000 to 2014. *Id.* ¶ 32. During the Class Period, Defendants Logan and Derbyshire (collectively, the "Individual Defendants") were responsible for reviewing and signing Salix's SEC filings and Sarbanes-Oxley ("SOX") certifications, and for discussing Salix's performance on regular conference calls held with investors and analysts. *Id.* ¶¶ 31-32.

---

[1] The five funds are (1) PWCM Master Fund Ltd.; (2) Pentwater Equity Opportunities Master Fund Ltd.; (3) Oceana Master Fund Ltd.; (4) Pentwater Merger Arbitrage Master Fund Ltd.; and (5) LMA SPC for and on behalf of the MAP98 Segregated Portfolio. (CCAC ¶ 28).

### B. The Alleged Scheme

#### 1. <u>Salix's Sales Model</u>

Like many pharmaceutical companies, Salix employed a wholesale model for distributing its products: Salix sold directly to wholesale customers, who in turn sold Salix medications to retail pharmacies to fill patient prescriptions. *Id.* ¶ 39. Because Salix derived its revenue from sales to wholesalers (rather than from sales to retail pharmacies or individual customers), wholesaler inventory levels provided a critical metric for evaluating (1) the health of the company, and (2) continuing demand for Salix's products. *Id.* ¶¶ 3, 39.

In the years prior to the Class Period, Salix regularly reported that wholesaler inventory levels for its key drugs, Xifaxan and Apriso, were generally in the 10- to 12-week range. *Id.* ¶ 49. Unlike many pharmaceutical companies, Salix did not employ Distribution Service Agreements ("DSAs")[2] that contractually mandated these inventory levels. *See id.* ¶¶ 47-48. Rather, Salix relied on internal company data to track inventory levels based on the volume of what was shipped to wholesale customers, what was passed on to retail pharmacies, and what was returned. *Id.* ¶ 48.

#### 2. <u>The Channel-Stuffing Scheme</u>

Plaintiffs allege that, sometime before the start of the Class Period, Defendants initiated a scheme to "stuff the channel" with Salix's key products, i.e., to increase levels of wholesaler inventory vastly beyond prescription demand, in order to make Salix's financial performance appear stronger than it actually was. *Id.* ¶ 5. Defendants allegedly did so through tactics such as: (1) for key products, offering steep price discounts that were "two to four times greater than industry standards"; (2) announcing future price increases in order to encourage extra purchases

---

[2] DSAs are also sometimes referred to as Inventory Management Agreements ("IMAs"). (CCAC ¶ 47).

before the price increase took effect; and (3) paying wholesalers millions of dollars for "marketing services" in exchange for quid pro quo agreements to buy even greater amounts of Salix's products than they otherwise would have done. *Id.* ¶¶ 8, 65-67. These techniques caused wholesaler inventory levels of Salix's key drugs, Xifaxan and Apriso, to climb significantly. By the start of the Class Period, Salix's wholesale customers had accumulated "at least nine months' worth of inventory," more than three times the amount Salix had previously reported as its inventory level of 10 to 12 weeks. *Id.* ¶ 5.

On November 7, 2013, the day before the start of the Class Period, Salix announced that it was acquiring Santarus, another pharmaceutical company that specialized in medications for gastrointestinal conditions. *Id.* ¶ 58. Immediately upon completing this acquisition, the Defendants expanded their channel stuffing scheme to include Santarus's leading drugs, Glumetza and Uceris. *Id.* ¶ 8, 59. To do this, Defendants cancelled the existing DSAs that Santarus had in place with its wholesale customers, *id.* ¶ 64, and used the same techniques that Defendants had previously employed with Salix's own products, such as offering steep price discounts and announcing future price increases to encourage short-term purchasing, *id.* ¶ 66. According to Plaintiffs, the scheme to stuff the channel with new Santarus drugs was necessary to offset the inevitable decline in revenues for Salix's legacy products, Xifaxan and Apriso, given that inventory levels for these products had reached nine months by the time Salix announced its acquisition of Santarus. *See id.* ¶ 63. Although wholesaler inventory levels for Santarus products were low at the time the company was acquired by Salix, by the end of the Class Period they had climbed to seven months for the Santarus drug Glumetza, and five months for the Santarus drug Uceris, all as a result of Defendants' alleged channel-stuffing scheme. *See id.* ¶¶ 8, 16, 95.

3.   <u>Potential Acquirers Discover the Channel Stuffing</u>

Meanwhile, Salix's strong revenue growth attracted the interest of potential acquirers. *Id.*
¶ 51. At the beginning of the Class Period, Defendant Logan was approached by the CEO of
another pharmaceutical company, Allergan, about the possibility of acquiring Salix. *Id.* ¶ 52. The
parties began negotiations, and Allergan sought to conduct a due diligence review of Salix's
records (1) to ensure that the company's financial statements were accurate, and (2) to make an
independent evaluation of the company's projections for future performance. *Id.* ¶ 53. Salix,
however, repeatedly rejected Allergan's requests, allegedly because Defendants knew that any
due diligence would uncover their scheme and their elevated levels of wholesaler inventory. *Id.* ¶
54. In July 2014, Allegan made a formal offer to buy Salix for $180 per share, and then in
August 2014, raised its offer to $205 per share, which was approximately 30% higher than
Salix's then-share price. *Id.* ¶¶ 54, 90. Salix and Allergan then entered into a confidentiality
agreement, and Salix provided Allergan access to its "electronic data room." *Id.* ¶ 90. Within
days of beginning its due diligence, Allergan discovered the inventory backlog. *Id.* ¶ 91.
Allergan then reduced its offer by $30 per share, and confidentially "advised [Salix] that it had
become concerned with the levels of wholesaler inventory of the company's key products in the
distribution channel." *Id.* Allergan allegedly told Salix that it would not move forward with the
proposed acquisition until Salix disclosed its inventory problems to investors. *Id.* ¶ 93.

The same day that Allergan lowered its bid, Salix began discussions with another
potential acquirer, pharmaceutical company Actavis. *Id.* ¶ 92. Actavis made an offer of $178 to
$180 per share, and shortly thereafter, Salix provided Actavis with access to its electronic data
room so that Actavis could conduct due diligence. *Id.* Actavis, like Allergan, discovered the
inventory problem almost immediately, and withdrew its offer just six days later. *Id.*

4.  Disclosure of the Inventory Problem and Aftermath

After the close of the market on November 6, 2014, the last day of the Class Period, Defendants issued a press release disclosing Salix's elevated wholesaler inventory levels and updating Salix's revenue guidance for the remainder of 2014. *Id.* ¶¶ 16, 94-95. Defendants revealed that (1) wholesaler inventory levels for Salix drugs Xifaxan and Apriso were at nine months, and had held "largely constant" at this level throughout all of 2014, and (2) wholesaler inventory levels for recently-acquired Santarus drugs Glumetza and Uceris were at seven months and five months, respectively. *Id.* ¶ 95. The press release stated that Salix expected it would take approximately two years to reduce inventory levels for these medications to its previously-established three-month level. *Id.* The company also revised its full-year revenue guidance for 2014 from $1.6 billion to $1.4 billion (a reduction from $6.16 per share to $5.20 per share). *Id.* Salix also announced that Defendant Derbyshire had resigned from the company, effective immediately. *Id.* ¶ 97. On the same day, Salix disclosed during a conference call with investors that the Audit Committee of Salix's Board of Directors had retained independent counsel to conduct a review of "the facts and circumstances raised with respect to the inventory levels of the company's key products." *Id.* ¶¶ 93, 98.

In response to this announcement, Salix's stock price fell sharply on the following day of trading, dropping from $138.55 at close on November 6 to $91.47 at close on November 7, a decline of approximately 34% in a single day. *Id.* ¶ 109.

Then, in January of 2015, Salix announced that its Audit Committee had determined that Salix's financial statements for 2013 and for the first three quarters of 2014 would need to be re-issued because (1) they improperly accounted for marketing services for which Salix had paid wholesalers; (2) they improperly recognized revenue for certain contracts upon shipment of the

6

drugs, rather than upon delivery; and (3) the statement for the fourth quarter of 2013 understated the product return reserve. *Id.* ¶¶ 116-119. The Restatement, which was issued in March of 2015, provided updated numbers for Salix's net income, earnings per share, and net product revenue. *Id.* ¶ 120. Salix also announced in January of 2015 that Defendant Logan was retiring and stepping down from the Board of Directors. *Id.* ¶ 114.

On February 22, 2015, Salix announced that it had entered into an agreement to be acquired by Valeant Pharmaceuticals. *Id.* ¶ 129. Coinciding with this announcement, Valeant's CEO told investors that Valeant had been given the opportunity to conduct due diligence before proposing an offer price, and that Valeant was confident with the information that it was able to obtain. *Id.* ¶¶ 128, 131-32. Valeant's CEO stated that "[i]t was actually pretty straightforward. We went in and we actually got our financing and we got the wholesale reports. We know precisely how much of each product each SKU is in the channel and in detail," and that Valeant had "about as close to perfect information as you could have in terms of what the inventory situation is." *Id.* ¶ 132. Salix and Valeant subsequently agreed on a price of $173 per share. *Id.* ¶ 130.

The agreement with Valeant made the Individual Defendants eligible to receive significant "change-in-control" payments. *Id.* ¶¶ 133-34. Under the terms of their employment contracts, the Individual Defendants were entitled to receive payouts worth tens of millions of dollars upon the acquisition of Salix, even though they were no longer working for the company. *Id.* ¶¶ 38, 72. However, when they left Salix, the Individual Defendants signed agreements that entitled the Salix Board to "claw back" these payments in a number of specified circumstances, including if the Board determined that the departing employee had "intentionally engaged in wrongdoing that has resulted, or would reasonably be expected to result, in material harm to

7

[Salix]."[3] *Id.* ¶¶ 97, 114. On March 24, 2015, before the acquisition by Valeant was finalized, the Salix Board exercised this power and cancelled the payments to the Individual Defendants. *Id.* ¶¶ 134-35. However, the Board did not announce the reason(s) for its decision to exercise the clawback.

### C.  Allegedly False and Misleading Statements

Plaintiffs allege in the CCAC that Defendants made a number of false or misleading statements or material omissions during the Class Period, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. *See id.* ¶¶ 151-222. In particular, Plaintiffs allege that Defendants' press releases, SEC filings, and statements during quarterly conference calls with investors were false or misleading with respect to (1) the levels of wholesaler inventory for Salix's key products; (2) Salix's financial results, including its net income and net product revenue, given the company's failure to disclose the increased inventory levels; (3) Salix's compliance with GAAP and SEC rules; and (4) the effectiveness of Salix's internal controls. *Id.* ¶ 151.

### D.  Procedural History

Plaintiffs filed their original class action complaint on November 7, 2014. (Compl. [Doc. No. 1]). Following the appointment of Pentwater Funds as Lead Plaintiff and the consolidation of cases, *Woburn Retirement Sys. v. Salix Pharm., Ltd.*, Nos. 14-CV-8925, 14-CV-9226, 2015 WL 1311073 (S.D.N.Y. Mar. 23, 2015) (Wood, J.), Plaintiffs filed their Consolidated Class Action Complaint ("CCAC"). [Doc. No. 82]. On June 12, 2015, Defendants filed the instant Motions to

---

[3] The agreements also authorized the exercise of the clawback if either Logan or Derbyshire (1) breached any obligations set forth under the agreement, including those relating to cooperation with Salix, acknowledgement of payment, non-disclosure of confidential information, non-competition, non-solicitation, non-disparagement, and a prohibition on making use of non-public information; (2) breached the terms of a release each was required to sign under the agreement; or (3) was found to have committed a violation of law by the U.S. Securities and Exchange Commission or any other regulatory or governmental agency or court of law. *See* (SEC Form 8-K filed Nov. 5, 2014, 3 [Doc. No. 99-7]).

Dismiss the Complaint, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), for failure to state a claim. *See* (Mem. of Def. Salix Pharmaceuticals, Ltd., in Supp. Mot. to Dismiss the Consolidated Class Action Compl. ("Salix Mot."), [Doc. No. 98]); (Mem. of Def. Adam C. Derbyshire in Supp. Mot. to Dismiss the Consolidated Class Action Compl. ("Derbyshire Mot."), [Doc. No. 96]); (Joinder in Mots. to Dismiss of Salix Pharmaceuticals, Ltd. and Adam C. Derbyshire ("Logan Mot."), [Doc. No. 101]).

## II.    LEGAL STANDARD

In general, to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the supporting factual allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where a plaintiff has failed to "nudge" a claim "across the line from conceivable to plausible," a district court must dismiss the complaint. *Twombly*, 550 U.S. at 570. The Court must accept as true all well-pleaded factual allegations in a complaint and "draw[] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

A complaint that asserts securities fraud, however, must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4. *See ECA & Local 134 IBEW Joint Pension Trust of Chicago v. J.P. Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Rule 9(b) provides that a party alleging fraud "must state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), and the PSLRA provides that a party alleging fraud must "state with particularity

facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A); *see also ECA*, 553 F.3d at 196 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)) (noting that although a court will "normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, the PSLRA establishes a more stringent rule for inferences involving scienter" (internal quotation marks omitted)).

Because Plaintiffs assert claims of securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, they are subject to these heightened pleading requirements.

## III.   DISCUSSION

"The elements of a private securities fraud claim based on violations of § 10(b) and Rule 10b-5 are: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007).

Here, Defendants allege that Plaintiffs have failed to show the first and second elements listed above, namely (1) a material misrepresentation or omission by Defendants, and (2) scienter.[4] The Court disagrees.

---

[4] The Court finds unavailing Defendants' brief suggestion in two footnotes that Plaintiffs do not adequately allege loss causation. *See* (Salix Mot., 15 n.10); (Salix Reply, 5 n.6). Plaintiffs have adequately alleged loss causation because the alleged misstatements and omissions discussed herein were corrected by the November 6, 2014 disclosure, not when Salix issued its Restatement. *See Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 231 (S.D.N.Y. 2009)) (Crotty, J.).

### A.  Actionable Misstatements or Omissions

To succeed on their Section 10(b) claims, Plaintiffs must allege that each Defendant made a "material misrepresentation or a material omission as to which he had a duty to speak." *S.E.C. v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 162 (S.D.N.Y. 2011) (Jones, J.). Under Rule 9(b), Plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 329 (2d Cir. 2002) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)).

"An omission is actionable under federal securities laws only when the defendant is subject to a duty to disclose the omitted facts." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 575 (S.D.N.Y. 2013) (Koeltl, J.), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) (internal quotation marks and alterations omitted.). This duty can arise in one of two ways: either (1) "expressly pursuant to an independent statute or regulation—i.e., an affirmative legal disclosure obligation"; or (2) "as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts." *In re Sanofi-Aventis Sec. Litig*, 774 F. Supp. 2d 549, 561 (S.D.N.Y. 2011) (Daniels, J.) (internal citations and quotation marks omitted).

Plaintiffs properly allege that Defendants made material misstatements or omissions with respect to the inventory levels of Salix's drugs during conference calls with investors on

February 27, May 8, and August 7, 2014, and in their accompanying press releases and SEC filings.

       1.   <u>The Alleged Misstatements</u>

       *a.   The February 27 Conference Call*

On February 27, 2014, during a conference call held with analysts to discuss Salix's fourth quarter 2013 financial results, an analyst asked, "on Xifaxan, anything going on in the quarter inventory wise which would prevent quarter-over-quarter growth?" Defendant Derbyshire responded, "in terms of the inventory levels on Xifaxan based on the latest run rate or run rate data, we were right in line with demand, so no changes with Xifaxan." (CCAC ¶ 171).

Plaintiffs allege this statement was misleading because Defendant Derbyshire said that there were no changes to report on Xifaxan inventory levels, even though (1) inventory levels had climbed to approximately nine months, and (2) Salix had previously reported on numerous occasions that inventory levels for Xifaxan were in the range of 10 to 12 weeks. *Id.* ¶ 172.

      *b.   The May 8 Press Release and Conference Call*

On May 8, 2014, Salix issued a press release summarizing their first quarter 2014 results. In the press release, Defendant Logan was quoted as saying that "sales of Xifaxan 550 and Apriso were below prescription demand for the first quarter of 2014," but that "[w]e expect Xifaxan 550 sales to exceed prescription demand or be in line with prescription demand in the second quarter of 2014 as wholesalers bring Xifaxan 550 inventories back to more typical levels." *Id.* ¶ 182.

Plaintiffs allege that Logan's statement was misleading, because her comment that Salix expects wholesalers to bring inventory "back to more typical levels" in the coming quarter(s) implied that the then-current level of wholesaler inventory was *below* the typical level of 10 to

12 weeks. *Id.* ¶ 182. This was misleading in light of the fact that Xifaxan inventory levels throughout the Class Period were astronomically higher than the previously reported "typical" level. *Id.* ¶ 183.

On the same day, in a conference call with analysts, Derbyshire repeated these assertions almost verbatim during his prepared remarks, again noting the expectation that wholesalers would "bring Xifaxan 550 levels back to more typical levels." *Id.* ¶ 188. Later, during the question-and-answer portion of the call, Derbyshire responded to several questions from analysts regarding inventory levels of Xifaxan. One such exchange:

> Q (analyst): "Maybe you can clarify the comment about the inventory level . . . . [I]f you can just clarify for each of your products and the Santarus products, where it stood at the end of the year and where it stands now."
>
> A (Derbyshire): "Yes, so we would expect by the end of second quarter that, ideally, all of our inventories for all of our products would be in that 10- to 12-week range. Clearly, we would be in the two- to three-month range, so we would fully expect that. Keep in mind that shipments, especially of the Santarus products, were happening very early in the quarter, in first quarter. And so here we are in May,  so inventories are again at that two- to three- month timeframe. We would like for it to be 10 to 12 weeks and we would expect it to be there by the end of second quarter."

*Id.* ¶ 192.

Plaintiffs allege that this comment was misleading because it implied that then-current inventory levels were such that Defendants *reasonably* expected them to be in the 10- to 12-week range by the end of the second quarter—roughly seven weeks from the date of the phone call—even though inventory levels for Xifaxan were, in fact, approximately nine months and, as Salix later disclosed, would take almost two years to return to the "typical" level. *Id.* ¶ 193.

Another exchange:

> Q (analyst): "I was wondering if you guys could maybe quantify on a dollar basis how much inventory contributed to maybe Uceris and how much of the draw down contributed to Xifaxan."

A (Derbyshire): "[I]f you look at the run rate for Xifaxan and apply it to what was shipped, so the run rate would be about $175 million and we shipped $114 million. So that would imply that a month-and-a-half or so of inventory was – came down."

*Id.* ¶ 194.

Later in the call Derbyshire made a similar statement regarding the impact of inventory changes on revenue: "[O]n your question regarding the revenue . . . And then for Xifaxan, it represented a decrease in inventory of a little over a month." *Id.* ¶ 196.

Plaintiffs allege that Derbyshire's comments were misleading because, like Logan's and Derbyshire's earlier statements, they implied that inventory levels for Xifaxan were below the typical level of 10 to 12 weeks, rather than significantly above that level. *Id.* ¶¶ 195, 197.

### c.   *The August 7 Conference Call*

On August 7, 2014, Salix held a conference call with analysts to discuss their second quarter 2014 results. *See id.* ¶¶ 204-21. During the call, Derbyshire again made statements and answered questions regarding the inventory levels of Salix's key products, including Xifaxan. In his opening remarks, he stated that "product revenue for Xifaxan and Apriso was impacted by some inventory destocking in the wholesale channel during the second quarter of 2014, although less than the first quarter of 2014. Currently we expect destocking may continue to a lesser degree in the third quarter and normalize in the fourth quarter." *Id.* ¶ 204.

Later in the call, Derbyshire responded to a number of questions regarding current wholesaler inventory levels for Xifaxan:

Q (analyst): "If I could follow up on the inventory a little bit more, I know some of these things are difficult to predict, but maybe you could share a little bit more perspective on what investigation you've done with your customers and where things stand relative to IMA levels? I think we discussed last quarter, you try to keep these products in a pretty tight range of 10 weeks to 12 weeks and looking over last quarter and this quarter, it seems that some of these products have come down relative to the run rate . . . . So I was hoping you could share

14

a little bit more color on what on a product-by-product basis, some of them seem to be at very high inventory levels and some quite low, where they individually stand."

A (Derbyshire): "Yeah, sure I would expect that Glumetza and Uceris will come down in third quarter and then as you can see both with Apriso and Xifaxan they did come more in line with demand. They didn't quite get there, but we would expect that to continue to become more in line with demand in third quarter and then to normalize in fourth quarter."

Q (analyst): "[W]hat's your sense of how much inventory is in the channel at this point? . . . It is within your contractual ranges or not?"

A (Derbyshire): "Well, we don't have IMAs, we don't have any contracts."

Q (analyst): "Okay, So you have nothing . . . "

A (Derbyshire): "Right."

Q (analyst): ". . . so your 10 weeks . . . "

A (Derbyshire): "Right."

Q (analyst): ". . . to 12 weeks is not contractual it's just your goal."

A (Derbyshire): "Right. Correct."

*Id.* ¶ 210. Derbyshire later reiterated his comments that he expected wholesale inventory levels to

return to normal levels during the third and fourth quarters, but stated that the "normal" level in

the future would be lower than 10 to 12 weeks:

Q (analyst): "What are your plans to get better clarity going forward so we have more of a – is there anything you can do in terms of reaching out to customers, is the former target of say 12 weeks, 13 weeks just too high for the wholesalers without some type of contractual arrangement?"

A (Derbyshire): "So your first question, yes, I mean obviously we have – we're in touch with our trade partners. But you're right, I mean I think the reality of keeping that three months of inventory is no longer going to be the case. So they again they're softening and we can expect them to continue to soften some in the third quarter and more so normalize in fourth quarter."

*Id.* ¶ 216. Derbyshire later repeated his statement that the new "normal" level of inventory for wholesalers was eight to ten weeks, rather than the prior level of 10 to 12 weeks, and suggested that this shift was the cause of the inventory destocking. *See id.* ¶ 212.

Throughout the call Derbyshire consistently avoided providing direct answers about current inventory levels for Salix's products, but reassured investors that his predictions were based on accurate information about those inventory levels:

> Q (analyst): "I'm sorry if I missed this. I don't think I heard your estimate for where you think inventory levels actually are at the end of the second quarter for Xifaxan and Apriso? And perhaps a naïve question, but how do you actually know with specificity without IMAs?"
>
> A (Derbyshire): "[W]e have visibility in the inventories because we know what we ship, we know what pulls through, we know what returns are. So, we have a visibility into inventory level. Again we would be hopeful because we are not under IMAs that when things do normalize that we can normalize around that eight week or a little less level and that would be true for both Xifaxan and for Apriso."

*Id.* ¶ 218.

Plaintiffs allege that these statements were misleading because they implied that the reduction in revenue for Xifaxan was attributable to a reduction of wholesaler inventory *below* the prior stated target of 10 to 12 weeks, even though inventory levels were, in fact, at or around nine months. *Id.* ¶¶ 217, 219, 221. The statements were also misleading because they implied that the destocking was likely to conclude within a few months, even though Defendants later announced that it would take approximately two years to return inventory to the previous levels. *Id.* ¶¶ 205, 209, 213, 221. And Derbyshire's final quoted statement was misleading because it asserted that Defendants had knowledge of the inventory levels and implied that his other statements with respect to inventory levels were based on that knowledge. *See id.* ¶ 219. If

Defendants did not, as they claim, have *actual* knowledge of the elevated inventory levels, this statement was false and misleading.

2.   <u>Defendant's Statements Are Not Protected by the PSLRA Safe Harbor</u>

Defendants argue that the above statements regarding inventory levels are not actionable because they are forward-looking statements entitled to protection under the PSLRA safe harbor and the bespeaks caution doctrine.[5] The PSLRA provides that a defendant "shall not be liable with respect to any forward-looking statement" if (1) the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," 15 U.S.C. § 78u-5(c)(1)(A)(i), or (2) the plaintiff fails to show that the statement was "made with actual knowledge" that the statement was false or misleading, *id.* § 78u-5(c)(1)(B)(i)-(ii).[6] However, neither of these provisions applies to the above statements.

---

[5] The PSLRA defines "forward-looking statements" as:
(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.
15 U.S.C. § 78u-5(i)(1).
[6] For a defendant who is a natural person, the plaintiff must show that the statement was made "with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B)(i). For a defendant who is a business entity, the plaintiff must show that the statement was (1) "made by or with the approval of an executive officer of that entity" and (2) "made or approved by such officer with actual knowledge by that officer that the statement was false or misleading."

17

a. *Defendants' Statements Are Not Protected under the Actual Knowledge Safe Harbor*

The PSLRA safe harbor requires plaintiffs to show that forward-looking statements were made with actual knowledge of their falsity by the speaker. 15 U.S.C. § 78u-5(c)(1)(B)(i)-(ii). "[B]ecause the safe harbor specifies an 'actual knowledge' standard for forward-looking statements, 'the scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity.'" *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010) (quoting *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009)); *see also In re ITT Educ. Servs., Sec. Litig.*, 34 F. Supp. 3d 298, 306 (S.D.N.Y. 2014) (Oetken, J.).

However, this safe harbor provision does not apply to any "allegedly false statement [that] has both a forward-looking aspect and an aspect that encompasses a representation of present fact." *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) (Berman, J.); *see also In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03-CV-3111, 2005 WL 225288, at *13 (S.D.N.Y. Feb. 1, 2005) (Sweet, J.) ("Statements that might arguably have some forward-looking aspect are unprotected by the PSLRA safe harbor provision to the extent that they are premised on representations of present fact."). The safe harbor also does not protect material omissions. *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001) (Buchwald, J.); *City of Providence v. Aeropostale, Inc.*, No. 11-CV-7132, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013) (McMahon, J.).

Defendants are correct that many of the above-identified statements are forward-looking, because they predict future inventory levels. But a number of these statements *also* encompass representations of present fact, and those representations are *not* subject to the PSLRA safe

18

harbor. For instance, statements by the Individual Defendants in the first quarter 2014 press release and conference call describe their expectation that wholesaler inventory of Xifaxan would return to "typical" levels by the end of the following quarter. Those statements, in turn, are predicated upon representations that *current* inventory levels lie below the previously-stated target level of 10 to 12 weeks, because Salix Executives expected revenue to rise in the following quarter as wholesalers "bring Xifaxan 550 inventories back to more typical levels." Those representations concerning current inventory levels constitute actionable misstatements, and, because they pertain to present facts rather than future projections, are not subject to the heightened scienter requirement of the PSLRA safe harbor.[7]

Similarly, many of Defendants' statements are made misleading because of material omissions, particularly in light of historical facts regarding inventory.[8] For instance, during the second quarter 2014 conference call, analysts repeatedly questioned Derbyshire about the current wholesaler inventory levels for each of Salix's products, asking: "I was hoping you could share a bit more color on what on a product-by-product basis, some of them seem to be at very high inventory levels and some quite low, where they individually stand"; "[W]hat's your sense of

---

[7] The *Aeropostale* decision provides a helpful analogy. There, the court held that certain earnings projections were not protected under the PSLRA safe harbor:

> Viewed in isolation, Aeropostale's earnings projections fall within the definition of a forward-looking statement under the PSLRA . . . . But these statements are accompanied by statements that the projections and outlook incorporate the effect of clearing through the inventory, sometimes even within the same sentence. Such statements imply that the earnings projections accurately reflect the sales and inventory problems that Defendants were aware of at the time the statements were made, demonstrating that the statements are not solely forward-looking, but instead incorporate a present fact whose accuracy could be determined at the time the statements were made.

*See Aeropostale*, 2013 WL 1197755, at *13 (internal quotations omitted).

[8] Prior to the start of the Class Period, the Individual Defendants had "repeatedly addressed analyst and investor questions concerning the company's inventory levels for its key products." (CCAC ¶ 147). These statements established an expectation among investors and analysts that inventory for Xifaxan and other Salix products was generally in the 10- to 12-week range. *Id.* (alleging statements dating back to 2005 that "trade inventory is three months"; "inventory levels will flatten out at roughly the 10- to 12-week level that we like to keep in the channel"; and that Salix would maintain 10 to 12 week inventory levels for Xifaxan, which is "where the majority of [Salix's] products are").

how much inventory is in the channel at this point?"; and "I'm sorry if I missed this. I don't think I heard your estimate for where you think inventory levels actually are at the end of the second quarter for Xifaxan and Apriso." (CCAC ¶¶ 210, 218). In response to these questions, Derbyshire never mentioned Salix's current inventory levels of Xifaxan or Apriso, or even rough estimates of those levels, but offered repeated assurances that he expected the inventory levels to "normalize" in the following quarter to the "new normal" level of approximately eight weeks.

The omission of any information with respect to current inventory levels is material and misleading, because that omission led analysts to believe that inventory levels were merely slightly outside of the range that Defendants described as "normal" and could be returned to that level within about three months. In fact, as Defendants later revealed, it would take several years to return wholesaler inventory of Xifaxan to the prior level of 10 to 12 weeks, and presumably even longer to reduce it to the "new normal" level of eight weeks. The statements are also misleading in light of Derbyshire's assurance that "we have visibility in the inventories," because it led investors to believe that Defendants' future projections were based on accurate knowledge of current inventory levels. If Derbyshire did not have such knowledge, as Defendants contend, then his statement that he did was materially misleading.

The Court's reading of these statements is bolstered by Plaintiffs' allegations regarding public comments made by analysts after the conference calls. *See* (CCAC ¶¶ 79, 82-84). These comments reveal that analysts understood the Defendants' statements as representations of the *current* levels of wholesaler inventory, not just future projections. *Id.* Although a listener's misunderstanding of what was said does not, on its own, make a statement misleading, the allegation that several different analysts understood Defendants as describing current inventory

levels provides support for the Court's conclusion that Defendants' statements are reasonably interpreted as such.

In sum, Defendants' statements in the May 8 press release and conference call and the August 7 conference call, taken in light of the overall context in which they were made, are not subject to the PSLRA safe harbor for forward-looking statements because they (1) incorporated misleading representations of present fact, and/or (2) were made misleading by material omissions.

### b. Defendants' Cautionary Language Was Inadequate

Defendants' statements are also not entitled to protection under the meaningful cautionary language prong of the PSLRA safe harbor or the similar judicially-created bespeaks caution doctrine. *See Slayton*, 604 F.3d at 770 n.5 (2d Cir. 2010).

"To avail themselves of the safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton*, 604 F.3d at 772.[9] To be eligible for the safe harbor, "the relevant cautionary language must be prominent and specific, and must directly address exactly the risk that plaintiffs claim was not disclosed." *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013) (Marrero, J.) (internal quotation marks omitted); *In re Barrick Gold Sec. Litig.*, No. 13-CV-3851, 2015 WL 1514597, at *8 (S.D.N.Y. Apr. 1, 2015) (Scheindlin, J.) ("[T]he cautionary language must be . . . tailored to the specific

---

[9] Other Circuits have held similarly. *See Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 256 (3d Cir. 2009) ("Cautionary language must be extensive and specific. A vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge."); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) ("The requirement for meaningful cautions calls for substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors.")

future projections, estimates, or opinions that the plaintiffs challenge." (internal quotation marks omitted)). "Vague disclosures of general risks will not protect defendants from liability." *In re MF Glob. Holdings*, 982 F. Supp. 2d at 304.

Here, the cautionary language provided by Defendants was inadequate to warn of the specific risk that Plaintiffs have alleged. The cautionary statements included at the beginning of each conference call were brief and generic, stating only that "[a]ctual results might differ materially from those indicated by these forward-looking statements as a result of various important factors, including those discussed in our press releases and SEC filings, including our Form 10-K for 2013." *See, e.g.* (Q2 2014 Earnings Call, 1 [Doc. No. 99-2]). This boilerplate disclaimer fails to identify even a single "important factor" that could lead to different results. And the general reference to factors "discussed in our press releases and SEC filings" fails to supply the necessary specificity. Defendants cannot escape liability by referring generally to every factor that has ever been mentioned in any one of their public statements or SEC filings, because such a broad disclaimer fails to alert investors to the specific risks they are facing. Even the language in the Form 10-K for 2013 fails to address the specific risk that is at issue here. In more than twelve pages of cautionary statements, "inventory" is mentioned only once as a possible factor that could impact future revenue predictions: "potential increased purchases of inventory by wholesalers in anticipation of potential price increases or introductions of new dosages or bottle sizes, and subsequent lower than expected revenue as the inventory is used." (2013 Form 10-K, 49 [Doc. No. 99-1]). This limited reference fails to alert the reasonable investor either to (1) the much broader risk of inventory build-up at issue here, or (2) the lack of management review of inventory levels to monitor the risk.

Courts have also noted that a defendant's failure to update cautionary language over time to reflect new information and new risks supports the conclusion that such statements are merely boilerplate. *See Slayton*, 604 F.3d at 772-73 ("Our conclusion is bolstered by the fact that the defendants' cautionary language remained the same even while the problem changed."). Here, Defendants' cautionary statements are word-for-word the same in each of the four calls that took place during the Class Period, except for the reference to the 10-K being updated from 2012 to 2013 halfway through the Class Period. *See* (Q3 2013 Earnings Call, 2, [Doc. No. 99-11]); (Q4 2013 Earnings Call, 2 [Doc. No. 99-12]); (Q1 2014 Earnings Call, 2 [Doc. No. 99-4]); (Q2 2014 Earnings Call, 2-3 [Doc. No. 99-2]). And the cautions with respect to inventory in Salix's 2012 and 2013 forms 10-K are, likewise, word-for-word the same. Defendants' failure to update these statements from quarter to quarter and from year to year renders them meaningless in light of the changing circumstances and risks.

In sum, Plaintiffs have sufficiently alleged actionable misstatements and material omissions by each Defendant necessary to support their claims under Section 10(b) of the Exchange Act.[10]

---

[10] Defendants also argue that some of their statements are non-actionable because (1) they are statements of opinion, *see* (Salix Mot. 29-30), or (2) they are mere puffery, *id.* at 25.

    Defendants' argument about opinion appears to pertain only to their statements about the reasons for changes in wholesaler buying patterns. *See id.* at 29-30. However, to the extent that Defendants intend to argue that the statements described above are non-actionable statements of opinion, the Court disagrees. A statement of opinion may be actionable if it is predicated upon an untrue supporting statement of fact or if the statement omits material facts about the speaker's "inquiry into or knowledge concerning a statement of opinion." *Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327, 1329 (2015). Even if the projections regarding future inventory levels are statements of opinion, those opinions either (1) are predicated upon untrue supporting statements of fact regarding current inventory levels, or (2) omit material facts about the speaker's inquiry into or knowledge of facts that would support the stated opinion. Therefore, the statements are actionable.

    Defendants also argue that their statements are non-actionable because they are merely "vague expressions of puffery and corporate optimism." (Salix Mot., 25). This argument is unavailing. Although "expressions of puffery and corporate optimism do not give rise to securities violations" even if it later turns out the optimism was unwarranted, *City of Roseville Employees' Ret. Sys. v. Nokia Corp.*, No. 10-CV-0967, 2011 WL 71588548, at *6 (S.D.N.Y. Sept. 6, 2011) (Daniels, J.) (quoting *Rombach*, 355 F.3d at 164), Defendants' statements here go far beyond the sorts of puffery that courts have previously found protected. *Compare San Leandro Emergency Med.*

### B.  Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). A court must decide "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs Inc.*, 551 U.S. at 322-23 (emphasis in original). To qualify as "strong," the inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs Inc.*, 551 U.S. at 314; *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009) (citing *City of Brockton Ret. Sys. v. Shaw Group Inc.,* 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) (McMahon, J.)) ("When the competing inferences rest in equipoise, the tie . . . goes to the plaintiff.") (internal citation and quotation marks omitted). But an adequate inference of scienter "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs Inc.*, 551 U.S. at 324 (quoting *Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004)); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("[W]e do not require the pleading of detailed evidentiary matter in securities litigation.").

In the Second Circuit, "[t]he requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong

---

*Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 811 (2d Cir. 1996) (statements that defendant was "optimistic about its earnings" and "expected [its products] to perform well" were non-actionable puffery) *with Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (defendants' statements about inventory were more than just "rosy predictions" and therefore were actionable).

    Courts have also found that statements constitute puffery when they are so generic that they "cannot have misled a reasonable investor," *San Leandro*, 75 F.3d at 811, and when they "lack the sort of definite positive projections that might require later correction," *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). Neither of those conditions is met here. Defendants' statements could and did mislead a number of reasonable investors, as evidenced by the comments of analysts following the quarterly conference calls. *See* (CCAC ¶¶ 79, 82-84). And the statements provided exactly the sort of definite projections that did require later correction in the press release and conference call on November 6, 2014, where Salix disclosed its inventory backlog. *See id.* ¶ 95. Therefore Defendants' statements cannot be characterized as vague statements of corporate optimism.

circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198.

Motives common to corporate officers, like "the desire for the corporation to appear profitable

and the desire to keep stock prices high to increase officer compensation," do not suffice to plead

scienter. *Id.*; *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000) (plaintiffs must "allege that

defendants benefitted in some concrete and personal way from the purported fraud."). A plaintiff

who cannot show scienter by alleging motive and opportunity can still "raise a strong inference

of scienter under the 'strong circumstantial evidence' prong, 'though the strength of the

circumstantial allegations must be correspondingly greater' if there is no motive."[11] *ECA*, 553

F.3d at 198-99 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)); *cf. Ganino*, 228

F.3d at 169 (a plaintiff is not required to plead scienter with "great specificity").

Recklessness is defined as "conduct which is highly unreasonable and which represents

an extreme departure from the standards of ordinary care to the extent that the danger was either

known to the defendant or so obvious that the defendant must have been aware of it." *In Re

Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted); *see also

Novak*, 216 F.3d at 308 ("It is the actual facts of our securities fraud cases that provide the most

concrete guidance as to the types of allegations required" to meet the pleading standard for

recklessness.). "[S]ecurities fraud claims typically have sufficed to state a claim based on

recklessness when they have specifically alleged defendants' knowledge of facts or access to

information contradicting their public statements." *Novak*, 216 F.3d at 308. "Where plaintiffs

contend defendants had access to contrary facts, they must specifically identify the reports or

statements containing this information." *Id.* at 309.

---

[11] Because Plaintiffs have failed to plead scienter based on motive and opportunity, the Court proceeds to
evaluate Plaintiffs' allegations of scienter under the strong circumstantial evidence of recklessness prong.

      1.  <u>Plaintiffs' Allegations Raise a Strong Inference of Scienter</u>

Plaintiffs properly allege scienter based on circumstantial evidence of recklessness because: (1) Defendants were reckless in failing to learn Salix's true wholesale inventory levels; (2) Salix's Board clawed back millions of dollars' worth of compensation from the Individual Defendants; (3) the Individual Defendants resigned after the alleged fraud was revealed; and (4) the magnitude of the alleged fraud, in conjunction with the fact that the fraud involved Salix's core operations, provides supplemental support for a strong inference of scienter.[12]

      *a.  Defendants Were Reckless in Failing to Learn Salix's True Inventory Levels*

Plaintiffs allege sufficient facts to show that Defendants knew or were reckless in failing to learn Salix's true inventory levels. Two sets of alleged facts support Plaintiffs' position: (1) the ease with which potential acquirers discovered Salix's true inventory levels; and (2) Plaintiffs' identification of specific reports and statements showing that Defendants were aware of or could access Salix's true wholesale inventory levels.

First, potential acquirers Allergan, Actavis, and Valeant discovered Salix's high inventory levels within days of performing their due diligence. *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011) (Sweet, J.) (finding scienter where "JPMorgan discovered in the course of one weekend the overvaluation of assets and underestimation of risk exposure"). Allergan, initially denied access to Salix's internal information on three separate occasions, discovered Salix's wholesale inventory levels less than a week after accessing the company's electronic data room. (CCAC ¶¶ 54, 91-93, 140). After conducting its due diligence, Allergan dramatically reduced and eventually dropped its offer to

---

[12] The Individual Defendants' scienter is imputed to Salix. *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-CV-8557, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (McMahon, J.).

acquire Salix. *Id.* Similarly, six days after Actavis was given access to Salix's data to conduct its due diligence, it too withdrew its acquisition offer because of Salix's wholesale inventory levels. *Id.* ¶¶ 92, 140.

The company that ultimately acquired Salix, Valeant Pharmaceuticals, said the process of discerning Salix's inventory levels was "pretty straightforward." *Id.* ¶¶ 132, 142. Valeant's CEO stated that Valeant knew "precisely how much of each product, each SKU [stock keeping unit] is in the channel and in detail," and that Valeant had "about as close to perfect information as you could have in terms of what the inventory situation is." *Id.* Although Valeant's due diligence was conducted after Salix disclosed its true wholesale inventory numbers, Valeant drew the same conclusions from information found in Salix's electronic data room as Allergan and Actavis. The allegations that three different companies were able to quickly discern Salix's true wholesale inventory levels weigh in favor of scienter based on recklessness.

Second, Plaintiffs have identified specific reports *and* statements containing information about Salix's true wholesale inventory level. *See Novak*, 216 F.3d at 308; *see also Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 481-82 (S.D.N.Y. 2010) (Scheindlin, J.). Plaintiffs allege that Salix received reliable non-public reports detailing inventory levels from its wholesalers on at least a quarterly basis. (CCAC ¶ 142). Valeant's CEO confirmed the existence of these "wholesale reports" when describing how Valeant was able to confidently determine Salix's true inventory numbers. *Id.* ¶ 45. Salix also maintained internal reports that were compiled "by adding estimated inventory in the channel at the beginning of the period, plus net product shipments for the period, less estimated prescriptions written for the period." *Id.* ¶ 43. Defendant Derbyshire oversaw this analysis, *id.*, and acting CFO Tim Creech told investors on a conference

call that these internal reports were "consistent" with the reports provided by wholesalers, *id.* ¶ 142.

In addition to these reports, Plaintiffs allege that Defendants claimed they had accurate knowledge of Salix's wholesale inventory levels. When asked by an analyst how he knew inventory levels with specificity, Defendant Derbyshire, CFO of Salix during the Class Period, responded by saying, "we have visibility in the inventories because we know what we ship, we know what pulls through, we know what returns are." (CCAC ¶¶ 4, 48). Defendant Derbyshire's statement concerning Salix's knowledge of precise inventory levels weighs in favor of scienter in this case. *See Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (Sullivan, J.) (plaintiffs adequately pleaded scienter where they alleged defendants "told the investing public that they monitored the value of their portfolio"); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 782-83 (S.D. Tex. 2012) (defendants repeated statements about safety weighed "strongly in favor of the inference that [the CEO] paid special attention to . . . safety efforts or, at the least, was reckless in not doing so while continuing to publicly tout improvements").

The ease with which potential acquirers were able to determine Salix's true wholesale inventory levels, taken together with the specific reports and statements that Plaintiffs identify, suffice to raise a strong inference of scienter.[13]

---

[13] An additional fact supporting scienter is Defendants' decision to cancel the DSAs for Salix's newly acquired company, Santarus. DSAs—which are common in the industry—are a way to reduce the risks related to channel stuffing and better control and manage inventories. (CCAC ¶ 47). In 2008 Salix's auditor, Ernst & Young LLP, recommended that Salix enter into DSAs as a way to "reduce the risk of accounting issues related to 'channel stuffing,'" as doing so helps companies to "maintain inventory levels that are consistent with the underlying demand." *Id.* Salix not only failed to implement DSAs itself, but Salix also cancelled the DSAs between Santarus and its wholesalers upon acquiring Santarus. *Id.* ¶ 48.

b. *Salix's Board Exercises the Clawback Provisions in the Individual Defendants' Resignation Agreements*

In further support of an inference of scienter, Plaintiffs allege that Salix clawed back millions of dollars' worth of compensation from the Individual Defendants. (CCAC ¶¶ 23, 136, 138). Although Defendants have never explicitly admitted to engaging in wrongdoing, Defendants do not dispute that one of provisions of the resignation agreements allows for a clawback based on a Board determination that the Individual Defendants "intentionally engaged in wrongdoing."[14] (Salix Reply, 6-7 [Doc. No. 112]); (Decl. of Jared J. Stanisci, Exs. G-I, [Doc. Nos. 99-7, 99-8, 99-9]). The Board's decision to exercise the clawback against the Individual Defendants, regardless of the provision of the resignation agreements under which it was exercised, weighs in favor of a strong inference of scienter.

c. *The Individual Defendants' Resignations*

The Individual Defendants' resignations provide additional evidence of scienter. *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) (Holwell, J.) (noting that "highly unusual or suspicious" resignations add to the overall pleading of circumstantial evidence of fraud, including "when independent facts indicate that the resignation was somehow tied to the fraud alleged"); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (Scheindlin, J.) (finding that resignations of company's CEO and auditor supported inference of scienter); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n. 176 (S.D.N.Y. 2007) (Scheindlin, J.) (noting that "the resignations of [the defendants], although

---

[14] Plaintiffs note that the clawback provision may be exercised if: "the Board of Directors of Parent, acting in good faith, determines that, at any time during the period in which you were employed by Salix or served as a director, officer or employee of the Company, including, without limitation, Parent, you intentionally engaged in wrongdoing that has resulted, or would reasonably be expected to result, in material harm to Parent or any of its subsidiaries or affiliates, or to the business or reputation of Parent or any of its subsidiaries or affiliates." (Decl. of Jared J. Stanisci, Exs. G-H, [Doc. No. 99-7, 99-8]).

not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud"). Defendant Derbyshire resigned the day Salix announced its true wholesale inventory numbers. (CCAC ¶¶ 32, 138). Defendant Logan, who was "manning the wheel" at Salix when it was engaging in allegedly fraudulent conduct, retired two months later, during investigations by Salix's Audit Committee and the SEC. *Id.* ¶¶ 20, 115, 138. The resignations of the Individual Defendants were "highly unusual or suspicious" because the Board exercised the clawback provisions in their resignation agreements, and Salix later issued restatements of its financial statements for the full year 2013 and for the first three quarters of 2014. *Id.* ¶¶ 116-27; *see, e.g.*, *In re Adaptive Broadband Sec. Litig.,* No. 01-CV-1092, 2002 WL 989478, at \*14 (N.D. Cal. Apr. 2, 2002) (finding support for scienter where corporate officers' resignations "occurred as [the company]'s financials were being restated and as [the company] was conducting its own internal investigation."). Thus, the circumstances of Defendants' resignations support a strong inference of scienter.

> d.   *The Magnitude of the Alleged Fraud and the Core Operations Rationale*

The magnitude of Defendants' alleged fraud and the fact that it involved the core operations of Salix's business also support a strong inference of scienter. Although Defendants are correct that Plaintiffs cannot plead scienter based *solely* on the magnitude of the fraud or on the fact that the alleged fraud concerned Salix's core operations, these additional allegations buttress the allegations of scienter discussed above. *See, e.g. Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) (Koeltl, J.) ("[T]he magnitude of the alleged fraud provides some additional circumstantial evidence of scienter."); *In re Complete Mgmt. Inc. Sec. Litig.,* 153 F. Supp. 2d at 327 (citing *Rothman v. Gregor,* 220 F.3d 81, 92 (2d Cir. 2000)) ("[T]he magnitude of the write-off rendered 'less credible' the proposition that

30

defendants there were somehow surprised by their sudden reversal of fortune.");[15] *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) (Sullivan, J.) ("[T]he Court considers 'core operations' allegations to constitute supplementary but not independently sufficient means to plead scienter.").

The magnitude of the alleged fraud is startling by any measure; inventory levels were three times what Defendants had previously stated, and the backlog resulted in a $500 million diminution in revenue compared to previous projections. (CCAC ¶ 5). And the alleged fraud concerned Salix's core drugs: Xifaxan, Apriso, Glumetza, and Uceris. *Id.* ¶¶ 63-68. Further, wholesale inventory levels were crucial metrics for tracking sales of these drugs, and in turn provided one of the "most critical accounting policies and estimates upon which [the Company's] financial status depends." (CCAC ¶¶ 3, 8, 40, 146, 165). *See New Orleans Employees Ret. Sys. v. Celestica*, Inc., 455 F. App'x 10, 14 & n.3 (2d Cir. 2011) (plaintiffs properly pleaded scienter where "inventory levels" were "key to measuring Celestica's financial performance and [were] a subject about which investors and analysts often inquired"). The magnitude of the alleged fraud, and the fact that it involved Salix's key drugs and "critical" wholesale inventory metric, all provide additional support for finding that Defendants acted with scienter. *See, e.g.*, *In re Dynex Capital, Inc. Sec. Litig.*, No. 05-CV-1897, 2009 WL 3380621, at *15 (S.D.N.Y. Oct. 19, 2009) (Baer, J.) (citing cases) ("[W]hen paired with allegations of knowledge or recklessness the fact of the restatement, as well as its size and relation to a defendant's 'core operations' are all some evidence of scienter.").

---

[15] *See also In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 763 F. Supp. 2d at 517 ("Although the size of the fraud alone does not create an inference of scienter, 'the enormous amounts at stake coupled with the detailed allegations regarding the nature and extent of [the client's] fraudulent accounting and [the accountant's] failure to conduct a thorough and objective audit create a strong inference that [the auditor] was reckless in not knowing that its audit opinions materially misrepresented [the company's] financial state.') (quoting *In re Global Crossing*, 322 F. Supp. 2d 319, 347 (S.D.N.Y. 2004) (Lynch, J.)).

2.  <u>Defendant's Arguments Are Unavailing</u>

Defendants' arguments against there being a strong inference that Defendants acted with scienter fail because: (1) Defendants do not present a cogent non-fraudulent inference; and (2) Defendants are wrong that this is a fraud-by-hindsight case.

First, Defendants fail to provide the Court with any cogent non-fraudulent inference that is *more* compelling than the inferences of fraud alleged by Plaintiffs. *See, e.g.*, *Sloman v. Presstek, Inc.*, No. 06-CV-377, 2007 WL 2740047, *7-8, (D.N.H. Sept. 18, 2007). Defendants state only that there is a "plausible inference of non-culpability." (Salix Reply, 4). To the extent that Defendants expand on what that plausible inference may be, they do so by stating merely that the alleged fraud was a "mistake." (Salix Mot., 14). Defendants fail to posit any rational inferences of benign intent.

Second, Defendants are incorrect that this is a fraud-by-hindsight case. Courts often reject an incantation of fraud-by-hindsight when plaintiffs allege that "the company failed to take into account information that was available to it" at the time that the company issued the incorrect statements or omissions. *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F. Supp. 2d 474, 494-95 (S.D.N.Y. 2004) (Conner, J.); *see also In re Vivendi Universal, S.A.*, No. 02-CV-5571, 2004 WL 876050, at *6 (S.D.N.Y. Apr. 22, 2004) (Holwell, J.) (collecting cases) (rejecting defendant's contention that "plaintiffs' allegations of a 'liquidity crisis' constitute pleading fraud by hindsight" because "the Second Circuit has explicitly recognized that plaintiffs may rely on post-class period data to confirm what a defendant should have known during the class period"). Here, Plaintiffs have identified wholesale reports, internal reports, and statements by Defendants indicating their contemporaneous knowledge of wholesale inventory levels. Although some of Plaintiffs' allegations are based on events that occurred after the Class Period,

Plaintiffs have met their burden of pleading scienter under the PSLRA, given the events alleged to have that occurred during the Class Period.

Accordingly, Plaintiffs' allegations are sufficient to state a claim under Section 10(b) and Rule 10b-5.[16]

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are DENIED in their entirety.

SO ORDERED.

Dated: New York, New York
        April 22, 2016

_____/s/_____
KIMBA M. WOOD
United States District Judge

---

[16] Because the Court finds that Plaintiffs have sufficiently alleged direct liability for each Defendant under Section 10 of the Exchange Act, it does not reach the issue of secondary liability for the Individual Defendants under Section 20(a).