**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | Case No. 14 Civ. 8925 (KMW) |
| IN RE SALIX PHARMACEUTICALS, LTD. | ) | CLASS ACTION |
| | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S**
**MOTION FOR AN AWARD OF ATTORNEYS' FEES**
**<u>AND REIMBURSEMENT OF LITIGATION EXPENSES</u>**

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
Salvatore J. Graziano
John Rizio-Hamilton
Katherine M. Sinderson
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiff the Pentwater*
*Funds and Lead Counsel for the Settlement*
*Class*

Dated:  June 19, 2017

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………………..iii

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ..............................................................................................................5

I.    LEAD COUNSEL IS ENTITLED TO AN  AWARD OF ATTORNEYS' FEES
FROM THE COMMON FUND ..........................................................................5

II.    THE COURT SHOULD AWARD A REASONABLE  PERCENTAGE OF THE
COMMON FUND ..............................................................................................6

III.    THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER
EITHER THE PERCENTAGE-OF-THE-FUND METHOD OR THE
LODESTAR METHOD......................................................................................7

    A.    The Requested Attorneys' Fees Are Reasonable Under the Percentage-of-
the-Fund Method....................................................................................7

    B.    The Requested Attorneys' Fees Are Reasonable Under the Lodestar
Method ...................................................................................................9

IV.    THE FEE REQUEST IS ENTITLED TO A PRESUMPTION OF
REASONABLENESS BECAUSE IT IS BASED ON AN A FEE AGREEMENT
ENTERED INTO WITH LEAD PLAINTIFF AT THE OUTSET OF THE
LITIGATION....................................................................................................11

V.    OTHER FACTORS CONSIDERED BY COURTS IN THE SECOND CIRCUIT
CONFIRM THAT THE REQUESTED FEE IS FAIR AND REASONABLE.................13

    A.    The Time and Labor Expended Support the Requested Fee...................14

    B.    The Risks of the Litigation Support the Requested Fee .......................15

    C.    The Magnitude and Complexity of the Action Support the Requested Fee .........18

    D.    The Quality of Lead Counsel's Representation Supports the Requested
Fee........................................................................................................18

    E.    The Requested Fee in Relation to the Settlement .................................19

    F.    Public Policy Considerations Support the Requested Fee .....................20

    G.    The Reaction of the Settlement Class to Date Supports the Requested Fee ..........20

VI.    LEAD COUNSEL'S EXPENSES ARE REASONABLE AND WERE
NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED .................21

VII.   PLAINTIFFS SHOULD BE AWARDED THEIR REASONABLE COSTS AND
       EXPENSES UNDER 15 U.S.C. §78u-4(a)(4)....................................................................22

CONCLUSION..........................................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
    No. 03 MDL 1529 LMM, 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006), *aff'd*,
    272 F. App'x 9 (2d Cir. 2008) ........................................................................8, 19

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
    No. 03-1519 (AET), slip op. (D.N.J. Jan. 30, 2013), ECF No. 405.........................8

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001)...................................................................15

*Anwar v. Fairfield Greenwich Ltd.*,
    1:09-cv-00118 (S.D.N.Y.) ......................................................................................7

*In re Apollo Grp. Inc. Sec. Litig.*,
    No. 04-2147, 2012 WL 1378677 (D. Ariz. Apr. 20, 2012) .....................................9

*In re AremisSoft Corp. Sec. Litig.*,
    210 F.R.D. 109 (D.N.J. 2002)...........................................................................9, 11

*In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act
    (ERISA) Litig.*,
    772 F.3d 125 (2d Cir. 2014)..................................................................................23

*In re Bank of New York Mellon Corp. Forex Transactions Litig.*,
    148 F. Supp. 3d 303, 305 (S.D.N.Y. 2015)............................................................8

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
    472 U.S. 299 (1985)................................................................................................6

*Bd. of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
    No. 09 Civ. 686 (SAS), 2012 WL 2064907 (S.D.N.Y. June 7, 2012)....................8

*Blum v. Stenson*,
    465 U.S. 886 (1984) (Brennan, J., concurring).......................................................7

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980)................................................................................................5

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001)..................................................................................12

*In re China Sunergy Sec. Litig.*,
    No. 07 Civ. 7895 (DAB), 2011 WL 1899715 (S.D.N.Y. May 13, 2011)..............21

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974).............................................................................15

*In re CMS Energy Sec. Litig.*,
    No. 02-cv-72004, 2007 WL 9611274 (E.D. Mich. Sept. 6, 2007) ............................9

*In re Comverse Tech., Inc. Sec. Litig.*,
    No. 06-CV-1825 (NGG) (RER), 2010 WL 2653354 (E.D.N.Y. June 24, 2010) ........... *passim*

*Cornwell v. Credit Suisse Grp.*,
    No. 08-cv-03758 (VM), slip op. (S.D.N.Y. July 18, 2011), ECF No. 117 ............................11

*In re DaimlerChrysler AG Sec. Litig.*,
    No. 00-0993 (KAJ), slip op. (D. Del. Feb. 5, 2004), ECF No. 971 ..........................9

*In re Deutsche Telekom AG Sec. Litig.*,
    No. 00-CV-9475 (NRB), 2005 WL 7984326 (S.D.N.Y. June 9, 2005) ............................8, 11

*DeValerio v. Olinski*,
    673 F. App'x 87 (2d Cir. 2016) ........................................................................12

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
    No. 02-CV-3400 (CM) (PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)................ *passim*

*In re Genworth Fin. Inc. Sec. Litig.*,
    No. 3:14-cv-00682-JRS, 2016 WL 7187290 (E.D. Va. Sept. 26, 2016) ..................................8

*In re Gilat Satellite Networks, Ltd.*,
    No. CV-02-1510 (CPS)(SMG), 2007 WL 2743675 (E.D.N.Y. Sept. 18, 2007) ....................24

*In re Global Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) .......................................................................19

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000)........................................................................ *passim*

*Hicks v. Morgan Stanley*,
    No. 01 Civ. 10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005)..........................6, 20

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002).............................................................11, 20

*In re Marsh & McLennan Cos. Sec. Litig.*,
    No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)..........................12, 23

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) .......................................................................7, 18

*In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*,
No. 08-2177 (DMC)(JAD), 2013 WL 5505744 (D.N.J. Oct. 1, 2013)...................................8

*Missouri v. Jenkins*,
491 U.S. 274 (1989)..............................................................................................7, 10

*N.J. Carpenters Health Fund v. Residential Capital LLC*,
No. 08-cv-8781-HB, slip op. (S.D.N.Y. July 31, 2015), ECF No. 353 ...................................8

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
No. 08-cv-10783, 2016 WL 3369534 (S.D.N.Y. May 2, 2016) ..........................................7, 11

*In re Nortel Networks Corp. Sec. Litig.*,
539 F.3d 129 (2d Cir. 2008)..............................................................................12, 13

*In re Oxford Health Plans, Inc. Sec. Litig.*,
MDL No. 1222, 2003 U.S. Dist. LEXIS 26795 (S.D.N.Y. June 12, 2003)..............................8

*In re Pfizer Inc. Sec. Litig.*,
No. 04-cv-09866 (LTS) (HBP), slip op. (S.D.N.Y. Dec. 21, 2016), ECF No.
727....................................................................................................................8

*In re Rite Aid Corp. Sec. Litig.*,
146 F. Supp. 2d 706 (E.D. Pa. 2001) ....................................................................9

*In re Rite Aid Corp. Sec. Litig.*,
362 F. Supp. 2d 587 (E.D. Pa. Mar. 24, 2005) ................................................9, 11

*Savoie v. Merchs. Bank*,
166 F.3d 456 (2d Cir. 1999)..............................................................................6

*In re Schering-Plough Corp. Sec. Litig.*,
No. 01-829, 2009 WL 5218066 (D.N.J. Dec. 31, 2009)...............................................9

*Schuh v. HCA Holdings Inc.*,
No. 3:11-cv-01033, slip op. (M.D. Tenn. Apr. 14, 2016), ECF No. 563...............................8

*Schwartz v. TXU Corp.*,
No. 02-2243, 2005 WL 3148350 (N.D. Tex. Nov. 8, 2005)...........................................9

*Silverman v. Motorola, Inc.*,
No. 07 C 4507, 2012 WL 1597388 (N.D. Ill. May 7, 2012), *aff'd*, 739 F.3d
956 (7th Cir. 2013)............................................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..........................................................................................6

v

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
    724 F. Supp. 2d 160 (S.D.N.Y. 1989) ........................................................................10

*In re Veeco Instruments Inc. Sec. Litig.*,
    No. 05 MDL 01695 (CM), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ...................... *passim*

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005) ...................................................................................7, 10

*In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*,
    364 F. Supp. 980 (D. Minn. 2005) .............................................................................11

**Statutes**

15 U.S.C. §78u-4(a)(4) .............................................................................................22

**Other Authorities**

Fed. R. Civ. P. 23(h) ...................................................................................................1

Fed. R. Civ. P. 30(b)(6) ............................................................................................10

H.R. Conf. Rep. No. 104-369, (1995), reprinted in 1995 U.S.C.C.A.N. 730 ...............................12

Court-appointed Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP ("Lead Counsel"), respectfully submits this memorandum of law in support of its motion, pursuant to Rule 23(h) of the Federal Rules of Civil Procedure, for an award of attorneys' fees in the amount of $44,613,850, or approximately 21.24% of the Settlement Fund, plus interest earned at the same rate as the Settlement Fund.[1]   Lead Counsel also seeks reimbursement of $1,930,744.24 in litigation expenses that were reasonably and necessarily incurred in prosecuting and resolving the Action, and reimbursement of $29,800.00 in costs incurred by Plaintiffs directly related to their representation of the Settlement Class.

## PRELIMINARY STATEMENT

The proposed Settlement, which provides for payment of $210 million in cash in exchange for the resolution of the Action, is an excellent result for the Settlement Class.  The Settlement represents a substantial percentage of the likely recoverable damages in this case.  In undertaking this litigation, counsel faced numerous challenges to proving both liability and damages that posed the serious risk of no recovery, or a substantially lesser recovery than the Settlement, for the Settlement Class.  The significant monetary recovery was achieved through the skill, tenacity and effective advocacy of Lead Counsel, which litigated this Action on a fully contingent fee basis against highly skilled defense counsel.  Lead Counsel had to devote a vast amount of time and resources to the Action, litigating through an extensive and hard-fought fact discovery process before the Settlement could be obtained.

---

[1]   Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated March 24, 2017 (ECF No. 216-1) (the "Stipulation") or in the Declaration of Salvatore J. Graziano in Support of (I) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Graziano Declaration" or "Graziano Decl."), filed herewith.  Citations to "¶" in this memorandum refer to paragraphs in the Graziano Declaration.

As detailed in the accompanying Graziano Declaration,[2] Lead Counsel vigorously pursued this litigation from its outset by, among other things: (i) conducting an extensive investigation into Defendants' alleged misstatements, which included a thorough review of SEC filings, analyst reports, conference call transcripts, press releases, company presentations, media reports and other public information; (ii) drafting a detailed consolidated complaint based on this investigation; (iii) successfully opposing Defendants' motions to dismiss; (iv) engaging in substantial and highly contested fact discovery efforts, which included obtaining and reviewing more than 2.7 million pages of documents produced by Defendants and third parties; taking, defending, or participating in 13 depositions; and litigating a number of significant discovery disputes; (v) moving for class certification, including conducting related discovery, preparing an expert report on market efficiency, and opposing a motion by Defendants to exclude the testimony of Lead Plaintiff's expert; (vi) consulting extensively with experts concerning loss causation and damages, accounting issues, and the pharmaceutical industry; and (vii) negotiating the Settlement with Defendants.  ¶¶ 5, 17-48.

The Settlement achieved through Lead Counsel's efforts is a particularly favorable result when considered in light of the significant risks of proving the Defendants' liability and establishing damages, which are set forth in detail in the Graziano Declaration at paragraphs 50 to 68.  With respect to liability, Defendants would contend that their alleged misstatements concerning Salix's wholesale inventory levels were not actionable or false, because they were

---

[2]  The Graziano Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Action (¶¶ 14-49); the nature of the claims asserted (¶¶ 10-13, 19-20); the negotiations leading to the Settlement (¶¶ 46-48); the risks and uncertainties of continued litigation (¶¶ 50-68); and a description of the services Lead Counsel provided for the benefit of the Settlement Class (¶¶ 5, 14-48).

general estimates or targets, rather statements of present fact, and that their statements about product revenues were accurate and were not misleading because they had not engaged in any improper "channel stuffing."  ¶¶ 51-53.  Lead Plaintiff would have faced even more meaningful hurdles in proving that Defendants acted with scienter.  Defendants would argue that they did not know the precise inventory levels for Salix's products, which were held by third-party wholesalers, and that calculation of these inventory levels was imprecise and based on uncertain, judgmental estimates regarding future sales patterns, and, thus, any errors in their statements concerning the inventory levels were not intended.  ¶ 54.

Moreover, Defendants also disputed loss causation and damages in the Action. Defendants would have contested the amount of damages that could be attributed to the revelation of allegedly false statements, as opposed to new information about Salix that was unrelated to the alleged fraud, and would have challenged Plaintiffs' ability to prove what part of the damages were caused by the disclosure of the fraud.  ¶¶ 61-63.  Defendants also would have argued that a large portion of the class was not harmed because the price of Salix common stock quickly rebounded from its price following the corrective disclosure, and because the Company was acquired relatively shortly after the revelation of the fraud at a price that significantly exceeded the share price at the end of the Class Period.  ¶ 64.  Given these risks, Lead Counsel respectfully submits that the Settlement achieved is a testament to its hard work and the quality of its representation.

As compensation for their efforts on behalf of the Settlement Class and the risks of non-payment they faced in bringing the Action on a contingent basis, Lead Counsel seeks an award of $44,613,850 in attorneys' fees, and reimbursement of reasonable litigation expenses.  The requested fee amounts to approximately 21.24% of the Settlement Amount, which is well within

the range of fees that courts in this Circuit have awarded in securities class actions with comparable recoveries on a percentage basis.  Further, the requested fee represents a multiplier of 3.1 of Plaintiffs' Counsel's lodestar, which is within the range of multipliers typically awarded in class actions with significant contingency risks such as this one.

Moreover, the fee is requested pursuant to a written retainer agreement entered into between Lead Plaintiff the Pentwater Funds and Lead Counsel at the outset of the litigation. ¶ 87.  Lead Plaintiff is a sophisticated institutional investor that actively supervised the Action and has endorsed the requested fee as consistent with its agreement and as fair and reasonable in light of the quality of the result obtained, the work counsel performed and the risks of the litigation.  *See* Declaration of Francis J. Strezo, attached as Exhibit 2 to the Graziano Declaration ("Strezo Decl."), at ¶¶ 8-10.

In addition, pursuant to the Preliminary Approval Order, 68,694 copies of the Notice have been mailed to potential Settlement Class Members and their nominees through June 16, 2017, and the Summary Notice was published in *The Wall Street Journal* and transmitted over the *PR Newswire*.  *See* Declaration of Stephanie A. Thurin Regarding (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date, attached as Exhibit 1 to the Graziano Decl. ("Thurin Decl."), at ¶ 7, 8.  The Notice advised potential Settlement Class Members that Lead Counsel would apply for an award of attorneys' fees in amount not to exceed 22% of the Settlement Fund and reimbursement of litigation expenses (including reimbursement of the reasonable costs and expenses of Plaintiffs) in an amount not to exceed $2.5 million.  *See* Thurin Decl. Exh. A at ¶¶ 5, 77.  The fees and expenses sought by Lead Counsel do not exceed the amounts set forth in the Notice.  While the deadline set by the Court for Settlement Class Members to object to the

requested attorneys' fees and expenses has not yet passed, to date, no objections to the requests for fees and expenses have been received.  ¶¶ 74, 98.[3]

In light of the recovery obtained, the time and effort devoted by Lead Counsel, the work performed, the skill and expertise required, and the risks that counsel undertook, Lead Counsel submits that the requested fee award is reasonable.  In addition, the expenses for which Lead Counsel seeks reimbursement were reasonable and necessary for the successful prosecution of the Action.

## ARGUMENT

### I.  LEAD COUNSEL IS ENTITLED TO AN AWARD OF ATTORNEYS' FEES FROM THE COMMON FUND

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).  Courts recognize that awards of fair attorneys' fees from a common fund "serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons," and therefore "to discourage future misconduct of a similar nature."  *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM) (PED), 2010 WL 4537550, at *23 (S.D.N.Y. Nov. 8, 2010) (citation omitted); *see In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115808, at *2 (S.D.N.Y. Nov. 7, 2007) (same).

---

[3]  The deadline for the submission of objections is July 5, 2017.  Should any objections be received, Lead Counsel will address them in reply papers, which will be filed with the Court on or before July 17, 2017.

Indeed, the Supreme Court has emphasized that private securities actions, such as the instant Action, are "an essential supplement to criminal prosecutions and civil enforcement actions" brought by the SEC. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *accord Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'") (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)). Compensating plaintiffs' counsel for the risks they take in bringing these actions is essential, because "[s]uch actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class." *Hicks v. Morgan Stanley*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005).

## II. THE COURT SHOULD AWARD A REASONABLE PERCENTAGE OF THE COMMON FUND

Lead Counsel respectfully submits that the Court should award a fee based on a percentage of the common fund obtained. The Second Circuit has expressly approved the percentage method, recognizing that "the lodestar method proved vexing" and had resulted in "an inevitable waste of judicial resources." *Goldberger*, 209 F.3d at 48-50 (holding that either the percentage of fund method or lodestar method may be used to determine appropriate attorneys' fees); *Savoie v. Merchs. Bank*, 166 F.3d 456, 460 (2d Cir. 1999) (stating that the "percentage-of-the-fund method has been deemed a solution to certain problems that may arise when the lodestar method is used in common fund cases"). More recently, the Second Circuit has reiterated its approval of the percentage method, stating that it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation," and has noted that the "trend in this Circuit is toward the percentage

method." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (citations omitted); *see also In re Converse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG) (RER), 2010 WL 2653354, at *2 (E.D.N.Y. June 24, 2010); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 146 (S.D.N.Y. 2010).

### III.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER EITHER THE PERCENTAGE-OF-THE-FUND METHOD OR THE LODESTAR METHOD

#### A.   The Requested Attorneys' Fees Are Reasonable Under the Percentage-of-the-Fund Method

The Supreme Court has recognized that an appropriate court-awarded fee is intended to approximate what counsel would receive if they were bargaining for the services in the marketplace. *See Missouri v. Jenkins*, 491 U.S. 274, 285-86 (1989).   If this were a non-representative action, the customary fee arrangement would be contingent, on a percentage basis, and typically in the range of 30% to 33% of the recovery.   *See Blum v. Stenson*, 465 U.S. 886, 903 (1984) ("In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers.   In those cases, therefore, the fee is directly proportional to the recovery.") (Brennan, J., concurring).

The fee of approximately 21.24% requested by Lead Counsel pursuant to its retainer agreement with Lead Plaintiff is well within the range of percentage fees that have been awarded in the Second Circuit in securities class actions and other similar litigation with comparable recoveries.   *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, 1:09-cv-00118 (S.D.N.Y.) (awarding total fees of 28.8% on $235.25 million aggregate settlement)[4]; *NECA-IBEW Health & Welfare*

---

[4] Four separate fee orders were entered in *Anwar v. Fairfield Greenwich Ltd.*, 1:09-cv-00118 (S.D.N.Y.) on March 28, 2013, November 22, 2013, November 20, 2015 and May 6, 2016 (ECF Nos. 1099, 1233, 1457, 1569) (all attached hereto as Exhibit 1).

*Fund v. Goldman Sachs & Co.*, No. 08-cv-10783, 2016 WL 3369534, at *1 (S.D.N.Y. May 2, 2016) (awarding 21% of $272 million settlement); *In re Bank of New York Mellon Corp. Forex Transactions Litig.*, 148 F. Supp. 3d 303, 305 (S.D.N.Y. 2015) (awarding 25% of $180 million settlement); *Bd. of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09 Civ. 686 (SAS), 2012 WL 2064907, at *3 (S.D.N.Y. June 7, 2012) (awarding 25% of $150 million settlement); *Comverse*, 2010 WL 2653354, at *6 (awarding 25% of $225 million settlement); *In re Deutsche Telekom AG Sec. Litig.*, No. 00-CV-9475 (NRB), 2005 WL 7984326, at *4 (S.D.N.Y. June 9, 2005) (awarding 28% of $120 million settlement); *In re Oxford Health Plans, Inc. Sec. Litig.*, MDL No. 1222, 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003) (awarding 28% of $300 million settlement).[5]

The requested fee is also consistent with fee awards in similarly sized securities class actions in other circuits. *See, e.g., In re Genworth Fin. Inc. Sec. Litig.,* No. 3:14-cv-00682-JRS, 2016 WL 7187290, at *1-*2 (E.D. Va. Sept. 26, 2016) (awarding 28% of $219 million settlement); *Schuh v. HCA Holdings Inc.,* No. 3:11-cv-01033, slip op. at 1 (M.D. Tenn. Apr. 14, 2016), ECF No. 563 (awarding 30% of $215 million settlement) (attached hereto as Ex. 2); *In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*, No. 08-2177 (DMC)(JAD), 2013 WL 5505744, at *3, *46 (D.N.J. Oct. 1, 2013) (awarding a 28% of $215 million settlement); *Alaska Elec. Pension Fund v. Pharmacia Corp.*, No. 03-1519 (AET), slip op. at 2 (D.N.J. Jan. 30, 2013), ECF No. 405

---

[5] Indeed, percentage fees of this amount and higher have often been awarded in much larger settlements in the Southern District. *See, e.g., In re Pfizer Inc. Sec. Litig.*, No. 04-cv-09866 (LTS) (HBP), slip op. at 2 (S.D.N.Y. Dec. 21, 2016), ECF No. 727 (awarding 28% of $486 million settlement) (attached hereto as Ex. 3); *N.J. Carpenters Health Fund v. Residential Capital LLC*, No. 08-cv-8781-HB, slip op. at 2 (S.D.N.Y. July 31, 2015), ECF No. 353 (awarding 20.75% of $335 million settlement) (attached hereto as Ex. 4); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529 LMM, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) (awarding 21.4% of $455 million settlement), *aff'd*, 272 F. App'x 9 (2d Cir. 2008).

(awarding 27.5% of $164 million settlement) (attached hereto as Ex. 5); *In re Apollo Grp. Inc. Sec. Litig.*, No. 04-2147, 2012 WL 1378677, at *9 (D. Ariz. Apr. 20, 2012) (awarding 33.3% of $145 million settlement); *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 WL 1597388, at *4 (N.D. Ill. May 7, 2012) (awarding 27.5% of $200 million settlement), *aff'd*, 739 F.3d 956 (7th Cir. 2013); *In re Schering-Plough Corp. Sec. Litig.*, No. 01-829, 2009 WL 5218066, at *5-*6 (D.N.J. Dec. 31, 2009) (awarding 23% of $165 million settlement fund); *In re CMS Energy Sec. Litig.*, No. 02-cv-72004, 2007 WL 9611274, at *4 (E.D. Mich. Sept. 6, 2007) (awarding 22.5% of $200 million settlement); *Schwartz v. TXU Corp.*, No. 02-2243, 2005 WL 3148350, at *24-*34 (N.D. Tex. Nov. 8, 2005) (awarding 22% of $149.75 million settlement); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589 (E.D. Pa. Mar. 24, 2005) (awarding 25% of $126.6 million settlement); *In re DaimlerChrysler AG Sec. Litig.*, No. 00-0993 (KAJ), slip op. at 1 (D. Del. Feb. 5, 2004), ECF No. 971 (awarding 22.5% of $300 million settlement) (attached hereto as Ex. 6); *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 130-35 (D.N.J. 2002) (awarding 21.6% of $194 million settlement); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 736 (E.D. Pa. 2001) (awarding 25% of $193 million settlement).

In sum, the fee requested here is well within the range of fees awarded on a percentage basis in comparable actions.

### B.      The Requested Attorneys' Fees Are Reasonable Under the Lodestar Method

To ensure the reasonableness of a fee awarded under the percentage-of-the-fund method, the Second Circuit encourages district courts to cross-check the proposed award against counsel's lodestar. *See Goldberger*, 209 F.3d at 50.

Here, Plaintiffs' Counsel[6] spent a total of 34,402.35 hours of attorney and other professional support time prosecuting the Action for the benefit of the Settlement Class. ¶ 89. Plaintiffs' Counsel's lodestar, derived by multiplying the hours spent by each attorney and paraprofessional by their current hourly rates, is $14,185,499.25.[7] *See id.* The requested fee of $44,613,850 (before interest), therefore represents a multiplier of 3.1 of the total lodestar.

The requested 3.1 multiplier in this Action is within the range of multipliers commonly awarded in securities class actions and other comparable litigation. In cases of this nature, fees representing multiples above the lodestar are regularly awarded to reflect the contingency fee risk and other relevant factors. *See FLAG Telecom*, 2010 WL 4537550, at *26 ("a positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors"); *Comverse*, 2010 WL 2653354, at *5 ("Where, as here, counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar").

Indeed, in complex contingent litigation, lodestar multipliers between 2 and 5 are commonly awarded. *See, e.g., Wal-Mart*, 396 F.3d at 123 (upholding multiplier of 3.5 as

---

[6] In addition to Lead Counsel, Plaintiffs' Counsel includes Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), counsel for named plaintiff Fort Lauderdale; and Hach Rose Schirripa & Cheverie, LLP ("Hach Rose"). These firms performed work under the direction of Lead Counsel that assisted in the prosecution of this Action and provided a benefit to the Settlement Class by, among other things, assisting in the drafting and review of pleadings and motion papers and assisting with the review of documents produced in discovery. In addition, Robbins Geller assisted in the production of documents by Fort Lauderdale and prepared for and defended the Rule 30(b)(6) deposition of Fort Lauderdale.

[7] The Supreme Court and courts in this Circuit have approved the use of current hourly rates to calculate the base lodestar figure as a means of compensating for the delay in receiving payment, inflationary losses, and the loss of interest. *See Missouri v. Jenkins*, 491 U.S. at 284; *Veeco*, 2007 WL 4115808 at *9; *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp. 2d 160, 163 (S.D.N.Y. 1989).

reasonable on appeal); *NECA-IBEW v. Goldman*, 2016 WL 3369534, at *1 (awarding 21% fee on $272 million settlement representing a 3.9 multiplier); *Deutsche Telekom*, 2005 WL 7984326, at *4 (awarding 25% of $120 million settlement representing a 3.96 multiplier); *Cornwell v. Credit Suisse Grp.*, No. 08-cv-03758 (VM), slip op. at 4 (S.D.N.Y. July 18, 2011), ECF No. 117 (awarding fee representing a 4.7 multiplier) (attached hereto as Ex. 7); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (awarding fee equal to a 4.65 multiplier, which was "well within the range awarded by courts in this Circuit and courts throughout the country").[8]

In sum, Lead Counsel's requested fee award is well within the range of what courts in this Circuit regularly award in class actions such as this one, whether calculated as a percentage of the fund or in relation to Lead Counsel's lodestar. Moreover, as discussed below, each of the factors established for the review of attorneys' fee awards by the Second Circuit in *Goldberger* also strongly supports a finding that the requested fee is reasonable.

## IV. THE FEE REQUEST IS ENTITLED TO A PRESUMPTION OF REASONABLENESS BECAUSE IT IS BASED ON AN A FEE AGREEMENT ENTERED INTO WITH LEAD PLAINTIFF AT THE OUTSET OF THE LITIGATION

The requested fee should be afforded a presumption of reasonableness because it is based on an agreement Lead Counsel entered into with a sophisticated institutional Lead Plaintiff at the outset of the litigation. And, even if a formal presumption of reasonableness is not afforded to the fee based on the pre-litigation agreement, the existence of the agreement and the approval of

---

[8] *See also AremisSoft*, 210 F.R.D. at 135 (awarding 21.6% of $194 million settlement representing a 4.3 multiplier); *Rite Aid*, 362 F. Supp. 2d at 589-90 (awarding 25% of $126.6 million settlement representing a 6.96 multiplier); *In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*, 364 F. Supp. 980, 999 (D. Minn. 2005) (awarding fee representing a 4.7 multiplier).

the requested fee by Lead Plaintiff, which was actively involved in the prosecution and settlement of the Action, strongly support approval of the fee.

The PSLRA was intended to encourage institutional investors like the Pentwater Funds to assume control of securities class actions in order to "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." H.R. Conf. Rep. No. 104-369, at *32 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 731. Congress believed that these institutions would be in the best position to monitor the ongoing prosecution of the litigation and to assess the reasonableness of counsel's fee request.

A number of courts have found, in light of Congress's intent to empower lead plaintiffs under the PSLRA to select and supervise attorneys on behalf of the class, that a fee agreement entered into by a PSLRA lead plaintiff and its counsel at the outset of the litigation should be considered presumptively reasonable. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001) (*ex ante* fee agreements in securities class actions enjoy "a presumption of reasonableness"); *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *15 (S.D.N.Y. Dec. 23, 2009) ("Since the passage of the PSLRA, courts have found such an agreement between fully informed lead plaintiffs and their counsel to be presumptively reasonable"). While the Second Circuit has not directly ruled on whether a formal presumption of reasonableness should be afforded to a fee agreement entered into between counsel and a lead plaintiff appointed under the PSLRA, *see In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133-34 (2d Cir. 2008) ("We leave open the question of how much weight should be given to fees agreed upon by PSLRA Lead Plaintiffs"); *DeValerio v. Olinski*, 673 F. App'x 87, 91 (2d Cir.

2016) (declining to consider the issue because it had been waived), it has indicated that the Court should, at least, give "serious consideration" to such agreements, *see Nortel*, 539 F.3d at 133-34.

Even if no formal presumption of reasonableness is adopted, Lead Counsel respectfully submits that the fact that the fee is based on the *ex ante* agreement with Lead Plaintiff should be given substantial weight when evaluating the reasonableness of Lead Counsel's fee request.  For example, the Second Circuit has stated that:

> We expect . . . that district courts will give serious consideration to negotiated fees because PSLRA Lead Plaintiffs often have a significant financial stake in the settlement, providing a powerful incentive to ensure that any fees resulting from that settlement are reasonable. In many cases, the agreed-upon fee will offer the best indication of a market rate, thus providing a good starting position for a district court's fee analysis.

*Nortel*, 539 F.3d at 133-34; *see also Comverse*, 2010 WL 2653354, at *4 ("an *ex ante* fee agreement is the best indication of the actual market value of counsel's services").

Here, Lead Plaintiff is a classic example of the type of sophisticated and financially interested investor that Congress envisioned serving as a fiduciary for the class when it enacted the PSLRA.  Lead Plaintiff took a very active role in the litigation and closely supervised the work of Lead Counsel.  *See* Strezo Decl. ¶¶ 4-6.  Accordingly, the endorsement of the fee as reasonable by Lead Plaintiff supports approval of the fee.  *See Veeco*, 2007 WL 4115808, at *8 ("public policy considerations support the award in this case because the Lead Plaintiff . . . – a large public pension fund – conscientiously supervised the work of lead counsel and has approved the fee request").

## V.      OTHER FACTORS CONSIDERED BY COURTS IN THE SECOND CIRCUIT CONFIRM THAT THE REQUESTED FEE IS FAIR AND REASONABLE

The Second Circuit has set forth the following criteria that courts should consider when reviewing a request for attorneys' fees in a common fund case:

(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50 (internal quotes and citation omitted). Consideration of these factors, together with the analyses above, demonstrates that the fee requested by Lead Counsel is reasonable.

### A.     **The Time and Labor Expended Support the Requested Fee**

The substantial time and effort expended by Lead Counsel in prosecuting the Action and achieving the Settlement also support the requested fee. The Graziano Declaration details the efforts of Lead Counsel in prosecuting Lead Plaintiff's claims over the course of the litigation. As set forth in greater detail in the Graziano Declaration, Lead Counsel, among other things:

- conducted an extensive investigation into Defendants' alleged misstatements, which included a thorough review of the SEC filings of Salix and other related companies, analyst reports, conference call transcripts, press releases, company presentations, media reports and other public information, and analysis of the movement and pricing data associated with Salix publicly traded common stock and options with the assistance of a damages expert (¶¶ 17-18);

- researched and drafted a detailed consolidated complaint based on this investigation (¶¶ 19-20);

- successfully opposed Defendants' motions to dismiss following thorough briefing (¶¶ 21-24);

- conducted extensive and highly contested fact discovery efforts, which included obtaining and reviewing more than 2.7 million pages of documents produced by Defendants and third parties (¶¶ 26-33);

- took, defended, or participated in 13 depositions, and had substantially completed preparations for four additional depositions, including those of the two Individual Defendants (Salix's CEO and CFO during the Class Period) (¶¶ 34-35);

- moved for class certification, which included detailed briefing, related discovery, and preparation of an expert report on market efficiency (¶¶ 39-43);

- opposed Defendants' motion to exclude the testimony of Lead Plaintiff's market efficiency expert on *Daubert* grounds (¶¶ 42-43);

- litigated a number of significant discovery disputes, including over the production of documents concerning Salix's internal investigation and the scope of Plaintiffs' obligations to produce pre- and post-Class Period transaction data (¶¶ 36-38, 40);

- consulted extensively with experts concerning loss causation and damages, accounting issues, and the pharmaceutical industry (¶¶ 18, 38, 44-45); and

- engaged in extensive settlement negotiations with Defendants' Counsel (¶¶ 46-48).

As noted above, Lead Counsel and the other Plaintiffs' Counsel expended more than 34,000 hours prosecuting this Action with a lodestar value of over $14 million.   ¶ 89. Throughout the litigation, Lead Counsel staffed the matter efficiently and avoided any unnecessary duplication of effort.   ¶ 90.   The time and effort devoted to this case by Lead Counsel was critical in obtaining the favorable result achieved by the Settlement, and confirms that the fee request here is reasonable.

### B.      The Risks of the Litigation Support the Requested Fee

The risk of the litigation is one of the most important *Goldberger* factors.   *See Goldberger*, 209 F.3d at 54; *Comverse*, 2010 WL 2653354, at *5.   The Second Circuit has recognized that the risks associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974) (citation omitted).   "Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation."   *Comverse*, 2010 WL 2653354, at *5 (citation omitted); *see also In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (it is

"appropriate to take this [contingent-fee] risk into account in determining the appropriate fee to award").

While Lead Counsel believes that the claims of Lead Plaintiff in this Action are meritorious, Lead Counsel recognized that there were a number of substantial risks in the litigation from the outset and that Lead Plaintiff's ability to succeed at trial and obtain a substantial judgment was far from certain.

As discussed in greater detail in the Graziano Declaration and in the memorandum of law in support of the Settlement, there were substantial risks here with respect to establishing both liability and damages in the Action.  Lead Counsel faced the risks that the statements made by Salix and the Individual Defendants concerning Salix's wholesaler inventory levels might be found not to be actionable or false by the Court or a jury.  ¶¶ 51-53.  Defendants contended that their statements about Salix's inventory levels were general estimates or targets that were not actionable because they were forward-looking statements or expressions of corporate optimism, and because the wholesaler inventory levels was imprecise and based on uncertain estimates.  ¶¶ 52, 54.  Lead Counsel also faced the risk that Defendants' statements concerning quarterly product revenues might be found not misleading if Lead Counsel could not prove that Defendants had not engage in improper "channel stuffing" to increase its revenues.  ¶ 53.

Lead Counsel also faced substantial challenges in establishing that Defendants acted with scienter.  Defendants asserted that they lacked reliable information on the precise amount of the inventory levels (which were maintained by third-party wholesalers, not Salix), that those inventory levels were based on uncertain estimates of future sales of Salix products, and that the levels fluctuated and rose significantly during the Class Period.  Thus, they contended that any inaccuracies in their statements concerning the wholesaler inventory levels were due to their

failure to promptly detect those changes, not the result of any intent to deceive investors.  ¶ 54. Moreover, Defendants would have argued that there was no concrete motive for them to engage in fraud.  ¶ 55.

Lead Counsel also recognized that there would be significant challenges in proving loss causation and damages in the Action.  While the price of Salix common stock dropped sharply following the disclosures made after the close of trading on November 6, 2014, Defendants had powerful arguments that a substantial portion of that price decline was attributable to the market's reaction to other (non-fraud related) information about Salix that was released at the same time, including the news that Salix's quarterly earnings would be well below market projections.  ¶¶ 61-62.   Lead Counsel faced the risk that Plaintiffs might not carry their burden of proving what portion of Salix's price decline was attributable to revelation of the allegedly false statements as opposed to the other news, and therefore might not be able to recover any of those damages.  ¶ 63.

Lead Counsel also faced the risks that damages could be substantially reduced because Salix common stock quickly rebounded from its price following the alleged corrective disclosure, and the Company was acquired relatively shortly afterwards at a price that significantly above the share price at the end of the Class Period.  Defendants argued that class members who retained their shares after the end of the Class Period and who benefited from the price rebound by selling the shares they purchased during the Class Period for a gain had no recoverable damages in the Action.  ¶ 64.

In the face of the many uncertainties regarding the outcome of the case, Lead Counsel undertook this case on a wholly contingent basis, knowing that the litigation could last for years and would require the devotion of a substantial amount of time and a significant expenditure of

litigation expenses with no guarantee of compensation. ¶ 94. Lead Counsel's assumption of this contingency fee risk strongly supports the reasonableness of the requested fee. *See FLAG Telecom*, 2010 WL 4537550, at *27 ("Courts in the Second Circuit have recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award."); *Marsh ERISA*, 265 F.R.D. at 148 ("There was significant risk of non-payment in this case, and Plaintiffs' Counsel should be rewarded for having borne and successfully overcome that risk.").

**C.      The Magnitude and Complexity of the Action Support the Requested Fee**

The magnitude and complexity of the Action also support the requested fee. Courts have long recognized that securities class action litigation is "notably difficult and notoriously uncertain." *FLAG Telecom*, 2010 WL 4537550, at *27 (quoting *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999)). This case was no exception. As noted above and in the Graziano Declaration, the litigation raised a number of complex questions concerning liability and loss causation that would have required extensive efforts by Lead Counsel and consultation with experts to bring to resolution. To build the case, Lead Counsel had to dedicate a substantial amount of time to conducting an extensive factual investigation, obtaining extensive discovery from Salix and its wholesalers, through a hard fought and contested process, and working extensively with Lead Plaintiff's experts to analyze the claims and the evidence obtained. Accordingly, the magnitude and complexity of the Action supports the conclusion that the requested fee is fair and reasonable.

**D.      The Quality of Lead Counsel's Representation Supports the Requested Fee**

The quality of the representation by Lead Counsel is another important factor that supports the reasonableness of the requested fee. Lead Counsel submits that the quality of its representation is best evidenced by the quality of the result achieved. *See, e.g.*, *Veeco*, 2007 WL

4115808, at *7; *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 467 (S.D.N.Y. 2004).  Here, the Settlement provides a very favorable result for the Settlement Class in light of the serious risks of continued litigation, and represents a substantial portion of likely recoverable damages.  *See* ¶¶ 50-68.  Lead Counsel respectfully submits that the quality of its efforts in the litigation to date, together with its substantial experience in securities class actions and its commitment to this litigation, provided it with the leverage necessary to negotiate the Settlement.

Courts have repeatedly recognized that the quality of the opposition faced by plaintiffs' counsel should also be taken into consideration in assessing the quality of the counsel's performance.  *See, e.g., Veeco*, 2007 WL 4115808, at *7 (among factors supporting 30% award of attorneys' fees was that defendants were represented by "one of the country's largest law firms"); *Adelphia*, 2006 WL 3378705, at *3 ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work") (citation omitted), *aff'd*, 272 F. App'x 9 (2d Cir. 2008).   Here, Defendants were represented by able counsel from Cadwalader, Wickersham & Taft LLP, Cahill Gordon & Reindel LLP; Williams & Connolly LLP; and Buckley Sandler LLP, who zealously represented their clients throughout this Action. *See* ¶ 92.   Notwithstanding this capable opposition, Lead Counsel's thorough investigation, ability to present a strong case, successful opposition of Defendants' motion to dismiss, and demonstrated willingness to vigorously prosecute the Action through a lengthy and highly contested discovery process enabled it to achieve the favorable Settlement.

### E.    The Requested Fee in Relation to the Settlement

Courts have interpreted this factor as requiring the review of the fee requested in terms of the percentage it represents of the total recovery.  "When determining whether a fee request is reasonable in relation to a settlement amount, 'the court compares the fee application to fees

awarded in similar securities class-action settlements of comparable value.'" *Comverse*, 2010 WL 2653354, at *3 (citation omitted). As discussed in detail in Part III above, the requested fee is well within the range of percentage fees that courts in the Second Circuit have awarded in comparable cases. Accordingly, the fee requested is reasonable in relation to the Settlement.

### F.       Public Policy Considerations Support the Requested Fee

A strong public policy concern exists for rewarding firms for bringing successful securities litigation. *See FLAG Telecom*, 2010 WL 4537550, at *29 (if the "important public policy [of enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook"); *Maley*, 186 F. Supp. 2d at 373 ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered."); *Hicks*, 2005 WL 2757792, at *9 ("To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding.") (citation omitted). Accordingly, public policy favors granting Lead Counsel's fee and expense application here.

### G.       The Reaction of the Settlement Class to Date Supports the Requested Fee

The reaction of the Settlement Class to date also supports the requested fee. Through June 16, 2017, Epiq has disseminated the Notice to 68,694 potential Settlement Class Members and nominees informing them, among other things, that Lead Counsel intended to apply to the Court for an award of attorneys' fees in an amount not to exceed 22% of the Settlement Fund and up to $2.5 million in expenses. *See* Thurin Decl. ¶ 7 and Ex. A thereto. While the time to object to the Fee and Expense Application does not expire until July 5, 2017, to date, no objections have been received. ¶¶ 74, 98. Should any objections be received, Lead Counsel will address them in its reply papers.

## VI.    LEAD COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED

Lead Counsel's fee application includes a request for reimbursement of Plaintiffs' Counsel's litigation expenses, which were reasonably incurred and necessary to the prosecution of the Action.  *See* ¶¶ 101-109.  These expenses are properly recovered by counsel.  *See In re China Sunergy Sec. Litig.,* No. 07 Civ. 7895 (DAB), 2011 WL 1899715, at *6 (S.D.N.Y. May 13, 2011) (in a class action, attorneys should be compensated "for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and necessary to the representation'") (citation omitted); *FLAG Telecom,* 2010 WL 4537550, at *30 ("It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class").  As set forth in detail in the Graziano Declaration, Plaintiffs' Counsel incurred $1,930,744.24 in litigation expenses in the prosecution of the Action.  ¶ 100.  Reimbursement of these expenses is fair and reasonable.

The expenses for which reimbursement are sought are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, expert fees, on-line research, court reporting and transcripts, photocopying, travel costs, and postage expenses.  The largest expense is for retention of Lead Plaintiff's experts, in the amount of $1,665,617.61, or 86% of the total litigation expenses. ¶ 103.  Another significant expense was the cost for electronic discovery vendor in managing the enormous database of documents received, which came to $111,696.89, or 5.8% of the total amount of expenses.  ¶ 104.  The combined costs for on-line legal and factual research, in the amount of $65,912.53, represented 3.4% of the total amount of expenses. *Id*.   A complete breakdown by category of the expenses incurred by Plaintiffs' Counsel is set forth in Exhibit 4 to

the Graziano Declaration.  These expense items are billed separately by Lead Counsel, and such charges are not duplicated in the firm's hourly billing rates.

The Notice informed potential Settlement Class Members that Lead Counsel would apply for reimbursement of litigation expenses in an amount not to exceed $2.5 million, which might include the reasonable costs and expenses of Plaintiffs directly related to their representation of the Settlement Class.  The total amount of expenses requested by Lead Counsel is $1,960,544.24, which includes $1,930,744.24 in reimbursement of litigation expenses incurred by Plaintiffs' Counsel and $29,800.00 in reimbursement of costs and expenses incurred by Plaintiffs, an amount well below the amount listed in the Notice.  To date, there has been no objection to the request for expenses.

## VII.   PLAINTIFFS SHOULD BE AWARDED THEIR REASONABLE COSTS AND EXPENSES UNDER 15 U.S.C. §78u-4(a)(4)

In connection with its request for reimbursement of Litigation Expenses, Lead Counsel also seeks reimbursement of $29,800 in costs and expenses incurred by Plaintiffs directly related to their representation of the Settlement Class.  The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class."  15 U.S.C. § 78u-4(a)(4).

Here, while several employees of the Pentwater Funds dedicated time to the Action by reviewing significant pleadings and briefs in the Action, communicating regularly with Lead Counsel, searching for and gathering their internal documents for production in response to Defendants' document requests, and monitoring the progress of settlement negotiations, Lead Plaintiff seeks reimbursement only for the value of the time spent by its portfolio manager, Frank Strezo.  *See* Strezo Decl. ¶¶ 4, 12.  Mr. Strezo devoted a total of 44 hours to assisting in the

prosecution of this Action including, by among other things, communicating with Lead Counsel; reviewing pleadings; gathering and reviewing documents in response to discovery requests; and preparing for and sitting for his deposition. *Id.* ¶ 12.  The time that Mr. Strezo spent on these activities was time that he otherwise would have expected to spend on other work for Lead Plaintiff and, thus, represented a cost to Lead Plaintiff.  Mr. Strezo's time is valued at $500 per hour and, accordingly, Lead Plaintiff seeks reimbursement of $22,000.  *Id.*

Additional Plaintiff Fort Lauderdale seeks reimbursement of $7,800 for time spent on the Action by its Plan Administrator, which included reviewing pleadings, responding to discovery requests, and preparing for and participating in his deposition.  *See* Declaration of Nicholas Schiess, attached as Exhibit 5 to the Graziano Declaration, at ¶¶ 4-6.

Numerous courts have approved reasonable awards to compensate lead plaintiffs for the time and effort they spent on behalf of a class. In *Marsh & McLennan*, the court awarded $144,657 to the New Jersey Attorney General's Office and $70,000 to certain Ohio pension funds, to compensate them "for their reasonable costs and expenses incurred in managing this litigation and representing the Class."  2009 WL 5178546, at *21.  As the court noted, their efforts in communicating with lead counsel, reviewing submissions to the court, responding to discovery requests, providing deposition testimony and participating in settlement discussions were "precisely the types of activities that support awarding reimbursement of expenses to class representatives." *Id.*; *see also In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 772 F.3d 125, 133 (2d Cir. 2014) (affirming award of over $450,000 to representative plaintiffs for time spent by their employees on the action); *Flag Telecom*, 2010 WL 4537550, at *31 (approving award of $100,000 to Lead Plaintiff for time spent on the litigation); *Veeco*, 2007 WL 4115808, at *12 (awarding institutional lead plaintiff $15,900 for

time spent supervising litigation, and characterizing such awards as "routine" in this Circuit); *In re Gilat Satellite Networks, Ltd.,* No. CV-02-1510 (CPS)(SMG), 2007 WL 2743675, at *19 (E.D.N.Y. Sept. 18, 2007) (granting PSLRA awards where, as here, "the tasks undertaken by employees of Lead Plaintiffs reduced the amount of time those employees would have spent on other work and these tasks and rates appear reasonable to the furtherance of the litigation").

The awards sought by Plaintiffs are reasonable and justified under the PSLRA based on the active involvement of Plaintiffs in the Action, and should be granted.

## CONCLUSION

For the foregoing reasons, Lead Counsel respectfully requests that the Court award attorneys' fees in the amount of $44,613,850, plus interest at the same rate as earned by the Settlement Fund; $1,930,744.24 in reimbursement of the reasonable litigation expenses that Lead Counsel incurred in connection with the prosecution of the Action; and $29,800.00 in reimbursement of Plaintiffs' costs and expenses.

Dated:  June 19, 2017                    Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**

*/s Salvatore J. Graziano*
Salvatore J. Graziano
John Rizio-Hamilton
Katherine M. Sinderson
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiff the Pentwater Funds
and Lead Counsel for the Settlement Class*

#1088587

24