**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| | ) | Case No. 14 Civ. 8925 (KMW) |
| IN RE SALIX PHARMACEUTICALS, LTD. | ) | CLASS ACTION |
| | ) | |
| | ) | |

**DECLARATION OF SALVATORE J. GRAZIANO IN SUPPORT OF:**
**(I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF**
**SETTLEMENT AND PLAN OF ALLOCATION; AND**
**(II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS'**
**FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

## TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................2

II.     HISTORY OF THE ACTION ......................................................................4

        A.      Background ............................................................................................ 4

        B.      Commencement of the Action and the Appointment of Lead Plaintiff and
                Lead Counsel ......................................................................................... 5

        C.      The Investigation and Filing of the Complaint ...................................... 6

        D.      Defendants' Motions to Dismiss............................................................ 8

        E.      The Parties Conduct Extensive Discovery............................................ 10

                1.      Document Discovery ................................................................. 11

                2.      Depositions ............................................................................... 13

                3.      Discovery Disputes .................................................................. 15

        F.      Lead Plaintiff's Motion for Class Certification ................................... 16

        G.      Work with Experts and Consultants ..................................................... 18

        H.      The Parties Settle the Action................................................................ 19

        I.      The Court Grants Preliminary Approval to the Settlement ................... 20

III.    RISKS OF CONTINUED LITIGATION ...................................................20

        A.      Risks Concerning Liability and Class Certification.............................. 21

        B.      Risks Related To Damages ................................................................... 24

IV.     LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY
        APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE......................................27

V.      ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT....................................29

VI.     THE FEE AND EXPENSE APPLICATION ...........................................32

        A.      The Fee Application............................................................................... 33

                1.      Lead Plaintiff Has Authorized and Supports the Fee Application............ 33

i

2.      The Work and Experience of Lead Counsel ............................................. 34

3.      Standing and Caliber of Defendants' Counsel ........................................ 36

4.      The Risks of Litigation and the Need to Ensure the  Availability of
        Competent Counsel in High-Risk  Contingent Cases ............................... 36

5.      The Reaction of the Settlement Class to the Fee Application .................. 38

B.      The Litigation Expense Application ...................................................... 39

VII.    CONCLUSION ............................................................................................42

I, SALVATORE J. GRAZIANO, declare as follows:

1.      I am a partner of the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G").  BLB&G serves as Lead Counsel for Lead Plaintiff, PWCM Master Fund Ltd., Pentwater Equity Opportunities Master Fund Ltd., Oceana Master Fund Ltd., Pentwater Merger Arbitrage Master Fund Ltd., and LMA SPC for and on behalf of the MAP98 Segregated Portfolio (collectively, "Lead Plaintiff" or the "Pentwater Funds") and the Settlement Class in the above-captioned action (the "Action").[1]  I have personal knowledge of the matters set forth herein based on my active participation in all aspects of the prosecution and settlement of the Action.

2.      I submit this declaration in support of Lead Plaintiff's motion, pursuant to Federal Rule of Civil Procedure 23(e), for final approval of the proposed Settlement with Defendants that will resolve the claims asserted in the Action and approval of the proposed plan of allocation of the proceeds of the Settlement (the "Plan of Allocation") and Lead Counsel's motion for an award of attorneys' fees and reimbursement of litigation expenses (the "Fee and Expense Application").

3.      In support of these motions, Lead Plaintiff and Lead Counsel are also submitting the exhibits attached hereto, the Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Memorandum"), and the Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee Memorandum").

---

[1] All capitalized terms used herein that are not otherwise defined herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated March 24, 2017 (ECF No. 216-1) (the "Stipulation"), which was entered into by and among (i) Lead Plaintiff, on behalf of itself and the Settlement Class, and (ii) defendant Salix Pharmaceuticals, Ltd. ("Salix" or the "Company") and defendants Carolyn J. Logan and Adam C. Derbyshire (collectively, the "Individual Defendants" and, together with Salix, "Defendants").

## I.    INTRODUCTION

4.    The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $210,000,000 for the benefit of the Settlement Class.  As detailed herein, Lead Plaintiff and Lead Counsel believe that the proposed Settlement represents an excellent result and is in the best interests of the Settlement Class.  Lead Plaintiff would have faced significant risks in establishing Defendants' liability and proving damages in the Action, and the proposed $210 million settlement represents a substantial percentage of the maximum damages that Lead Plaintiff reasonably believed could be established at trial.  Thus, as explained further below, the Settlement provides a considerable benefit to the Settlement Class by conferring a substantial, certain, and immediate recovery while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover nothing or less than the Settlement Amount after years of additional litigation and delay.

5.    The proposed Settlement is the result of extensive efforts by Lead Plaintiff and Lead Counsel, which included, among other things detailed herein: (i) conducting an extensive investigation into the alleged fraud including a thorough review of SEC filings, analyst reports, conference call transcripts, press releases, company presentations, media reports and other public information; (ii) drafting a detailed consolidated complaint based on this investigation; (iii) successfully opposing Defendants' motions to dismiss; (iv) undertaking substantial and highly contested fact discovery efforts, which included obtaining and reviewing more than 2.7 million pages of documents produced by Defendants and third parties; taking, defending, or participating in 13 depositions; and engaging in a number of significant discovery disputes; (v) moving for class certification, including conducting related discovery, preparing an expert report on market efficiency, and opposing a motion by Defendants to exclude the testimony of Lead Plaintiff's

expert; (vi) consulting extensively with experts concerning loss causation and damages, accounting issues, and the pharmaceutical industry throughout the litigation; and (vii) engaging in a vigorous arm's-length settlement negotiations to achieve the Settlement.

6.     Due to the efforts summarized in the foregoing paragraph, and more fully set forth below, Lead Plaintiff and Lead Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action at the time they reached the proposed Settlement.  The Settlement was achieved only after intense arm's-length negotiations between the Parties.  Lead Plaintiff and Lead Counsel believe that the Settlement represents a very favorable outcome for the Settlement Class and that its approval would be in the best interests of the Settlement Class.

7.     As discussed in further detail below, the Plan of Allocation was developed with the assistance of Lead Plaintiff's damages expert, and provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis based on losses attributable to the alleged fraud.

8.     With respect to the Fee and Expense Application, the requested fee of $44,613,850 (or approximately 21.24% of the Settlement Fund), plus interest earned at the same rate as the Settlement Fund, is based on a retainer agreement entered into with Lead Plaintiff at the outset of the litigation, and, as discussed in the Fee Memorandum, is well within the range of percentage awards granted by courts in this Circuit and elsewhere in similarly sized securities class action settlements and as confirmed by a lodestar multiplier cross-check.  Lead Counsel respectfully submit that the fee request is fair and reasonable in light of the result achieved in the Action, the efforts of Lead Counsel and the other Plaintiffs' Counsel, and the risks and complexity of the litigation.

9.     For all of the reasons set forth herein and in the accompanying memoranda, including the quality of the result obtained and the numerous significant litigation risks discussed below, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable and adequate, and should be approved.  In addition, Lead Counsel respectfully submits that its request for attorneys' fees and reimbursement of litigation expenses – which has been reviewed and approved by Lead Plaintiff – is also fair and reasonable, and should be approved.

## II.     HISTORY OF THE ACTION

### A.     Background

10.     In this Action, Lead Plaintiff alleged that, during the period from November 8, 2013 through November 6, 2014 (the "Class Period"), Salix; Carolyn J. Logan, Salix's Chief Executive Officer during the Class Period; and Adam C. Derbyshire, Salix's Chief Financial Officer during the Class Period, made material, public misrepresentations concerning Salix's "wholesaler inventory levels" in violation of the federal securities laws.

11.     During the Class Period, Salix was a specialty pharmaceutical company whose common stock traded on the NASDAQ.  Salix sold drugs principally used to treat gastrointestinal disorders and derived its revenue from selling these products to wholesale pharmaceutical customers who, in turn, resold and distributed Salix's products to pharmacies, hospitals, and other customers.  The Company's reported "wholesaler inventory level," which represented the number of weeks' worth of product that the wholesalers kept to fill orders placed by pharmacies dispensing the drug to patients, was one of the most critical metrics to investors in analyzing Salix's value as a company because it was viewed as a key measure of demand for the Company's products and the growth of its revenue stream.

12.     Lead Plaintiff alleged that Defendants repeatedly represented during the Class Period that wholesalers maintained 10 to 12 weeks of inventory for Salix's key products, but that, in fact, the wholesaler inventory levels were much higher, as much as nine months' worth, as a result of "channel stuffing" efforts that artificially inflated the Company's revenues by inducing wholesalers to purchase drugs in amounts that far exceeded actual demand.  Lead Plaintiff alleged that two pharmaceutical companies that had considered acquiring Salix, Allergan Inc. and Actavis plc, quickly discovered the undisclosed inventory backlog when they were granted access to the Salix's internal data in August 2014 and October 2014 respectively, and subsequently withdrew their offers to acquire the Company.

13.     On November 6, 2014, after the close of the market, Salix disclosed the truth about its inventory levels.  Salix announced that wholesalers' inventory for its four key drugs were at nine-month levels, and that two of these drugs had held "largely constant" at that level throughout all of 2014.  Salix also announced that selling down this inventory backlog would materially depress revenues for at least two years and that Defendant Derbyshire, its CFO, had resigned effective immediately.  Following this announcement, Salix's stock price dropped significantly, from a close of $138.55 on November 6, 2013 to a close of $91.47 on November 7, 2014.

**B.     Commencement of the Action and the Appointment of Lead Plaintiff and Lead Counsel**

14.     Beginning on November 7, 2014, two securities class action complaints were filed in the United States District Court for the Southern District of New York (the "Court"), styled *Woburn Retirement System v. Salix Pharmaceuticals, Ltd.*, 14-CV-8925 and *Bruyn v. Salix Pharmaceuticals, Ltd.*, 14-CV-9226.  In accordance with the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), notice to the public was issued setting forth the deadline by which putative class members could move the Court to be appointed as lead plaintiff.

15.     On January 6, 2015, the Pentwater Funds moved for appointment as lead plaintiff and for approval of its counsel, BLB&G, as Lead Counsel.  (ECF Nos. 20, 21, 23.)  Other persons and entities also moved for appointment as lead plaintiff.  (ECF Nos. 3-19, 22, 24-28.)  The motion was heavily contested, including through a competing movant's motion to take discovery of the Pentwater Funds, but the movants' submissions established that the Pentwater Funds had the largest financial interest in the Action.

16.     On March 23, 2015, the Court entered an Opinion & Order that consolidated *Woburn Retirement System v. Salix Pharmaceuticals, Ltd.,* 14-CV-8925 and *Bruyn v. Salix Pharmaceuticals, Ltd.*, 14-CV-9226 and recaptioned the Action as *In re Salix Pharmaceuticals, Ltd.*, Case No. 14 Civ. 8925 (KMW); appointed the Pentwater Funds as Lead Plaintiff for the consolidated action; and approved Lead Plaintiff's selection of BLB&G as Lead Counsel for the class.  (ECF No. 64.)

**C.      The Investigation and Filing of the Complaint**

17.     Prior to filing the consolidated complaint on behalf of Lead Plaintiff, Lead Counsel undertook an extensive investigation into the allegations and the facts surrounding the alleged fraud.  This investigation included a thorough review and analysis of:  (a) SEC filings made by Salix; Valeant Pharmaceuticals International, Inc. ("Valeant"), a company that acquired Salix after the end of the Class Period; and Santarus, Inc. ("Santarus"), a company that Salix acquired during the Class Period; (b) research reports by securities and financial analysts; (c) transcripts of Salix's, Valeant's, and Santarus's earnings and other investor conference calls; (d) publicly available presentations by Salix; (e) Salix's press releases and media reports; (f) economic analyses of the movement and pricing data associated with Salix's publicly traded common stock and options; and (g) other publicly available material and data.

18.     Lead Counsel also retained and consulted with multiple experts in connection with the preparation of the Complaint, including experts in accounting, the pharmaceutical industry and damages.  For example, Lead Counsel consulted with a damages expert concerning the impact of Defendants' alleged misstatements and omissions on the market price of Salix's common stock, and the damages suffered by Salix shareholders.

19.     On May 8, 2015, Lead Plaintiff filed and served the Consolidated Class Action Complaint (ECF No. 82) (the "Complaint"), which included the City of Fort Lauderdale General Employees' Retirement System ("Fort Lauderdale") as an additional named plaintiff.   The Complaint asserts claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against Defendants Logan and Derbyshire under Section 20(a) of the Exchange Act.   Among other things, the Complaint alleges that Defendants made materially false and misleading statements about Salix's wholesaler inventory levels during the Class Period.   Specifically, the Complaint alleges that Defendants repeatedly represented during the Class Period that wholesalers maintained 10 to 12 weeks of inventory for Salix's bestselling drug, Xifaxan, and its other key products, but later disclosed, after the close of market on November 6, 2014, that these wholesale inventory levels were in fact at nine-month levels.

20.     The Complaint alleges that the price of Salix common stock was artificially inflated during the Class Period as a result of Defendants' allegedly false and misleading statements, and dropped significantly when the alleged truth was revealed after the close of trading on November 6, 2014.  The Complaint alleges that the prices of publicly traded options on Salix common stock also were distorted as the result of the artificially inflated price of Salix common stock, and that investors who purchased publicly traded call options on Salix common stock or sold publicly

traded put options on Salix common stock during the Class Period were damaged when the truth was revealed.

D.      **Defendants' Motions to Dismiss**

21.     On June 12, 2015, Defendants served and filed their motions to dismiss the Complaint.  (ECF Nos. 95-101.)  Defendants argued that the Complaint should be dismissed because Plaintiffs had failed to allege any actionable misrepresentations or omissions and failed to plead facts giving rise to a strong inference of scienter.  Specifically, Salix filed a memorandum, joined in by the Individual Defendants, that argued, among other things:

    (a)      that Defendants' statements about inventory levels were not actionable because they were statements of inventory "targets" or "estimates" – not statements of present fact;

    (b)      that Defendants' responses to analysts' questions concerning the reasons for revenue and inventory fluctuations in certain products were not actionable because they were speculation or statements of opinion;

    (c)      that Defendants' statements about Salix's quarterly product revenues were accurate statements about the Company's past performance and were not misleading;

    (d)      that many of the statements challenged by Plaintiffs were forward-looking statements accompanied by meaningful cautionary language and thus were protected by the PSLRA's "safe harbor" provision and the "bespeaks caution" doctrine;

    (e)      that many of the alleged misstatements were non-actionable because they were vague expressions of puffery or corporate optimism;

    (f)      that Plaintiffs did not adequately allege motive for Defendants to engage in fraud and that Plaintiffs' assertion that the Individual Defendants were motivated by compensation that they would receive upon the acquisition of the Company was insufficient because this alleged motive was common to nearly all officers and was irrational because the alleged scheme would be uncovered by any potential acquirer of Salix;

    (g)      that Plaintiffs failed to allege strong circumstantial evidence of conscious misbehavior or recklessness because Plaintiffs' allegations that Defendants were aware of the true inventory levels when they made their challenged statements were not sufficiently specific and the Individual Defendants' seniority and the magnitude of the fraud could not by themselves support a strong inference of scienter;  and

8

(h)     that Salix's post-Class Period restatement of its financials in January 2015 did not relate to the false statements alleged in the Complaint or indicate a fraud had occurred and could not support an inference of scienter.

(ECF No. 98.)  The memorandum was supported by over 500 pages of exhibits.  (ECF No. 99.)

Defendant Derbyshire filed an additional memorandum arguing that the Complaint failed to state

a claim against him for control liability under Section 20(a) (ECF No. 96) and Defendant Logan

also joined in that argument (ECF No. 101).

22.     On July 17, 2015, Plaintiffs served and filed their opposition to Defendants'

motions to dismiss the Complaint.  (ECF No. 109.)  Among other things, Plaintiffs argued:

(a)     that Defendants' alleged misstatements about inventory levels were statements of current fact and were false when made;

(b)     that Defendants' statements about the reasons for revenue and inventory fluctuation were not unactionable opinions but were statements of fact;

(c)     that Defendants' statements about quarterly product demand and revenue were materially misleading, even if literally true, because they omitted critical facts such as (i) that wholesaler inventory levels were dramatically out of line with underlying demand; (ii) that reducing the inventory backlog would materially depress revenues for two years; and (iii) that the reported revenue was generated by a channel-stuffing scheme, rather than by sales to meet true demand;

(d)     that Defendants' alleged misstatements were not protected by the PSLRA's "safe harbor" or the "bespeaks caution" doctrine because they were material misstatements or omissions of present or historical facts or because the accompanying cautionary language was insufficient;

(e)     that Defendants' statements were not inactionable puffery because they were not mere generalities but were highly material statements of present fact that were relied on by investors;

(f)     that the allegations of the Complaint gave rise to a strong inference of scienter, including as a result of Salix's clawback of millions of dollars of Logan's and Derbyshire's compensation based on "intentional wrongdoing," and the circumstances of Derbyshire's abrupt resignation;

(g)     that the Complaint adequately alleged that Salix's true wholesaler inventory levels were known by or recklessly disregarded by Defendants because (i) Salix received

reports detailing inventory levels from wholesalers on a regular basis; (ii) potential acquirers uncovered the issue within days of accessing Salix's data; (iii) the Individual Defendants had assured investors they had detailed knowledge of the inventory levels; and (iv) this was considered a key metric that was central of the Company's business; and, finally,

(h)     that other allegations in the Complaint, including the existence of a multi-faceted channel-stuffing scheme that could only be carried out only with Defendants' knowledge, the Company's refusal to enter into standard inventory agreements with wholesalers that would have prevented the fraud, and the magnitude of the alleged fraud, also strongly supported an inference of scienter.

Thereafter, on July 28, 2015, Lead Plaintiff filed a letter concerning a recently decided Second Circuit decision relevant to the motions.  (ECF No. 110.)

23.     On August 3, 2015, Defendants served their reply papers in further support of their motions to dismiss.  (ECF Nos. 111, 112, 114-115.)

24.     On March 31, 2016, the Court entered an Order denying Defendants' motions to dismiss in their entirety.  (ECF No. 123.)  On April 22, 2016, the Court entered a more detailed Opinion and Order setting forth the reasons for its denial of the motions.  (ECF No. 127.)

25.     On May 31, 2016, Defendants filed and served their Answers to the Complaint. (ECF Nos. 128-130.)  In their Answers, Defendants denied that any of the statements at issue were materially false or misleading, or made with scienter.  Each of the Defendants asserted at least twenty defenses in his, her or its respective Answer including, among others, that their statements were protected by the PSLRA safe harbor, that claims were barred because of a lack of loss causation, and that the class's damages, if any, were speculative.

**E.     The Parties Conduct Extensive Discovery**

26.     Discovery in the Action commenced in April 2016.

27.     During May 2016, the parties negotiated the terms of the protective order governing the treatment of documents and other information produced in discovery.  Each side exchanged drafts of the protective order and edits thereto.  The parties ultimately agreed to the terms of a

stipulated protective order, which Lead Plaintiff submitted to the Court on June 2, 2016.  (ECF

No. 133-2.)  The Court entered the stipulated protective order on June 6, 2016.  (ECF No. 135.)

28.     Following negotiations with Defendants, Lead Plaintiff also submitted a Stipulated

Discovery Plan and Scheduling Order on June 2, 2016, to govern, among other things, the

scheduling of initial disclosures, fact and expert discovery, and the filing of motions for class

certification and summary judgment.  (ECF No. 131-1.)  The Court entered the Stipulated

Discovery Plan and Scheduling Order on June 6, 2016.  (ECF No. 134.)  The key deadlines set

forth in this order were as follows:

| | |
|---|---|
| Substantial completion of production of responsive documents | 10/10/2016 |
| Deadline for motion for class certification | 10/10/2016 |
| End of fact discovery | 1/27/2017 |
| Expert reports due | 2/24/2017 |
| End of expert discovery | 5/11/2017 |
| Deadline for motions for summary judgment | 6/23/2017 |
| Trial start date | 10/3/2017 |

29.     In addition, on August 1, 2016, the parties exchanged initial disclosures pursuant

to Rule 26(a)(1) of the Federal Rules of Civil Procedure.

**1.     Document Discovery**

30.     Lead Plaintiff served its first request for production of documents on Defendants

on April 14, 2016.  In the months that followed, Lead Counsel engaged in numerous meet and

confers and extensive negotiations with Defendants' Counsel over the scope and adequacy of

Defendants' discovery responses, including relating to search terms to be used and custodians

whose documents should be searched.

31.     The Parties also issued extensive discovery requests to various third parties.  Lead

Plaintiff issued 21 subpoenas to various third parties including, among others, Allergan, Valeant,

Salix's pharmaceutical wholesalers, Salix's outside auditor, and banks and financial advisors

involved in the acquisition or potential acquisition of Salix.   The chart below identifies the recipients of the subpoenas issued by Lead Plaintiff, the date of the subpoenas, and the role of the subpoenaed entity in the case:

| Subpoenaed Entity | Date | Role in Case |
|---|---|---|
| Allergan, Inc. | 4/15/2016 | Potential acquirer of Salix |
| Valeant | 4/15/2016 | Post-Class Period acquirer of Salix |
| AmerisourceBergen Corp. | 4/20/2016 | Pharmaceutical wholesaler |
| Cardinal Health, Inc. | 4/20/2016 | Pharmaceutical wholesaler |
| Ernst & Young LLP | 4/20/2016 | Salix's outside auditor |
| McKesson Corporation | 4/20/2016 | Pharmaceutical wholesaler |
| Allergan, plc | 5/20/2016 | Potential acquirer of Salix |
| Centerview Partners LLC | 8/8/2016 | Investment bank / financial advisor |
| Deusche Bank AG | 8/8/2016 | Investment bank / financial advisor |
| HSBC Bank Plc. | 8/8/2016 | Investment bank / financial advisor |
| J.P. Morgan & Co. | 8/8/2016 | Investment bank / financial advisor |
| Quality King Distributors, Inc. | 8/8/2016 | Pharmaceutical wholesaler |
| ValueCentric LLC | 8/19/2016 | Provider of sales management and analysis software to Salix |
| Timothy Creech | 9/10/2016 | Senior Vice President, Finance and Administrative Services, Salix Pharmaceuticals |
| Craig Miller | 9/11/2016 | Director, Trade Relations, Salix Pharmaceuticals |
| Cord Logistics Inc. | 9/19/2016 | Salix's shipping and warehousing provider |
| BDO USA, LLP | 9/20/2016 | Forensic auditor for Salix board |
| PriceWaterhouseCoopers LLP | 9/20/2016 | Forensic auditor for Salix's board |
| Symphony Health Solutions Corp. | 9/20/2016 | Salix's pricing and data provider |
| Teneo Holdings LLC | 9/20/2016 | Salix's outside communications firm |
| Teneo Strategy LLC | 9/20/2016 | Salix's outside communications firm |

Defendants also served four subpoenas on AmeriSourceBergen, McKesson, RiteAid and Walgreens.

32.     In response to the requests for production of documents and subpoenas, Defendants and third parties produced a total of more than 2.7 million pages of documents to Lead Plaintiff.

12

The documents Lead Plaintiff obtained included documents produced to the SEC and depositions taken by the SEC in its parallel investigation of Salix.  Attorneys from Lead Counsel and other Plaintiffs' Counsel reviewed, analyzed, and coded the documents received from Defendants and third parties.  In reviewing the documents, the attorneys were tasked with making several analytical determinations as to the documents' importance and relevance.  Specifically, they determined whether the documents were "hot," "highly relevant," "relevant," or "irrelevant."  They also assessed which specific issues the documents concerned and determined the identities of the Salix employees or other potential deponents to whom the documents related so that the documents could be easily retrieved when preparing for depositions.

33.   In addition, Lead Plaintiff (and additional named plaintiff Fort Lauderdale) searched for and gathered documents that were responsive to Defendants' requests for production of documents, which documents were then reviewed by Lead Counsel.  In total, Lead Plaintiff and Fort Lauderdale produced more than 60,000 pages of documents to Defendants.

### 2.   Depositions

34.   A total of 13 depositions were taken in the Action before the Settlement was reached.  These included the depositions of representatives of Lead Plaintiff and Fort Lauderdale and of Lead Plaintiff's expert witness on market efficiency that were taken in connection with the motion for class certification.  They also include ten depositions of fact witnesses, including employees of pharmaceutical wholesalers AmerisourceBergen Corp., McKesson and Cardinal Health; a partner at Salix's outside auditor Ernst & Young LLP, and high-level employees and a Board member of Salix.  The chart below identifies the depositions that were taken in the Action, by deponent, date of deposition, and witness affiliation or title during the Class Period:

| Deponent | Date | Witness Affiliation or Title |
|---|---|---|
| Elizabeth McMahon | 11/01/2016 | AmerisourceBergen Corp. (pharmaceutical wholesaler) |
| Frank Strezo | 11/01/2016 | Lead Plaintiff Pentwater Funds |
| David Tabak | 11/03/2016 | Lead Plaintiff's Market Efficiency Expert |
| Nicholas Schiess | 11/07/2016 | Additional Plaintiff Fort Lauderdale General Employees' Retirement Fund |
| Yuri B. Kasinky | 12/01/2016 | McKesson Corporation (pharmaceutical wholesaler) |
| Michael Constantino | 12/12/2016 | Ernst & Young LLP (Salix's outside auditor) |
| James F. Barlow | 12/14/2016 | Principal Accounting Officer, Allergan, Inc. |
| Shawn Bechtold | 12/14/2016 | Cardinal Health, Inc. (pharmaceutical wholesaler) |
| George Michael Freeman | 12/20/2016 | Associate Vice President, Investor Relations, Salix Pharmaceuticals |
| William Keane | 1/12/2017 | Director and Audit Committee Chair, Salix Pharmaceuticals |
| Gordon W. McCoun | 1/13/2017 | Teneo Strategy (Salix's outside communications firm) |
| Todd Krzyzaniak | 1/13/2017 | Associate Director of Accounting, Salix Pharmaceuticals |
| Tim Creech | 1/18/2017 | Senior Vice President, Finance and Administrative Services, Salix Pharmaceuticals |

35.    As noted above, the Court had established January 27, 2017 as the deadline for all fact discovery in the Action, including all depositions of fact witnesses.  Lead Plaintiff had scheduled four additional depositions for the final week of fact discovery from January 23 to January 26 – Individual Defendants Derbyshire and Logan (Salix's CFO and CEO during the Class Period) and two other senior Salix sales executives.  As of Friday January 20, 2017, Lead Counsel's extensive preparations for these key depositions was largely complete when Salix announced that they would be producing an additional 32,000 documents during the week of January 23, many of which had previously been withheld as privileged.  In light of this new production of a large volume of documents on the eve of these remaining depositions, Plaintiffs

and Defendants agreed to postpone the depositions scheduled for the week of January 23 (just days before they were scheduled) and reschedule them to occur no later than February 28, 2017. The Parties submitted this request to the Court, along with other alterations to the litigation schedule that maintained the same trial date, by letter on January 23, 2017. (ECF No. 208.) The Court approved the revised schedule the following day. (ECF No. 211.) The rescheduled depositions were ultimately not held because the Parties reached an agreement in principle to settle the Action in early February.

### 3.    Discovery Disputes

36.    Discovery in the Action was highly contested. Lead Counsel and Defendants' Counsel exchanged numerous letters and participated in numerous meet-and-confer sessions regarding discovery and document production and disputes over the scope of documents produced. While many of these disputes were resolved through negotiation between the Parties and without the intervention of the Court, several required presentation of the issues to the Court through letters or motion papers.

37.    One such dispute concerned Salix's refusal to produce documents concerning its internal investigation into the alleged fraud, the investigation that led to the alleged corrective disclosure in the Action and the decision to fire the Individual Defendants and seek to clawback millions of dollars in their compensation. A closely related dispute concerned Lead Plaintiff's efforts to obtain deposition testimony from Bradley Bondi, the attorney who conducted the internal investigation while he was a partner of Cadwalader, Wickersham & Taft LLP. (Mr. Bondi had subsequently changed firms and was a partner at Cahill Gordon & Reindel LLP, Salix's counsel in this Action, at the time his testimony was sought.) Lead Plaintiff contended that Salix had waived any privilege related to the internal investigation because it had disclosed information about the investigation to its outside auditor, government entities and Defendant Logan and

15

because Defendants were attempting to discredit the investigation while simultaneously preserving the privilege. The Parties wrote a number of letters to the Court relating to these disputes. (ECF Nos. 170, 173, 174, 178, 179, 197, 201, 202.) On January 13, 2017, Lead Plaintiff formally moved to compel Salix to produce documents concerning the internal investigation and to permit the deposition of Mr. Bondi. (ECF No. 198-200.) Salix ultimately agreed to produce thousands of documents related to the internal investigation that it had previously withheld as privileged shortly before the Court denied Lead Plaintiff's motion. (ECF No. 210.)

38.     Lead Plaintiff also served interrogatories and requests for admission on Defendants and exchanged numerous letters with Defendants concerning discovery issues. Throughout the discovery process, Lead Counsel continued to consult extensively with experts, including with respect to damages suffered by Salix shareholders.

**F.     Lead Plaintiff's Motion for Class Certification**

39.     On October 10, 2016, Lead Plaintiff filed and served its motion for class certification. (ECF No. 145-147.) The motion was supported by a memorandum of law (ECF No. 146) and an expert report from Lead Plaintiff's damages expert, Dr. David Tabak, of National Economic Research Associates, Inc. ("NERA"), opining that the markets for Salix common stock and publicly traded options on Salix common stock were efficient and that damages for investors in Salix common stock and options could be calculated through a common methodology (ECF No. 147-5).

40.     In connection with the class certification motion, Defendants' Counsel took the depositions of Dr. Tabak and representatives of the Pentwater Funds and Fort Lauderdale. Through discovery, Defendants aggressively sought to establish that Plaintiffs were not adequate or typical class representatives because they would be subject to unique defenses based on their pattern of trading in Salix securities before or after the Class Period and other factors. During the

course of this discovery, the Parties disputed the extent to which information on Plaintiffs' pre- and post-Class Period trading should be required to be produced, which resulted in a series of letters to the Court on the issue.  (ECF Nos. 153, 154, 159.)  The issue was resolved by an Order of the Court entered on November 10, 2016, which required the production of trading information for the 11 months prior to the Class Period but, as argued by Lead Counsel, limited the production of post-Class Period transaction information to the 90-day PSLRA look-back period (in contrast to the five months of post-Class Period transaction data sought by Defendants).  (ECF No. 165.)

41.     On January 3, 2017, Salix filed and served its opposition to Lead Plaintiff's class certification motion, in which the Individual Defendants joined.  (ECF Nos. 185, 186, 189, 191.) Defendants' memorandum in opposition to the motion was supported by a declaration with 22 exhibits.  In opposition to class certification, Defendants contended that Plaintiffs were not proper class representatives and that Plaintiffs were not entitled to the fraud-on-the-market presumption of reliance.  Defendants argued, among other things:

(a)     that Plaintiffs were not proper class representatives because – Defendants' alleged – they had not been forthright in discovery or had not adequately responded to Defendants' discovery requests;

(b)     that Lead Plaintiff the Pentwater Funds was not an adequate or typical class representative because it was subject to unique defenses based on its trading in Salix-related securities during and after the Class Period, including its active trading during the Class Period, its trading in over-the-counter options, and its purchase of a substantial number of shares of Salix common stock after the end of the Class Period;

(c)     that Lead Plaintiff was managed by an "event-driven hedge fund" and that its investment strategy that led to its purchases of Salix common stock in the Class Period was premised on the belief that Salix would be acquired by another pharmaceutical company at a substantial premium, and thus the purchases were not made in reliance on the accuracy of Salix's stock price;

(c)     that (as Defendants argued in a separate motion to exclude his testimony) Dr. Tabak's expert report on the efficiency of the market for Salix common stock and options should be excluded and that, therefore, Plaintiffs could not establish the

17

efficiency of the market and were not entitled a presumption of reliance based on the fraud-on-the-market theory; and

(d)     that a class of purchasers and sellers of Salix options should not be certified because of the large number of different option series that traded during the Class Period and because Plaintiffs had not established numerosity for options traders.

42.     On January 3, 2017, Salix also filed a motion to exclude the expert report and testimony of Dr. Tabak, Lead Plaintiff's market efficiency expert, in which the Individual Defendants joined. (ECF Nos. 180, 187, 188, 190, 192.) Defendants' motion was supported by an expert report from Salix's financial economics expert, who sought to rebut the conclusions of Dr. Tabak's report concerning the efficiency of the market for Salix securities. Defendants argued that Dr. Tabak's methods for establishing the efficiency of the markets for Salix stock and options were unsound and unreliable and that therefore the report should be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

43.     On January 17, 2017, Lead Plaintiff served and filed its reply papers in further support of class certification and in opposition to Defendants' motion to preclude Dr. Tabak's testimony. (ECF Nos. 203-204.) Defendants served and filed their reply papers in further support of the motion to exclude Dr. Tabak's testimony on January 24, 2017.

### G.     Work with Experts and Consultants

44.     Lead Counsel consulted extensively with experts while investigating and prosecuting the Action on behalf of Lead Plaintiff, including experts in the areas of the damages, loss causation and market efficiency, accounting and the pharmaceutical industry. Lead Plaintiff's efforts to develop this expert evidence were essential to their ability to support their claims and overcome Defendants' anticipated defenses. Lead Plaintiff's experts included: (i) Dr. Tabak of NERA, who was Lead Plaintiff's expert on loss causation, damages and market efficiency; (ii) Andy Mintzer, CPA, who was Lead Plaintiff's expert on accounting issues; and (iii) John

Russell, who was Lead Plaintiff's expert on the pharmaceutical industry, including matters such as wholesaler inventory levels, contractual relationships between pharmaceutical companies and wholesalers, and channel stuffing.

45.     Lead Counsel consulted with these experts throughout the litigation of the Action, including extensively in preparing the Complaint, in reviewing documents produced in discovery, in preparing questions for depositions of fact witnesses and during the settlement negotiations.  In addition, as noted above, Lead Counsel worked with Dr. Tabak to prepare an expert report on market efficiency and class-wide damages methodology that was filed in support of Lead Plaintiff's class certification motion and defended his deposition.   After the Settlement was reached, Lead Counsel also worked extensively with Dr. Tabak and his team at NERA in developing the Plan of Allocation, as discussed below.

### H.     The Parties Settle the Action

46.     In December 2016, in the midst of intense ongoing discovery and litigation of Plaintiffs' class certification motion, the Parties discussed the possibility of resolving the Action through settlement, but those negotiations broke down because the Parties' positions were too far apart.  Settlement discussions resumed in January 2017 as the Parties were working intensely to complete fact discovery and taking numerous depositions.

47.     In early February 2017, shortly after Salix produced thousands of documents that had previously been withheld as privileged and the final depositions in the Action (including those of the two Individual Defendants) were postponed, the Parties intensified their settlement discussions.  These extensive, arm's-length negotiations ultimately culminated in an agreement in principle to settle the Action for $210,000,000 that was memorialized in a term sheet executed on February 8, 2017.

48.     In the ensuing weeks, the parties negotiated the final terms of the Settlement and drafted the settlement agreement and related papers such as notices to be provided to the Settlement Class.  On March 24, 2017, the parties executed a Stipulation and Agreement of Settlement (ECF No. 216-1) (the "Stipulation"), which set forth the detailed terms of the parties' agreement to settle all claims asserted in the Action for $210,000,000, subject to the approval of the Court.

**I.      The Court Grants Preliminary Approval to the Settlement**

49.     On March 24, 2017, Lead Plaintiff filed an unopposed motion for preliminary approval of the Settlement.  (ECF No. 216-218.)  On April 5, 2017, the Court entered the Order Preliminarily Approving Settlement and Providing for Notice (ECF No. 220) (the "Preliminary Approval Order"), which, among other things:   (i) preliminarily approved the Settlement; (ii) approved the form of Notice, Summary Notice, and Claim Form, and authorized notice to be given to Settlement Class Members through first-class mailing of the Notice and Claim Form, posting of the Notice and Claim Form on a Settlement website, and publication of the Summary Notice in *The Wall Street Journal* and over *PR Newswire*; (iii) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, or the fee and expense application; and (iv) set a schedule for the filing of opening papers and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Application.  The Preliminary Approval Order also set a Settlement Hearing for July 24, 2017 at 11:00 a.m. to determine, among other things, whether the Settlement should be finally approved.

**III.     RISKS OF CONTINUED LITIGATION**

50.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $210,000,000 cash payment, and represents a significant portion of the recoverable damages in the Action.  Lead Plaintiff and Lead Counsel believe that the proposed Settlement is a

positive, outstanding result for the Settlement Class in light of the risks of continued litigation.  As explained below, Lead Plaintiff faced substantial risks with respect to proving liability, certifying the class, and establishing loss causation and damages in this case.

### A.   Risks Concerning Liability and Class Certification

51.   While Lead Plaintiff and Lead Counsel believe that the claims asserted against Defendants in the Action are meritorious, they recognize that this Action presented a number of substantial risks to establishing Defendants' liability.   Defendants had vigorously contested and would have continued to argue that their statements about Salix's wholesaler inventory levels were not actionable, and were not false when they were made, and, in any event, that the Individual Defendants did not know that the statements were false or were not reckless in making the alleged misstatements.

52.   First, Defendants had contended and would have continued to argue that they made no actionable false statements because the alleged misstatements concerning Salix's wholesaler inventory levels were not statements of present fact but were estimates or targets.   Defendants would argue that these statements were therefore protected as forward-looking statements or were not actionable as expressions of corporate optimism.   Defendants would also have contended, in opposition to Plaintiffs' allegations, that they lacked reliable information on the precise amount of the inventory levels (which were maintained by third-party wholesalers, not Salix).

53.   Defendants also maintained that they had not engaged in any improper "channel-stuffing" activities such as creating fictitious sales or making unwanted shipments, and had engaged only in appropriate sales efforts such as offering incentives for purchases.   As such, Defendants argued that their statements concerning quarterly product revenues (which reflected actual historical sales) were not misleading because they had not engaged in any undisclosed, improper channel stuffing.   Defendants asserted that the lack of any material restatement of Salix's

revenue numbers as a result Salix's thorough post-Class Period investigation demonstrated that Salix had not been engaged in improper channel stuffing.

54.     Even if Lead Plaintiff could establish that Defendants' statements were actionable and false, they would still have faced even more substantial challenges in proving that the false statements were made with fraudulent intent or recklessness.  Defendants would contend that Lead Plaintiff could not establish any intent to defraud because the calculation of Salix's wholesaler inventory levels was imprecise and based on uncertain, judgmental estimates, including estimates of future sales of Salix's products, and any errors in their statements concerning this metric were not intended.  Defendants would have argued that they did not know the precise inventory levels held by third-party wholesalers when they made the challenged statements and that those levels fluctuated and rose significantly during the Class Period so that any inaccuracies in their statements were due to their failure to promptly detect those changes, rather than any intent to deceive investors.

55.     Defendants would also have continued to assert that there was no motive for Defendants to engage in fraud.  Plaintiffs alleged that Defendants had a motive to perpetuate the fraud based on the substantial compensation they would receive if Salix were acquired by another company, an event which was more likely to occur if potential acquirers believed that Salix's products were performing well in the market.  Defendants argued, however, that this theory of motive for the alleged fraud did not withstand scrutiny because any potential acquirer of Salix would have reviewed the wholesale inventory levels and uncovered the alleged fraud, thus depriving the Individual Defendants of any financial benefit from the alleged fraud.  Indeed, this argument was supported by the fact that two potential acquirers of Salix in late summer and fall of

2014 had quickly detected the high inventory levels when given access to Salix's internal information in the course of their due diligence.

56.     While many of these arguments were made unsuccessfully by Defendants on their motions to dismiss, when the Court was required to accept all allegations in the Complaint as true, there was a significant possibility that Defendants could have succeeded in these arguments at subsequent stages of the litigation when allegations in the Complaint would need to be supported by admissible evidence.

57.     Defendants had also vigorously opposed class certification.  Defendants contended that Lead Plaintiff and Fort Lauderdale were inadequate class representatives.  Among other things, Defendants claimed that Lead Plaintiff was subject to unique defenses because it was an active trader in Salix securities during the Class Period and because it had purchased a large stake in Salix after the corrective disclosure occurred.  Defendants also argued that, by its nature as an event-driven hedge fund, Lead Plaintiff was not relying on the integrity on Salix's market price, but on the possibility of Salix's acquisition by another company when it made its decision to purchase Salix securities.

58.     Defendants also argued that the class should not be certified because Plaintiffs had not established that the fraud-on-the-market presumption of reliance was applicable.  In connection with this argument, Defendants mounted an attack on Plaintiffs' expert, claiming that his report establishing market efficiency should be excluded because the methodology he used was unsound and unreliable.  Defendants also challenged the certification of a class including traders in Salix options, arguing that each of over 900 different series of Salix options (each with different strike prices and expiration dates) had to be treated as a separate security and that Plaintiffs had not established the efficiency of the markets for these securities, or that the number of investors who

traded in any one of these options was sufficient to establish numerosity.  Defendants also noted three pending Rule 23(f) appeals currently before the Second Circuit concerning class certification decisions in securities fraud cases which threatened to change or increase Plaintiffs' burden in certifying the class.  (ECF No. 153.)

59.     Even if the class were certified, in order to succeed on the merits, Lead Plaintiff would have had to prevail at several additional stages in the litigation, including a motion for summary judgment, and trial, as well as on the appeals that would likely follow.  At each of those stages, there were significant risks attendant to the continued prosecution of the Action, and there was no guarantee that further litigation would have resulted in a higher recovery, or any recovery at all.

**B.     Risks Related To Damages**

60.     Even assuming that Lead Plaintiff overcame each of the above risks and successfully established liability, it also faced risks in proving damages and loss causation.  Indeed, while these issues were not before the Court at the motion to dismiss stage, they were a critical driver of the settlement value of this case.

61.     Lead Plaintiff would have confronted considerable challenges in establishing loss causation and damages.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear the burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'").  Defendants would have contested the amount of damages that could be attributed to the revelation of the allegedly false statements, as opposed to new information about Salix that was unrelated to the alleged fraud, and would have challenged Plaintiffs' ability to prove what damages were caused by the disclosure.  In addition, Defendants also would have argued that a large portion of the class was not harmed because the price of Salix common stock quickly rebounded from its price following the corrective disclosure, and because the Company

24

was acquired relatively shortly after the revelation of the fraud at a price that significantly exceeded the share price at the end of the Class Period.

62.     *First*, Defendants would point to the fact that the November 6, 2014 disclosure contained other negative information about Salix, including a significant quarterly earnings miss, in addition to the disclosures concerning the inventory levels and Derbyshire's resignation. Defendants would have argued that this earning miss was not related to the alleged fraud and that a very substantial part of the price decline that occurred following the November 6 disclosure was a reaction to this information, not to information at issue in this case.

63.     Defendants would have argued that Plaintiffs bore the burden of proof in "disaggregating" the impact of this "confounding," non-fraud information from the impact of the information at issue in our case.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) ("to establish loss causation, *Dura* requires plaintiffs to disaggregate those losses caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,' from disclosures of the truth behind the alleged misstatements").  Defendants would have argued that this disaggregation could not be done by Lead Plaintiff's expert in this case, and that even if it could, it would substantially reduce damages.

64.     *Second*, Defendants also would have argued that a large portion of the class suffered little or no damages from the alleged fraud because the price of Salix common stock quickly rebounded from its price following the corrective disclosure, and because the Company was acquired relatively shortly thereafter at a price that significantly exceeded the share price at the end of the Class Period.  Defendants would have argued that class members who retained their

25

shares after the end of the Class Period and who benefited from the price rebound by selling their shares purchased during the Class Period for a gain had no recoverable damages in the Action.

65.     In addition, Defendants had emphatically opposed class certification and would have continued to contend that the Action was not suitable for class treatment.  Lead Plaintiff also still faced the substantial burdens of summary judgment motions, trial and likely appeals – a process which could possibly extend for years and might lead to a smaller recovery, or no recovery at all.  Given these significant litigation risks, Lead Plaintiff and Lead Counsel believe that the proposed $210 million Settlement is an excellent resolution of the Action for the Settlement Class.

66.     As discussed above, this case presented some complex questions with respect to determining the amount of damages that could be recovered and the range of possible damages varied widely depending on assumptions and methodology adopted.  However, after carefully evaluating all of the issues and considering Defendants' arguments concerning damages and loss causation, Lead Plaintiff's damages expert, in consultation with Lead Counsel, concluded that the total damages that Lead Plaintiff would be reasonably likely to be able to prove at trial would be approximately $600 million.  Notably, however, had Defendants' loss causation arguments been accepted in full or even in part at summary judgment or trial, damages could have been significantly lower than that amount, or eliminated entirely.  Even if Plaintiffs were successful at trial, Defendants could have challenged the damages of each and every large class member in post-trial proceedings, substantially reducing any aggregate recovery by Plaintiffs.  Accordingly, the $210 million Settlement represents a substantial percentage of damages that could be reasonably expected to be proved at trial and, in light of the other litigation risks discussed above, represents a very favorable resolution of the Action for Settlement Class Members.

67.     Finally, even if Lead Plaintiff had succeeded in proving all elements of their case at trial and obtained a jury verdict, Defendants would almost certainly have appealed.  An appeal would not only have renewed all the risks faced by Lead Plaintiff and the Settlement Class, as Defendants would have re-asserted all their arguments summarized above, but also would have engendered significant additional delay and costs before Settlement Class Members could have received any recovery from this case.

68.     In the context of these significant litigation risks, and the immediacy and amount of the $210,000,000 recovery for the Settlement Class, Lead Plaintiff and Lead Counsel believe that the Settlement is an excellent result, is fair, reasonable, and adequate, and is in the best interest of the Settlement Class.

## IV.   LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

69.     The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to the Settlement Class.   The Preliminary Approval Order also set a July 5, 2017 deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation and/or the Fee and Expense Application or to request exclusion from the Class, and set a final approval hearing date of July 24, 2017.

70.     Pursuant to the Preliminary Approval Order, Lead Counsel instructed Epiq Systems, Inc. ("Epiq"), the Court-approved Claims Administrator, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice.  The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, object to the

27

Settlement, the Plan of Allocation and/or the Fee and Expense Application, or exclude themselves from the Settlement Class.  The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 22% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $2.5 million.  To disseminate the Notice, Epiq obtained information from Salix and from banks, brokers and other nominees regarding the names and addresses of potential Settlement Class Members.  *See* Declaration of Stephanie A. Thurin Regarding (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Thurin Decl."), attached hereto as Exhibit 1, at ¶¶ 3-6.

71.     Epiq began mailing copies of the Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members and nominee owners on April 27, 2017.  *See* Thurin Decl. ¶¶ 2-4.  As of June 16, 2017, Epiq had disseminated a total of 68,694 Notice Packets by first-class mail to potential Settlement Class Members and nominees.  *Id.* ¶ 7.

72.     On May 12, 2017, in accordance with the Preliminary Approval Order, Epiq caused the Summary Notice to be published in the national edition of *The Wall Street Journal* and to be transmitted over the *PR Newswire*.  *Id.* ¶ 8.

73.     Lead Counsel also caused Epiq to establish a dedicated settlement website, www.SalixSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to downloadable copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order and Complaint.  *See* Thurin Decl. ¶ 10.  That website became operational on April 27, 2017.  *Id.*  Lead Counsel also made copies of the Notice and Claim Form available on its own website, www.blbglaw.com, beginning on April 27, 2017.

74.     As set forth above, the deadline for Settlement Class Members to file objections to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or to request exclusion from the Settlement Class is July 5, 2017.  To date, no requests for exclusion have been received (*see* Thurin Decl. ¶ 11), and no objections to the Settlement, the Plan of Allocation or Lead Counsel's Fee and Expense Application have been received.  Lead Counsel will file reply papers on or before July 17, 2017, that will address any requests for exclusion and objections that may be received.

## V.      ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

75.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less any (a) Taxes, (b) Notice and Administration Costs, (c) Litigation Expenses awarded by the Court, and (d) attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than August 9, 2017.  As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

76.     Lead Counsel worked extensively with Lead Plaintiff's damages expert in developing the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation"). Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Complaint.

77.     The Plan of Allocation is set forth at pages 9 to 14 of the Notice.  *See* Thurin Decl., Ex. A at pp. 9-14.  As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might

have been able to recover at trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  Notice ¶ 47.  Instead, the calculations under the plan are only a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.

78.     In developing the Plan of Allocation, Lead Plaintiff's damages expert calculated the estimated amount of artificial inflation in Salix common stock and Salix Call Options (and the estimated amount of artificial deflation in Salix Put Options) during the Class Period allegedly caused by Defendants' alleged false and misleading statements.  Lead Plaintiff's damages expert reviewed publicly available information regarding Salix and performed statistical analyses of the price movements of Salix Securities and the price performance of relevant market and peer indices during the Class Period.  Notice ¶ 49.  In calculating the estimated artificial inflation, Lead Plaintiff's damages expert considered the price change in Salix common stock in reaction to the announcement made after the close of trading on November 6, 2014, adjusting for price changes attributable to market and industry factors.

79.     In general, the Recognized Loss Amounts calculated under the Plan of Allocation will be the lesser of:  (a) the difference between the amount of alleged artificial inflation (or deflation in the case of Put Options) in the Salix Securities at the time of purchase or acquisition and the time of sale, or (b) the difference between the purchase price and the sale price (if sold during the Class Period).  In order to have a Recognized Loss Amount, a Settlement Class Member who purchased or acquired Salix Securities (or wrote Put Options) during the Class Period must have held those Salix Securities through at least the 4:30 p.m. Eastern time on November 6, 2014, the time when the alleged corrective disclosure occurred.  Notice ¶¶ 51, 53(a), 57(a), 58(a).  Claimants who purchased and sold all their Salix Securities before the alleged corrective disclosure

will have no Recognized Loss Amount under the Plan of Allocation because any loss suffered on those transactions would not be the result of the alleged misstatements in the Action.

80.     Recognized Loss Amounts for shares of Salix common stock sold (and Salix Options closed) during the 90-day period after the end of the Class Period are further limited to the difference between the purchase price and the average closing price of the security during that period.  Recognized Loss Amounts for Salix Securities still held as of February 4, 2015, the end of the 90-day period, will be 50% of the lesser of (a) the amount of artificial inflation or deflation in the security at the time of purchase or (b) the difference between the purchase price and the average closing price for the security during that 90-day period.  The 50% discount applied to these retained shares accounts for the substantial increase in the price of Salix common stock that occurred by and shortly after that date, including as a result of Salix's acquisition by Valeant at a substantial premium to its trading price.

81.     The Plan of Allocation also limits Claimants based on whether they had an overall market loss in their transactions in Salix common stock or Salix Options during the Class Period. A Claimant's Recognized Claim based on transactions in Salix common stock will be limited to his, her or its market loss in common stock transactions during the Class Period; and his, her or its Recognized Claim based on Salix Options will be limited to his, her or its market loss in Salix Options transactions during the Class Period.  However, market gains in common stock will not be netted against Recognized Claims or market losses in Salix Options, or vice versa.  Notice ¶¶ 67-69.

82.     In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered on purchases of Salix common stock or Salix Call Options (and sales of Salix Put Options)

31

that were attributable to the misconduct alleged in the Complaint.  Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

83.     As noted above, as of June 16, 2017, more than 68,000 copies of the Notice, which contains the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, had been sent to potential members of the Settlement Class.  S*ee* Thurin Decl. ¶ 7.  To date, no objections to the proposed Plan of Allocation have been received.

## VI.     THE FEE AND EXPENSE APPLICATION

84.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court on behalf of Plaintiffs' Counsel[2] for an award of attorneys' fees of $44,613,850, or approximately 21.24% of the Settlement Fund, plus interest earned at the same rate as the Settlement Fund (the "Fee Application").  Lead Counsel also requests reimbursement of litigation expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $1,930,744.24.  Lead Counsel further requests reimbursement to Plaintiffs of $29,800 in costs and expenses that they incurred directly related to their representation of the Settlement Class, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4).  The legal authorities supporting the requested fee and expenses are discussed in Lead

---

[2] In addition to Lead Counsel, Plaintiffs' Counsel includes Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), counsel for named plaintiff Fort Lauderdale; and Hach Rose Schirripa & Cheverie, LLP ("Hach Rose").  These firms performed work under the direction of Lead Counsel that assisted in the prosecution of this Action and provided a benefit to the Settlement Class by, among other things, assisting in the drafting and review of pleadings and motion papers and assisting with the review of documents produced in discovery.  In addition, Robbins Geller assisted in the production of documents by Fort Lauderdale and prepared for and defended the Rule 30(b)(6) deposition of Fort Lauderdale.

Counsel's Fee Memorandum.  The primary factual bases for the requested fee and expenses are summarized below.

### A.      The Fee Application

85.      For its efforts on behalf of the Settlement Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Lead Plaintiff and the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances and taking into account the litigation risks faced in a class action.  Use of the percentage method has been recognized as appropriate by the Supreme Court and Second Circuit for cases of this nature.

86.      Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved.  As discussed in the Fee Memorandum, a 21.24% fee award is fair and reasonable for attorneys' fees in common fund cases such as this and is within the range of percentages awarded in securities class actions in this Circuit with comparable settlements.

### 1.      Lead Plaintiff Has Authorized and Supports the Fee Application

87.      Lead Plaintiff the Pentwater Funds is a sophisticated institutional investor that closely supervised and monitored the prosecution and settlement of the Action.  *See* Declaration of Francis J. Strezo (the "Strezo Decl."), attached hereto as Exhibit 2, at ¶¶ 4-6.  Lead Plaintiff has evaluated the Fee Application and fully supports the fee requested.  The fee requested is consistent with a retainer agreement entered into between Lead Plaintiff and Lead Counsel at the outset of the litigation, which provided for different levels of percentage fees based on the size of the

recovery. *Id* ¶ 8. The retainer agreement allows for a fee of 22% of the first $100 million recovery, 21% of the next $100 million, and 20% of the amount above $200 million (net of expenses), for a total of $44,613,850, or about 21.24% of the Settlement.[3] *Id*. After the agreement to settle the Action was reached, Lead Plaintiff has approved the proposed fee as consistent with the written retainer agreement and believes it is fair and reasonable in light of the quality of the result obtained, the work counsel performed and the risks of the litigation. *Id*. ¶ 9.

### 2.  The Work and Experience of Lead Counsel

88.  Attached hereto as Exhibits 3A, 3B, and 3C, respectively, are my declaration on behalf of BLB&G and the declarations of David A. Rosenfeld on behalf of Robbins Geller, and Frank R. Schirripa on behalf of Hach Rose, in support of Lead Counsel's motion for an award of attorneys' fees and reimbursement of litigation expenses (the "Fee and Expense Declarations"). Each of the Fee and Expense Declarations include a schedule summarizing the lodestar of the firm and the litigation expenses it incurred, delineated by category. The Fee and Expense Declarations indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm and the lodestar calculations based on their current billing rates. These declarations were prepared from contemporaneous daily time records regularly maintained and prepared by the respective firms, which are available at the request of the Court.

89.  Plaintiffs' Counsel have expended a total of 34,402.35 hours in the prosecution of this Action, for a lodestar of $14,185,499.25. Under the lodestar approach, the requested fee

---

[3] As discussed below in paragraphs 100 to 106, Lead Counsel is seeking reimbursement of $1,930,744.24 in litigation expenses incurred by all Plaintiffs' Counsel. Accordingly, the amount of the Settlement, net of expenses, is $208,069,255.76. The fee requested pursuant to the terms of the retainer agreement is $22 million (22% of first $100 million) plus $21 million (21% of the second $100 million) plus $1,613,850 (20% of $8,069,255.76), for a total of $44,613,850.

results in a multiplier of 3.1.  As described above in greater detail, the work that Plaintiffs' Counsel performed in this Action included: (i) conducting an extensive investigation into the alleged fraud including a review of SEC filings, analyst reports, conference call transcripts, press releases, company presentations, media reports and other public information; (ii) drafting a detailed complaint based on this investigation; (iii) opposing Defendants' motions to dismiss; (iv) engaging in substantial fact discovery, which included reviewing the more than 2.7 million pages of documents produced by Defendants and third parties and taking, defending or participating in 13 depositions, preparing and serving interrogatories, numerous meet and confers, and Court correspondence and motions related to discovery disputes; (v) moving for class certification, including preparing an expert report on market efficiency and conducting related discovery; (vi) opposing Defendants' motion to exclude the testimony of Lead Plaintiff's market efficiency expert; (vii) consulting extensively with experts concerning loss causation and damages, accounting issues and the pharmaceutical industry; and (viii) engaging in vigorous arm's-length settlement negotiations to achieve the Settlement.

90.    As detailed above, throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action.  I maintained control of and monitored the work performed by other lawyers at BLB&G and other Plaintiffs' Counsel on this case.   While I personally devoted substantial time to this case, and personally reviewed and edited all pleadings, court filings, and other correspondence prepared on behalf of Lead Plaintiff, other experienced attorneys at my firm were involved in settlement negotiations and other matters.  More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level.  Throughout the litigation, Plaintiffs' Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

91.     As demonstrated by the firm resume included as Exhibit 3A-3 hereto, Lead Counsel is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases.  BLB&G is consistently ranked among the top plaintiffs' firms in the country.  Further, BLB&G has taken complex cases such as this to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities class actions.  I believe this willingness and ability added valuable leverage in the settlement negotiations.

### 3.     Standing and Caliber of Defendants' Counsel

92.     The quality of the work performed by Lead Counsel in attaining the Settlement should be evaluated in light of the quality of its opposition.  Salix and the Individual Defendants were represented by extremely able counsel from Cadwalader, Wickersham & Taft LLP, Cahill Gordon & Reindel LLP; Williams & Connolly LLP; and Buckley Sandler LLP.  In the face of this skillful and well-financed opposition, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants and their counsel to settle the case on terms that will significantly benefit the Settlement Class.

### 4.     The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases

93.     The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Lead Counsel in bringing this Action to a successful conclusion are described above.  Those risks are relevant to the Court's evaluation of an award of attorneys' fees.  Here, the risks assumed by Lead Counsel, and the time and expenses incurred by Plaintiffs' Counsel without any payment, were extensive.

94.     From the outset, Lead Counsel understood that it was embarking on a complex, expensive, lengthy and hard-fought litigation with no guarantee of ever being compensated for the

substantial investment of time and the outlay of money that vigorous prosecution of the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would further advance all of the costs necessary to pursue the case vigorously on a fully contingent basis, including funds to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case such as this typically demands.  Because complex shareholder litigation generally proceeds for several years before reaching a conclusion, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Plaintiffs' Counsel have received no compensation during the course of this Action and no reimbursement of out-of-pocket expenses, yet they have incurred more than $1.9 million in expenses in prosecuting this Action for the benefit of Salix investors.

95.     Lead Counsel also bore the risk that no recovery would be achieved.  As discussed above, from the outset this case presented a number of significant risks and uncertainties, including challenges in proving the falsity of Defendants' statements and establishing loss causation and damages.

96.     As noted above, the Settlement was reached only after Lead Counsel had engaged in substantial discovery, which included reviewing 2.7 million pages of documents and taking, defending or participating in 13 depositions, and only after Lead Plaintiff's motion for class certification was fully briefed.  However, had the Settlement not been reached when it was and this litigation continued, Lead Counsel would have been required to complete fact discovery, including taking additional depositions of high-level Salix employees and the Individual Defendants, and then engage in extensive expert discovery efforts, including assisting with the preparation of opening and rebuttal reports from Lead Plaintiff's experts on damages, accounting

and the pharmaceutical industry, preparing for and defending their depositions, and taking the depositions of Defendants' experts.  After the close of discovery, it would be highly likely that Defendants would move for summary judgment, which would have to be briefed and argued, a pre-trial order would have to be prepared, proposed jury instructions would have to be submitted, and motions *in limine* would have to be filed and argued.  Substantial time and expense would need to be expended in preparing the case for trial.  The trial itself would be expensive and uncertain.  Moreover, even if the jury returned a favorable verdict after trial, it is likely that any verdict would be the subject of numerous post-trial motions, post-trial challenges to individual class members' damages, and a complex multi-year appellate process.

97.     Lead Counsel's persistent efforts in the face of significant risks and uncertainties have resulted in a significant and certain recovery for the Settlement Class.  In light of this recovery and Lead Counsel's investment of time and resources over the course of the litigation, Lead Counsel believes the requested attorneys' fee is fair and reasonable and should be approved.

### 5.     The Reaction of the Settlement Class to the Fee Application

98.     As noted above, as of June 16, 2017, over 68,000 Notice Packets had been mailed to potential Settlement Class Members advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 22% of the Settlement Fund.  *See* Thurin Decl. ¶ 7 and Ex. A (Notice ¶¶ 5, 77).  In addition, the Court-approved Summary Notice has been published in *The Wall Street Journal* and transmitted over the *PR Newswire*.  *Id*. ¶ 8.  To date, no objections to the request for attorneys' fees have been received.

99.     In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action,

and the contingent nature of the representation, Lead Counsel respectfully submits that the requested fee is fair and reasonable.

### B.      The Litigation Expense Application

100.     Lead Counsel also seeks reimbursement of $1,930,744.24 in litigation expenses that were reasonably incurred in connection with the prosecution of the Action (the "Expense Application").

101.     From the outset of the Action, Lead Counsel and other Plaintiffs' Counsel have been cognizant of the fact that they might not recover any of their expenses, and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years.  Lead Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action.  Counsel's fee award was also based on the class recovery net of these expenses.  Consequently, Lead Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

102.     As set forth in Exhibit 4 hereto, Plaintiffs' Counsel have incurred a total of $1,930,744.24 in unreimbursed litigation expenses in connection with the prosecution of the Action.  The expenses are summarized in Exhibit 4, which was prepared based on the declarations submitted by each firm and identifies each category of expense, *e.g.*, expert fees, on-line legal and factual research, travel costs, telephone and photocopying expenses, and the amount incurred for each category.  As attested to in each firm's Fee and Expense Declaration (Exhibits 3A to 3C hereto), these expenses are reflected on the books and records maintained by Plaintiffs' Counsel.  These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred.  Importantly, these expenses were

billed separately by Plaintiffs' Counsel and are not duplicated among the respective firms' billing rates.

103.    Of the total amount of expenses, $1,665,617.61, or approximately 86%, was expended for the retention of experts.  As noted above, Lead Counsel consulted extensively with experts in loss causation and damages, accounting, and the pharmaceutical industry during its investigation and the preparation of the Complaint and during the course of discovery.   In connection with Lead Plaintiff's motion for class certification, Lead Plaintiff's damages expert, Dr. Tabak, submitted a report on the efficiency of the market for Salix common stock and options and was deposed by counsel for Defendants.  Lead Counsel consulted further with Dr. Tabak during settlement negotiations with Defendants and in connection with the development of the proposed Plan of Allocation.  All of these experts were instrumental in Lead Counsel's appraisal of the claims and in bringing about the favorable result achieved.

104.    Another significant cost was the expense of retaining a database provider to host and manage the database containing the extensive document production obtained in the Action.  Those costs totaled $111,696.89, or approximately 5.8% of the total expenses.   The combined costs of on-line legal and factual research were $65,912.53, or approximately 3.4% of the total expenses.

105.    Plaintiffs' Counsel also incurred $22,724.94 in travel costs, principally for travel in connection with depositions in the Action that occurred around the country, including in Costa Mesa, California; Columbus, Ohio; Washington, DC; and San Francisco, California.  As detailed in its Fee and Expense Declaration, Lead Counsel imposed limitations on these travel costs, including limiting airfare to coach rates and capping expenses for meals and hotels.

106.   The other expenses for which Lead Counsel seeks reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, filing fees, court reporter fees, copying costs (in-house and through outside vendors), long distance telephone charges, and postage and delivery expenses.

107.   Additionally, Plaintiffs seek reimbursement of the reasonable costs and expenses that they incurred directly in connection with their representation of the Settlement Class.  Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum, at 22-23.  Lead Plaintiff is seeking reimbursement of $22,000 for the time expended in connection with the Action by its portfolio manager, Frank Strezo, who spent a substantial amount of time communicating with Lead Counsel; reviewing pleadings and motion papers; gathering and reviewing documents in response to discovery requests; and preparing for and sitting for deposition.  *See* Strezo Decl. ¶ 12.  Additional Plaintiff Fort Lauderdale is seeking reimbursement of $7,800 for the time spent by its Plan Administrator, Nicholas Schiess, on the case, including in reviewing pleadings, responding to discovery requests; and preparing for and participating in a deposition.  *See* Declaration of Nicholas Schiess, attached hereto as Exhibit 5, at ¶¶ 3-6.

108.   The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of expenses in an amount not to exceed $2.5 million, including an application for reimbursement of the reasonable costs and expenses incurred by Plaintiffs directly related to their representation of the Settlement Class.  Notice ¶¶ 5, 77.  The total amount requested, $1,960,544.24, which includes $1,930,744.24 in reimbursement of litigation expenses incurred by Plaintiffs' Counsel and $29,800 in reimbursement of costs and expenses incurred by Plaintiffs, is

41

significantly below the $2.5 million that Settlement Class Members were advised could be sought. To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

109.   The expenses incurred by Plaintiffs' Counsel and Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement.   Accordingly, Lead Counsel respectfully submit that the expenses should be reimbursed in full from the Settlement Fund.

**VII.   CONCLUSION**

110.   For all the reasons set forth above, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable and adequate.   Lead Counsel further submits that the requested fee should be approved as fair and reasonable, and the request for reimbursement of total litigation expenses in the amount of $1,960,544.24, which includes Plaintiffs' costs and expenses, should also be approved.

I declare, under penalty of perjury, that the foregoing is true and correct.   Executed June 19, 2017.

<em>/s Salvatore J. Graziano</em><br>
Salvatore J. Graziano

#1086077