USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/18/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X

WOBURN RETIREMENT SYSTEM,

                Plaintiff,

-v-

SALIX PHARMACEUTICALS, LTD., et al.,

                Defendants.
----------------------------------------------------X

14-CV-8925 (KMW)
**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

    This Opinion considers the Motion for Final Approval of the Settlement and Plan of Allocation ("Approval Motion"), filed by Lead Plaintiff Pentwater Funds, and the Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Attorneys' Fees Motion"), filed by Lead Counsel Bernstein Litowitz Berger & Grossman LLP ("Lead Counsel" or "Bernstein Litowitz"). For the reasons stated below and stated at the Settlement Fairness Hearing held on July 28, 2017, the Court GRANTS both motions.

## I. Introduction and Procedural History

    On March 23, 2015, this Court consolidated two putative securities fraud class actions against Salix Pharmaceuticals and two of its officers and directors. Both alleged that Salix materially misled the public by deliberately making false or misrepresentative statements, or by failing to correct such statements, between November 8, 2013 and November 6, 2014 (the "Class Period"). Plaintiffs claim that Salix's fraudulent actions artificially increased the price of Salix securities. This Court appointed Pentwater Funds as Lead Plaintiff, and Bernstein Litowitz as Lead Counsel for the consolidated action. (Doc. No. 64.)

Defendants subsequently filed a Motion to Dismiss the Consolidated Class Action Complaint, which this Court denied in its entirety on March 31, 2016. (Doc. Nos. 123, 127.) The parties then proceeded with discovery, with Defendants producing millions of documents and Plaintiffs' counsel taking several depositions. (Approval Motion at 2, 5.)

Following the Court's resolution of a discovery dispute on January 24, 2017, the parties informed the Court that they had reached an agreement to settle. The Court preliminarily approved the settlement and appointed a claims administrator on April 5, 2017. (Doc. No. 220.)

The proposed settlement resolves all claims in this action, in exchange for a cash payment of $210 million payment to class members. The Court granted final approval of the settlement, the plan of allocation, and the application for attorneys' fees and reimbursement of litigation expenses at the July 28, 2017 Settlement Fairness Hearing, for the reasons that follow.

## II.     Final Approval of the Settlement

Under Federal Rule of Civil Procedure 23(e), this Court must approve a class action settlement before it is executed. To do so, adequate notice of the proposed settlement must be provided to potential class members, and the Court must hold a hearing to determine the fairness of the settlement. Fed. R. Civ. P. 23(e).

"A court may approve a class action settlement if it is 'fair, adequate, and reasonable, and not a product of collusion.'" *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (quoting *Joel A v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)). To evaluate the settlement's fairness, a court should consider "both the settlement's terms and the negotiating process leading to settlement." *Id.* (quoting *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)).

2

## A. Adequacy of Notice

Under both the Due Process Clause and Rule 23, the adequacy of notice in a class action is determined by its reasonableness. There are no rigid standards to determine the reasonableness of notice; if the average class member understands "the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings," then the notice is adequate. *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982).

A Court-approved Claims Administrator, Epiq, sent notice packets to approximately 73,000 potential class members—everyone who could be identified with reasonable effort—covering information required by the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 23(c)(2)(B). The notice was also published in the Wall Street Journal, was transmitted over the PR Newswire, and was published on Lead Counsel's website. The notice provided: (i) an explanation of the Action; (ii) the definition of the settlement class; (iii) the amount of the settlement and the reasons for it; (iv) the plan of allocation; (v) an approximation of the attorneys' fees and costs to be requested; (vii) the right to opt-out or object; and (viii) the binding effect of this Court's judgment on Class members.

The Court finds that the notice given in this case was reasonable and adequate.

## B. Procedural Fairness

When settlement is achieved through arm's-length negotiations, between experienced and capable counsel, after meaningful discovery, "a presumption of fairness, adequacy, and reasonableness" will apply to the class settlement. *Wal-Mart*, 396 F.3d at 116.

The parties engaged in protracted, arm's-length negotiations between counsel, who were well-versed in the strengths and weaknesses of the case, after months of intensive fact discovery. Thus, the Court finds the settlement to have been achieved through a fair and reasonable process.

### C. Substantive Fairness

In *City of Detroit v. Grinnell Corp.*, the Second Circuit set forth nine factors to determine whether a settlement is substantively fair and reasonable, pursuant to Rule 23(e). The factors are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) ("*Grinnell*"), *abrogated on other grounds by Goldberger v. Integrated Reserves, Inc.*, 209 F.3d 43 (2d Cir. 2000). A court may consider the totality of the factors "in light of the particular circumstances." *In re Merrill Lynch & Co., Inc.*, 2007 WL 313474, at *9 (S.D.N.Y Feb. 1, 2007) (Keenan, J).

*1. Complexity, Expense, and Likely Duration of the Litigation*

Lead Plaintiff states that although the case settled toward the end of discovery, it would have required substantially more time and expense to conclude discovery, litigate to a verdict, and potentially await appeal of the decision—which would have delayed recovery for class members. (Approval Motion at 3, 8.)

Thus, this factor supports the approval of the settlement.

4

### 2. Reaction of the Class to Settlement

The Claims Administrator distributed notice widely, to several thousands of potential Class members. Neither the parties nor the Court received any objections to the settlement or to the Plan of Allocation. No institutional investors—sophisticated class members constituting the majority of common stockholders during the Class Period—have objected, either. There were only two requests for exclusion from the Class.

The Class members' favorable reaction to the settlement "is perhaps the most significant factor in [the] *Grinnell* inquiry." *Wal-Mart*, 396 F.3d at 119. This constitutes strong evidence that the proposed settlement is fair. *See In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 382 (S.D.N.Y. 2013) (Stein, J.) (quoting *Grinnell*, 495 F.2d at 462).

The Court concludes that the lack of objections to the settlement and minimal requests for exclusion are indicative of the adequacy of the settlement.

### 3. Stage of the Proceedings and Amount of Discovery Completed

At the time that the parties agreed to settle, Plaintiffs' counsel had conducted substantial discovery, and Plaintiffs had "a thorough understanding of their case" before entering into the settlement. *Wal-Mart*, 396 F.3d at 118.

Lead Plaintiff states that Lead Counsel thoroughly investigated the legal and factual issues in this action, and the parties had the benefit of an extensive discovery process, including millions of pages of documents and ten fact witness depositions. (Approval Motion at 5, 9.) The fact investigation enabled Lead Counsel to be well-informed to "gauge the strengths and weaknesses of their claims and the adequacy of settlement." *In re AOL Time Warner, Inc.*, 2006

5

WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006) (Kram, J.). This *Grinnell* factor weighs in favor of approval.

### 4. *The Risks of Continued Litigation*

A court must also consider the likelihood that the class would prevail, at trial, when determining the reasonableness, fairness, and adequacy of settlement. The fourth, fifth, and sixth *Grinnell* factors concern risks: the plaintiff's risks of establishing liability and damages, and the risk that the Court might deny class certification.

#### i. Liability

Although Lead Plaintiff successfully challenged the Defendants' Motion to Dismiss, the class risked being unable to prove, at trial, that Defendants' alleged misstatements were materially false, and that Defendants acted with scienter in making these statements. Salix had a host of defenses—for example, that the supposed misstatements were forward-looking estimates, and thus not actionable, and that Defendants lacked any motive to engage in fraud. Lead Plaintiff acknowledged the difficulty of overcoming Salix's defenses.

#### ii. Damages/Loss Causation

Proving loss causation would have been an additional challenge for Lead Plaintiff. (*See* Approval Motion at 18-19.) Lead Plaintiff bore the burden of disaggregating negative information about Salix from the alleged misstatements in the company's November 6, 2014 corrective disclosure, to prove that the Class's losses were caused by Defendants' alleged misrepresentations, and not by other market forces.

Additionally, Salix was acquired by Valeant after the end of the Class Period. This caused the common stock to rise to a price significantly higher than the share price after the

6

company's corrective disclosure. *Id.* at 19. Lead Plaintiff would have had to demonstrate at trial that in spite of this price increase, shareholders sustained damages. Warring experts, Lead Plaintiff contends, would have confused the jury. *Id.*

In light of the significant possibility that plaintiffs may not have prevailed at trial, this Court finds that the risk of establishing causation, liability, and damages at trial heavily supports the reasonableness of the settlement.

        iii. Maintaining a Class Through Trial

Defendants contested class certification on the ground that Lead Plaintiff was atypical of the class. This would have subjected Plaintiffs to considerably more risk. *In re AOL Time Warner, Inc.*, 2006 WL 903236, at *12.

In summary, the *Grinnell* "risk factors" also favor the settlement.

    *5. The Ability of the Defendants to Withstand a Greater Judgment*

Defendants could have satisfied a greater judgment than the settlement amount; however, this factor alone does not render the settlement unfair, given the force of the other *Grinnell* factors in determining the settlement to be reasonable. *D'Amato*, 236 F.3d at 86; *see also Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *11 (S.D.N.Y. Mar. 24, 2014) (McMahon, J.).

    *6. Range of Reasonableness in Light of Best Possible Recovery and All the Attendant Risks of Litigation*

"[T]he question for the Court is not whether the settlement represents the highest recovery possible ... but whether it represents a reasonable one in light of the many uncertainties the class faces." *In re Citigroup*, 965 F. Supp. 2d at 384.

7

Lead Plaintiff's expert estimated that the total damages, if the class succeeded at trial, would be $600 million. (Approval Motion at 17.) This Court finds that a settlement of $210 million—approximately a third of that estimate—is highly favorable to Plaintiffs, who risked recovering a much smaller sum, given the risks attendant to continued litigation.

In sum, all of the *Grinnell* factors support the Court's approval of this settlement as fair, reasonable, and adequate.

### D. Plan of Allocation

The Court approves the parties' plan to apportion the settlement proceeds based on each claimant's respective market loss (the "Plan of Allocation"). The Plan of Allocation was developed by Lead Counsel and Lead Plaintiff's damages expert. Each claimant who has documented proof of a purchase or other acquisition of Salix common stock or Salix Call Option, or sale of a Salix Put Option during the Class Period and 90 days after the Class Period, will be assigned a "Recognized Loss Amount":

(1) For those who purchased Salix stock, the Recognized Loss Amount will be "the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase price and sales price of the stock, whichever is less." (Approval Motion at 19.)
(2) For those who sold Salix common stock or for whom Salix Options closed during the 90 days after the Class Period, the Recognized Loss Amount is limited to "the difference between the purchase price and the average closing price of the security during that period." *Id.* at 20.
(3) For those claimants who still held Salix securities at the end of the 90-day period, the Recognized Loss Amount will be "50% of the lesser of (a) the amount of artificial inflation (or deflation) in the security at the time of purchase or (b) the difference between the purchase price and the average closing price for the security during that 90-day period." *Id.*
(4) Finally, claimants who bought and sold Salix securities before the alleged misstatements were made at 4:30 p.m. on November 6, 2014, have no Recognized Loss Amount. *Id.* at 19.

8

There have been no objections to the Plan. The Court deems the Plan of Allocation to be fair, reasonable, and adequate, and approves the payment of the net settlement fund proportional to each claimant's Recognized Loss Amount.

### III. Approval of Attorneys' Fees and Reimbursements

Lead Counsel request a fee award of 21.24% of the Settlement Fund of $210 million, after deducting expenses. This amounts to a sum of $44,609,218, plus interest. Counsel also request reimbursement of litigation expenses in the amount of $1,983,708.41. (Lead Plaintiff's Reply at 2, 6.)

"[W]here an attorney succeeds in creating a common fund from which members of a class are compensated for a common injury inflicted on the class, ... the attorneys whose efforts created the fund are entitled to a reasonable fee—set by the court—to be taken from the fund." *Goldberger*, 209 F.3d at 47. In the Second Circuit, district courts traditionally award plaintiffs' counsel fees in class actions in one of two ways: either the percentage of the fund method, or the lodestar method. The former calculates a reasonable percentage of the settlement fund, and the latter is an assessment of the market value of the work performed by plaintiffs' attorneys. *See In re Merrill Lynch*, 2007 WL 313474, at *12.

The trend in the Second Circuit is to award attorneys' fees based on the percentage of the fund method; however, courts cross-check this value with the lodestar amount, to ensure that the fees awarded do not exceed what is reasonable under the circumstances. A cross-check is crucial here because of the high amount of this settlement, to avoid awarding plaintiffs' counsel a "windfall." *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 373 (S.D.N.Y. 2013) (Stein, J.).

9

## A. *Goldberger* Factors to Assess the Reasonableness of Attorneys' Fees

Pursuant to the factors set forth in *Goldberger v. Integrated Resources*, district courts in this Circuit weigh the following factors to determine the reasonableness of attorneys' fees: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Wal-Mart*, 396 F.3d at 121 (citing *Goldberger*, 209 F.3d at 50).

### 1. Time and Labor Expended by Counsel: The Lodestar Cross-Check

The lodestar amount is calculated by multiplying the number of hours counsel spent throughout this action by reasonable hourly rates; this allows the Court to evaluate the extent of the time and labor expended in comparison to the percentage of the fund requested as attorneys' fees.

Lead Counsel Bernstein Litowitz, as well as co-counsel Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), and Hach Rose Schirripa & Cheverie, LLP ("Hach Rose"), have submitted detailed time records demonstrating a great deal of work on this case over the last three years—over 34,000 hours of work done by the three firms. Counsel investigated the facts, moved to be appointed Lead Plaintiff and Lead Counsel, submitted amended pleadings, successfully defended the Motion to Dismiss, conducted discovery, took ten fact witness depositions, consulted experts, moved for class certification, and ultimately negotiated a favorable settlement for their clients. (Attorneys' Fees Motion at 2.)

The Court agrees that counsel should be compensated for their extensive work on this case. The lodestar value of counsel's work, not including expenses, is $14,185,499.25. This reflects the various hourly billing rates for partners, which ranged from $700 to $995 at Bernstein Litowitz, $715 to $980 at Robbins Geller, and $550 to $695 at Hach Rose, as well as for associates, staff and project attorneys, financial and economic analysts, investigators, paralegals, and other support staff. Lead Counsel billed approximately 87% of the total lodestar.

Lead Counsel request a fee equivalent to 21.24% of the net settlement fund, or $44,609,218, which reflects a lodestar multiplier of approximately 3.14. Lead Counsel contend that this percentage and this multiplier are within the range of reasonable percentages and multipliers approved in this Circuit, and cite decisions in support. (Attorneys' Fees Motion at 10–11.)

A 3.14 multiplier for a case that settled for $210 million is significant. *See In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 401 (S.D.N.Y. 2013) (Stein, J.) ("Courts in this Circuit have trended toward awarding lower percentages and lower multipliers for awards from extremely large common funds such as this one."); *In re Merrill Lynch*, 2007 WL 313474, at *23 (recognizing that courts since *Goldberger* question multipliers exceeding 2.03).

Lead Counsel have cited decisions approving awards of attorneys' fees in comparable cases that constitute different lodestar multipliers. *E.g.*, *In re Bank of New York Mellon Corp. Forex Transactions Litig.*, 148 F. Supp. 3d 303, 305 (S.D.N.Y. 2015) (Kaplan, J.) (awarding 25% of $180 million settlement) **(lodestar multiplier of 0.96)**; *Bd. of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2012 WL 2064907, at *3 (S.D.N.Y. June 7, 2012) (Scheindlin, J.) (awarding 25% of $150 million settlement) **(lodestar multiplier of 2.86)**; *In re*

11

*Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *6 (E.D.N.Y. June 24, 2010) (Garaufis, J.) (awarding 25% of $225 million settlement) (**lodestar multiplier of 2.78**); *In re Deutsche Telekom AG Sec. Litig.*, 2005 WL 7984326, at *4 (S.D.N.Y. June 9, 2005) (Buchwald, J.) (awarding 28% of $120 million settlement) (**lodestar multiplier of 3.96**).

Although a lodestar multiplier of 3.14 for a settlement of $210 million is high, it is still within the range of lodestar multipliers approved in this Circuit. Thus, this *Goldberger* factor favors approval of the requested attorneys' fees.

### 2. Magnitude and Complexities of the Litigation

The remaining *Goldberger* factors bolster Lead Counsel's requested amount of attorneys' fees. Securities class action litigation is "notably difficult and notoriously uncertain." *In re Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y. 1993) (Pollack, J.). Investigating and litigating this action was undoubtedly complex and required expert consultation; this factor reinforces the reasonableness of the requested fees.

### 3. Risk of the Litigation

The Second Circuit held that the risk of the litigation is one of the most important factors, if not the foremost factor, to consider when determining the reasonableness of fees. *Goldberger*, 209 F.3d at 54; *Merrill Lynch*, 2007 WL 313474, at *16.

Particularly when lawyers undertake a case on a contingency fee basis, and thus assume a great deal of risk, the Second Circuit has held that it is appropriate to award fees that exceed the lodestar amount. *See Grinnell*, 495 F.2d at 470 ("No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success.").

As discussed *supra*, Lead Plaintiff faced substantial hurdles to recovery, as they needed to prove scienter, loss causation, and damages. Success at trial was not certain. In spite of these risks, Lead Counsel agreed to litigate on a contingency basis. *Flag Telecom,* 2010 WL 4537550, at *27.

Thus, the Court finds that Lead Counsel's assumption of the risk of litigating this case supports the reasonableness of the requested fee.

### 4. *Quality of Representation*

The Court has reviewed the backgrounds of the attorneys working for the class, and of opposing counsel. Lead Counsel successfully challenged the Motion to Dismiss, vigorously prosecuted the action through a highly contested discovery process, and achieved a favorable settlement against a well-represented opponent. Counsel all have ample experience in class action litigation. Altogether, the high quality of representation warrants the requested fee award.

### 5. *Requested Fee in Relation to Settlement*

The PSLRA expressly contemplates that attorneys' fees should be calculated using the percentage method. 15 U.S.C. § 78u–4(a)(6). Lead Counsel requests $44,609,218, or approximately 21.24% of the Settlement Fund of $210 million, after expenses are deducted. Lead Counsel cites several decisions in this Circuit, in which courts awarded attorneys' fees that amounted to similar percentages of the settlement amount. (*See* Attorneys' Fees Motion at 7–8). For a settlement in the hundreds of millions of dollars, a request of over 20% is substantial; however, because the percentage is within the range of what is reasonably granted in this Circuit, and the lodestar multiplier is reasonable, the Court approves Lead Counsel's fee request.

The fee agreement is pursuant to a written retainer agreement between Lead Plaintiff, a sophisticated entity, and Lead Counsel, entered into at the outset of the litigation. (*See* Attorneys' Fees Motion at 11–13.) Courts have found that *ex ante* fee agreements between lead counsel and lead plaintiffs enjoy a presumption of reasonableness under the PSLRA. *See In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 356 (S.D.N.Y. 2005) (Cote, J.); *In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001).

Thus, the Court finds the requested fee of 21.24% of the net settlement fund to be reasonable.

### 6. *Public Policy Considerations*

To provide financial incentives for class action securities litigation, "[p]ublic policy concerns favor the award of reasonable attorneys' fees." *In re Merrill Lynch*, at *21; *see also In re Citigroup*, 965 F. Supp.2d at 400. The work done by Lead Counsel on a contingency basis inures to the benefit of the entire Class. Thus, the award of 21.24% of the settlement fund is appropriate, and not excessive, to encourage future securities class actions.

### B. Fairness Hearing & *Flanagan*

In the Settlement Fairness Hearing, the Court noted its concern that two secondary law firms, Robbins Geller and Hach Rose, were heavily involved in this action, even after the Court appointed Bernstein Litowitz, a very well-staffed law firm, as Lead Counsel in March of 2015. The Court expressed concern with the inefficiency of that distribution of work, which may impose needless fees on the class.

Lead Counsel indicated their desire to engage the other firms and other plaintiffs as insurance against the attacks that Lead Plaintiff was an ineffective class representative. Because

14

that "insurance" should have been obtainable with far less work by secondary law firms, the Court, in its capacity "as a guardian of the rights of absent class members," *Goldberger*, 209 F. 3d at 52, requested that in the future, before Lead Counsel chooses additional firms to represent the Class, and decides how much work they will perform, that Lead Counsel explain to the Court the need for work allocation, so that the Court can ensure that the class's resources will not be wasted. (Settlement Fairness Hearing Tr. at 9:21-10:16).

The Court acknowledges that the Second Circuit's decision in *Flanagan* controls. *See Flanagan, Lieberman, Hoffman & Swaim v. Ohio Pub. Employees Ret. Sys.*, 814 F.3d 652 (2d Cir. 2016). In that case, the district court had denied attorneys' fees, to be paid from a securities class action settlement fund, to non-lead counsel, finding that its work did not benefit the class. The Second Circuit overturned that decision, holding instead that a rebuttable presumption of correctness applies to a lead plaintiff's decision to apportion attorneys' fees from the settlement fund to non-lead counsel. *Flanagan* was also a case with a capped percentage-of-the-fund recovery on attorneys' fees. *Id.* at 658.

Given the similarity of the fee arrangements in this case to those in *Flanagan* (in both cases, the percentage fee cap was negotiated *ex ante*), this Court finds no reason to deny the presumption of correctness to the fee agreement between Lead Counsel and Lead Plaintiff. *See In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *16 (S.D.N.Y. Apr. 26, 2016) (Cote, J.).

### C. Reimbursement of Litigation Expenses

The Court finds that the request to reimburse litigation expenses of $1,953,908.41 is reasonable. The significant bulk of expenses went toward Lead Plaintiff's experts, as well as

online legal research, and an electronic discovery vendor, among other expenses and costs. The Notice to the Class stated that expense reimbursement request would not exceed $2.5 million, and it has not. (Attorneys' Fees Motion at 20.) There have been no objections to this request.

The Court thus approves the requested reimbursement of litigation expenses.

### IV. Conclusion

For the foregoing reasons, the Court GRANTS the Motions for Final Approval of the Settlement and Plan of Allocation, Motion for Attorneys' Fees in the amount of $44,609,218, and Motion for the Reimbursement of Litigation Expenses of $1,953,908.41. This resolves docket nos. 221 and 223. All other pending motions are moot.

SO ORDERED.

DATED: New York, New York
August 18, 2017

*[signature]*
KIMBA M. WOOD
United States District Judge